```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        15 CR 379 (PKC)

 5   JUAN ORLANDO HERNANDEZ,

 6              Defendant.                Conference
     ------------------------------x
 7
                                         New York, N.Y.
 8                                       November 15, 2022
                                         12:25 p.m.
 9

10   Before:

11
                       HON. P. KEVIN CASTEL,
12
                                         District Judge
13
                          APPEARANCES
14
     DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16   BY:  ELINOR TARLOW
         JACOB H. GUTWILLIG
17       DAVID ROBLES
         Assistant United States Attorneys
18
     RAYMOND L. COLON
19       Attorney for Defendant

20   Also Present:
     Angel Martinez
21   Gabriel Mitre, Interpreter (Spanish)
     Francisco Olivero, Interpreter (Spanish)
22

23

24

25
```

1           (Case called)

2           MS. TARLOW:  Good afternoon, your Honor, Elinor Tarlow

3  for the government.  I am joined at counsel's table by my

4  colleagues, Jacob Gutwillig and David Robles.

5           THE COURT:  Good to see you all.  I'm sorry.  Your

6  name is?

7           MR. ROBLES:  David Robles.

8           THE COURT:  Thank you very much.  I didn't have you on

9  my appearance sheet.  Thank you.  Yes, I did.  I guess I had

10  Michael Lockhard also on there.

11          Please be seated.

12          Appearing for the defendant.

13          MR. COLON:  Good afternoon, your Honor, Raymond Colon

14  on behalf of Mr. Juan Orlando Hernandez.

15          THE COURT:  Mr. Juan Orlando Hernandez is also present

16  with us.

17          And you have an investigator at your table.  If you

18  want to put his name on the record, please.

19          MR. COLON:  That's correct, your Honor.  That's

20  Mr. Angel Martinez to my right and to the Court's left.

21          THE COURT:  We have two court certified interpreters

22  with us this morning.

23          Let me hear from the government the status of the

24  update on discovery in this case.

25          MS. TARLOW:  Yes, your Honor.

1          Since our last conference in May, we have made five

2     discovery productions of unclassified discovery amounting to

3     several terabytes of data.  Those materials consists of, among

4     other things, recordings of meetings with the defendant's

5     coconspirators, extractions from electronic devices of

6     coconspirators, subpoena returns for subscriber information,

7     among other things, search warrants and returns for social

8     media accounts, including accounts belonging to the defendant

9     and his codefendants, and physical evidence, including drug

10    ledgers.

11         We have undertaken a broad review of DA case files

12    also related to other Honduran money laundering and

13    drug-trafficking investigations.  We have produced a

14    significant amount of material, in an abundance of caution,

15    related to those investigations.  We are completing that review

16    and will supplement productions, if necessary, if we determine

17    there is any Rule 16 as to this defendant.

18         We also will produce any additional materials that we

19    obtain in the course of our investigation of other charged

20    defendants who are part of this conspiracy whose cases are

21    pending before your Honor.

22         With respect to classified discovery, without going

23    into any specifics here, we are in the process of reviewing our

24    classified holdings in advance of the February 1 section 4

25    deadline.  We are continuing to coordinate with various

1   governmental agencies and components about the scope and volume

2   of those materials, and we intend to provide the Court with an

3   update *ex parte* and under seal in the coming weeks about the

4   status of our review.  It's our understanding --

5           THE COURT:  When can I anticipate that?

6           MS. TARLOW:  Your Honor, I expect in the next several

7   weeks, in approximately two to three weeks.

8           THE COURT:  Before year end?

9           MS. TARLOW:  Yes, your Honor.

10          We facilitated a clearance process for defense

11  counsel, and we understand he is in the process of seeking to

12  obtain clearance.

13          THE COURT:  In terms of a schedule, we have the

14  February 1 date as the section 4 deadline, and we have a trial

15  date of April 24, 2023 for the trial of this action.

16          Are there any other dates on the schedule in this

17  case?

18          MS. TARLOW:  No, your Honor.  And we would

19  respectfully ask that the Court set pretrial motion deadlines.

20          THE COURT:  Let me hear from Mr. Colon.

21          I will just say, Mr. Colon, what I'm proposing to do

22  in a moment is, I'll set a date for the government's disclosure

23  of 404(b) evidence, their requests to charge, their voir dire,

24  and any other *in limine* motions they wish to make, and I'll set

25  a date for your response to that, and I'll also set a date for

1    the final pretrial conference in this case.

2              Let me hear from you.  Are there any motions you

3    anticipate in this case?

4              MR. COLON:  Thank you, your Honor.

5              There are motions that I would anticipate.  We have

6    not been able to review all the discovery.  It's voluminous,

7    quite frankly, something that we have been battling with in

8    terms of access.

9              Let me just say this, Judge.  I'm sure we will be

10    making motions.  Some of the motions or some of the issues I'll

11    just raise to the Court are the inaudibility of some of the

12    audio that we have seen and heard.  It's clear that even though

13    I speak fluent Spanish, not only can I not hear it, but it's

14    very difficult to understand.

15              THE COURT:  What kind of a motion would that be?  If

16    it's inaudible and not clear and you can't make it out, what

17    would that motion be?

18              MR. COLON:  It would something along the lines of some

19    sort of audibility hearing or an enhancement of what they

20    provided.  It's very difficult to hear it.

21              I will say, we don't have the best conditions in the

22    jail.  We are dealing with other visitors or, let's say, noise,

23    background noise that interrupts or affects our ability to

24    understand or hear it.

25              In fact, one of the things that we have tried to do is

1     make use of the headphones that they provide in the jail which

2     probably date back to prior to 9/11, quite frankly.  That's how

3     old they are.  When I attempted to bring in a better version of

4     an earphone, I was told I couldn't do that.  They didn't give

5     me a rationale.  I know better than to argue with the officers.

6     I was assistant commissioner of correction in New York many

7     years ago, so I know what the rules are.  But that certainly

8     has affected our ability to understand what's being said.

9             THE COURT:  You can get in touch with counsel to the

10    warden at the MDC and have an intelligent dialogue:  What

11    brand, what model, what make and why you need this.

12            But with regard to the recordings, is the government

13    providing you with drafts of any conversations, draft

14    translations?

15            MR. COLON:  They are providing us with summaries,

16    Judge.

17            THE COURT:  Summaries?

18            MR. COLON:  Summaries, written summaries that go back,

19    I don't know, eight, nine years maybe.  That invites -- that's

20    opened the door to something else I was going to refer to,

21    Judge.

22            I, along with my client, we review the material on

23    a -- almost on a daily basis at the jail.  We both speak

24    Spanish.  His English is not that bad, but at least he can

25    understand most of what I say to him or what may be mentioned

1     or what's in the summaries, which are in English.

2          What I have noticed, Judge, are omissions in the

3     summaries or, what I used to call in the old days, after-action

4     reports that summarize what was said in the video.  We found

5     out, or at least we located several videos where exculpatory

6     statements made by coconspirators like -- I don't know if you

7     want me to put them on the record, using epithets, the letters

8     HP.  I'm being very diplomatic about -- it's basically s-o-n

9     space o-f-a-b-i-t-c-h, son of a -- right.  That's what they say

10    in Spanish.  Or they say, he is not going along with us.  He is

11    not communicating.  He refuses to have meetings with us.

12         THE COURT:  Would these summaries ever come into

13    evidence?

14         MR. COLON:  They don't.  But the fact that they are

15    not in the summaries, as indicated, or at least showed me or

16    evidenced me of a pattern of omissions of these types of

17    statements.  Now, one is different, one.  But now two or three

18    or four, they are consistently omitted or missing from the

19    summaries.

20         THE COURT:  These are summaries that are being

21    provided.  What I'm interested in is, if and to the extent the

22    government sees conversations that they intend to use at trial,

23    it would seem to me that it would be appropriate for the

24    government to make those interim or draft translations

25    available to you on a rolling basis.

1            Do you think that would help?

2            MR. COLON:  A rolling basis, way before trial,

3    obviously, which is --

4            THE COURT:  Of course.  As they do the translations

5    and conclude that these are conversations they are likely to

6    offer and recognizing with the translations there would have to

7    be a stipulation that it's not the final translation, that it's

8    subject to revision, it would be produced to you.

9            The reason I think this would be helpful to you and

10   appropriate for the government to do is because, in my

11   experience, it's rare that you don't have on a transcription

12   instances where it says inaudible.  Now, if you say it's not

13   inaudible, it says that SOB, or something like that, first, you

14   are going to get on the phone with the government.  And then if

15   that doesn't work, if they don't say, you know, we went back,

16   we listened, I think you are right, or it says, son of, but it

17   doesn't finish the whole phrase, we will put that much, the

18   last seems to be inaudible, then you can have an intelligent

19   discussion.

20           Let me just press pause with you for a moment, Mr.

21   Colon, and ask the government, does the government have any

22   objection to doing that?

23           MS. TARLOW:  No, your Honor.

24           In fact, we have already provided defense counsel with

25   certain translations, including exhibits that were marked for

1   the Tony Hernandez trial in front of your Honor, which included

2   translations of certain recordings, and we will continue to

3   provide defense counsel with draft translations, pursuant to a

4   stipulation, which we have already entered into with defense

5   counsel.

6          THE COURT:  The stipulation is in place.  The

7   commitment is on the record now.

8          Let me hear the balance, Mr. Colon.

9          MR. COLON:  Let me say, Judge, we have had a very good

10  communication here with the government, and they have always

11  reached out and asked me whether they could help, so we have no

12  problems there.  In fact, we had the conversation outside the

13  courtroom where I brought that up to them, and they said that

14  they would review that material because I want to give it to

15  them en masse, not just piecemeal, so that they can have those

16  recordings.

17         We heard -- we read that there was an omission in the

18  report and we clearly heard it.  This is not a question of

19  audibility.  We heard what was said and it wasn't in the

20  report.  But I know that my colleagues across the aisle will

21  assist us.  We have no problem.  They have helped -- on many

22  issues they have been very, very gracious enough to help us

23  with that.

24         Let me just say other things, Judge, with respect to

25  the discovery.  Reviewing it is one thing.  The other issue is

1    the ability to have access to my client.  But I think we

2    hammered out another -- we hammered out a solution to another

3    problem.  That's that the discovery material is so voluminous,

4    so extensive, and we sit down -- I can be in that jail -- I'm

5    essentially in that jail five to six to seven hours a day.

6         What has happened is, though, that we have a

7    protective order, and I was very, very careful not to violate

8    it or even come close to going over the line.  So I have kept

9    all the materials, and I have taken them to the jail, and he

10   has gone over the materials with me.  I have not left anything

11   with him.  In an abundance of caution, that's how I want to

12   play this.

13        I have spoken to the government, and I told them that

14   he needs to be able to look at some of this material when I'm

15   not there, so I believe we have got a solution to that.  They

16   are going to be redacting any of the sensitive material,

17   providing a terabyte or a disk for me or a USB so that I can

18   give it to my client and he can review that while I'm not there

19   in his free time.  I think we have gotten that taken care of.

20   Again, that's part of the discussions that we have.  It's very

21   collegial, and I don't think it will be a problem.  I am going

22   to designate those things or we are going to look at that which

23   needs to be excised from the terabyte or the hard drive that

24   they do give us.  Again, it's working.  The process works in

25   terms of resolving the issues that I'm concerned about.

1          I have to say, Judge, my colleagues have been very

2    gracious.

3          I have to say, also, in the Bureau of Prisons, even

4    though there are some problems I want to highlight in terms of

5    access, and I believe what creates a problem for the Sixth

6    Amendment effective representation -- Judge, the BOP personnel

7    have been -- management has been very helpful.  I can give you

8    names:  Executive Assistant Plore, Legal Division Attorney

9    Ms. Poppapetchu.  I wanted to make sure I had that name right.

10   Mr. Cardu.  They have all helped when they could help.

11         Again, jails have -- institutions, facilities have

12   their own rules that we have to abide by.  The problem -- the

13   pervasive problem at the BOP is lack of personnel.  They just

14   don't have the personnel.  What I'd like to say in military

15   jargon is, they don't have the cannon fodder to put out there.

16         There is not much that the Justice Department can

17   really do about it unless they send people over to cover those

18   jobs.  But I've had officers had to be relieved.  They weren't

19   relieved.  Some of them just decided to relieve themselves,

20   which to me is something that was quite astonishing.  I don't

21   know if you can relieve yourself.  Certainly that would be like

22   an Article 15 charge, abandoning your post under uniform code

23   of military justice.  I don't understand how they can relieve

24   themselves, but they do.  They have walked off the post.  It's

25   because they don't have somebody to be there on time.  That

1   becomes a problem because that means essentially our visit is

2   going to be truncated.  They will have to leave, and we have to

3   cut the visits out.

4            Or I'll use this euphemism.  Sometimes there happens

5   to be a situation, that's just a euphemism for a riot an

6   attack, an assault, a stabbing.  They will close down the

7   visit.  They have to leave because there is some situation that

8   requires the attention or reinforcements to come to resolve

9   that.

10           What that means is that we lose time.  And I cannot

11  afford -- we cannot afford to lose time for our visits to be

12  interrupted.  But that's the story.  That's the life.  That's

13  how a jail operates.  It can change at any minute, change on a

14  dime.  We understand that.  But it's difficult for us and it's

15  frustrating for us to be in that situation.

16           That being said, Mr. Plore was able to put us in

17  another wing of the jail to avoid those types of situations

18  where the population or the individuals that are housed there

19  are in a certain category, that they are not likely to have

20  either fisticuffs or altercations.  That's helped a lot.

21           That's also helped with what we have had in the past

22  with separation orders.  There is a plethora of separation

23  orders in this case.  If it's not MS13, it's somebody related

24  to the coconspirators.  They did move us to the east wing,

25  where we don't have really that issue.

1          But, on the way here my client was transported not by

2     himself, as it had been in the past, but with other

3     individuals.  We spoke about that outside the courtroom, the

4     AUSAs and myself, about making sure that the sep orders that

5     the jail has are consistent with what the marshal service has,

6     but he felt very uncomfortable being in that big a crowd,

7     obviously because of who he is, the ex-president of Honduras,

8     the fact that he believed there were some members of the MS13

9     there.  There may have been someone of a certain origin that

10    might have been part of a terrorist group.

11          This is what his perception is, Judge.  I am not

12    saying that is what it was.  But the fact that he is concerned

13    about it is enough to concern me and to put it on the record.

14          I think we are able to address that with the

15    conversation we had and I know that they have been very true to

16    their word in terms of those concerns that I've had.  But he

17    was very concerned.  This is the first time he comes over en

18    masse.

19          Judge, if I may, just a few more things I want to make

20    sure that I cover.  We talked about, I spoke to the government

21    about this, the fact that it seems like some of the rules

22    appear to be a moving-target scenario at the jail.

23          For instance, I'm allowed to bring in my hard drive

24    and a charger at one point, and then it is taken away.  Some of

25    the officers said they have not seen the order or anything in

 1    writing that indicates that.  Up to about a week ago we were

 2    being allowed to bring a charging cable in.  Then, all of a

 3    sudden, that disappeared on Saturday when I went to see my

 4    client.  And that -- there has been a seesawing back and forth

 5    on whether we can bring a charging cable or not.

 6           Here is the problem and how it affects the Sixth

 7    Amendment.  What happens is, if you don't have a full charge

 8    and you are looking at material, then you basically have to

 9    leave at that point.  Again, it curtails our visit.

10           THE COURT:  I don't want to state the obvious, but I

11    fear I must.  In that situation I am going to a jail visit, I

12    am going to charge up my machine because I don't know what's

13    going to happen.  Wouldn't that be the smart thing to do?

14           MR. COLON:  Judge, I do it all the time, because I'm

15    anticipating that the rules may change.  But that charge may

16    only last a couple of hours, especially with video.

17           THE COURT:  I understand.

18           MR. COLON:  If I'm there for seven hours and my

19    battery dies out, even though it is 100 percent -- because I'm

20    constantly monitoring the battery life.

21           THE COURT:  The fact of the matter is, as you know,

22    I'm the judicial branch of government.  The Bureau of Prisons

23    is in the executive branch, and I guess the head of BOP reports

24    up to the same person who the U.S. Attorney for the district

25    reports on up to.

1        And certainly I have the ability to say I'm going to

2   release the defendant pending trial, but I don't have the

3   ability to modify the charger rule.  I have no clue as to what

4   the concern is or whether this is simply a misunderstanding on

5   the part of one of the good folks who work for the BOP.  I have

6   no idea.

7        This is why we, as a court, have made sure that there

8   is a counsel at the facility who will accept communications

9   from lawyers and do their honest best to try and come up with

10  solutions, and certainly the government can be of assistance.

11       But I can't sit up here and say, all right, you have a

12  device and you have a charging unit, I order that your charging

13  unit come in.  I have no idea what they are concerned with.

14  What's happened?  Have people smuggled weapons into charging

15  units?  Have they smuggled drugs into charging units?  I

16  haven't a clue.  I don't know what the risks or concern is.  Do

17  people get strangled with the cords?  I have no idea.

18       You would probably have better ideas and a better

19  imagination on the subject than I would.  I appreciate you

20  putting it on the record, but that's all you're accomplishing

21  here.

22       MR. COLON:  I understand that, Judge.  I have to

23  explain this to my client.

24       THE COURT:  I understand.

25       MR. COLON:  But what I did hear was, because I knew

1    exactly what they were going to say, is, well, they can

2    strangle you or can strangle somebody.  I said, that's OK,

3    except there are cables in the room for that dilapidated

4    equipment that they could do the same thing with those cables.

5    It made no sense.

6         But the point is, Judge, I have spoken to the

7    government.  They are going to try to see if they can

8    ameliorate the situation.  It's helpful, but even my

9    colleagues, who have been erstwhile in trying to help us -- and

10   I told my client, even you can't order them to do that because

11   that's how jails are run.

12        Judge, I think that's it, basically.  I don't want to

13   take up all your time.  I think that's it.

14        May I just confer with my client for a second?

15        THE COURT:  Sure, please.

16        MR. COLON:  We are done, Judge.  I'm sorry to take up

17   all the Court's time, but I had to address it so my client

18   could understand how the process works.

19        Thank you so much, sir.

20        THE COURT:  Of course.

21        With regard to the material that's been produced, are

22   there any suppression motions you have or any motions addressed

23   to the face of the indictment or anything of the like?  I am

24   not suggesting you should have such motions, but I want to know

25   now, to the extent that -- obviously not for something that

1    hasn't been produced to you yet.  You can't predict the future.

2    But as to what you have seen and reviewed, do you have any

3    present motions?

4              MR. COLON:  No, sir.

5              THE COURT:  That's fine.

6              Let me come up with a schedule for pretrial

7    submissions in this case, which will include any motions *in*

8    *limine* that you wish to make.  Let me come up with that.

9              I am going to require the government to submit its

10   requests to charge, voir dire, 404(b) evidence, and any *in*

11   *limine* motions that they have by March 3, 2023.  I am going to

12   give the defendant until March 21 to respond to that, including

13   any requests to charge that you are requesting, any voir dire

14   you are requesting, and any *in limine* motions that you wish to

15   make.

16             MR. COLON:  I'm sorry, Judge.  What date was that?

17             THE COURT:  That was March 21.

18             MR. COLON:  Thank you.

19             THE COURT:  You are going to respond to the

20   government's submissions and make any submissions of your own.

21             I am going to state the obvious to both sides.  I have

22   tried two jury trials so far, the Ramirez case and the Juan

23   Antonio Hernandez case, so you have the Court's instructions to

24   the jury in those cases.  It would be wise and prudent to look

25   at that and perhaps key off of those instructions and say,

1   Judge, we have no objection to your giving the same

2   instructions, or we ask that you supplement it with this or

3   take that out or what have you.  This is advice not just for

4   the government, but also for defense counsel.

5               Then any response by the government to the defendant's

6   submissions by April 4, 2023.  I will ask my deputy to give us

7   a date for the final pretrial conference any time after April

8   12, on or after April 12.

9               THE DEPUTY CLERK:  We can do it April 12, 2 p.m.

10              THE COURT:  That would be fine.

11              That's going to be the final pretrial conference.

12              When does the government propose to make its 3500

13  material available?

14              MS. TARLOW:  Your Honor, we expect to start, begin

15  producing 3500 materials in the next month or so, and then we

16  will produce them on a rolling, ongoing basis.

17              THE COURT:  With them all produced by when?

18              MS. TARLOW:  I would say, your Honor, several months

19  before trial.

20              THE COURT:  That sounds pretty unusual and good.

21              MR. COLON:  I didn't hear.

22              THE COURT:  What counsel said was, expect to have it

23  all produced, the words were several months before trial.

24              MS. TARLOW:  Your Honor, I should be clear.  Of course

25  we will be continuing to create 3500, which we will produce as

1   we create it.  There may be a handful of witnesses who present

2   exceptional safety concerns who we might not produce until

3   closer to trial, but the vast majority would be several months

4   beforehand.

5          THE COURT:  Let's see whether we can give this a

6   little bit more precision.  You will either make an application

7   to the Court for delayed production or produce your 3500

8   material by March 24, 2023.

9          Is that acceptable to the government?

10          MS. TARLOW:  Yes, your Honor.

11          THE COURT:  That's subject to your representation that

12   you are going to be doing it prior to that on a rolling basis.

13          MS. TARLOW:  Yes, your Honor.

14          MR. COLON:  What did you say in terms of the

15   production, March what, sir?

16          THE COURT:  24.  By March 24, the government will have

17   completed the production of its 3500 material, except for any

18   witness as to whom on or before that date they have made an

19   application to the Court for a delayed production, and I'll

20   look at the motion.

21          MR. COLON:  Am I understand that they will commence on

22   a rolling basis?

23          THE COURT:  That's what I heard.  That's what I heard

24   out of the mouth of the prosecutor.

25          MS. TARLOW:  Yes, your Honor, that's correct.

```
 1                THE COURT:  Just confirmed.

 2                MR. COLON:  Fine, Judge.

 3                THE COURT:  What else do we have?  Have I excluded

 4     time through the trial date?

 5                MS. TARLOW:  No, your Honor.  It's just excluded

 6     through today's date.

 7                THE COURT:  Let me hear your application.

 8                MS. TARLOW:  The government moves to exclude time in

 9     the interests of justice through April 12 --

10                THE COURT:  How about the trial?

11                MS. TARLOW:  Through the trial date, your Honor.

12                THE COURT:  Which is April 24, 2023.

13                MS. TARLOW:  Yes, your Honor.  In order to allow

14     defense to continue review of voluminous discovery in this

15     case, for the parties to file their pretrial motions, including

16     motions in limine, and so that the parties could continue any

17     pretrial resolution discussions.

18                THE COURT:  Mr. Colon.

19                MR. COLON:  I understand, Judge.

20                THE COURT:  Any objection?

21                MR. COLON:  No, sir.  I understand.  No objections.

22                THE COURT:  I find that the ends of justice will be

23     served by granting a continuance to April 24, 2023, the start

24     of the trial, and the need for such a continuance outweighs the

25     best interests of the public and the defendant in a speedy
```

1   trial.

2          The reason for my finding is that the time is needed

3   to enable defense counsel and the defendant to continue to

4   review discovery materials, to allow the government to complete

5   its production of discovery materials, and allow the government

6   to produce translations on a rolling basis, 3500 material on a

7   rolling basis, for the government to make its submissions that

8   the Court has ordered, and for defense counsel to make his

9   submissions, as well as for the parties to prepare for trial.

10         Accordingly, the time between today and April 24, 2023

11   is excluded under the Speedy Trial Act.

12         Anything further from the government?

13         MS. TARLOW:  No, your Honor.

14         THE COURT:  From the defendant.

15         MR. COLON:  No, your Honor.  Thank you, sir.

16         THE COURT:  Thank you, all very much.  We are

17   adjourned.

18         (Adjourned)

19

20

21

22

23

24

25