UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- v. -

JUAN ORLANDO HERNANDEZ,
    a/k/a "JOH," and
JUAN CARLOS BONILLA VALLADARES,
    a/k/a "Tigre,"

       Defendants.

S7 15 Cr. 379 (PKC)
S8 15 Cr. 379 (PKC)

---

**THE GOVERNMENT'S MOTIONS *IN LIMINE***

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Jacob H. Gutwillig
David J. Robles
Elinor L. Tarlow
Kyle A. Wirshba
Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

BACKGROUND ............................................................................................................. 9

   I. Overview ............................................................................................................... 9

   II. Background on Juan Orlando ........................................................................... 12

      A. 1998-2012: Juan Orlando is Elected to the Honduran Congress and Partners with Drug Traffickers ............................................................................................................... 12

      B. 2012-2013: Juan Orlando Campaigns for President of Honduras with the Support of His Drug Trafficking Partners ........................................................................................ 15

      C. 2014-2017: Juan Orlando Continues to Accept Bribes and Protects Drug Traffickers as President ................................................................................................................. 20

      D. 2017-2018: Juan Orlando's Re-election to a Second Presidential Term ........................ 22

      E. 2021-2022: Juan Orlando Attempts to Avoid Extradition and Prosecution in the United States ................................................................................................................... 26

   III. Background on Bonilla ................................................................................... 27

ARGUMENT ............................................................................................................. 30

   I. Evidence of Narcotics-Related Corruption Is Admissible as Direct Evidence and Pursuant to Rule 404(b) ............................................................................................................. 30

      A. Applicable Law ....................................................................................... 31

      B. Discussion .............................................................................................. 32

   II. Statements Made to Cooperating Witnesses by the Defendants and Their Co-Conspirators Are Admissible Pursuant to Rules 801(d)(2)(A), 801(d)(2)(E), and 804(b)(3)....................... 35

      A. Applicable Law ....................................................................................... 36

      B. Evidence of Statements Made by Co-Conspirators to Alex Ardon and CW-1 Is Admissible Under the Hearsay Rules .................................................................................... 39

      C. Video Recordings Made by Leonel Rivera Containing Statements by Co-conspirators Are Admissible ................................................................................................................. 46

      D. Evidence of Statements by Honduran Drug Trafficker Co-conspirators to Leonel Rivera Is Admissible Under the Hearsay Rules .............................................................................. 50

      E. Evidence of Statements by Fuentes Ramirez to Leonel Rivera Is Admissible Under the Hearsay Rules .............................................................................................................. 53

      F. Evidence of Statements Made by Tony Hernandez to Diaz Morales Is Admissible Under the Hearsay Rules ......................................................................................................... 55

      G. Evidence of Statements by CC-1 to CW-2 Is Admissible Under the Hearsay Rules ...... 58

    H. Evidence of Statements by Tony Hernandez and a Honduran Drug Trafficker Coconspirator to Chang Monroy Is Admissible Under the Hearsay Rules ......................... 60

III. Evidence of Statements by Honduran Officials, Including Juan Orlando, and Fuentes Ramirez to Jose Sanchez Is Admissible ................................................................................. 63

IV. Evidence of Bonilla's Participation in A Drug-Related Murder Is Admissible ................ 68

V. Evidence of Drug Ledgers Seized from Nery López Sanabria Is Admissible .................... 72

VI. Electronic Communications by Central American Drug Traffickers Regarding Cocaine Bearing the Stamp "TH" Are Admissible ................................................................................. 74

    A. Relevant Facts ................................................................................................................ 75

    B. Discussion ...................................................................................................................... 76

VII. Evidence from Co-Conspirators' Electronic Devices and Accounts Is Admissible ......... 80

    A. Electronic Evidence from Tony Hernandez's Cellphones, Including Photographs of Machineguns, Is Admissible as Direct Evidence .................................................................. 80

    B. Electronic Evidence from CW-1's Laptop, Including Spreadsheets Cataloguing Political Bribes, Is Admissible as Direct Evidence ............................................................................. 85

    C. Electronic Evidence from Fuentes Ramirez's Cellphone, Including Photographs of Firearms and Cash, and Waze Data, Is Admissible as Direct Evidence .............................. 87

    D. Evidence from Daniel Gutierrez's iCloud and Instagram Accounts Is Admissible ......... 92

    E. The Electronic Evidence is Admissible Under Rule 404(b) ........................................... 95

CONCLUSION ........................................................................................................................... 96

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Bourjaily v. United States*,
  483 U.S. 171 (1987) ................................................................ 40

*Ohio v. Clark*,
  135 U.S. 2173 (2015) ............................................................. 43

*Rosemond v. United States*,
  572 U.S. 65 (2014) ................................................................ 89

*United States v. Abdalla*,
  No. 14 Cr. 716, 2018 WL 5819799 (S.D.N.Y. Oct. 23, 2018) ........................................ 76, 77

*United States v. Amato*,
  No. 03 Cr. 1382 (NGG), 2006 WL 1720402 (E.D.N.Y. June 20, 2006) ............................... 80

*United States v. Arrington*,
  867 F.2d 122 (2d Cir. 1989) ................................................... 76

*United States v. Ashraf*,
  320 F. App'x 26 (2d Cir. 2009) ............................................... 80

*United States v. Ayala*,
  601 F.3d 256 (4th Cir. 2010) ................................................. 80

*United States v. Baptiste*,
  264 F.3d 578 (5th Cir. 2001) ................................................. 77

*United States v. Barnes*,
  560 F. App'x 36 (2d Cir. 2014) .............................................. 76

*United States v. Barret*,
  No. 10 Cr. 809, 2011 WL 6704862 (E.D.N.Y. Dec. 21, 2011) ............................... 76

*United States v. Beech-Nut Nutrition Corp.*,
  871 F.2d 1181 (2d Cir. 1989) ............................................. 49, 72

*United States v. Bick*,
  711 F. App'x 664 (2d Cir. 2017) ............................................. 43

*United States v. Chin*,
  83 F.3d 83 (4th Cir. 1996) ................................................... 77

*United States v. Curley*,
    639 F.3d 50 (2d Cir. 2011) ............................................... 35

*United States v. Delligatti*,
    No. 15 Cr. 491, 2018 WL 1033242 (S.D.N.Y. Feb. 23, 2018) ............... 48

*United States v. Delva*,
    No. 12 Cr. 802, 2014 WL 4460360 (S.D.N.Y. Sept. 10, 2014) ............. 49

*United States v. Doyle*,
    130 F.3d 523 (2d Cir. 1997) ............................................. 42

*United States v. Dupree*,
    870 F.3d 62 (2d Cir. 2017) .............................................. 73

*United States v. Fiumano*,
    No. 14 Cr. 518, 2016 WL 1629356 (S.D.N.Y. Apr. 25, 2016) ............. 35

*United States v. Gadsden*,
    300 F. App'x 108 (2d Cir. 2008) ...................................... 75-76

*United States v. Gigante*,
    166 F.3d 75 (2d Cir. 1999) ......................................... 49, 71-72

*United States v. Gohari*,
    227 F. Supp. 3d 313 (S.D.N.Y. 2017) ................................. 35, 37

*United States v. Gonzalez*,
    110 F.3d 936 (2d Cir. 1997) ............................................. 34

*United States v. Gotti*,
    457 F. Supp. 2d 395 (S.D.N.Y. 2006) ................................... 40

*United States v. Gupta*,
    747 F.3d 111 (2d Cir. 2014) ............................................. 73

*United States v. Hernandez*,
    521 F. App'x 14 (2d Cir. 2013) ......................................... 85

*United States v. Kuthuru*,
    665 F. App'x 34 (2d Cir. 2016) ...................................... 46-47, 70

*United States v. Lang*,
    589 F.2d 92 (2d Cir. 1978) ............................................. 42

*United States v. Maldonado-Rivera*,
    922 F.2d 934, 959 (2d Cir. 1990) .................................... 86, 101

*United States v. Matthews,*
    20 F.3d 538 (2d Cir. 1994) ............................................... 42

*United States v. Moskowitz,*
    581 F.2d 14 (2d Cir. 1978) ........................................ 90, 98

*United States v. Muniz,*
    60 F.3d 65 (2d Cir. 1995) ................................................. 89

*United States v. Ortiz,*
    962 F. Supp. 2d 565 (S.D.N.Y. 2013) ........................... 72, 73

*United States v. Paone,*
    782 F.2d 386 (2d Cir. 1986) ......................................... 40-41

*United States v. Parker,*
    554 F.3d 230 (2d Cir. 2009) ............................................. 85

*United States v. Persico,*
    645 F.3d 85 (2d Cir. 2011) ............................................... 42

*United States v. Persico,*
    832 F.2d 705 (2d Cir. 1987) ............................................. 72

*United States v. Pipola,*
    83 F.3d 556 (2d Cir. 1996) ............................................... 38

*United States v. Rahme,*
    813 F.2d 31 (2d Cir. 1987) ............................................... 41

*United States v. Riccardi,*
    620 F. App'x 11 (2d Cir. 2015) ..................................... 90-91

*United States v. Rivera,*
    60 Fed. App'x. 854 (2d Cir. 2003) .................................... 50

*United States v. Robinson,*
    702 F.3d 22 (2d Cir. 2012) ............................................... 35

*United States v. Roldan-Zapata,*
    916 F.2d 795 (2d Cir. 1990) ........................................ 91, 93

*United States v. Russo,*
    302 F.3d 37 (2d Cir. 2002) .......................................... 40, 70

*United States v. Rutkoske,*
    506 F.3d 170 (2d Cir. 2007) ............................................. 35

*United States v. Saget*,
   77 F.3d 223 (2d Cir. 2004) .......................................................... 50, 54

*United States v. Sasso*,
   59 F.3d 341 (2d Cir. 1995) ................................................................ 73

*United States v. Savoca*,
   335 F. Supp. 2d 385 (S.D.N.Y. 2004) .............................................. 72

*United States v. Simmons,*
   923 F.2d 934 (2d Cir. 1988) .............................................................. 41

*United States v. Stratton,*
   779 F.2d 820 (2d Cir. 1985) .............................................................. 68

*United States v. Ulbricht*,
   79 F. Supp. 3d 466 (S.D.N.Y. 2015) ................................ 35, 75, 77

*United States v. Vegas,*
   27 F.3d 773 (2d Cir. 1994) ......................................................... 89-90

*United States v. Wexler,*
   522 F.3d 194 (2d Cir. 2008) ....................................................... 41-42

*United States v. Williams,*
   506 F.3d 151 (2d Cir. 2007) .............................................................. 50

*Williamson v. United States*,
   512 U.S. 594 (1994) ........................................................................... 41

*Zaken v. Boerer*,
   964 F.2d 1319 (2d Cir. 1992) ........................................................... 80

## Rules

Federal Rule of Evidence 401 ............................................................ 34, 84
Federal Rule of Evidence 402 ................................................................... 35
Federal Rule of Evidence 403 .............................................................. *passim*
Federal Rule of Evidence 404 .............................................................. *passim*
Federal Rule of Evidence 801 .............................................................. *passim*
Federal Rule of Evidence 804 .............................................................. *passim*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- v. -

JUAN ORLANDO HERNANDEZ,
    a/k/a "JOH," and
JUAN CARLOS BONILLA VALLADARES,
    a/k/a "Tigre,"

        Defendants.

S7 15 Cr. 379 (PKC)
S8 15 Cr. 379 (PKC)

---

The Government respectfully submits this memorandum in support of motions *in limine* seeking the following rulings with respect to the upcoming trial of Juan Orlando Hernandez ("Juan Orlando"), Juan Carlos Bonilla Valladares ("Bonilla"), and Mauricio Hernandez Pineda ("Pineda")[1]:

1. Evidence of narcotics-related corruption, including the use of drug proceeds to fund political campaigns and bribe politicians and law enforcement, is admissible as direct evidence and pursuant to Rule 404(b);

2. Testimony regarding statements made by the defendants, former drug traffickers, politicians, and members of the Honduran National Police who were the defendants' co-conspirators is admissible pursuant to Rules 801(d)(2)(E), 804(b)(3), and/or 801(d)(2)(A);

3. Evidence of Bonilla's participation in a drug-related murder is admissible as direct evidence and pursuant to Rule 404(b);

---

[1] The Government filed its motions in *limine* as to Pineda on October 28, 2022. (Dkt. No. 487 (the "Pineda MILs")). The Pineda MILs are attached hereto as Exhibit A and incorporated by referenced herein. The Government seeks to admit the evidence described in the Pineda MILs against co-conspirator defendants Juan Orlando and Bonilla for the reasons set forth in the Pineda MILs and below.

4. Evidence of seizures of firearms, cash, and drug ledgers from Nery López Sanabria is admissible as direct evidence and pursuant to Rule 404(b);

5. Electronic communications by Central American drug traffickers regarding cocaine bearing a stamp with the initials of one of the defendants' co-conspirators are admissible pursuant to Rules 804(b)(3) and 801(d)(2)(E); and

6. Electronic evidence from certain of the defendants' co-conspirators' electronic devices and electronic accounts, including pictures of machineguns, bulk cash, and communications concerning the Honduran military and drug-trafficking associates, is admissible as direct evidence and pursuant to Rules 404(b), 801(d)(2)(E), and 804(b)(3).[2]

## BACKGROUND[3]

### I. Overview

Juan Orlando and Bonilla held powerful official positions in Honduras during the charged conspiracy. Juan Orlando served as the President of Honduras from 2014 to 2022, and before that as President of the Honduran National Congress ("HNC") from 2010 to 2014. Bonilla served first as a regional police chief in Honduras and then as Chief of the Honduran National Police ("HNP") from 2012 to 2013. Both Juan Orlando and Bonilla wielded incredible influence and partnered with some of the most notorious narcotics traffickers in Honduras, allowing them to flourish under their control. These drug traffickers, while running their own operations, often worked together

---

[2] The Government is submitting a single consolidated memorandum in support of its six motions *in limine*.

[3] The Government respectfully submits that all of the evidence described in this brief, including with respect to acts of bribery and corruption, is admissible as direct evidence. The Government hereby provides notice that it also intends to offer this evidence, in the alternative, pursuant to Rule 404(b). The Government will continue to meet with potential witnesses between now and trial, and will supplement this notice as necessary should the Government learn of any additional evidence that it may seek to offer pursuant to Rule 404(b).

in connection with drug shipments and in neutralizing threats to their common interest. They did this by, in part, paying bribes and providing other support to high-ranking government and police officials, like Juan Orlando and Bonilla, who in turn protected them from prosecution. This symbiotic relationship, and the cycle of corruption and drug money that fueled it, was the core of the charged conspiracies.

Honduras—a country of roughly ten million people—borders Guatemala, El Salvador, and Nicaragua in Central America and is divided into 18 different departments. For purposes of the charged conspiracy, the most pertinent departments are (i) Copán and Cortes, departments along the Guatemala border through which huge quantities of United States-bound cocaine were transported; (ii) Lempira, Juan Orlando's home department where he and Juan Antonio Hernandez Alvarado, a/k/a "Tony Hernandez," served as Congressmen and developed partnerships with prolific drug traffickers; (iii) Francisco Morazán, which includes Tegucigalpa, the capital of Honduras, where numerous meetings occurred between high-ranking politicians and drug traffickers.



Honduras has two principal political parties, the Liberal Party and the National Party. Juan Orlando was a member of the National Party. Since at least 2000, both political parties have supported and facilitated wide-spread drug trafficking in exchange for massive bribes to support their campaigns and to enrich themselves. During the charged conspiracy, while Honduras's political elite, including Juan Orlando, privately worked hand-in-hand with drug traffickers, they publicly pretended to support the United States' efforts to curb drug trafficking. Behind the scenes, Juan Orlando continued to receive massive amounts of drug trafficking proceeds from a network of prolific drug traffickers to fund his political campaigns and in exchange delivered on his promise to protect them from extradition to the United States. The only significant Honduran drug traffickers aligned with Juan Orlando's National Party who were extradited to the United States from Honduras while Juan Orlando was in power[4] were two brothers, Miguel Arnulfo Valle Valle and Luis Antonio Valle Valle, the leaders of a Copán-based drug trafficking organization ("DTO") referred to as *Los Valles*.[5] However, Juan Orlando told cooperating witnesses that the Valle

---

[4] More recently, in January 2023, Arnaldo Urbina Soto ("Urbina Soto"), a member of the National Party and former Mayor of Yoro, Honduras, was extradited from Honduras to the United States on drug trafficking and firearms charges. Urbina Soto remains in custody pending trial. *See United States v. Urbina Soto, et al.*, 18 Cr. 497 (DLC).

[5] Miguel and Luis Valle pled guilty in 2016 to drug trafficking charges in the Eastern District of Virginia and Southern District of Florida, pursuant to cooperation agreements with the Eastern District of Virginia. *See* 13 Cr. 20897 (S.D. Fla.). They were each subsequently sentenced to 300 months' imprisonment. In 2014, the Department of Treasury, Office of Foreign Assets Control ("OFAC") designated the leadership of the *Los Valles* DTO as Specially Designated Narcotics Traffickers pursuant to the Foreign Narcotics Kingpin Designation Act ("Kingpin Act"). In its accompanying press release, OFAC described the organization's use of "a combination of brutal violence and public corruption in order to keep a stronghold on their base of operations in Copán, Honduras." Press Release, *Treasury Targets Honduran Drug Trafficking Organization and Its*

brothers had been extradited only because they had threatened to kill Juan Orlando. The vast majority of the co-conspirators in this scheme were never prosecuted in Honduras despite trafficking massive quantities of cocaine and committing brutal acts of violence. Juan Orlando and his powerful allies ensured their protection.

The rampant drug trafficking that occurred with Juan Orlando's support, and with the help of high-ranking officials like Bonilla, resulted in lawlessness in Honduras and directly contributed to Honduras's rampant violent crime, corruption, and poverty.

## II. Background on Juan Orlando

### A. 1998-2012: Juan Orlando is Elected to the Honduran Congress and Partners with Drug Traffickers

Juan Orlando's political career spanned more than 20 years. In 1998, Juan Orlando was elected as a Congressman for Lempira. By 2005, while still a Congressman, Juan Orlando was already accepting tens of thousands of dollars in bribes from Victor Hugo Diaz Morales ("Diaz Morales"), a Honduran drug trafficker who is now cooperating with the Government. In return, Tony Hernandez and his associates provided Diaz Morales with information from law enforcement sources to facilitate drug shipments. For example, Tony Hernandez provided Diaz Morales with information regarding operations of the Honduran Navy; efforts by the United States to train Honduran Air Force pilots to fly at night to conduct anti- narcotics operations; military radar capabilities so that cocaine plane shipments would avoid detection; and interdiction efforts by certain HNP officials. Based in part on the information Diaz Morales obtained in exchange for his

---

*Network*, U.S. Dep't of the Treasury (Aug. 20, 2014), *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl2611.aspx.

bribes to Juan Orlando, Diaz Morales, along with Tony Hernandez, worked together to transport approximately 140,000 kilograms of United States-bound cocaine through Honduras between 2004 and 2016. Not a single kilogram of those 140,000 was seized by Honduran law enforcement. Nor was Diaz Morales investigated or arrested by Honduran authorities despite being widely known to be a ruthless drug trafficker, who has now admitted as part of his cooperation to committing or participating in 18 murders.

Juan Orlando's partnership with a network of Honduras's most prolific drug traffickers escalated as he became more powerful. In 2009, Juan Orlando began to campaign to become President of the Honduran Congress and Porfirio Lobo Sosa ("Pepe Lobo," his close political ally and fellow National Party member, began to campaign to become President of Honduras. Juan Orlando and Pepe Lobo worked together to obtain $2 million in drug trafficking proceeds for their respective campaigns from Amilcar Alexander Ardon Soriano ("Alex Ardon"), the mayor of El Paraiso, a municipality in Honduras close to the Guatemalan border. In exchange, Juan Orlando and Pepe Lobo promised to protect Alex Ardon from arrest and extradition, and to appoint a member of Alex Ardon's family ("CW-1")[6] to a position in the Government of Honduras. Alex Ardon then sent emissaries to take control of polling stations around El Paraiso, and facilitated the casting of approximately 3,000 fraudulent votes in support of Juan Orlando, Pepe Lobo, and other National Party candidates.

On November 29, 2009, Pepe Lobo was elected as President and Juan Orlando was re-elected as a Congressman. Alex Ardon then helped Juan Orlando bribe three Copán-based

---

[6] The Government is providing under seal as Exhibit B a key for the co-conspirator numbers.

Congressmen to ensure that Juan Orlando was elected as President of the HNC. Once in that role, Juan Orlando fulfilled his promises to Alex Ardon and CW-1. Juan Orlando appointed CW-1 as head of *Fonda Vial*, a Honduran government agency responsible for infrastructure and construction. At Juan Orlando's direction, CW-1 doled out contracts to front companies that major cocaine traffickers used to launder drug trafficking proceeds. Alex Ardon and CW-1's drug trafficking activities also flourished. Between 2010 and 2012, Alex Ardon, CW-1, and Tony Hernandez distributed approximately two or three cocaine shipments per month using helicopters, planes, boats, and trucks to transport the drugs. Some of this cocaine was manufactured by Tony Hernandez in his drug laboratory in Colombia. Knowing that Juan Orlando and other corrupt officials were protecting him, Tony Hernandez boldly stamped his cocaine with his own initials ("TH"). Likewise understanding the total protection Juan Orlando and Tony Hernandez provided him, Alex Ardon also had some of his cocaine stamped with his initials ("AA"). Over this time, Alex Ardon, CW-1, and Tony Hernandez were responsible for transporting approximately 40,000 kilograms of United States-bound cocaine through Honduras.

Juan Orlando provided protection for other drug traffickers during this period. As early as 2011, Juan Orlando was partnering with Geovanny Fuentes Ramirez, a Honduran drug trafficker who helped produce and transport cocaine shipments for *Los Cachiros*, one of the most violent and prolific drug trafficking organizations in Honduras. In approximately 2011, Honduran law enforcement raided Fuentes Ramirez's cocaine laboratory. Approximately 30 or 40 days after the raid, Fuentes Ramirez met with Julio Cesar Barahona, then the President of the Judiciary in Honduras, who had been appointed to that position by Juan Orlando in his capacity as President of the HNC. Upon his arrival, Barahona stated that he had been sent by the "boss" so that he could

"help out" Fuentes Ramirez, *i.e.*, that Barahona had been dispatched by Juan Orlando to insulate Fuentes Ramirez from prosecution. Following that meeting, Fuentes Ramirez continued to operate with impunity and, as described below, in partnership with Juan Orlando with protection from the Honduran military.

**B. 2012-2013: Juan Orlando Campaigns for President of Honduras with the Support of His Drug Trafficking Partners**

In January 2012, as described above, Honduras amended its Constitution to permit the extradition of Honduran nationals to the United States to face drug trafficking charges. Tony Hernandez told Alex Ardon that the amendment was adopted in response to pressure that the United States had applied on Pepe Lobo and Juan Orlando, but assured Alex Ardon that he and CW-1 would not face extradition. Tony Hernandez also told Alex Ardon that, although he no longer would sell Alex Ardon cocaine, he would continue to rent helicopters to Alex Ardon to transport cocaine and drug money and provide protection for those shipments. Between 2012 and 2014, approximately two or three times per month, Alex Ardon paid Tony Hernandez $50,000 to transport cocaine on his helicopters and to receive guaranteed safe passage for the flights based on Tony Hernandez's access to radar and law enforcement information.

Around the time the extradition amendment passed in 2012, Juan Orlando also started campaigning for his first term as President of Honduras. In public, Juan Orlando named Alex and CW-1 (still head of *Fonda Vial*) as the leaders of the National Party's re-election effort in Copán. In private, Tony Hernandez urged Alex Ardon to use drug money to muster political support for Juan Orlando from all of the Copán mayors. Tony Hernandez also assured Alex Ardon that Juan Orlando would provide Ardon with the same level of protection Pepe Lobo had provided if the campaign was successful.

Prior to the 2013 presidential election, Juan Orlando privately solicited and accepted millions of dollars from drug traffickers and misappropriated Honduran government funds for his campaigns. Leading up to the 2013 election, Alex Ardon spent approximately $1.5 million in drug trafficking proceeds to bribe politicians in Copán to support Juan Orlando. Alex Ardon paid nearly every mayor in Copán in some form, and was explicit during each interaction that he was paying the mayors in exchange for their support of Juan Orlando ahead of the upcoming election. In return, Juan Orlando promised Alex Ardon that he would continue to provide protection to Alex Ardon and would ensure that government contracts were awarded in Copán, which would help Alex Ardon and CW-1's ongoing money laundering activities and improve the infrastructure around Alex Ardon and CW-1's stronghold (including roads that could be used to transport cocaine more efficiently).

Juan Orlando also received bribes from his co-conspirators outside of Honduras, who relied on his position of power to maintain their vast drug trafficking. The Sinaloa Cartel based in Mexico, for example, utilized Honduras as a major transshipment point between the cocaine labs of Colombia and the Cartel controlled territories inside Mexico. Juan Orlando's role in protecting Sinaloa's access to that transshipment point was vital, and he therefore received bribes, from infamous leader of the Sinaloa Cartel Joaquín Archivaldo Guzmán Loera, a/k/a "El Chapo," with whom Juan Orlando's connections dated back several years. Since approximately 2010, Tony Hernandez had been working in coordination with Alex Ardon and *Los Valles* to provide El Chapo and the Sinaloa Cartel with mass quantities of cocaine and with heavily armed security for the transport of those shipments through western Honduras, with an ultimate destination of the United States. In approximately 2013, Tony Hernandez met directly with El Chapo, for the first time, at

a ranch owned by the *Los Valles* DTO in Copán.  At the meeting, El Chapo asked Tony Hernandez for broader security assurances, as El Chapo wanted to transport cocaine across Honduras from the Nicaraguan border to the Guatemalan border.  El Chapo offered Tony Hernandez $1 million to fund Juan Orlando's campaign in exchange for protection.  Tony Hernandez said he would consider it.  Days after the meeting, Tony Hernandez told Alex Ardon that he had spoken to Juan Orlando, that Juan Orlando agreed to accept the $1 million from El Chapo, and that Juan Orlando said he urgently needed the money for his campaign.  Tony Hernandez also told Alex Ardon that Juan Orlando had warned that they should be careful that they were not photographed or recorded meeting with El Chapo.  As a result, Tony Hernandez and Alex Ardon met with El Chapo again in Copán.  Tony Hernandez brought heavily armed security to the meeting, including Pineda, his cousin and a high-ranking HNP officer, wielding a machinegun, and told El Chapo that, if Juan Orlando won the election, El Chapo's shipments across Honduras would be safe and that Alex Ardon and the Valle brothers—key facilitators of El Chapo's Sinaloa Cartel activities in the region—would also be protected from extradition.  El Chapo, in turn, provided Tony Hernandez with $1 million in cash, which they counted on the table in front of Alex Ardon.

Juan Orlando also received bribes from another high-ranking member of the Sinaloa Cartel ("CC-1") to support his presidential campaign.  In the months leading up to Juan Orlando's election as President of Honduras, this drug trafficker provided approximately $1,000,000 in bribes to an official at the Port of Cortez ("CC-2")—through which the Sinaloa Cartel and others shipped drugs into Honduras—who had said that the candidate (meaning Juan Orlando) needed support.  Then, the day prior to the presidential election, an associate and fellow member of the Sinaloa Cartel ("CW-2") provided $300,000 to an individual from whom the high-ranking member of the Sinaloa

Cartel had purchased a house and who provided security for Ricardo Alvarez, Juan Orlando's eventual running mate and Vice President, and who later said that the money was to be used as a final push for Juan Orlando's and Alvarez's campaign.

In advance of the 2013 presidential election, Juan Orlando also received drug proceeds from Yankel Rosenthal,[7] a Liberal Party politician, and Carlos Lobo,[8] a Honduran drug trafficker who worked with the Sinaloa Cartel. During a November 2013 recorded meeting,[9] just prior to the national election, Yankel Rosenthal and a group of traffickers, including Carlos Lobo, discussed ongoing efforts to corruptly obtain protection from Juan Orlando and Yani Rosenthal, then the Liberal Party candidate for president. Among other things, Yankel Rosenthal confirmed that he had given Juan Orlando $250,000 of drug trafficking proceeds from Carlos Lobo, and Yankel Rosenthal discussed the possibility of Juan Orlando meeting with Carlos Lobo and other traffickers after the election. After Juan Orlando won the election, he appointed Yankel Rosenthal to a cabinet-level position with the title Minister of Investment Promotion.

---

[7] Yankel Rosenthal pled guilty in 2017 to a money laundering offense. *See United States v. Rosenthal*, 13 Cr. 413 (JGK) (S.D.N.Y.). In January 2018, Judge Koeltl sentenced Yanked Rosenthal to 36 months' imprisonment.

[8] Lobo pled guilty in May 2016 to participating in a cocaine-importation conspiracy. *See United States v. Lobo*, No. 15 Cr. 174 (LGS). In September 2017, Judge Schofield sentenced Lobo principally to 288 months' imprisonment, a $50,000 fine, and $266,667 in forfeiture.

[9] In 2013, OFAC designated *Los Cachiros*, its two leaders Devis Leonel Rivera Maradiaga and Javier Rivera Maradiaga, and many of their front companies under the Kingpin Act. Following these designations, the Riveras began cooperating proactively with the DEA and made numerous recordings of politicians and drug traffickers discussing bribes paid to various politicians, including Juan Orlando, for their support and protection from extradition.

Juan Orlando also obtained drug proceeds to fund his campaign from the leaders of *Los Cachiros*—Leonel Rivera and Javier Rivera—who are now cooperating with the Government. During Juan Orlando's presidential campaign, Leonel Rivera and Javier Rivera attended a birthday party for a relative of Pepe Lobo, along with Juan Orlando and Oscar Najera, a National Party Congressman. At the birthday party, the Riveras discussed supporting Juan Orlando's campaign by using drug money to pay bribes at polling places in the Colon Department. After the party, Oscar Najera reiterated to Leonel Rivera that he needed money to support Juan Orlando's campaign by bribing election workers in Colon, which Oscar Najera represented in the HNC and *Los Cachiros* used as a base of operations. Oscar Najera explained that Juan Orlando had promised to make Oscar Najera President of the HNC if Juan Orlando was elected President of Honduras. Based on the request, Leonel Rivera had a worker bring 300,000 lempiras to the meeting, which he provided to Oscar Najera for Juan Orlando's presidential campaign.

In the lead-up to his 2013 presidential election, Juan Orlando also relied on CW-1 to help him commit voter fraud. CW-1 met regularly with Juan Orlando to discuss their strategies, including the payment of bribes, for certain departments in Honduras where Juan Orlando was not leading in the polls. As part of those efforts, for example, CW-1 traveled with two of Juan Orlando's brothers—Amilcar Hernandez and Marcos Hernandez—to towns in Copán that were not supporting Juan Orlando. CW-1 and Juan Orlando's brothers used drug money to bribe officials who controlled those voting centers to manipulate the vote count in Juan Orlando's favor, and CW-1 also met an engineer who was put in charge of shutting down the servers for the electoral tribunal, known as the Tribunal Supremo Electoral ("TSE"), which was responsible for certifying the election results so that the vote count could be manipulated in Juan Orlando's favor.

Ricardo Alvarez appealed the results of the 2012 primary election, accusing Juan Orlando of fraud and asking for a recount. The Honduran Supreme Court, known as the *Corte Suprema de Justicia* (the "CSJ"), by that time stocked with judges loyal to Juan Orlando, rejected Alvarez's appeal. Juan Orlando then purportedly won the presidential election in November 2013, with Ricardo Alvarez as his running mate and Vice President.

### C. 2014-2017: Juan Orlando Continues to Accept Bribes and Protects Drug Traffickers as President

Juan Orlando became President of Honduras in January 2014. In his capacity as head of state, Juan Orlando continued to abuse his power. He accepted drug-fueled bribes and consolidated power in exchange for allowing drug traffickers to operate with impunity in Honduras and, despite false public representations to the contrary, protecting them from extradition to the United States.

As described above, in December 2014, the Valle brothers were extradited to the United States. Although Juan Orlando publicly made it appear as though their extraditions were an effort to combat drug trafficking, Tony Hernandez privately explained to Alex Ardon that the extraditions were in retaliation for the Valle brothers having organized an effort to kill Juan Orlando.[10] Tony Hernandez assured Alex Ardon that as long as Juan Orlando and the National Party were in power, Alex Ardon and CW-1 would not be arrested or extradited.

Juan Orlando also continued receiving bribes and guaranteeing protection for his coconspirators. For example, during multiple meetings in 2013 and 2014, Juan Orlando accepted

---

[10] In approximately 2014, the Valle brothers described their assassination plot to Leonel Rivera, who was already working with the DEA at the time and declined to participate.

tens of thousands of dollars from Fuentes Ramirez. Juan Orlando promised to protect Fuentes Ramirez from arrest and extradition, noting that the President of the HNC Mauricio Oliva and Honduran Attorney General Oscar Chinchilla would protect Juan Orlando and Fuentes Ramirez and make them "untouchable." Juan Orlando also discussed with Fuentes Ramirez their plan to send massive quantities of cocaine to the United States—stating that they would "stuff the drugs right up the noses of the gringos"—and told Fuentes Ramirez to coordinate with Tony Hernandez regarding drug shipments.

Similarly, in 2014, Leonel Rivera, who was at that time cooperating with the DEA, recorded several meetings during which he discussed with co-conspirators bribes that had been paid to Juan Orlando and the protections that those drug traffickers were receiving. For example, during a March 2014 recorded meeting with Urbina Soto, the former Mayor of Yoro and drug trafficking partner of *Los Cachiros*, Leonel Rivera complained about Honduran law enforcement operations following the 2013 OFAC designations that targeted properties belonging to *Los Cachiros.* Urbina Soto responded that he had discussed the issue with Juan Orlando, and that Juan Orlando said: "Mayor, you should not worry about anything as long as the guys are discrete. There won't be any problems. The problem will arise when people don't exercise discretion."

Beginning in 2016, allegations regarding Tony Hernandez's drug trafficking activities started to become more prominent in media reporting in Honduras. In response, and in order to ensure that he could win the upcoming 2017 presidential election, Juan Orlando took steps to distance himself from Tony Hernandez, increase his contact with U.S. Government officials, and give the appearance that he was working closely with the U.S. Government to combat drug trafficking.

### D. 2017-2018: Juan Orlando's Re-election to a Second Presidential Term

By the time of the November 2017 election, Juan Orlando and the National Party controlled all aspects of the Honduran government, including the HNC, the CSJ, law enforcement, the military, the TSE, and the *Dirección de Lucha Contra el Narcotrafico* ("DLCN")—which is the Honduran agency charged with fighting drug trafficking and is analogous to the DEA in the United States. Juan Orlando and his allies used those organizations to corruptly facilitate his re-election and eliminate dissent regarding the fraudulent results.

Prior to the 2017 election, no president had run for re-election in Honduras because provisions of its Constitution limited individuals to serve one presidential term. In 2015, however, the CSJ—which Juan Orlando controlled—issued a ruling that declared these constitutional prohibitions on re-election inapplicable to presidential elections. The court decision, which *de facto* removed presidential term limits, was strongly contested in Honduras.

Juan Orlando and his allies then went on to fix the 2017 presidential election by using drug proceeds to corrupt the election process. In 2017, during Juan Orlando's re-election campaign, Juan Orlando's drug trafficking coconspirators again provided millions of dollars of drug money to Juan Orlando's campaign to ensure that Juan Orlando would remain in power and their massive cocaine operation would remain protected. Just like in 2013, Juan Orlando used that drug money to bribe election officials and manipulate the vote count to fraudulently win the election—including by shutting down the computer system of the agency responsible for counting votes.

Juan Orlando's strategy to fix the 2017 presidential election worked. Hondurans voted on November 26, 2017. The next morning, one of the members of the TSE reported that Salvador Nasralla, the opposition candidate, had a commanding lead with 57 percent of the votes counted.

The TSE then stopped reporting any results for a day and a half until the head of the TSE announced that approximately one million votes from rural polling centers were being manually counted at TSE's headquarters. During this process, on November 29, 2017, TSE's data center shut down, which resulted in an hours-long interruption in data entry. While the TSE publicly asserted that the shutdown was due to technical difficulties, CW-1 was told that an engineer purposefully made TSE's computer system fail to help Juan Orlando. When counting resumed, the TSE reported that Juan Orlando had won by a little over one percentage point.

By December 1, 2017, tens of thousands of protestors took to the streets to protest the election results. Juan Orlando paid a National Party official to pay gang members to incite and commit acts of violence at the protests, which would in turn justify law enforcement action, imposition of a curfew, and using force against the protestors. As a result, there were numerous violent confrontations between demonstrators and security forces, resulting in a high death toll, primarily among demonstrators. In the wake of this, human rights organizations issued general assessments about the irregularities in the election and the overall lack of faith in its results.

Following Juan Orlando's re-election, his involvement in narcotics trafficking operations continued. On June 6, 2018, the Honduran military police recovered multiple firearms, grenades, a large amount of U.S. currency, and drug ledgers from a car in which Nery López Sanabria, a Honduran drug trafficker, was a passenger. During the search of the vehicle, law enforcement recovered from hidden compartments (1) multiple firearms; (2) almost $200,000; (3) two grenades; and (4) 11 drug ledgers. Below are photographs of the cash and firearms recovered from the vehicle:




The drug ledgers included Juan Orlando's initials and Tony Hernandez's name, and detailed various large-scale cocaine transactions. For example, one of the entries, dated February 27, 2018 and labeled "Hard Work," reflects a 650-kilogram cocaine shipment involving Tony Hernandez. The entry states that (i) Tony Hernandez sent one "Nava" (Navajo airplane) with 650 kilograms of cocaine, 490 of which belonged to Tony Hernandez; (ii) Tony Hernandez charged $9,300 per kilogram; (iii) Tony Hernandez received a million dollar up-front payment; (iv) Tony Hernandez was owed a total of $4.9 million; and (v) Sanabria made a payment for information about law enforcement radar used to track airplanes used in narcotics trafficking.

Juan Orlando's initials "JOH" appear on multiple pages in several ledgers, for example:

On the left, the ledger page reads "JOH and his people," and then lists payments to Juan Orlando and his employees. "JOH" appears in at least two of the other ledgers with corresponding entries reflecting drug trafficking payments made to Juan Orlando:



Shortly after this evidence came to light, in November 2018, Tony Hernandez was charged with narcotics and weapons offenses in this District. *See United States v. Juan Antonio Hernandez Alvarado*, S2 15 Cr. 379 (PKC). Rumors began circulating that certain of Juan Orlando's drug trafficking partners intended to surrender. Juan Orlando became increasingly desperate to protect himself and began to take steps to ensure that his drug trafficking partners would not abandon him and reveal his illicit activities. In late 2018, for example, Alex Ardon received a call from Pineda, assuring Alex Ardon that Juan Orlando had confirmed there was no warrant or extradition order against Alex Ardon and affirming that Juan Orlando was still protecting him. In June 2019, CW-1 similarly met with a Honduran mayor who advised CW-1 that Juan Orlando was worried that

Alex Ardon would speak out against him and threatened to harm Alex Ardon and CW-1 if Juan Orlando was compromised.

The following year, in October 2019, Tony Hernandez was convicted following a jury trial. During trial, the Government introduced the ledgers described above, which include notations reflecting payments to "Tony Hernandez" and Juan Orlando.

### E.  2021-2022: Juan Orlando Attempts to Avoid Extradition and Prosecution in the United States

On November 28, 2021, Honduras held presidential elections.  Xiomara Castro—the wife of former Honduran President and Liberal Party member José Manuel Zelaya Rosales—from the Liberty and Refoundation ("LIBRE") party was elected as the next president of Honduras and took office on January 27, 2022.  One of the features of her campaign was a commitment to combat narcotics trafficking and permit extradition to the United States.

As described above, in private, Juan Orlando worked for years with violent drug traffickers to harm the United States, telling his co-conspirators that he wanted to "stuff the drugs up the noses of the gringos."  In public, however, Juan Orlando presented himself as a stalwart ally of the United States, supporting policies important to the current and past administrations.  In particular, Juan Orlando's public support—under diplomatic pressure from the U.S. Department of State ("DOS")—for the passage in 2012 of an amendment to the Honduran Constitution that, for the first time, authorized the extradition of Honduran nationals to the United States to face prosecution for drug trafficking charges.  Juan Orlando's public actions, which often coincided with public disclosures in Honduran investigations or the DEA's investigation implicating Juan Orlando in drug trafficking, were a transparent effort to insulate himself from prosecution in the United States. In the wake of Castro's election, Juan Orlando redoubled his efforts

### III. Background on Bonilla

Bonilla served a critical role in this scheme as a protector and violent enforcer of the conspiracy's drug trafficking activities. Bonilla was a member of the HNP for almost 30 years, eventually being appointed as chief of the HNP. He corruptly exploited these official positions to facilitate cocaine trafficking and used violence, including murder, to protect the particular group of politically connected drug traffickers he aligned with, including Juan Orlando and Tony Hernandez.

Bonilla was a member of the Honduran National Police from 1985 to 2016. During that time, he held high-ranking positions, including Regional Police Chief and, from 2012 to 2013, Chief of Police for all of Honduras. Notwithstanding his position in law enforcement, Bonilla carried out a murder for Alex Ardon and Tony Hernandez. In 2011, Alex Ardon and Tony Hernandez were working together to transport cocaine throughout Honduras to the Guatemalan border, where it was then transported through Guatemala and Mexico toward its ultimate destination in the United States. That same year, a rival Honduran drug trafficker ("Victim-1") attempted to prevent Tony Hernandez and Alex Ardon from transiting cocaine shipments toward the Guatemalan border through Santa Rita, Copán, a municipality in Honduras. When Alex Ardon reported this issue to Tony Hernandez, Tony Hernandez responded that Victim-1 needed to be killed, and that Tony Hernandez would direct Bonilla to carry out the murder. At the time, Bonilla was a Regional Chief of the HNP, with authority over the police in several departments along the Guatemalan border, including Copán. Approximately three days later, Tony Hernandez told Alex Ardon that Bonilla was monitoring Victim-1's location and planning Victim-1's murder. Soon thereafter, Tony Hernandez reported to Alex Ardon that Bonilla succeeded in having Victim-1

murdered. Tony Hernandez further told Alex Ardon that Bonilla was able to coordinate Victim-1's murder despite the security protecting Victim-1 because Bonilla had access to armed security and armored vehicles.

Bonilla also helped protect drug trafficking activities of another cooperating witness, Diaz Morales. From 2004 to 2016, Tony Hernandez, Diaz Morales, and Mario Jose Calix Hernandez—a former deputy mayor of the Gracias, Lempira municipality in Honduras, who was another member of this drug trafficking operation and a close associate of Tony Hernandez—worked together and with others to manufacture and distribute approximately 140 tons of cocaine destined for the United States.[11] During the course of his cocaine trafficking with Diaz Morales, Tony Hernandez assured Diaz Morales that Bonilla would protect their drug trafficking operation.

For example, in 2010, Tony Hernandez advised Diaz Morales that Tony Hernandez and Juan Orlando, who was then President of the HNC, helped Bonilla advance his position within the HNP, and that in return Bonilla protected their drug trafficking activities. Tony Hernandez also explained that Bonilla was highly trusted by Tony Hernandez and Juan Orlando; that Bonilla was very violent; and that Tony Hernandez and Juan Orlando entrusted Bonilla with special assignments, including murders.

Diaz Morales also understood that Bonilla protected Tony Hernandez's cocaine transport operations by, among other things, ensuring that the HNP did not stop vehicles carrying Tony

---

[11] Calix Hernandez is charged in this District in Indictment S3 15 Cr. 379 (PKC) with narcotics and firearms offenses in connection with his involvement in the drug trafficking operation described herein. The United States has requested the arrest of Calix Hernandez from the Government of Honduras.

Hernandez's cocaine and by providing sensitive information about law enforcement's aerial and maritime interdiction operations. For example, in or about 2014 and 2015, Diaz Morales coordinated cocaine shipments that arrived in Honduras by plane on clandestine airstrips and were then transited by vehicle across Honduras toward the Guatemalan border. The cocaine shipments were accompanied by armed security carrying firearms, including M-16 rifles. In the course of coordinating these shipments, Diaz Morales bribed members of the HNP, including two twins who are Bonilla's nephews and were also HNP officers, to ensure safe arrival and transport of the cocaine in Honduras. Bonilla's nephews told Diaz Morales that Tony Hernandez and Bonilla were providing the nephews with sensitive law enforcement information to ensure that the cocaine loads were not seized. Diaz Morales paid the nephews hundreds of thousands of dollars in drug proceeds for their assistance securing safe passage of Diaz Morales's cocaine. These payments are corroborated by Diaz Morales's notes, which reflect a payment to the "Double Broder," a reference to Bonilla's nephews. The nephews confirmed to Diaz Morales that they in turn paid a portion of those drug proceeds to Bonilla and Tony Hernandez.

Finally, on at least one occasion in late 2012 or early 2013, Bonilla himself, along with Mexican narcotics traffickers, received a shipment of approximately 800 to 850 kilograms of cocaine at a clandestine airstrip located in the Yoro Department. When the cocaine-laden plane landed, the Mexican traffickers arrived at the airstrip accompanied by Bonilla, along with two police patrol cars and armed officers in full police uniform. Bonilla was present when the Mexican traffickers paid CC-3, a Honduran drug trafficker who maintained the airstrip, in cash. The drugs were then loaded into the two police cars, which left with their sirens on.

## ARGUMENT

### I. Evidence of Narcotics-Related Corruption Is Admissible as Direct Evidence and Pursuant to Rule 404(b)

Juan Orlando relied on drug proceeds to fund his political campaigns, first for President of the HNC and then for President of Honduras. This also was true of Juan Orlando's co-conspirators, who relied on drug proceeds to fund political campaigns—in addition to Juan Orlando's—and bribe politicians and law enforcement officials, including Bonilla and Pineda, in order to ensure the safe passage of their cocaine and protect them from law enforcement action in Honduras. *See, e.g.*, Pineda MILs at 14-18. Thus, evidence of narcotics-related corruption in Honduras is admissible at trial, as direct evidence and pursuant to Rule 404(b), in order to establish the nature of the conspiracy and the defendants' roles in it, the relationship between co-conspirators, and the defendants' motive and intent. The Court granted similar motions *in limine* in connection with the trials of Tony Hernandez and Fuentes Ramirez. *See United States v. Juan Antonio Hernandez Alvarado*, S2 15 Cr. 379 (PKC), Dkt. No. 85, Sept. 13, 2019 Final Pretrial Conference Tr. ("Tony Hernandez FPTC Tr.") at 4-5 (finding that evidence of narcotics-related corruption constituted "direct evidence of the conspiracy," and ultimately permitting such evidence to be introduced at trial); *United States v. Geovanny Fuentes Ramirez*, S6 15 Cr. 379 (PKC), Dkt. No. 251, Feb. 12, 2021 Final Pretrial Conference Tr. ("Fuentes Ramirez FPTC") at 7-8 (ruling that evidence of narcotics-related corruption was admissible as "evidence in furtherance and during the charged conspiracy"). As described below, the reasons that supported the Court's admission of narcotics-related corruption in those cases apply with equal force here.

### A. Applicable Law

#### 1. Direct Evidence of the Defendant's Guilt

Relevant evidence "need only tend to prove the government's case," such as "evidence that adds context and dimension to the government's proof of the charges." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). Thus, background evidence is relevant and admissible, pursuant to Rule 401, where it tends "to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Id.* (internal quotation marks omitted). Evidence is also admissible if it relates to conduct that: (i) "'arose out of the same transaction or series of transactions as the charged offense'"; (ii) "'is inextricably intertwined with the evidence regarding the charged offense'"; or (iii) "'is necessary to complete the story of the crime on trial.'" *United States v. Gohari*, 227 F. Supp. 3d 313, 317 (S.D.N.Y. 2017) (quoting *United States v. Robinson*, 702 F.3d 22, 36-37 (2d Cir. 2012)). "Evidence fitting within one of these three categories is considered direct evidence and Rule 404 is not applicable." *United States v. Fiumano*, No. 14 Cr. 518, 2016 WL 1629356, at *3 (S.D.N.Y. Apr. 25, 2016).

#### 2. Other Acts Evidence Pursuant to Rule 404(b)

Under Rule 404(b), courts "may allow evidence of other acts by the defendant if the evidence is relevant to an issue at trial other than the defendant's character and if the risk of unfair prejudice does not substantially outweigh the probative value of the evidence." *United States v. Ulbricht*, 79 F. Supp. 3d 466, 479 (S.D.N.Y. 2015). "This Circuit follows the inclusionary approach, which admits all other act evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under

Rule 402." *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011) (internal quotation marks omitted). In general, evidence is admissible under Rule 404(b) "if (1) it is introduced for a proper purpose, (2) it is relevant to the charged offense, (3) its prejudicial effect does not substantially outweigh its probative value and (4) is admitted with a limiting instruction if requested." *United States v. Rutkoske*, 506 F.3d 170, 176-77 (2d Cir. 2007).

## B. Discussion

The charged drug trafficking and firearms conspiracies were heavily intertwined with, and relied upon, bribing public officials—chief among them, Juan Orlando—members of law enforcement—like Bonilla and Pineda—and other drug traffickers to ensure that their drug trafficking activities would be protected. At trial, the Government intends to offer evidence, including cooperating witness testimony, of bribes that were paid to Juan Orlando, Pineda,[12] other HNP officials, and Tony Hernandez.

The Government will present testimony from cooperating witnesses, who will detail payments, including, among others, $2 million in drug trafficking proceeds for Juan Orlando's (to become President of the HNC) and Pepe Lobo's (for President) campaigns, monthly payments to then-Honduran Congressman Tony Hernandez to ensure the safe passage of cocaine, approximately $1.5 million in to bribe politicians in Copán to support Juan Orlando, and $1 million in cash that El Chapo provided to Tony Hernandez—all of which were used to ensure that Juan Orlando obtained and stayed in power and could continue to protect the operations of this cocaine-importation operation and also ensure that its leaders were not arrested or prosecuted.=

---

[12] *See* Pineda MILs at 14-18.

Similarly, the Government expects to offer testimony about Bonilla's narcotics-related corruption. Bonilla advanced to Chief of the HNP, in part, because of support from Juan Orlando and other politicians and drug traffickers. As early as approximately 2004, Bonilla began protecting drug loads for Tony Hernandez, Diaz Morales, and Mario Calix Hernandez. Bonilla used his position in law enforcement to ensure safe passage of cocaine shipments by, for example, ensuring that the HNP did not stop vehicles carrying Tony Hernandez's cocaine and by providing sensitive information about law enforcement's aerial and maritime interdiction operations. Over time, Bonilla rose to become a trusted associate of Tony Hernandez's, so much so that, as the Government expects Alex Ardon will testify, Juan Orlando and Tony Hernandez trusted Bonilla with special assignments, including murder. The evidence of Bonilla's narcotics-related corruption primarily concerns Bonilla abusing his position within the HNP to facilitate safe passage of drugs for his coconspirators and commission of acts of violence to support the conspiracy's narcotics trafficking, and evidence that Bonilla, like Juan Orlando and Pineda, also received bribes in the form of narcotics proceeds. For example, the Government expects that Diaz Morales will testify that he paid Bonilla's nephews hundreds of thousands of dollars in drug proceeds for their assistance in securing safe passage of the conspiracy's cocaine, and that in turn the nephews paid a portion of those proceeds to Bonilla and Tony Hernandez.

Evidence of such high-level corruption involving the defendants and their co-conspirators is admissible as direct proof because it is inextricably intertwined with the charged crimes (indeed, it is an essential part of how the conspiracy operated) and is also necessary to complete the story of the crimes on trial. *See Gohari*, 227 F. Supp. 3d at 317. The evidence tends to explain, for example, why the co-conspirators came together, how they operated, and why they were able to

continue crimes of this magnitude unabated for years. The defendants' receipt of bribes is part of the charged conspiracy—for Juan Orlando, drug proceeds that fueled his campaigns, kept him in power, and ensured that he could continue to protect his co-conspirators from prosecution and extradition; for Bonilla and Pineda, the drug proceeds they received from co-conspirators were directly connected to their facilitating the safe passage of the conspiracy's cocaine and their career advancement within the HNP to positions from which they could continue to facilitate the conspiracy's operations. The millions in dollars in bribes that Juan Orlando received from various drug traffickers and other politicians are thus direct evidence of the charged conspiracy. Those bribes were used to ensure that Juan Orlando would be elected president of the HNC and, later, President of Honduras, so that he could protect his co-conspirators from prosecution. The same is true of the bribes paid to Bonilla and Pineda. Indeed, for similar reasons and as noted above, the Government sought to admit, and the Court permitted, such testimony in the trials of Tony Hernandez and Fuentes Ramirez.

In the alternative, and for similar reasons, the corruption evidence is admissible pursuant to Rule 404(b). Evidence of narcotics-related corruption illustrates the broader criminal plan of the defendants and their co-conspirators to use drug trafficking to assert power and control in Honduras, and is probative of the defendants' motives and intent in joining the conspiracy, including to gain political and police power, and to enrich themselves by receiving bribes from politicians and other drug traffickers. *See United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996) (noting that evidence is admissible under Rule 404(b) "to explain how a criminal relationship developed" and "help the jury understand the basis for the co-conspirators' relationship of mutual trust"). Thus, evidence of narcotics-related corruption involving Juan Orlando, Bonilla, Pineda,

and their co-conspirators is independently admissible under Rule 404(b) as well.

Finally, evidence of narcotics-related corruption is not unduly prejudicial relative to other proof the Government expects to offer.  The Government has alleged that Juan Orlando effectively operated Honduras as a narco-state, acquiring political power through narcotics-fueled bribes and maintaining it by allowing the free flow of drugs through Honduras.  The allegations against Bonilla include committing murder on behalf of drug dealers and abusing his position as the Chief of the HNP to support narcotics trafficking.  The narcotics-related corruption described here, including the receipt of bribes and support of narcotics traffickers in service of career advancement, is no more sensational than that conduct.  Accordingly, evidence of the full breadth of the corruption that facilitated the charged conspiracy is not barred by Rule 403.

## II. Statements Made to Cooperating Witnesses by the Defendants and Their Co-Conspirators Are Admissible Pursuant to Rules 801(d)(2)(A), 801(d)(2)(E), and 804(b)(3)

Several of the defendants' co-conspirators made statements to Alex Ardon, Leonel Rivera, Fuentes Ramirez, Fernando Chang Monroy ("Chang Monroy"), CW-1, and CW-2, regarding the drug trafficking conspiracy, their joint efforts to protect themselves and their drug trafficking operation, and their attempts to increase their power in Honduras.  As set forth below, evidence of these statements either is not hearsay, exempted under the hearsay rules, or both, and has significant probative value.  This includes certain statements made by the defendants themselves which are admissible as the defendants' own statements as to the defendant who made them—Juan Orlando, Bonilla, or Pineda—and, for the reasons set forth below, as co-conspirator statements as to the other defendants.  Certain of these statements made by unavailable co-conspirators are also independently admissible as statements against penal interest.

### A. Applicable Law

#### 1. Rule 801(d)(2)(A): Statement of a Party Opponent

The Federal Rule of Evidence 801(d)(2)(A) provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party in an individual or representative capacity." Fed. R. Evid. 801(d)(2)(A); *see also United States v. Russo*, 302 F.3d 37, 43 (2d Cir. 2002) ("Statements made by the defendant may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party."). Moreover, statements made by a defendant are admissible under this exception even if the statement, on its face, is not incriminating. *See, e.g.*, *United States v. Gotti*, 457 F. Supp. 2d 395, 401-402 (S.D.N.Y. 2006) ("Cases explaining that an admission must be contrary to a position taken by the party at trial do so to distinguish Rule 801(d)(2)(A) from the more limited exception for statements against interest under Rule 804(b)(3), which must be against the declarant's interest at the time when made.").

#### 2. Rule 801(d)(2)(E): Co-Conspirator Statements

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement pursuant to this Rule, the Court must find two facts by a preponderance of the evidence: *first*, that a conspiracy that included the declarant and the defendant existed; and *second*, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

Once a conspiracy is shown to exist, the "evidence sufficient to link another defendant to

it need not be overwhelming," and "the 'in furtherance' requirement of Rule 801(d)(2)(E) is satisfied" when, for example, "a co-conspirator is apprised of the progress of the conspiracy, or when the statements are designed to induce his assistance." *United States v. Paone*, 782 F.2d 386, 390 (2d Cir. 1986) (internal quotation marks omitted). Statements between co-conspirators that "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy," further the conspiracy, *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1988), as do statements "that apprise a co-conspirator of the progress of the conspiracy," *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987).

### 3. Rule 804(b)(3): Statements Against Interest

Under Rule 804, if a declarant is "unavailable," there is an exception to the hearsay rule where:

> (A) a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and
>
> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3). This rule "is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States*, 512 U.S. 594, 599 (1994).

To satisfy Rule 804(b)(3), the proponent of the statement must show by a preponderance of the evidence: "(1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position

would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement." *United States v. Wexler*, 522 F.3d 194, 202 (2d Cir. 2008) (internal quotation marks omitted). A declarant is unavailable for purposes of Rule 804 if, as relevant here, the declarant is "exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies," Fed. R. Evid. 804(a)(1), or "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure the declarant's attendance or testimony," *id.* 804(a)(5)(B).

"A statement will satisfy Rule 804(b)(3)'s requirement that it 'tended' to subject the declarant to criminal liability if it would be probative in a trial against the declarant." *United States v. Persico*, 645 F.3d 85, 102 (2d Cir. 2011) (internal quotation marks omitted). Moreover, a declarant need not "be aware that the incriminating statement subjects him to immediate criminal prosecution," but instead, that the "incriminating statement sufficiently tended to subject the declarant to criminal liability so that a reasonable man in his position would not have made the statement unless he believed it to be true." *United States v. Lang*, 589 F.2d 92, 97 (2d Cir. 1978) (internal quotation marks and citation omitted).

Finally, the Second Circuit requires corroboration of both the declarant's and the statement's trustworthiness. *United States v. Doyle*, 130 F.3d 523, 543-44 (2d Cir. 1997). Statements made to co-conspirators, not in response to questioning, and not made in coercive atmospheres are sufficiently reliable for purposes of this Rule. *See, e.g.*, *United States v. Matthews*, 20 F.3d 538, 546 (2d Cir. 1994).

### 4. Confrontation Clause

Where hearsay is admissible under the Federal Rules of Evidence, it may nevertheless be prohibited by the Confrontation Clause of the Sixth Amendment. "But a statement 'cannot fall within the Confrontation Clause unless its primary purpose was testimonial'—that is, unless the statement, viewed objectively in light of all the relevant circumstances, was made or procured with a primary purpose of 'creating an out-of-court substitute for trial testimony.'" *United States v. Bick*, 711 F. App'x 664, 666 (2d Cir. 2017) (summary order) (quoting *Ohio v. Clark*, 135 U.S. 2173, 2180 (2015)).

## B. Evidence of Statements Made by Co-Conspirators to Alex Ardon and CW-1 Is Admissible Under the Hearsay Rules

As described above, Alex and CW-1 trafficked significant quantities of cocaine in Honduras for more than a decade. Alex Ardon, the mayor of the Honduran municipality of El Paraiso, and CW-1 bribed law enforcement and political officials in Honduras to protect themselves and their drug loads. In 2010, after receiving a bribe from Alex Ardon, Pepe Lobo and Juan Orlando appointed CW-1 to run *Fondo Vial*, a Honduran government agency responsible for construction and maintenance. CW-1 used that role to facilitate drug trafficking: he paved roads for drug shipments; developed corrupt relationships with Juan Orlando (with whom he met and spoke with on a regular basis) and many of his co-conspirators; and awarded government contracts, at Juan Orlando's and Alex Ardon's direction, to drug traffickers so that they could launder their drug trafficking proceeds. Alex Ardon and CW-1 also participated in voter fraud at Juan Orlando's direction by bribing others with drug trafficking proceeds to manipulate the Honduran presidential elections of 2013 and 2017. The Government expects to offer testimony from Alex and CW-1

about their personal involvement in these crimes with Juan Orlando, Bonilla, Pineda, and their co-conspirators.

The Government respectfully submits that the statements made by co-conspirators to Alex and CW-1 made in furtherance of the conspiracy, including those referred to below as "Statement [number]," are admissible through the testimony of Alex and CW-1[13]:

1. Sometime between approximately 2008 and 2010, Alex Ardon introduced CW-1 to Pineda. Alex Ardon told CW-1 that Pineda was an HNP officer who provided protection for their drug trafficking loads, including by helping to transport drug proceeds from El Paraíso to other locations throughout Honduras.

2. In approximately mid-2009, Alex Ardon told CW-1 that he had provided Pepe Lobo with a bribe in exchange for Pepe Lobo's promise to appoint CW-1 as the director of *Fondo Vial*, pave the roads used for drug trafficking, and provide protection for Alex Ardon and CW-1's trafficking.

3. In approximately late 2009, Juan Orlando called Alex Ardon and asked Alex Ardon to assist with bribing three congressmen in Copán so that Juan Orlando could become the President of the HNC. Alex Ardon bribed the politicians, and Juan Orlando became the President of the HNC. Shortly thereafter, Juan Orlando told Alex Ardon that he was going to support Alex Ardon and CW-1, and that they would always have protection from law enforcement and judges such that they would not be investigated.

4. In approximately 2010, CW-1 participated in meetings with Alex Ardon and other drug traffickers, including Tony Hernandez, to discuss drug trafficking. Tony Hernandez offered to provide security and transportation for cocaine, and also said that whatever he had previously done with respect to drug trafficking, including flights used to traffic cocaine, had been approved by Juan Orlando.

5. In approximately 2010, Juan Orlando told CW-1 to thank Alex Ardon for obtaining Congressional votes that Juan Orlando needed to become President of the HNC and that, without Alex Ardon's help, it would have been very difficult for him to have been elected to that position. At various times between approximately 2012 and 2017, Juan Orlando affirmed that he would provide protection to Alex Ardon and CW-1 from

---

[13] Alex Ardon testified about certain of these statements specifically, and generally about corruption, drug trafficking, the use of firearms, and violence, during the Tony Hernandez trial. *See* Tony Hernandez Trial Tr. at 360-519. The Government seeks to admit the Statements described above, as well others like them, at trial against the defendants.

investigation and extradition in exchange for their continued support for Juan Orlando's political campaigns, which support included campaign contributions consisting of drug proceeds and the commission of election fraud.

6. In approximately 2012, CW-1 advised Juan Orlando about a $100,000 bribe that the *Cachiros* had provided to CW-1, who in his role at *Fondo Vial* controlled awarding government contracts, and told Juan Orlando that he intended to use that money to pay for "trainings" (*i.e.*, bribes) in support of Juan Orlando's campaign. Juan Orlando thanked CW-1 and told him to be careful with "those donations."

7. In approximately 2012, Juan Orlando discussed, during a meeting with Alex Ardon and CW-1, using the Honduran military to provide security against rival drug traffickers that were threatening Alex Ardon and his drug trafficking operation. Later, CW-1 thanked Juan Orlando for providing that military security, to which Juan Orlando responded, "we are on the same team."

8. In approximately 2012, Alex Ardon asked Tony Hernandez why Juan Orlando had agreed to the extradition law. In response, Tony Hernandez said that Juan Orlando had been diplomatically forced into accepting the law but that Alex Ardon would not be extradited to the United States.

9. In approximately late 2012, Alex Ardon met with Juan Orlando at Juan Orlando's house in Tegucigalpa. There, Juan Orlando asked Alex Ardon not to run for mayor again because Alex Ardon's political career was creating political issues for Juan Orlando. Juan Orlando promised that if Alex Ardon agreed not to run, CW-1 could remain in his position at *Fondo Vial* and that Alex and CW-1 would be able to continue to receive the same protection from prosecution that they enjoyed under Pepe Lobo's administration. Juan Orlando also requested financial support for the election, which Alex Ardon agreed to give, later providing approximately $1.5 million in bribes to mayors throughout Honduras in exchange for explicit promises to support Juan Orlando's presidential election campaign.

10. In approximately 2012 and 2013, CW-1 communicated with Juan Orlando through an electronic communications application approximately once or twice a week, during which Juan Orlando provided updates on polling statistics and needing political support in certain towns, where Alex Ardon ultimately paid bribes to garner such support. Juan Orlando cautioned CW-1 that they needed to be careful using their phones to communicate.

11. In approximately early 2013, CW-1 informed Juan Orlando that they needed to bribe delegates at voting tables to alter the results of certain voting stations. Juan Orlando responded, in substance, that the end justifies the means and that they would need to do whatever would have to be done to win. CW-1 specified that the money was coming from he and Alex Ardon. Juan Orlando affirmed that CW-1 and Alex Ardon should not worry because Juan Orlando would protect them.

12. In approximately 2013, El Chapo, Tony Hernandez, Alex Ardon, CW-1, and other drug traffickers held two meetings in Copán. At the first meeting, El Chapo asked Tony Hernandez for broader security assurances, as El Chapo wanted to transport cocaine across Honduras from the Nicaraguan border to the Guatemalan border. El Chapo offered Tony Hernandez $1 million to fund Juan Orlando's campaign in exchange for protection. Tony Hernandez said he would consider that offer. Shortly after the first meeting, Tony Hernandez told Alex Ardon that he had spoken to Juan Orlando, that Juan Orlando agreed to accept the $1 million from El Chapo, and that Juan Orlando said he urgently needed the money for his campaign. At the second meeting, Tony Hernandez, Alex Ardon, and CW-1 met with El Chapo again in Copán. Tony Hernandez told El Chapo that, if Juan Orlando won the election, El Chapo's shipments across Honduras would be safe and that Alex Ardon and the Valle brothers—key facilitators of El Chapo's drug shipments through the region—would also be protected from extradition. El Chapo, in turn, provided Tony Hernandez with $1 million in cash, which they counted on the table in front of Alex Ardon.

13. In approximately mid-2017, Alex Ardon and CW-1 paid Juan Orlando and Tony Hernandez approximately $500,000 to help Juan Orlando's presidential reelection campaign so that Juan Orlando could remain in power and continue to protect Alex Ardon and CW-1 from investigation and extradition. At that meeting, Tony Hernandez affirmed that, as long as he and Juan Orlando were in power, Alex Ardon and CW-1 would not be prosecuted or extradited.

14. In approximately 2017, Pineda called Alex Ardon to inquire whether Alex Ardon had surrendered to U.S. authorities. Pineda said that Juan Orlando had asked Pineda to find out and, in the process, confirmed that there would be no warrant or extradition order against Alex Ardon.

The Statements are relevant and admissible. As an initial matter, insofar as any of the Statements reflect questions, requests, or demands, such as Juan Orlando's directive to CW-1 to thank Alex Ardon for his political support described in Statement 5, they are not hearsay. *See, e.g.*, *United States v. Kuthuru*, 665 F. App'x 34, 38 (2d Cir. 2016) ("Questions and commands are ordinarily not hearsay [.]"). Moreover, as set forth below, each of the Statements is admissible for multiple independent reasons under the hearsay rules.

First, Statements 3, 5, 6, 7, 9 through 11, and 13 are each admissible against Juan Orlando as admissions of a party opponent under Rule 801(d)(2)(A) and are not unduly prejudicial under

Rule 403. The statements made by Juan Orlando himself are highly probative of the charged conduct. They directly implicate Juan Orlando in the charged conspiracy, including by describing his protection of his drug trafficker co-conspirators, his receipt of corrupt support from those co-conspirators so that he could remain in power to protect the conspiracy's drug trafficking enterprise, as well as his efforts to warn CW-1 to be careful with his use of drug money and written communications. Similarly, Pineda's inquiry on behalf of Juan Orlando into whether Alex Ardon was cooperating and promises of protection on behalf of Juan Orlando, which are reflected in Statement 14, are admissible against Pineda under Rule 801(d)(2)(A) because they are probative of the charged conduct in that they reflect Pineda's attempt, at Juan Orlando's request, to dissuade Alex Ardon from cooperating with U.S. law enforcement. *See* Pineda MILs at 12.

Second, Statements 1 through 14 are all admissible against each of Juan Orlando, Bonilla, and Pineda as co-conspirator statements under Rule 801(d)(2)(E). The Government will establish that Juan Orlando, Bonilla, Pineda, Tony Hernandez, Alex Ardon, CW-1, and El Chapo, among others, were members of the charged conspiracy. As described above, *see supra* Section II, the evidence at trial—which will include the testimony of several cooperating witnesses—will demonstrate, among other things, that Juan Orlando leveraged his political power to provide protection for drug traffickers, including Tony Hernandez, Alex Ardon, and CW-1, and that those drug traffickers helped Juan Orlando stay in power by, for example, providing significant sums of drug money to Juan Orlando's campaigns and by the commission of election fraud. The on-the-ground protection provided to those drug traffickers came from corrupt members of the HNP, such as Bonilla and Pineda, who were working at the direction of Juan Orlando, Tony Hernandez, and other members of this conspiracy. In sum, the conspiracy's success depended primarily on

ensuring that the corrupt Honduran politicians and other government officials that protected the conspiracy's leadership and drug trafficking operations remained in power. The Statements, which concern the drug trafficking activities of the conspiracy and efforts to ensure that Juan Orlando remained in power, are thus highly relevant and not unduly prejudicial, satisfying Rule 403.

The Statements were also all made by members of the conspiracy in order to traffic cocaine or to leverage that drug trafficking to maintain and enhance Juan Orlando's political influence in Honduras, which in turn served to enrich the members of the conspiracy and protect them from prosecution. For example, Statements 1 and 4 involve explicit discussions about the conspiracy's cocaine shipments, including discussions about the protection that Pineda provided for those drug loads (Statement 1) and Tony Hernandez's offer to provide transportation and protection sanctioned by Juan Orlando (Statement 4). These conversations, which identified members of the charged conspiracy who could be trusted and relied upon to carry on their drug trafficking activities, were clearly in furtherance of the charged drug trafficking conspiracy. *See, e.g.*, *United States v. Delligatti*, No. 15 Cr. 491, 2018 WL 1033242, at *6 (S.D.N.Y. Feb. 23, 2018) ("[S]tatements that convey information about others in the same organized crime syndicate are considered to be during and in furtherance of a conspiracy"). Statements 2, 3, 5, 6, 7 through 9, and 11 through 14 similarly involve conduct that is equally at the core the charged conspiracy: requests for funds and political support, including through the commission of election fraud, in exchange for promises of protection and other assistance in furtherance of the charged conspiracy. *See United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999) (finding "in furtherance" requirement met where statements "induce a coconspirator's assistance"); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989) (finding "in furtherance" requirement met where

statements "prompt the listener to respond in a way that facilitates the carrying out of criminal activity" (internal quotation marks omitted)). Statements 6 and 10, which include warnings from Juan Orlando about being careful with the use of drug money (Statement 6) and when communicating via text message (Statement 10) reflect clear efforts to conceal the illegal activity of the conspiracy. *See United States v. Delva*, No. 12 Cr. 802, 2014 WL 4460360, at *10 (S.D.N.Y. Sept. 10, 2014) ("Statements made to hide the existence or activities of a conspiracy are made in furtherance of it."). And Statement 14 includes an attempt by Juan Orlando and Pineda to dissuade Alex Ardon from surrendering to U.S. law enforcement, including by reaffirming Juan Orlando's guarantees of protection. Accordingly, each of the Statements is properly admitted as a co-conspirator statement under Rule 801(d)(2)(E).

Third, Statements 4, 8, 12, and 13, which include statements made by Tony Hernandez, are also admissible against Juan Orlando, Bonilla, and Pineda as statements against Tony Hernandez's penal interest. These statements, on their face, expose Tony Hernandez to criminal liability because they directly reference his involvement in drug trafficking and bribery. These statements also bear the requisite indicia of reliability because they were made between co-conspirators engaged in joint criminal conduct, *i.e.*, "to a person whom the declarant believe[d] was an ally," rather than to "curry favor with authorities." *See United States v. Saget*, 77 F.3d 223, 230 (2d Cir. 2004); *United States v. Williams*, 506 F.3d 151, 155 (2d Cir. 2007). Witnesses other than CW-1—such as Alex Ardon and Giovanni Rodriguez[14]—will also testify about facts corroborating the reliability of Statements 4, 8, 12, and 13. For example, Alex Ardon will testify that he sold cocaine

---

[14] Rodriguez is identified as "CW-1" in the Pineda MILs.

with Tony Hernandez, and Giovanni Rodriguez will testify that he provided information to Pineda to protect Tony Hernandez and Alex Ardon's cocaine shipments. In addition, the evidence admitted at Tony Hernandez's 2019 trial before this Court (after which he was convicted of drug trafficking and firearms charges) further corroborate the reliability of these statements. Finally, Tony Hernandez is unavailable to testify. The Government is confirming with Tony Hernandez's counsel, but expects that he likely would invoke his Fifth Amendment right against self-incrimination if called to testify, and therefore is unavailable to testify. *See, e.g.*, *United States v. Rivera*, 60 Fed. App'x. 854, 858 (2d Cir. 2003) (finding that a co-defendant who pled guilty was unavailable for purposes of Rule 804(b)(3) because "[t]he Fifth Amendment privilege is not lost upon a plea of guilty when a reasonable risk of incrimination on other charges still exists"). Accordingly, Statements 4, 8, 12, and 13 are also independently admissible under Rule 804(b)(3).

Finally, the Statements are admissible under Rule 403. The Statements are not unduly prejudicial because they relate to the same drug-fueled political corruption that is at the core of the drug-trafficking conspiracy charged in Count One, and described above. *See supra* Section II. Accordingly, and for the reasons set forth above, the Government seeks an *in limine* ruling that the Statements are admissible at trial.

### C. Video Recordings Made by Leonel Rivera Containing Statements by Co-conspirators Are Admissible

As part of his cooperation with the DEA, Leonel Rivera surreptitiously recorded meetings with other Honduran officials and drug traffickers. The Government seeks to admit two of those recordings—dated in or about February and March 2014—which are described more fully below (collectively, the "Recordings"). The statements made during these recordings, which include videos of Tony Hernandez and other of the defendants' co-conspirators, are probative of the

existence of the drug trafficking conspiracy charged in Count One of the Indictment because they reflect direct evidence of the existence and methods of the drug trafficking conspiracy, including Tony Hernandez assisting the *Cachiros* in evading OFAC sanctions and Urbina Soto explicitly referencing statements by Juan Orlando effectively authorizing drug trafficking. For the reasons set forth below, the recorded statements during the February and March 2014 meetings are admissible under the hearsay rules and not unduly prejudicial under Rule 403.

### 1. Relevant Facts

#### i. The February 2014 Recording[15]

On February 6, 2014, Leonel Rivera recorded a meeting with Tony Hernandez at a restaurant in Tegucigalpa, just months after Tony Hernandez was elected to the HNC and Juan Orlando became President of Honduras. The Government anticipates that Leonel Rivera will testify at trial, as he did at the Tony Hernandez trial, *see* Tony Hernandez Trial Tr. at 784-86, that immediately in advance of the meeting, Leonel Rivera provided Tony Hernandez's representative, an attorney named Oscar Ramirez, $50,000 for Tony Hernandez. During the meeting, which the Government anticipates Leonel Rivera will testify was set up and attended by Juan Avila Meza, a corrupt HNP official, the men discussed Juan Orlando's administration making payments to the *Cachiros* through government contracts issued to a front company by Pepe Lobo's

---

[15] An English translation of the recording, which was originally in Spanish, is attached as Exhibit C. This translation, as well as the underlying recording, were admitted into evidence at the Tony Hernandez trial. (*See* Tony Hernandez Trial Tr. at 779-80, 789-797).

administration.[16]  Due to concerns about U.S. law enforcement scrutiny arising from existing OFAC sanctions against the *Cachiros*, Tony Hernandez agreed to issue payments in the name of another front company; requested copies of the prior contracts so he could facilitate the payments; and said he would seek assistance in obtaining the contracts from several Honduran officials, including Roberto Ordóñez, and CW-1.  After further conversation, Tony Hernandez said "we can start working together on that as soon as possible."  (Ex. C at 9:10).

### ii.    The March 2014 Recording[17]

On March 8, 2014, Leonel Rivera recorded a meeting with Urbina Soto, described above, *see supra* Section II.  The video of the recorded meeting shows Leonel Rivera handing Urbina Soto a cash bribe of approximately $9,000.  Urbina Soto responded that he had discussed the issue with Juan Orlando, and that Juan Orlando said: "Mayor, you should not worry about anything as long as the guys are discrete.  There won't be any problems.  There will be a problem when there is no secrecy."  (Ex. D at 4:32-34).

## 2.  Discussion

The Recordings are admissible against the defendants as co-conspirator statements, pursuant to Rule 801(d)(2)(E), and as statements against penal interest, pursuant to Rule 804(b)(3). The Government expects that testimony from Leonel Rivera, Alex Ardon, and CW-1, among

---

[16] Avila Meza pled guilty in April 2018 to conspiracy to import cocaine.  *See United States v. Avila Meza*, 15 Cr. 174 (LGS).  In March 2021, Judge Schofield sentenced Avila Meza to 12 years' imprisonment.

[17] An English translation of the recording, which was originally in Spanish, is attached as Exhibit D.

others, will show that each of the individuals in the Recordings—Tony Hernandez, Avila Meza, and Urbina Soto—was a member of the drug trafficking conspiracy with which the defendants are charged. These individuals are drug traffickers, HNP officials, and/or politicians who, as described above and in this Section, furthered the conspiracy through, *inter alia*, paying or accepting bribes and abusing their positions to facilitate the safe passage of drugs. The statements during the meetings, described above, are probative of the existence of the drug trafficking conspiracy involving Juan Orlando, Bonilla, and Pineda, because they reflect coordinated efforts by Juan Orlando's administration to facilitate financial assistance to drug traffickers (Tony Hernandez, Avila Meza) and/or convey that Juan Orlando sanctioned drug trafficking, with the implicit understanding of paying bribes to ensure that protection (Urbina Soto)Accordingly, the statements contained in the Recordings are admissible as co-conspirator statements pursuant to Rule 801(d)(2)(E).

The statements in the Recordings also are admissible pursuant to Rule 804(b)(3) as statements against penal interest. In both Recordings, the participants are talking about supporting drug dealers, either overly or by failing to take action. During the February 2014 meeting, for example Tony Hernandez discussed with Leonel Rivera forming front companies to help the *Cachiros* avoid OFAC sanctions; and in the March 2014 meeting, Urbina Soto explicitly stated that he had confirmed with Juan Orlando that, in effect, no Honduran law enforcement action would be taken against the *Cachiros* provided they remained "discrete." The statements in the Recordings plainly are against the penal interest of the individuals who made them. Further underscoring that point is that certain of the statements made in these recordings have been used in prosecutions of those individuals; including, for example, the admission of the February 2014

recording at trial against Tony Hernandez. The statements contained in the Recordings also bear the requisite indicia of reliability because they were made between co-conspirators engaged in joint criminal conduct, *i.e.*, "to a person whom the declarant believe[d] was an ally," *see Saget*, 77 F.3d at 230, specifically, Leonel Rivera, who in the declarants' view remained a co-conspirator and one of the most prominent narcotics traffickers in Honduras, not a witness cooperating with the DEA. Moreover, as with Tony Hernandez, the Government is confirming with counsel, but expects that he likely would invoke his Fifth Amendment right against self-incrimination if called to testify, and therefore is unavailable to testify. Accordingly, and for the reasons stated above, the statements in the Recordings, and the recordings themselves, have significant probative value and are admissible under the hearsay rules.

Finally, the Recordings are admissible under Rule 403. The statements contained in the Recordings are not unduly prejudicial because they relate to the bribe-based political corruption that is central to the operations of the drug-trafficking conspiracy charged in Count One, and described extensively above. Accordingly, for all of these reasons, the Government seeks an *in limine* ruling that the Recordings are admissible at trial.

### D. Evidence of Statements by Honduran Drug Trafficker Co-conspirators to Leonel Rivera Is Admissible Under the Hearsay Rules

The Government will seek to offer statements made to Leonel Rivera by CC-3, a Honduran drug trafficker who maintained a clandestine airstrip in the Yoro Department of Honduras, and Avila Meza, a corrupt HNP official, about Bonilla's involvement in drug trafficking. The Government respectfully submits that the statements of co-conspirators to Leonel Rivera in furtherance of their conspiracy, including the following referred to below as "Statement

[number]," are admissible through testimony of Leonel Rivera, pursuant to Rules 801(d)(2)(E) and 804(b)(3):

1. In or about late 2012 or early 2013, CC-3 told Leonel Rivera that, approximately a week prior, CC-3 had received a shipment of approximately 800 to 850 kilograms of cocaine to be delivered to a clandestine airstrip that CC-3 maintained. CC-3 previously had agreed to provide the drugs to Mexican narcotics traffickers who, in turn, would pay CC-3 approximately 25% of the value of the cocaine shipment in exchange for use of the airstrip. CC-3 told Leonel Rivera that, when the plane landed, the Mexican buyers arrived at the airstrip accompanied by Bonilla, along with two police patrol cars and armed officers in full police uniform. CC-3 told Leonel Rivera that the Mexican buyers, with Bonilla standing next to them, paid CC-3 in cash, then loaded the drugs into the two police cars, which CC-3 said then left with their sirens on. CC-3 expressed to Leonel Rivera that CC-3 was surprised Bonilla had been present for this transaction, given his position in the HNP.

2. In or about early 2013, Avila Meza told Leonel Rivera that Bonilla was providing protection for the drug trafficking activities of Diaz Morales.

Both Statements are admissible as co-conspirator statements under Rule 801(d)(2)(E). CC-3, who maintained a clandestine airstrip where CC-3 received small planes filled with cocaine, made Statement 1 to Leonel Rivera while the two were at the airstrip, which Leonel Rivera was scouting in anticipation of receiving a shipment of cocaine, at a time when Leonel Rivera was one of the largest drug traffickers in Honduras, working with his co-conspirators to move massive quantities of cocaine through Honduras toward the United States. That context in which Statement 1 was made—that Leonel Rivera, one of the largest drug traffickers in Honduras, was scouting a location to receive cocaine—bears the requisite indicia of reliability. Statement 2 also was made by a co-conspirator in furtherance of the drug trafficking conspiracy. Avila Meza was a corrupt member of the HNP who abused his position to facilitate the drug trafficking activities of certain of the defendants' co-conspirators, including Tony Hernandez and Fuentes Ramirez, *see, e.g.*, Fuentes Ramirez Trial Tr. at 348 (describing Avila Meza's involvement in drug trafficking and

violence).  His statement to Leonel Rivera (Statement 2), one of drug traffickers for whom Avila Meza provided security, was made about another of their drug trafficking partners—Diaz Morales—and Bonilla's role in protecting Diaz Morales' drug shipments.  Accordingly, the Statements are admissible as co-conspirator statements pursuant to Rule 801(d)(2)(E).

The Statements also are admissible pursuant to Rule 804(b)(3).  CC-3 admitted in Statement 1 that he facilitated the shipment of hundreds of kilograms of cocaine in exchange for a cut of the profits; moreover, Statement 1 was made in the context of CC-3 brokering another such deal with Leonel Rivera.  With respect to Statement-2, the fact that Avila Meza, a member of the HNP, knew that Bonilla—another member of the HNP who, at or about that time, was or had been the Chief of the HNP—was protecting drug shipments for Diaz Morales is highly inculpatory because it demonstrates Avila Meza's knowledge of drug trafficking and, at best, failure to stop or report that—of course, as set forth above, Avila Meza himself was deeply involved in the drug trafficking conspiracy.  Moreover, the Government expects that Diaz Morales will testify that he was receiving protection for drug shipments from Bonilla Valladares's nephews, who told Diaz Morales that they were receiving sensitive law enforcement information from Bonilla Valladares and Tony Hernandez, further underscoring the reliability of Statement-2.  Both declarants also are unavailable.  The Government anticipates that Leonel Rivera will testify that CC-3 is deceased, and therefore is unavailable.  *See* Fed. R. Evid. 804(a)(4).  As set forth above, the Government is confirming with counsel, but expects that if he were called to testify that Avila Meza would invoke his Fifth Amendment right against self-incrimination.

Finally, the Statements are not unduly prejudicial under Rule 403.  The Government anticipates offering testimony, described above, that Bonilla, at one point the Chief of the HNP,

committed a murder at Tony Hernandez's direction to eliminate a drug trafficking rival. That Bonilla would receive a cocaine shipment and protect the drug trafficking activities of Diaz Morales is no more prejudicial than that evidence. Accordingly, and for the reasons set forth above, the Government respectfully submits that the Statements are relevant and admissible.

### E. Evidence of Statements by Fuentes Ramirez to Leonel Rivera Is Admissible Under the Hearsay Rules

The Government will also seek to offer certain statements made by Fuentes Ramirez to Leonel Rivera in or about September 2020 as statements against Fuentes Ramirez's penal interest. After Fuentes Ramirez's arrest in Miami in March 2020, he was transferred to the Metropolitan Correctional Center (the "MCC") in New York. In or about September 2020, Fuentes Ramirez approached and talked to Leonel Rivera, who was also incarcerated at the MCC at that time, on two occasions. The Government respectfully submits that the statements Fuentes Ramirez made against his own penal interest, including the following referred to below as "Statement [number]," are admissible through testimony of Leonel Rivera:

1. In or about September 2020, Fuentes Ramirez told Leonel Rivera that Fuentes Ramirez believed he was in prison because of Juan Orlando; that, prior to his arrest, Fuentes Ramirez and Commissioner Martinez had met with a military official who said he was sent by Juan Orlando and who told them to sell one of Fuentes Ramirez's companies to Juan Orlando so that Juan Orlando could use it to launder, among other things, millions of dollars in drug-trafficking proceeds.

2. In or about September 2020, Fuentes Ramirez told Leonel Rivera that Fuentes Ramirez met with Juan Orlando on two occasions when Juan Orlando was running for reelection, paid Juan Orlando approximately 450,000 lempiras both times and, in exchange, received Juan Orlando's assurance that Juan Orlando would support Fuentes Ramirez with anything Fuentes Ramirez needed.

Leonel Rivera's testimony about these conversations was admitted at Fuentes Ramirez's trial, *see* Fuentes Ramirez Trial Tr. at 387-89, and the statements below are relevant and admissible

here as well, albeit as statements against penal interest under Rule 804(d)(3) and not admissions of a party opponent.

Fuentes Ramirez made the Statements to Leonel Rivera while he was incarcerated at the MCC awaiting trial on the same drug trafficking and firearms charges with which the defendants are charged. His admissions to Leonel Rivera about plans to launder millions of dollars in drug trafficking proceeds and bribing Juan Orlando plainly were plainly against his penal interest— indeed, the Government subsequently offered the Statements at trial against Fuentes Ramirez.

The Statements also bear the requisite indicia or reliability because they are corroborated. As set forth herein, *see supra* Section II, Comisionado Martinez was a corrupt HNP official who supported Fuentes Ramirez's drug trafficking, exchanged electronic communications with Geovanny Gutierrez, and is pictured with Juan Orlando in images on Gutierrez's iCloud account. This other, extrinsic evidence corroborates Statement 1, indicating the trustworthiness of Fuentes Ramirez's claim that he and Martinez had met with an official sent on Juan Orlando's behalf. Similarly, Statement 2 is corroborated both by Jose Sanchez's testimony about the two bribes Fuentes Ramirez paid to Juan Orlando in or about 2013 and 2014 and by the Waze data contained on the Fuentes Ramirez Cellphone, *see infra* Section VII.C.2, which reflects that Fuentes Ramirez traveled to the Presidential Palace on two occasions in 2019. This data adds credence to Statement 2 and Fuentes Ramirez's general statement about bribing Juan Orlando in exchange for protection.

Finally, the Statements are highly probative of the crime charged and, especially in light of the extensive testimony about bribes paid by drug traffickers to Juan Orlando, not unduly prejudicial. Fuentes Ramirez is unavailable, as his counsel has confirmed that he would invoke

his Fifth Amendment right against self-incrimination if called to testify. Accordingly, the Statements should be admitted under Rule 804(b)(3).

### F. Evidence of Statements Made by Tony Hernandez to Diaz Morales Is Admissible Under the Hearsay Rules

As set forth above, Diaz Morales was a long-standing member of this conspiracy who worked closely with Tony Hernandez in shipping cocaine through Honduras toward the United States, and also in funneling drug proceeds to Juan Orlando's campaigns dating back to at least as early as approximately 2005, when Juan Orlando was a Congressman. Between 2004 and 2016, with the protection of Juan Orlando, Diaz Morales and Tony Hernandez transported approximately 140,000 kilograms of cocaine through Honduras. *See supra* Section II. The Government respectfully requested *in limine* rulings on several statements made to Diaz Morales in the Pineda MILs. *See* Pineda MILs at 26-28. In addition to those statements, which relate largely to Pineda's role in the drug trafficking conspiracy, the Government respectfully submits that the following statements made to Diaz Morales by co-conspirators in furtherance of the conspiracy, including the following referred to below as "Statement [number],"—each of which was admitted at the Tony Hernandez trial—are admissible pursuant to Rules 801(d)(2)(E) and 804(b)(3) through the testimony of Diaz Morales:

1. In or about 2009, before giving a $100,000 bribe to the National Party, Tony Hernandez told Diaz Morales that if payment was made to the National Party campaign, and that if Pepe Lobo were elected President and Juan Orlando re-elected to the HNC, Tony Hernandez and Diaz Morales would have greater access to information from the HNP and Honduran army. Tony Hernandez explained further that receiving better information would prevent their cocaine shipments from being seized. Thereafter, in or about July 2010, at a birthday party for Diaz Morales, Tony Hernandez confirmed that he had received the $100,000 payment from Diaz Morales and that through better connections in Tegucigalpa, Tony Hernandez had obtained a lot of information to prevent the seizure of cocaine being trafficked through Honduras.

2.  In or about July 2010, at the same birthday party for Diaz Morales, Tony Hernandez told Diaz Morales that Bonilla was highly trusted by Tony Hernandez and Juan Orlando, that he could be placed in important positions, and that Bonilla was very violent and could commit murders.

3.  In or about July 2010, at the same birthday party for Diaz Morales, Tony Hernandez told Diaz Morales that it was very unlikely that an extradition law would be approved in Honduras and, even if extradition were approved as a result of pressure by the United States, there were internal processes at the CSJ that could be used to delay extradition. In response, Diaz Morales offered Tony Hernandez bribes to support Juan Orlando's campaign for the HNC. Tony Hernandez told Diaz Morales that he would let Diaz Morales know if he needed such bribe.

4.  In or about June 2010, at a birthday party for Tony Hernandez, Tony Hernandez told Diaz Morales that Juan Orlando would be the next National Party candidate for President. In response, Diaz Morales said that Juan Orlando was too young to become President and should wait. Tony Hernandez responded that very few people knew Juan Orlando would run, including Diaz Morales and a few members of the Hernandez family. Tony Hernandez further stated that, if Juan Orlando were to be elected President, there would be no issues with trafficking cocaine through Honduras.

Each of the Statements was admitted through Diaz Morales's testimony at the Tony Hernandez trial. *See* Tony Hernandez Trial Tr. at 203-209. There, the Statements were the defendant's (Tony Hernandez's) statements and admissible as statements of a party opponent, pursuant to 801(d)(2)(A). Here, the Statements are admissible as co-conspirator statements pursuant to Rule 801(d)(2)(E) and as statements against penal interest pursuant to Rule 804(d)(3).

As established at that trial and described above, Tony Hernandez and Diaz Morales were key members of the same drug trafficking conspiracy with which the defendants are charged. It also is plain that the Statements were made in furtherance of the drug trafficking conspiracy. The Statements, as a whole, describe the core conduct alleged as part of the conspiracy: drug-fueled bribes paid to Juan Orlando, and others, to ensure that members of the conspiracy could act with impunity and their cocaine could flow through Honduras without incident. Beyond that, the Statements contain information conveying co-conspirators' roles in the conspiracy and the means

by which the conspiracy is protected.  For example, in Statement 2, Tony Hernandez indicated that Bonilla, one of their co-conspirators, could be placed important positions, *i.e.*, positions of authority in the HNP, and also could protect the conspiracy through violence.   Similarly, Statements 3 and 4 also contain important information about continuing the conspiracy, in that information about the status of the extradition law and also Juan Orlando's position of power was important for members of the conspiracy to, among other things, plan future drug shipments. Moreover, that the Statements were made at birthday parties for Tony Hernandez and Diaz Morales underscores the closeness of the relationship between Tony Hernandez and Diaz Morales, demonstrating the interdependence of different members of the conspiracy who held different roles.   Accordingly, the Statements are admissible against the defendants as co-conspirator statements.

The Statements also are admissible as against penal interest.  Largely for the reasons stated above, Tony Hernandez's statements to Diaz Morales, and Diaz Morales's responses, are both highly inculpatory and carry indicia of reliability.  The Statements are an apt encapsulation of the conspiracy's aim to co-opt the political power of Honduras in service of facilitating drug trafficking for personal financial gain and to amass power.  They discuss bribes (Statement 1), police corruption (Statement 2), impunity through opposition to extradition (Statement 3), and the overall contention that Juan Orlando's election as President would make Honduras safe for drug trafficking (Statement 4).  And, as noted above, the circumstances of the Statements—at birthday parties for Tony Hernandez and Diaz Morales during back-to-back months in 2010—are highly probative of their reliability.  As set forth elsewhere herein,  the Government is confirming with Tony Hernandez's counsel, but believes that he likely would assert his Fifth Amendment right

against self-incrimination if called to testify, and therefore is unavailable for purposes of Rule 804(d)(3).

Finally, the Statements are not unduly prejudicial under Rule 403. Statements 1, 3, and 4 are similar in nature to other testimony described herein concerning bribes, corruption, and drug trafficking. Statement 2 is no more prejudicial with respect to Bonilla than the evidence that, more than just possessing a capacity for violence, he actually participated in the murder of Victim-1. Accordingly, and for the reasons set forth above, the Government respectfully submits that the Statements are relevant and admissible.

### G. Evidence of Statements by CC-1 to CW-2 Is Admissible Under the Hearsay Rules

In 2013, in the months leading up to the Honduran presidential election, CC-1—a high-ranking member of the Sinaloa Cartel—paid two $500,000 cash bribes to CC-2 to support Juan Orlando's presidential campaign. Later, the day before the presidential election, CW-2 provided $300,000 to another individual, who later told CC-1 that the money was to be used as a final push to support Juan Orlando's and Ricardo Alvarez's election.

The Government respectfully submits that these statements by Mexico-based co-conspirators in furtherance of the conspiracy, including the following referred to below as "Statement [number]," are admissible as co-conspirator statements through testimony of CW-2:

1. In or about 2013, prior to the Honduran presidential election, CC-2 told CC-1 that the candidate (Juan Orlando) needed some "collaboration." Thereafter, CC-1 told CW-2 that he gave $500,000 to CC-2.

2. In or about 2013, prior to the Honduran presidential election, CC-1 told CW-2 that CC-1 delivered another $500,000 to CC-2.

3. In or about 2013, approximately the day prior to the Honduran presidential election, CW-2 gave approximately $300,00 to an individual who later told CC-1 that the money was to be used as a last push for the President and Vice President elections.

The Government will establish through CW-2's testimony that CW-2 and CC-1 were members of the Sinaloa Cartel who coordinated cocaine shipments through Honduras, into Mexico, and then into the United States with other members of this conspiracy. The Government expects that CW-2 will explain that he worked for CC-1, as a conduit between the Sinaloa Cartel leadership and the Honduran drug trafficker coconspirators. For example, and among others, CW-2 trafficked cocaine with Fredy Renan Najera Montoya, a Honduran Congressman and drug trafficker.[18]

In or about April 2012, CC-1 and other drug traffickers had a meeting, after which CW-2 learned that there were zones at the Port of Cortez into which drugs could be shipped, and that an individual referred to as CC-2 was the second-in-command at the port. Approximately several days later, CC-1 was introduced to CC-2. As described in Statement 1, approximately six months before the Honduran presidential election, CC-2 told CC-1 that the candidate, a reference to Juan Orlando, needed some "collaboration." Thereafter, CC-1 had two meetings with CC-2, both at a gas station, during which CC-1 provided CC-2 with two $500,000 payments—to be provided to Juan Orlando. On the first occasion, CC-1 instructed CC-4, who worked for CC-1, to bring $500,000 to CC-1. When CC-4 arrived with the $500,000, CW-2 helped count the money. CC-1 and CC-4 left and, when CC-1 returned, CC-1 told CW-2 that the $500,000 had been provided to CC-2. Months later, as described in Statement 2, CW-2 took CC-1 to the gas station, whereupon

---

[18] Fredy Najera pled guilty in February 2020 to participating in a cocaine-importation conspiracy, use and possession of firearms in connection with that conspiracy, and participating in a conspiracy to use and carry machineguns and destructive devices in connection with the drug conspiracy. *See United States v. Najera*, 15 Cr. 378 (PGG). In October 2022, Judge Gardephe sentenced Najera principally to 360 months' imprisonment, a $10,00,000 fine, and $39,000,000 in forfeiture.

CW-2 observed CC-1 enter another vehicle; when CC-1 returned, he told CW-2 that he had paid CC-2 the $500,000. Finally, closer to the election, CW-2 provided approximately $300,000 to another individual, which, as described in Statement 3, CC-1 later told CW-2 was used to support Juan Orlando's and Ricard Alvarez's campaign for President and Vice President.

The Statements each relate to bribes paid to Juan Orlando and clearly were in furtherance of the drug trafficking conspiracy, so that members of the Sinaloa Cartel could purchase protection for cocaine transiting through Honduras to Mexico, and ultimately to the United States. Accordingly, the Statements are admissible under the hearsay rules and not unduly prejudicial under Rule 403, in light of the substantial testimony described herein about large bribes consisting of drug trafficking proceeds being paid to Juan Orlando.

### H. Evidence of Statements by Tony Hernandez and a Honduran Drug Trafficker Coconspirator to Chang Monroy Is Admissible Under the Hearsay Rules

In 2009 and 2010, Luis Antonio Santos Tobar, a/k/a "Tonito Santos"—one of Tony Hernandez's Honduran drug-trafficking co-conspirators—helped introduce Chang Monroy, a former large-scale Guatemalan drug trafficker who worked with Tony Hernandez for years, to Tony Hernandez during an in-person meeting where they discussed large drug shipments and weapons. Following the meeting, Santos Tobar provided additional detail to Chang Monroy regarding the roles played by Tony Hernandez and Rodolfo Alfredo Vergara Bonifante, a/k/a "El Cinco," a Colombian drug-trafficking associate of Tony Hernandez. Tony Hernandez's and Santos Tobar's statements to Chang Monroy are admissible against the defendants under Rule 801(d)(2)(E) and Rule 804(b)(3). The Government respectfully submits that statements of co-conspirators in furtherance of the conspiracy, including the following referred to below as "Statement [number]," are admissible through testimony of Chang Monroy:

1. In approximately 2009, Tony Hernandez told Chang Monroy that he had approximately two tons of cocaine in Honduras at the time, and that he also had access to a cocaine laboratory in Colombia where he could mark kilograms with unique stamps to identify his drugs, including but not limited to a "TH" stamp. Tony Hernandez said that he had strong relationships with Honduran politicians as well as the military and police, particularly in the Copán Department. Tony Hernandez also offered Chang Monroy weapons, including grenade launchers, machineguns, and an FN Herstal .57 pistol that he referred to in Spanish as a "cop killer."

2. On several occasions between approximately 2009 and 2010, Santos Tobar told Chang Monroy that the cocaine they were working to distribute and import was supplied by Tony Hernandez and Vergara Bonifante.

Tony Hernandez's statement to Chang Monroy (Statement 1) was admitted at Tony Hernandez's trial, albeit as the then-defendant's statements, as was Statement 2. *See* Tony Hernandez Trial Tr. at 914-922. The Statements are relevant and admissible here as well, both pursuant to Rule 801(d)(2)(E) and Rule 804(b)(3).

The Government will establish that Tony Hernandez and Santos Tobar were drug-trafficking co-conspirators through, among other testimony, the testimony of Chang Monroy. Chang Monry began working with Tony Hernandez in approximately 2009 and, for years later, trafficked cocaine—including cocaine stamped "TH"—with Tony Hernandez and others, including Santos Tobar. Chang Monroy will also describe his travel with Santos Tobar to inspect some of Tony Hernandez's cocaine. Strengthening the evidence of the existence of this conspiracy, Diaz Morales will describe collaborating with Santos Tobar and his associates on drug shipments, including during the period when Tony Hernandez was helping to protect Diaz Morales's shipments.

Tony Hernandez also made Statement 1 in furtherance of the conspiracy. In Statement 1, Tony Hernandez spoke in explicit detail about drug trafficking, stating that he had access to a

cocaine laboratory and used a "TH" cocaine stamp to mark his drugs, which is corroborated by other testimony and wire interceptions, discussed *infra* Section VI. Tony Hernandez also spoke about other core features of the conspiracy—strong relationships with Honduran politicians, police, and military, to assist in facilitating drug trafficking, and the use of firearms in doing so. Statement 1 was made in furtherance of the conspiracy because, among other reasons, information about access to a laboratory in Colombia and Tony Hernandez's strong relationships with Honduran officials, including in a particular geographic area, assisted the defendants' co-conspirators in trafficking drugs. Moreover, that Tony Hernandez used unique stamps, like "TH," to identify his drugs also was vital information to his co-conspirators, as it allowed them to identify (and confirm) the source of the drugs they were trafficking. Statement 2 furthered the conspiracy because Santos Tobar's subsequent confirmations to Chang Monroy that Tony Hernandez and Vergara Bonifante were participating in the conspiracy by supplying cocaine provided Chang Monroy with information about the status of the conspiracy and the roles played by other members, and assured Chang Monroy that they were still operating with a politically powerful coconspirator capable of protecting them and the cocaine.

The Statements are also admissible under Rule 804(b)(3). As set forth above, Tony Hernandez's counsel has confirmed that he would invoke his Fifth Amendment right against self-incrimination were he called to testify. Based on information from a cooperating witness, the Government believes that Santos Tobar is unavailable under Rule 804 because he is deceased. *See* Fed. R. Evid. 804(a)(4). The Statements both are highly inculpatory, relating to Tony Hernandez's own drug trafficking (Statement 1) and Santos Tobar's statement to Chang Monroy about engaging in drug trafficking with Tony Hernandez and Vergara Bonifante (Statement 2). Moreover, in

Statement 2, Santos Tobar also relayed mutually inculpatory information about his prior experience in drug trafficking with Tony Hernandez. *See United States v. Stratton*, 779 F.2d 820, 828-29 (2d Cir. 1985) (finding that declarant's statements regarding "history of the conspiracy" were "overwhelmingly contrary to his penal interests"). Tony Hernandez and Santos Tobar said these things in private to a co-conspirator at the time, Chang Monroy, without any indication that the Statements would be disclosed to authorities. *See id.* at 829 (finding statements sufficiently reliable where declarant "believed he was talking to co-conspirators rather than the authorities" and "therefore had no reason to lie or attempt to curry favor").

Accordingly, the Statements are admissible both as co-conspirator statements and statements against penal interest.

### III.  Evidence of Statements by Honduran Officials, Including Juan Orlando, and Fuentes Ramirez to Jose Sanchez Is Admissible

Multiple Honduran officials, including Juan Orlando, made statements in the presence of Jose Sanchez regarding the drug-trafficking conspiracy, including Juan Orlando protecting Fuentes Ramirez from prosecution and engaging in drug trafficking with him. Evidence of statements to or in the presence of Jose Sanchez is either not hearsay, exempted under the hearsay rules, or both, and has significant probative value for the reasons set forth above in Section. The Court granted a similar motion *in limine* in connection with the Fuentes Ramirez trial, *see* Fuentes Ramirez FPTC at 8-12, and Jose Sanchez's testimony relevant to this motion was admitted at trial, *see* Fuentes Ramirez Trial Tr. at 691-704.

The Government respectfully submits that statements of co-conspirators in furtherance of the conspiracy, including the following referred to below as "Statement [number]," are

admissible through testimony of Jose Sanchez, who personally witnessed each of the Statements when they were made:

1. In approximately 2011 or 2012, Julio Cesar Barahona told Fuentes Ramirez that he would intervene with law enforcement to prevent Fuentes Ramirez from being investigated or arrested for operating his cocaine laboratory.

2. In approximately 2013, Juan Orlando solicited large campaign contributions from a particular individual and described participating in widespread public corruption within the Honduran government, including embezzling United States aid through non-governmental organizations and stealing from Honduras's social security fund.

3. In approximately 2013 and 2014, Juan Orlando promised to protect Fuentes Ramirez from arrest and extradition; promised to help Fuentes Ramirez transport cocaine with the assistance of Honduras's armed forces; said he wanted to use Fuentes Ramirez's cocaine laboratory because of its proximity to a key shipping port; directed Fuentes Ramirez to coordinate with Tony Hernandez with respect to drug-trafficking activities; and stated that he was going to "stuff the drugs right up the noses of the gringos." In response, Fuentes Ramirez agreed to the arrangement with Juan Orlando.

The Statements by Honduran officials, including Juan Orlando, and Fuentes Ramirez to Jose Sanchez are relevant and admissible under the hearsay rules or are not hearsay. First, Statements 2 and 3 are plainly admissible against Juan Orlando as a party admission under Rule 801(d)(2)(A); additionally, insofar as Statement 3 reflects requests and instructions, it is not hearsay and therefore admissible. *See, e.g.*, *United States v. Kuthuru*, 665 F. App'x 34, 38 (2d Cir. 2016) ("Questions and commands are ordinarily not hearsay . . . ."). Second, as discussed in more detail below, Statement 1 and Fuentes Ramirez's portion of Statement 3 are admissible pursuant to Rule 804(b)(3), and all the Statements are admissible pursuant to Rule 804(d)(2)(E). Finally, these statements are not unduly prejudicial. Thus, admitting the Statements would not violate Rule 403.

All of the Statements are admissible under Rule 801(d)(2)(E). The Government will establish by a preponderance of the evidence that Juan Orlando, Fuentes Ramirez, and Barahona

were members of the charged drug-trafficking conspiracy, as well as a related conspiracy to leverage drug trafficking to maintain and enhance their political power and the control of the National Party in Honduras. *See United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002) ("[T]he objective of the joint venture that justifies deeming the speaker as the agent of the defendant need not be criminal at all."). As described above, Juan Orlando's campaigns, first for President of the HNC and then to be President of Honduras, were supported by drug traffickers and narcotics proceeds. Multiple cooperating witnesses will testify that by the time Juan Orlando made Statements 2 and 3, Juan Orlando had solicited and accepted millions of dollars of bribes from other members of this conspiracy—including drug traffickers Alex Ardon, Leonel Rivera, and El Chapo—to finance his political campaigns and facilitate the importation of huge quantities of cocaine into the United States. Juan Orlando did this with the help of the HNP, including Bonilla and Pineda, who facilitated the safe passage of drug shipments through Honduras and benefited both financially and with respect to career advancement by doing so. This and other evidence also establishes that Juan Orlando, Fuentes Ramirez, and Barahona were co-conspirators in the charged conspiracy. For example, the Government expects that Jose Sanchez will testify, as Jose Sanchez did at Fuentes Ramirez's trial, that Barahona was sent by Juan Orlando, who then was the President of the HNC, to ensure Fuentes Ramirez would escape prosecution. (Fuentes Ramirez Trial Tr. at 679-82). In turn, Fuentes Ramirez paid Barahona for his promise to protect Fuentes Ramirez's drug trafficking activities. Similarly, as set forth above, on at least two occasions Fuentes Ramirez paid bribes directly to Juan Orlando in exchange for protection of his cocaine laboratory and drug trafficking activities, and on one of those occasions explicitly directed Fuentes Ramirez to work with Tony Hernandez.

The statements at issue were also in furtherance of the conspiracy. Statements 1 and 3 by Barahona and Juan Orlando involved promises of protection that were designed to allow Fuentes Ramirez to continue his drug trafficking activities in exchange for bribes and, in the case of Statement 3, providing Juan Orlando with invaluable access to Fuentes Ramirez's cocaine laboratory. In Statement 3, Juan Orlando conveyed a request to Fuentes Ramirez to coordinate with Tony Hernandez on their future drug-trafficking activities. *See United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999) (finding "in furtherance" requirement met where statements "induce a coconspirator's assistance"); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989) (finding "in furtherance" requirement met where statements "prompt the listener to respond in a way that facilitates the carrying out of criminal activity" (internal quotation marks omitted)); *United States v. Persico*, 832 F.2d 705, 716 (2d Cir. 1987) (finding "in furtherance" requirement met where statements "solicited [listener's] assistance"). Statement 2 by Juan Orlando also furthered the conspiracy because it spurred assistance from

Statements 1 and the portion of Statement 3 made by Fuentes Ramirez are also separately admissible as statements against penal interest under Rule 804(b0(3) because the declarants are unavailable and the statements are against their penal interests, insofar as their remarks would be probative of their guilt were they to stand trial on drug trafficking or money laundering charges.

To start, Barahona is located abroad, outside the Government's subpoena power, and would likely invoke the Fifth Amendment if he were questioned under oath regarding these activities. *See United States v. Savoca*, 335 F. Supp. 2d 385, 390 (S.D.N.Y. 2004) ("[T]he 'unavailability' component is established by the fact that [the declarant] is expected to invoke his Fifth Amendment privilege."); *see also United States v. Ortiz*, 962 F. Supp. 2d 565, 573 (S.D.N.Y. 2013) (finding

witness unavailable where located outside United States at time of trial). Fuentes Ramirez was convicted at trial and sentenced to life imprisonment, and likely would invoke the Fifth Amendment if he were questioned under oath about his activities described above. As is clear from the substance of the Statements, which concern drug trafficking and corruption, Statements 1 and 3 are against the penal interest of the declarants because the Statements "implicated [the declarants] in [illegal] activity," and each declarant "would not have made the statement unless he believed it to be true." *United States v. Dupree*, 870 F.3d 62, 80 (2d Cir. 2017); *see also Ortiz*, 962 F. Supp. 2d at 573.

The statements are also sufficiently reliable because they were made in confidence in the presence of a benefactor of the National Party, Jose Sanchez, and, with respect to Statements 1 and 3, Fuentes Ramirez, "person[s] whom the declarant[s] believe[d] [was] an ally, not a law enforcement official." *United States v. Sasso*, 59 F.3d 341, 349 (2d Cir. 1995). Moreover, Statements 1 and 3 do not reflect "effort to shift blame" away from the declarants, and there is no possibility that they would have uttered these remarks "solely to curry favor with the authorities." *Id.*; *see also Dupree*, 870 F.3d at 80 (finding sufficient trustworthiness where declarant spoke to perceived ally and did not attempt to shift blame). Finally, because Juan Orlando and Barahona occupied high positions in the Honduran government, these declarants had "no need to attempt to impress [their] subordinate[]," Fuentes Ramirez and/or Jose Sanchez, by making "self-incriminating statements without a foundation of truth." *United States v. Gupta*, 747 F.3d 111, 129 (2d Cir. 2014). Therefore, Statements 1 and 3 also are admissible under Rule 804(b)(3).

Finally, the Statements are not unduly prejudicial under Rule 403. The Statements relate to Juan Orlando's protecting Fuentes Ramirez from prosecution, facilitating and protecting

Fuentes Ramirez's drug trafficking, and accepting bribes from Fuentes Ramirez. This is similar to the partnerships Juan Orlando maintained with other drug traffickers, such as Alex Ardon and CW-1, and no more prejudicial than his collaboration with those co-conspirators, as described above.

## IV. Evidence of Bonilla's Participation in A Drug-Related Murder Is Admissible

In approximately July 2011, at Tony Hernandez's direction, Bonilla murdered Victim-1. *See supra* Section III. Evidence of Bonilla's role in Vicitm-1's murder—which will be offered through the testimony of Alex Ardon, who spoke with Tony Hernandez about Bonilla's involvement in the murder—constitutes direct evidence of the crimes charged in the Indictment and is admissible. The Court admitted evidence of the murder of Victim-1, as well as that of another murder, at the Tony Hernandez trial. *See* Tony Hernandez FPTC Tr. at 8; Tony Hernandez Trial Tr. at 427-429, 436-443. Similarly, the Court also admitted evidence of five drug-related murders at the Fuentes Ramirez trial, for similar reasons also articulated in the Government's motions *in limine*. *See* Fuentes Ramirez FPTC Tr. at 16-18; Fuentes Ramirez Trial Tr. at 302-03, 342, 347-52, 364-65. Evidence of Bonilla's participation in a drug-related murder is admissible here for substantially similar reasons, set forth below.

As described above, in or about 2011, a rival Honduran drug trafficker named Victim-1 refused to allow Alex Ardon and his co-conspirators to use certain land to transit their cocaine. In response, Alex Ardon spoke to Tony Hernandez, who said that he would direct Bonilla Valladares to carry out the murder. Days later, Tony Hernandez reported back to Ardon that Bonilla Valladares was monitoring Victim-1's location and planning to murder him, and days after that, Tony Hernandez reported back to Alex Ardon that the murder was a success. Tony Hernandez

further explained to Alex Ardon that Bonilla Valladares was able to carry out the murder because of his own access to armed security and armored vehicles.

As an initial matter, Tony Hernandez's statements to Alex Ardon about Bonilla Valladares's involvement in Victim-1's murder are admissible as co-conspirator statements under Rule 801(d)(2)(E), for similar reasons to those explained above. Tony Hernandez's statements to Alex Ardon that he would enlist Bonilla Valladares to carry out the murder of one of Alex Ardon's rival drug traffickers, and that Bonilla Valladares carried out the murder, were clearly made in furtherance of the charged conspiracy, as they were meant to ensure that Alex Ardon and his co-conspirators carry on with their drug trafficking activities. Tony Hernandez's statements to Alex Ardon about Bonilla Valladares's involvement in the murder, which themselves implicate Tony Hernandez in the murder, are also separately admissible as statements against Tony Hernandez's penal interest under Rule 804(b)(3). Indeed, they bear the requisite indicia of reliability, given that Vicitm-1 was in fact murdered and Bonilla Valladares publicly provided a false exculpatory statement about his role in investigating the murder. And as described above, Tony Hernandez is unavailable to testify.

Evidence of Bonilla's role in Victim-1's murder is probative of his participation in the drug-trafficking conspiracy charged in Count One. This is particularly so because, as the Government expects Alex Ardon will testify, Bonilla committed this murder at Tony Hernandez's direction in order to eliminate a rival drug trafficker, illustrating the lengths to which Bonilla would go to assist his drug trafficking partners and political benefactors. *See Ulbricht*, 79 F. Supp. 3d at 485 (reasoning that "murder-for-hire evidence is directly relevant to proving the elements of the narcotics offense" because "the context of each of the alleged solicitations involves narcotics

dealers"); *see also United States v. Gadsden*, 300 F. App'x 108, 110 (2d Cir. 2008) (affirming admission of "past violent acts" because "such evidence helps to explain the mutual trust that existed between coconspirators" (internal quotation marks omitted)); *United States v. Arrington*, 867 F.2d 122, 130 (2d Cir. 1989) (reasoning that a "plot to silence witnesses further[ed] the goals" of a narcotics conspiracy); *United States v. Barret*, No. 10 Cr. 809, 2011 WL 6704862, at *5 (E.D.N.Y. Dec. 21, 2011) ("Acts of violence are frequently deemed to have been performed as overt acts in furtherance of, and thus are direct evidence of, an alleged drug distribution conspiracy."). Bonilla's participation in this murder with drug-trafficking co-conspirators therefore has significant probative value with respect to Count One.

Evidence related to the murder is also direct proof of Bonilla's use and possession of firearms, including automatic weapons and destructive devices, in furtherance of the drug-trafficking conspiracy, as charged in Count Two, and his conspiracy with others to use firearms in furtherance of the drug trafficking conspiracy, as charged in Count Three. *See United States v. Abdalla*, No. 14 Cr. 716, 2018 WL 5819799, at *4 (S.D.N.Y. Oct. 23, 2018) (reasoning that murder in furtherance of uncharged drug-trafficking conduct was "probative of the Defendants' opportunity to conspire to use and carry firearms in furtherance of drug crimes"); *see also United States v. Barnes*, 560 F. App'x 36, 41 (2d Cir. 2014) (reasoning that defendant's admission "about killing a rival drug dealer" was admissible "as direct proof of the charged crack conspiracy and of [defendant's] firearms possession related to that conspiracy").

Bonilla's participation in this murder is also relevant to the broader conspiracy, and to Juan Orlando in particular. Bonilla's participation in a drug-related murder at Tony Hernandez's behest, to protect Tony Hernandez's and Alex Ardon's drug profits and kill a rival, further demonstrates

the relationships among the co-conspirators in the charged conspiracy. Indeed, as described above, the Government expects that Diaz Morales will testify about statements Tony Hernandez made, making clear that Tony Hernandez and Juan Orlando helped Bonilla advance his position within the HNP specifically so that Bonilla would protect their drug trafficking activities, and entrusted Bonilla with special assignments, including murders—like that of Victim-1. *See supra* III.

Finally, evidence related to this murder is admissible under Rule 403. "Since 'drug trafficking is often attended by violence,' courts in this Circuit repeatedly have declined to preclude evidence of violence in narcotics cases." *Ulbricht*, 79 F. Supp. 3d at 487 (quoting *United States v. Sureff*, 15 F.3d 225, 228-29 (2d Cir. 1994) and collecting cases); *see also Abdalla*, 2018 WL 5819799, at *4; *United States v. Baptiste*, 264 F.3d 578, 590 (5th Cir. 2001) ("Although the evidence of the murders and attempted murders was prejudicial, it was necessary for the jury to understand the brutal nature of the conspiracy."); *United States v. Chin*, 83 F.3d 83, 88 (4th Cir. 1996) (finding no Rule 403 violation where "the murder demonstrated the extent to which [defendant] was willing to go, or at least threaten, in order to ensure that the heroin deal and any future deals went smoothly"). In ruling that no unfair prejudice in admitting evidence of Victim-1's murder at Tony Hernandez's trial, the Court noted that "more thought is required as to the 403 balancing . . . but it's a circumstance where the probative value of how the conspiracy operated, at least according to the [G]overnment, is important to the [G]overnment's ability to prove its case and is not substantially outweighed by the danger of unfair prejudice or another consideration." Tony Hernandez FPTC Tr. at 8. As the Court concluded, evidence of Victim-1's murder (as well as that of a second murder admitted at that trial) "fits in with the picture of the conspiracy being presented here." *Id.* So too is the case. In short, Bonilla's role in eliminating a drug trafficking

rival at Tony Hernandez's direction is core to the allegations here, as it demonstrates how corruption and violence went hand-in-hand to support preferred drug traffickers, like Tony Hernandez and Diaz Morales. The Rule 403 balancing with respect to this murder must also take into account the fact that the evidence in this case relates to extremely violent drug trafficking carried out by heavily armed criminals that were members of the charged conspiracy. For example, Rivera Maradiaga has admitted to causing 78 murders in connection with his cooperation agreement and Alex Ardon to 49. Particularly in that context, evidence related to Bonilla's participation in Victim-1's murder is not unduly prejudicial.

## V. Evidence of Drug Ledgers Seized from Nery López Sanabria Is Admissible

As described above, on June 6, 2018, Honduran military police recovered multiple firearms, grenades, a large amount of U.S. currency, and drug ledgers from a car in which Nery López Sanabria, a Honduran drug trafficker, was a passenger. The Government will seek to offer the content of the drugs ledgers, which are admissible for the truth of the matters asserted as co-conspirator statements under Rule 801(d)(2)(E).

The drug ledgers included Juan Orlando's initials and Tony Hernandez's name, and detailed various large-scale cocaine transactions. For example, one of the entries, dated February 27, 2018 and labeled "Hard Work," reflects a 650-kilogram cocaine shipment involving Tony Hernandez. The entry states that (i) Tony Hernandez sent one "Nava" (Navajo airplane) with 650 kilograms of cocaine, 490 of which belonged to Tony Hernandez; (ii) Tony Hernandez charged $9,300 per kilogram; (iii) Tony Hernandez received a million-dollar up-front payment; (iv) Tony Hernandez was owed a total of $4.9 million; and (v) Sanabria made a payment for information about law enforcement radar used to track airplanes used in narcotics trafficking.

Juan Orlando's initials "JOH" also appear on multiple pages in several ledgers. As described above, one ledger page reads "JOH and his people," and then lists payments to Juan Orlando and his employees. "JOH" appears in at least two of the other ledgers with corresponding entries reflecting drug trafficking payments made to Juan Orlando. Leonel Rivera will testify that Sanabria—who he called Nery—was another member of the conspiracy (which included, among others, Juan Orlando, Bonilla, and Pineda) with whom Leonel Rivera helped to receive cocaine shipments by plane. Diaz Morales also participated in drug trafficking with Sanabria, who he called Wilson.

These ledgers, found hidden in a car carrying Sanabria, reflect the conspiratorial relationship amongst this group as well as acts taken in furtherance of that conspiracy. The ledgers reflect payments made to both Tony Hernandez and Juan Orlando. And they detail a particular drug load weighing 650 kilograms trafficked using a "Nava" airplane. Regarding this load, the ledgers reflect that Tony Hernandez owned 490 of the 6580 kilograms, that Tony Hernandez charged $9,300 per kilogram; that Tony Hernandez received a million-dollar up-front payment; and that Tony Hernandez was owed a total of $4.9 million. The author of these ledgers transcribed these facts so that the facts could be easily recollected in the future and an accounting of drug trafficking could be maintained to ensure all were being paid what was expected. The content of a drug ledgers, maintained for the purpose of keeping an accounting of drug activities, is self-evidently made in furtherance of the conspiracy. *See United States v. Ashraf*, 320 F. App'x 26, 28 (2d Cir. 2009) (upholding the admission of drug ledgers as co-conspirator statements).

Moreover, that the Government may not be able to identify the precise author of the statements in the ledgers is immaterial, as "knowledge of the declarant's identity is not a

requirement [for the admissible of co-conspirator statements] as long as the trial court can reach a determination that the declarant is a member of the conspiracy." *United States v. Amato*, No. 03 Cr. 1382 (NGG), 2006 WL 1720402, at *3 (E.D.N.Y. June 20, 2006); *see also Zaken v. Boerer*, 964 F.2d 1319, 1323-24 (2d Cir. 1992) (distinguishing foundation for co-conspirator statement, which does not require knowledge of declarant's identity, from agent statement under Fed. R. Civ. P. 801(d)(2)(D), which does); *United States v. Ayala*, 601 F.3d 256, 268 (4th Cir. 2010) (recognizing that "it is not necessary for the offering party to identify the declarant by name"). Here, the jury may logically infer that Sanabria (a drug trafficker and member of the conspiracy) was carrying his own ledgers in a car in which he was also carrying firearms and apparent drug proceeds. As such, the ledgers are admissible as co-conspirator statements under Rule 801(d)(2)(E), even if the Government cannot identify the precise declarant within the conspiracy who authored the ledgers.

## VI. Electronic Communications by Central American Drug Traffickers Regarding Cocaine Bearing the Stamp "TH" Are Admissible

In June 2016, two drug traffickers in Central America ("CC-5" and "CC-6") exchanged electronic communications via the messaging application BlackBerry Messenger, which included discussion of purchasing hundreds of kilograms of cocaine in San Pedro Sula, Honduras, that were marked with a stamp bearing Tony Hernandez's initials, "TH." During the exchange, the traffickers exchanged a photograph of one of the "TH"-stamped kilograms. As described below and in the Pineda MILs, these messages, which plainly expose CC-5 and CC-6 to criminal liability, are admissible both as statements against penal interest under Rule 804(b)(3) and, separately, as co-conspirator statements under Rule 801(d)(2), because they reflect a discussion between purchasers of cocaine who were part of the same distribution chain as the members of the charged

conspiracy. These communications were admitted at the Tony Hernandez trial, *see* Tony Hernandez Trial Tr. at 149-50, 521-25, and the image of the "TH"-stamped kilogram also was admitted at the Fuentes Ramirez trial, *see* Fuentes Ramirez Trial Tr. at 993-994.

## A. Relevant Facts

On June 23, 2016, CC-5 and CC-6 exchanged communications for approximately five hours via BlackBerry Messenger, which were lawfully intercepted pursuant to a Title III wiretap in another District. (*See* Ex. E).[19] CC-5 and CC-6 exchanged these messages using Blackberry accounts subscribed in aliases rather than their names. During the exchange, CC-5 used a device that was connected to a Honduran telecommunications service provider, and CC-6's device was connected to a Guatemalan provider.

In sum, the interceptions revealed that CC-5 was late paying CC-6 in connection with a prior drug deal because CC-6's "client" had not paid him yet. (Ex. E at 2: 5). CC-5 was seeking to collect on the debt so that he could buy more cocaine. (*Id.* at 2:1, 7). He sent CC-6 a photograph of one of the kilograms, which bore the defendant's "TH" stamp:

---

[19] Exhibit E, which was also attached to the Pineda MILs and was previously admitted as GX 402 at Tony Hernandez's trial in October 2019, includes references to "Male-1" and "Male-2." For the Court's reference, CC-5 is "Male-1" and CC-6 is "Male-2."



(*Id.* at 2:3).  CC-5 indicated that the "TH"-stamped kilograms were in San Pedro Sula, Honduras ("SPS").  (*Id.* at 2:7).  He also expressed concern that he and CC-6 had "never made them," *i.e.*, the group supplying the cocaine, "wait like this."  (*Id.* at 4:3).  CC-5 and CC-6 agreed that they had to handle communications with the supplier carefully, and CC-5 indicated that "[h]e is the only one who gives me" cocaine.  (*Id.* at 5:11).  Throughout the day, CC-5 continued to pressure CC-6 for payment so that he could "pick up 200 things," *i.e.*, kilograms of cocaine, from "the picture that I sent."  (*Id.* at 6:1-3).  CC-6 urged caution because he had no money to pay for the drugs at that time.  (*E.g.*, *id.* at 6:13).

**B.  Discussion**

As set forth in the Pineda MILs, the electronic messages between CC-5 and CC-6 are admissible pursuant to Rule 804(b)(3).   Both CC-5 and CC-6 are unavailable because they are located outside the United States and likely would invoke the Fifth Amendment with respect to these communications if given the opportunity.[20]  The entire exchange is against the penal interests

---

[20] The prosecution team responsible for the wiretap yielding the messages believes that it has identified one of the participants in the exchange but not the other, has charged the individual in question, and is seeking to effect his provisional arrest in order to pursue extradition.   The

of CC-5 and CC-6 because they discussed past, present, and future drug dealings using fairly explicit language whose import was made even clearer by the transmission of the photograph of a kilogram of cocaine.

There are also sufficient indicia of reliability related to the BlackBerry messages. As described above, multiple witnesses will testify about Tony Hernandez's use of a cocaine stamp bearing his initials. *See, e.g.*, Tony Hernandez Trial Tr. at 150-52, 195-200, 203-04, 206-07, 209, 919-21. CC-5 and CC-6 exchanged messages in private using BlackBerry accounts subscribed in aliases rather than their names, reflecting their deliberate attempts to avoid detection when discussing their criminal conduct. CC-5 and CC-6 also had no reason to lie. To the contrary, CC-6 stated explicitly, "between you and I we always tell each other what the reality is." (Ex. E at 4:1). CC-6 explained that he was owed money, which caused his delinquency in payment to CC-5, and CC-5 informed CC-6 that his supplier of the "TH"-stamped cocaine was pressuring him to consummate a deal. CC-5 and CC-6 did not appear to seek to shift blame for their criminal conduct, and they had no reason to suspect that the communications were being intercepted such that it might be in their interests to puff regarding their connections or the "TH"-stamped cocaine they sought to distribute. Thus, the BlackBerry communications are admissible pursuant to Rule 804(b)(3).

The messages are also direct proof of the charged conspiracy and satisfy Rule 401. As described above and in the Pineda MILs, cooperating witnesses will testify that that Juan Orlando,

---

identification of this individual, however, has no bearing on his unavailability because he remains at large in an unknown location in Central America.

Bonilla, and Pineda provided various levels of protection for Tony Hernandez's drug trafficking, including his trafficking with Alex Ardon. The messages, on their face, reflect that the "TH"-stamped cocaine—which was sold by the charged conspiracy—was still being sold in or around 2016 (*i.e.*, within the time frame charged in the Indictment). The messages also reflect that CC-5 and CC-6 were downstream purchasers of cocaine, further corroborating the testimony of multiple cooperating witnesses who will describe that Tony Hernandez—who worked with Juan Orlando, Bonilla, Pineda, and others—was in fact distributing cocaine that was leaving Honduras.

The evidence at trial will also establish that, in or around the summer of 2016, around the time the messages were exchanged, Juan Orlando, Bonilla, and Pineda continued to play a crucial role in protecting Tony Hernandez's drug operation. For example, Juan Orlando continued seeking help from Alex Ardon and CW-1 to ensure he won reelection in 2017, in exchange for Juan Orlando's continued protection of their drug trafficking activity, which included Alex Ardon's direct dealings with Tony Hernandez. And in approximately 2015, Bonilla and Tony Hernandez were providing sensitive law enforcement information to Bonilla's nephews to ensure that cocaine loads belonging to Diaz Morales were not seized during transit through Honduras. As such, the messages serve as direct proof of the conspiracy that Government will be required to prove at trial.

The messages are also separately admissible as co-conspirator statements. The content of the messages demonstrates that CC-5 and CC-6 were downstream purchasers of Tony Hernandez's cocaine, through a connection to an intermediary they had worked with previously, and were therefore part of the same conspiracy and distribution chain as Tony Hernandez and his co-conspirators, including Juan Orlando, Bonilla, and Pineda. *See United States v. Hernandez*, 521 F. App'x 14, 17 (2d Cir. 2013) ("Preliminary questions of this nature are to be resolved by the

court by a preponderance of the evidence, which may include reference to the hearsay statements themselves so long as other independent evidence corroborates the fact of the defendant's participation in the conspiracy."); *see also United States v. Parker*, 554 F.3d 230, 238 (2d Cir. 2009) (describing a "chain conspiracy" in which "[o]ne who establishes a continuing business of selling drugs in large, wholesale quantities knows that the success of his selling business depends on the ability of his customers to resell to others, who in turn will resell to still others, until the product ultimately is sold to retail consumers"). CC-5 and CC-6 used the Spanish slang "Cuas" to address each other, which reflected friendship and familiarity, and the communications demonstrated that CC-5 and CC-6 had worked together previously in drug trafficking. (*See* Ex. E at 2:11 ("[Y]ou are always so punctual in paying me.")). The communications also indicated that CC-XX and CC-YY had worked previously with the person offering them Tony Hernandez's "TH"-stamped cocaine, and that CC-5 and CC-6 considered the relationship to be sensitive. (*Id.* at 5:11 ("He is the only one who gives to me . . . .")); *id.* at 4:3 ("Since this had never happened that they had to wait like this[.]"); *id.* at 4:11-13 ("I answer him as soon as soon as he sends a message because if not he might get the wrong idea, that I lost something you know. It is my responsibility to keep him posted," // "Yes, Cuas, I'm the same.")).

Finally, the communications between CC-5 and CC-6 were in furtherance of the conspiracy because they related to prior criminal dealings, a pending drug debt owed by CC-6 and his "client," and ongoing drug negotiations between CC-5, CC-6, and downstream suppliers of Tony Hernandez's cocaine related to the purchase of hundreds of the "TH"-stamped kilograms in Honduras. *E.g.*, *United States v. Maldonado-Rivera*, 922 F.2d 934, 959 (2d Cir. 1990) (finding "in furtherance" requirement met where statements "seek to induce a coconspirator's assistance,

or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy"). Therefore, the messages set forth in Exhibit E are admissible pursuant to Rule 801(d)(2)(E).

## VII. Evidence from Co-Conspirators' Electronic Devices and Accounts Is Admissible

The Government seeks to admit evidence from (i) two cellphones seized from Tony Hernandez in connection with his November 23, 2018 arrest; (ii) one cellphone seized from Fuentes Ramirez in connection with his March 1, 2020 arrest; and (iii) a laptop provided by CW-1 in connection with his surrender to law enforcement in or around September 2019. These devices contain, *inter alia*, photographs of co-conspirators; photographs depicting firearms, including machineguns, handguns, and destructive devices; and photographs depicting large quantities of U.S. currency. For the reasons set forth below, the Government respectfully submits that this evidence is admissible against the defendants as direct evidence and pursuant to Rules 801(d)(2)(E) and/or 804(b)(3). In the alternative, the electronic evidence described below is also separately admissible under Rule 404(b) to establish the defendants' knowledge, intent, opportunity, and/or lack of opportunity or mistake.

### A. Electronic Evidence from Tony Hernandez's Cellphones, Including Photographs of Machineguns, Is Admissible as Direct Evidence

For substantially the reasons set forth in the Pineda MILs, *see* Pineda MILs at 34-39, electronic evidence seized from Tony Hernandez's cellphones also is admissible against Juan Orlando and Bonilla. This includes, among other things, certain evidence from Tony Hernandez's cellphones admitted during his trial in October 2019, *see id.* at 34-36, including an image (pictured below) of what was identified at trial as a CZ Scorpion Evo, a machinegun, inscribed with Juan

Orlando Hernandez's name: "JUAN ORLANDO HERNANDEZ, PRESIDENTE DE LA REPUBLICA HONDURAS."



As described above, the evidence at trial will establish that members of the charged conspiracy, including Bonilla and Pineda, used and carried firearms—including military-grade weapons, such as those in the images stored on Tony Hernandez's cellphones—during and in furtherance of the conspiracy's narcotics trafficking. Indeed, the trial testimony will establish that both Bonilla and Pineda provided heavily armed security through the HNP for co-conspirator drug shipments and that Pineda also carried an assault rifle with him to drug trafficking meetings, including the 2013 meeting in which El Chapo offered Tony Hernandez a $1 million bribe for Juan Orlando's presidential campaign in exchange for continued protection of cocaine loads in Honduras. Moreover, CW-1 will testify that Juan Orlando and Tony Hernandez had an armed security team with them during the mid-2017 meeting at which Alex Ardon and CW-1 paid Juan Orlando and Tony Hernandez approximately $500,000 to ensure continued protection from investigation and arrest.

Evidence from Tony Hernandez's cellphones, including the photographs of machineguns depicted above, is admissible as direct evidence against each of the defendants.[21]  The fact that Tony Hernandez, a central member of this conspiracy, had photographs of firearms is probative of each of the defendants' guilt, particularly as it pertains to Counts Two and Three of the Indictment, which charge them with using and carrying firearms during and in relation to the drug trafficking crime charged in Count One (or aiding and abetting the same), and conspiring with Tony Hernandez and others to commit firearms offenses and with using and carrying firearms, respectively, because it demonstrates that members of the conspiracy in fact had, and had access to, the types of firearms that they are charged with carrying and using in connection with the charged drug conspiracy.   Moreover, with respect to aiding and abetting under Count Two, it is enough that a defendant facilitated drug shipments to or through a location where they knew that another participant would take steps to protect the shipment using a machinegun or destructive device, or otherwise facilitated the drug trafficking offense charged in Count One knowing that an accomplice would be using or carrying a gun in relation to that crime.  *See Rosemond v. United States*, 572 U.S. 65, 77-78 (2014) ("An active participant in a drug transaction has the intent needed to aid and abet a § 924(c) violation when he knows that one of his confederates will carry a gun. In such a case, the accomplice has decided to join in the criminal venture, and share in its benefits, with full awareness of its scope—that the plan calls not just for a drug sale, but for an armed one."). Accordingly, Juan Orlando, who may physically have been removed from the firearms and actual

---

[21] Absent a stipulation as to the authenticity of the contents of the cellphones, the Government will seek to offer this evidence through a law enforcement witness who performed the extractions of the data from the cellphones.

drug shipments, remains liable under an aiding and abetting theory, because he knowingly facilitated—by protecting certain drug traffickers from prosecution and extradition to the United States—these drug shipments with knowledge that drug traffickers, like Tony Hernandez, Alex Ardon, and Diaz Morales, among others, would use firearms to protect their cocaine shipments. The same is true of Bonilla and Pineda though, for both, the Government expects to offer testimony about their use and carrying of firearms and personal involvement in protecting drug loads, including with the use of firearms.

Similarly, photographs of firearms are direct evidence of the drug trafficking crime charged in Count One. Firearms constitute a tool of the drug trade. *See, e.g.*, *United States v. Muniz*, 60 F.3d 65, 71 (2d Cir. 1995) ("[T]here are innumerable precedents of this court approving the admission of guns in narcotics cases as tools of the trade."); *United States v. Vegas*, 27 F.3d 773, 778 (2d Cir. 1994) ("[T]his Court has repeatedly approved the admission of firearms as evidence of narcotics conspiracies, because drug dealers commonly keep firearms on their premises as tools of the trade." (internal quotation marks omitted)). That is particularly true where, as here, members of the conspiracy, including Bonilla and Pineda, used heavy weaponry, including machineguns and destructive devices, to protect drug shipments, and Juan Orlando used heavily armed security to protect them during meetings relating to drug trafficking. Thus, evidence that Tony Hernandez, an accomplice and a member of the charged conspiracy, had photographs of the types of guns used to facilitate the drug trafficking crime charged in Count One corroborates that testimony and constitutes direct proof. Moreover, photographs are not "statements," and thus, the rule against hearsay provides no basis for their exclusion. *United States v. Moskowitz*, 581 F.2d 14, 21 (2d Cir. 1978) ("The sketch itself, as distinguished from . . . statements about it, need not fit an exception

to the rule against hearsay because it is not a 'statement' and therefore can no more be 'hearsay' than a photograph identified by a witness."). Rather, the issue is whether the photographs and videos were relevant and, therefore, admissible. The photographs on Tony Hernandez cellphones plainly meet that standard.

Moreover, multiple cooperating witnesses are expected to testify concerning the possession of firearms by Pineda, Tony Hernandez, and their co-conspirators in connection with the charged crimes, including the same types of firearms depicted in Tony Hernandez's cellphones. Thus, photographs of firearms on Tony Hernandez's cellphones directly corroborate that testimony. *See, e.g.*, *United States v. Riccardi*, 620 F. App'x 11, 15 (2d Cir. 2015) ("The district court acted well within its discretion in concluding that the guns and ammunition were not being offered to prove propensity but, rather, as direct evidence of the charged robbery crimes as well as corroboration for [a cooperating witness's] testimony that Riccardi had provided him with the guns he used to commit the robbery.").

Finally, admitting the photographs would not be unduly prejudicial. Evidence of Tony Hernandez's possession of firearms does "not involve conduct any more sensational or disturbing than the crimes with which" the defendants have been charged. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). The Government expects that multiple witnesses will testify about the use of the very same types of firearms to protect drug shipments for the conspiracy, as well as about the murder of Victim-1, which was directed by Tony Hernandez and carried out by Bonilla. Accordingly, this evidence is not barred by Rule 403.

**B. Electronic Evidence from CW-1's Laptop, Including Spreadsheets Cataloguing Political Bribes, Is Admissible as Direct Evidence**

Following his arrest, CW-1 provided the Government with a cellphone and computer which he used for years in connection with his crimes. Those devices include the following categories of evidence, which the Government will seek to offer at trial:

1. Contact information for Juan Orlando and numerous of his co-conspirators, including Tony Hernandez and Pepe Lobo;

2. Excel spreadsheets detailing Juan Orlando's use of drug proceeds to commit voter fraud. For example, CW-1 maintained spreadsheets recording (i) bribes he and others paid to representatives at polling sites to manipulate votes in Juan Orlando's favor, which were referred to as payments for "trainings"; (ii) bribes paid to mayors, including each mayor's bank account information, to ensure that they garnered support for Juan Orlando; and (iii) bribes paid to municipalities in Copán where Juan Orlando lacked the votes necessary to legitimately win the election;

3. Numerous pictures of CW-1 with other politicians and co-conspirators, including a picture of CW-1 with Juan Orlando.

As described above, the Government expects that CW-1 will testify about his involvement in drug trafficking with Alex Ardon, and about Alex Ardon and CW-1's provision of drug proceeds to Juan Orlando and Tony Hernandez so that Juan Orlando could remain in power (including through manipulating elections) and continue to protect the conspiracy's drug trafficking operations. Specifically, CW-1 will testify about bribes he and others paid to help Juan Orlando fraudulently win the Honduran presidential elections in 2013 and 2017, as well as CW-1's use of *Fondo Vial* to award drug traffickers with contracts in order to launder drug proceeds.

Evidence from CW-1's electronic devices, which the Government may seek to offer through CW-1, is admissible as direct evidence against Juan Orlando, Bonilla, and Pineda. [22] To start, the contact information on CW-1's cellphone, which includes Juan Orlando, Tony Hernandez, and Lobo Sosa, corroborates CW-1's testimony concerning his relationships to members of the conspiracy, and contact with those individuals in furtherance of the conspiracy's objectives. CW-1's documentation of the bribes paid to support Juan Orlando's campaign, and photographs of CW-1 with Juan Orlando and other co-conspirators, is also highly probative. As described above, the Government expects to prove that Juan Orlando conspired with drug traffickers, such as Alex Ardon and CW-1, to garner support for his political campaigns so that Juan Orlando could stay in power and continue to protect the conspiracy's vast narcotics operation and its members. The electronic evidence from CW-1's devices is strong non-testimonial proof of the existence of that conspiracy. Moreover, this evidence further corroborates not only CW-1's testimony, but also the testimony of Alex Ardon, who will testify that he and CW-1 bribed local politicians and municipalities to ensure Juan Orlando's success in the polls.

That the evidence from CW-1's devices may not directly implicate Bonilla and Pineda does not counsel against its admissibility. As described above, CW-1 primarily communicated with Juan Orlando in furtherance of the charged conspiracy, and it is entirely unsurprising that members of such a large-scale international drug and firearms conspiracy played specific roles that may not have involved communicating with every other co-conspirator. But that does not make evidence

---

[22] Moreover, absent a stipulation as to the authenticity of the contents of these electronic devices, including any applicable metadata, the Government may also seek to offer this evidence through a law enforcement witness who performed the extractions of the data from the devices.

that tends to establish the relationship between other members of the conspiracy any less probative. Indeed, here, the Government expects that cooperating witnesses will testify that Juan Orlando's political power, which he obtained and maintained through the support of his drug trafficking co-conspirators like Alex Ardon and CW-1, allowed corrupt HNP officers, like Bonilla and Pineda, who worked at the direction of Juan Orlando and Tony Hernandez, to solicit significant bribes in exchange for their on-the-ground protection of the conspiracy's drug shipments. As such, the electronic evidence from CW-1's devices described above is highly probative of the charged conduct.

Finally, admitting the electronic evidence from CW-1's devices described above would not be unduly prejudicial. That evidence does "not involve conduct any more sensational or disturbing than the crimes with which" each of the defendants in this case is charged. *Roldan-Zapata*, 916 F.2d at 804. Indeed, the defendants are each charged with firearms offenses involving machineguns, and the testimony at trial will establish, as described above, that narcotics-related corruption of the type depicted in CW-1's Excel spreadsheets documenting bribes paid in support of Juan Orlando, was one of the primary means by which the charged conspiracy operated. Accordingly, this evidence is not barred by Rule 403.

### C. Electronic Evidence from Fuentes Ramirez's Cellphone, Including Photographs of Firearms and Cash, and Waze Data, Is Admissible as Direct Evidence

On or about March 1, 2020, Fuentes Ramirez was arrested at Miami International Airport. Law enforcement seized two cellphones from Fuentes Ramirez in connection with that arrest, which Fuentes Ramirez provided law enforcement officers with written consent to search.

The Government introduced as evidence certain of the contents seized from one of those cellphones (the "Fuentes Ramirez Cellphone") at Fuentes Ramirez's trial in March 2021,

including, among other things: (i) multiple police and military contacts, as well as electronic communications with certain of those individuals; (ii) data from the navigation application Waze reflecting that, on or about May 29 and June 12, 2019, Fuentes Ramirez traveled to the Presidential Palace; (iii) and photographs of firearms, including machineguns, handguns, and destructive devices, as well as photographs of bulk U.S. currency. For the reasons set forth below, that evidence is admissible against the defendants.

### 1. Contacts and Electronic Communications between Fuentes Ramirez and HNP and Military Officials Are Admissible

The Fuentes Ramirez Cellphone contains multiple police and military contacts, including contact information for (i) "Comisionado Martinez," which refers to Ramon Aldaberto Martinez Hernandez, a former HNP Comisionado and director of finance for the HNP until approximately 2017; and (ii) Lieutenant Colonel Salgado, a/k/a "Comanche," one of Fuentes Ramirez's corrupt military contacts. The Government respectfully submits that statements below, referred to as "Statement [number]," and each of which was admitted into evidence at the March 2021 trial of Fuentes Ramirez, are admissible as co-conspirator statements pursuant to Rule 801(d)(2)(E):

1. On or about November 18, 2019, Fuentes Ramirez and Comanche exchanged messages about *Los Valles* cartel. Comanche sent Fuentes Ramirez a news article about a son of Arnulfo Valle Valle having been murdered in Copán, to which Fuentes responded, in substance, that either the "competition … or the cops" had murdered the son.

2. On or about December 9, 2019, Fuentes Ramirez and Comanche exchanged messages about the murder of Luis Pinto, an attorney for *Los Valles*. Comanche wrote to Fuentes Ramirez, "Attorney Luis Pinto, the lawyer for the Valles, has just been murdered." Fuentes Ramirez responded, "Well, they knew what they were facing, now. Things are so bad here . . . those lawyers are going to be subdued, man, very, very clever." Later in the conversation, Fuentes Ramirez wrote, "it's easy as pie, defending a narco like that, the money is nice, but well, you have the consequences there, the enemies."

3. On or about February 25, 2020, Martinez provided Fuentes Ramirez with specific instructions about how to determine whether his phone was being wiretapped, and how

to remove any such wiretap.

The Statements are all admissible against each of Juan Orlando, Bonilla, and Pineda as co-conspirator statements under Rule 801(d)(2)(E). The Court previously determined that both Comanche and Martinez were members of the charged conspiracy. (*See* Fuentes Ramirez Trial Tr. at 6-7). So too, of course, was Fuentes Ramirez himself, and each of the Statements was admitted at trial against Fuentes Ramirez. (*See* Fuentes Ramirez Trial Tr. at 144-46, 848-850). Statements 1 and 2 both relate to *Los Valles* cartel. As discussed above, *see infra* Section II.B, Juan Orlando provided protection for *Los Valles*, who were coordinating with Tony Hernandez and Alex Ardon to provide El Chapo and the Sinaloa Cartel with massive quantities of cocaine that was ultimately destined for the United States. In Statement 3, Martinez provided Fuentes Ramirez with specific instructions about how to determine whether his phone was being wiretapped, and how to remove any such wiretap. Fuentes Ramirez was working directly with Juan Orlando, having entered into a drug trafficking partnership with him in or about 2013 or 2014 and paid bribes to Juan Orlando as recently as in or about 2019 to avoid extradition. Moreover, just as Fuentes Ramirez and Martinez were communicating directly, Juan Orlando and Martinez were, in turn, contacts. At trial the Government will seek to admit images depicting Juan Orlando together with Martinez, which were seized from Geovanny Daniel Gutierrez's, Fuentes Ramirez's son and a member of the drug trafficking conspiracy, iCloud account, discussed *infra* at Section VII.E. In addition to the Statements, the Fuentes Ramirez Cellphone also contains contact information for Comanche, Martinez, and other corrupt police and military officials, which the Government submits also is admissible against the defendants to demonstrate the means by which the drug trafficking conspiracy proceeded: Juan Orlando, the HNP (like Bonilla and Pineda), and

the Honduran military providing protection for drug traffickers in exchange for bribes. The Government anticipates that Jose Sanchez will testify, as he did at the *Fuentes Ramirez* trial, that Fuentes Ramirez leveraged his corrupt police and military contacts to protect his drug shipments and, in effect, become insulated from prosecution. *See, e.g.*, Fuentes Ramirez Trial Tr. at 702-08 (describing Fuentes Ramirez's collaboration with corrupt police officials and military contacts). Accordingly, the Statements, and other related and similar evidence on the Fuentes Ramirez Cellphone, are admissible pursuant to Rule 801(d)(2)(E).

### 2. Waze Data Is Admissible

The Fuentes Ramirez Cellphone contains data from the navigation application Waze on or about May 29 and June 12, 2019, after the Government filed submissions in the Tony Hernandez prosecution publicly disclosing that Juan Orlando was an investigative target. On May 28, 2019, the Government filed its opposition to Tony Hernandez's pre-trial motions, along with a declaration appended thereto. (*See* Dkt. Nos. 57, 58). The declaration included as an exhibit an application for authorization to obtain certain information pursuant to Title 18, United States Code, Section 2703(d), which, for the first time, publicly identified Juan Orlando as a target of the Government's investigation. (*See* Dkt. No. 58, Ex. 7 at ¶ 9). Similarly, on June 12, 2019, Tony Hernandez filed a reply brief in further support of his pre-trial motions. (*See* Dkt. No. 64). The Waze data on the Fuentes Ramirez Cellphone indicates that Fuentes Ramirez traveled to Casa Presidencial on or about May 29, 2019, the day after the Government publicly identified Juan Orlando as a target of its investigation; and also on or about June 12, 2019, *the same day* Tony Hernandez filed his reply brief. (*See* Fuentes Ramirez Trial Tr. at 870-72). Fuentes Ramirez also met, at Hernandez's direction, with Martinez and a senior Honduran Air Force officer to discuss a

money-laundering company that Hernandez wanted the defendant to sell to him. (Fuentes Ramirez Trial Tr. at 387-88). The Court admitted the Waze data at Fuentes Ramirez's trial and it is plainly relevant and admissible here to show that Juan Orlando was accepting bribes from Fuentes Ramirez and, in exchange, protecting him from extradition, which Fuentes Ramirez told Leonel Rivera when both were in custody at the MDC. Accordingly, the Waze data is admissible as direct evidence and pursuant to Rule 404(b).

### 3. Photographs of Firearms and Bulk U.S. Currency Are Admissible

The Fuentes Ramirez Cellphone also contained photographs of firearms, including machineguns, handguns, and destructive devices; as well as photographs of bulk U.S. currency. For example, the images below were admitted as evidence at Fuentes Ramirez's trial:




This type of evidence—photographs showing firearms and bulk U.S. currency consistent with drug trafficking proceeds—is relevant and admissible for largely the reasons set forth above with respect to the same categories of content seized from Tony Hernandez's cellphones. *See also*

*Moskowitz*, 581 F.2d at 21.  In particular, such evidence is probative of the defendants' commission of Counts Two and Three of the Indictment, which charge them with the use and possession on of firearms and conspiracy to do the same.  The Government alleges that Fuentes Ramirez, like Tony Hernandez, conspired directly with Juan Orlando in furthering the charged drug trafficking conspiracy.  As set forth above, the Government expects that Jose Sanchez will testify, as Jose Sanchez did at Fuentes Ramirez trial, that Jose Sanchez observed Juan Orlando and Fuentes Ramirez meet twice in person in or about 2013 and 2014, while Juan Orlando was campaigning for president of Honduras.  During one of those meetings, Juan Orlando and Fuentes Ramirez entered into a drug trafficking partnership and Juan Orlando directed Fuentes Ramirez to work with Tony Hernandez, providing Fuentes Ramirez with Tony Hernandez's cellphone number. Fuentes Ramirez and Tony Hernandez, as set forth above, moved their cocaine shipments through Honduran under the protection of, among others, HNP officers, including Bonilla and Pineda in Tony Hernandez's case.  Accordingly, evidence of firearms of the type the defendants and their co-conspirators were using to protect drug loads, and photographs of the cash they were making doing so, is relevant and admissible against the defendants as direct evidence and pursuant to Rule 404(b).

### D.  Evidence from Daniel Gutierrez's iCloud and Instagram Accounts Is Admissible

Pursuant to judicially-authorized search warrants, the Government obtained the contents of an iCloud account and an Instagram account belonging to Geovanny Daniel Gutierrez, one of Fuentes Ramirez's sons and co-conspirators in the drug trafficking conspiracy.  The evidence in these accounts included (i) photographs of Gutierrez with Juan Orlando and of Martinez with Juan Orlando; (ii) photographs of firearms, including machineguns, ammunition, and large quantities

of U.S. currency; and (iii) electronic communications of Gutierrez with, among others, Martinez, during which they discuss the defendant, other co-conspirators, firearms, and the defendant's bodyguards. This evidence is admissible at trial, as direct evidence and pursuant to Rule 404(b), in order to establish the nature of the conspiracy and the defendants' roles in it, the relationship between co-conspirators, and the defendants' motive and intent. The Court granted the Government's motion *in limine* to admit this evidence at the Fuentes Ramirez trial (*see* Dkt. Nos. 253, 271) and concluded that Gutierrez's statements in the Instagram and iCloud accounts were made "during and in furtherance of the conspiracy" and were admissible under either Rule 801(d)(2)(E) or 804(b)(3). (Fuentes Ramirez Trial Tr. at 1039-41).

The same is true here. Photographs of Gutierrez and Juan Orlando are probative of their relationship. So too is a photograph of Juan Orlando with Martinez, the corrupt Comisionado who conspired with Fuentes Ramirez, including by, in February 2020, providing Fuentes Ramirez with instructions to detect and avoid wiretaps on his phone, and with whom Gutierrez communicated about drug-related murders. The iCloud account also includes multiple images depicting an olive-colored, military-style AR-15 rifle with a "Navy insignia." Jose Sanchez testified that Fuentes Ramirez received a similar firearm from the Honduran military after his meetings with Juan Orlando, during which Juan Orlando agreed to use the Honduran military to protect cocaine shipments from Fuentes Ramirez's cocaine laboratory. Those images are probative of the existence of the conspiracy and the relationship among co-conspirators, including Juan Orlando, and therefore are admissible.

In addition to the photographs, Gutierrez's electronic communications with others, including Martinez, are—as the Court ruled at the Fuentes Ramirez trial—properly admitted as

co-conspirator statements and/or statements against penal interest.  In particular, the Government respectfully submits that electronic communications between Gutierrez and "Kruzia Murillo," dated on or about January 11, 2021, is admissible pursuant to Rule 801(d)(2)(E) and/or 804(b)(3).  On or about January 11, 2021, Gutierrez and "Krizia Murillo" exchanged communications in which they identify a number of the co-conspirators referenced, *anonymously*, by the Government's January 8, 2021 motions *in limine*.  In that exchange, the participants correctly identified "CC-10" as Barahona and "CC-4" as "Juancho," the nickname Fuentes Ramirez used for Juan Orlando.  *See* Fuentes Ramirez Trial Tr. at 693, 873-877.  Gutierrez wrote, "I know all of them" and "All of them are there."  The Court properly admitted that exchange into evidence at the Fuentes Ramirez trial, and the Government respectfully submits it should do the same here.  "[S]tatements between coconspirators that may be found to be in furtherance of the conspiracy include statements that provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy." *Maldonado-Rivera*, 922 F.2d at 959 (internal citations omitted).  Here, Gutierrez, a co-conspirator, is discussing the status of other co-conspirators, including Juan Orlando and of the conspiracy as a whole.  Additionally, as the Court found at the Fuentes Ramirez trial, this conversation between Gutierrez and Murillo, in which they specifically identify their co-conspirators, reflects their own participation in the conspiracy and also is admissible pursuant to Rule 804(b)(3).

Accordingly, and for the reasons set forth above, evidence from Gutierrez iCloud and Instagram accounts of the types described above and admitted at trial against Fuentes Ramirez is admissible against the defendants here.

### E. The Electronic Evidence is Admissible Under Rule 404(b)

In the alternative, the categories of electronic evidence described in Sections VII.A to VII.D above are also separately admissible under Rule 404(b) to establish the defendants' knowledge, intent, opportunity, and lack of accident or mistake, for many of the same reasons that make that evidence probative as direct evidence of their guilt. For example, co-conspirators' photographs of the types of firearms that the defendants are charged with possessing in this case demonstrate that members of the conspiracy in fact had and used firearms and therefore are probative of the defendants' knowledge and intent to commit the charged firearms offenses. Evidence that the defendants' co-conspirators carried firearms is also probative of the defendants' opportunity to commit the charged crimes with their co-conspirators, because it reflects that the defendants had access to such firearms. Moreover, with respect to the electronic evidence from CW-1's laptop, such as excel spreadsheets reflecting bribes paid to commit voter fraud, that evidence is also admissible under Rule 404(b) insofar as it illustrates the broader criminal plan of the defendants and their co-conspirators to use drug trafficking to assert power and control in Honduras, and is probative of the defendants' motives and intent in joining the conspiracy, including to gain political and police power, and to enrich themselves by receiving bribes from politicians and other drug traffickers, as described above. *See supra* [Section I.B]. Accordingly, the electronic evidence described above is also separately admissible under Rule 404(b).

**<u>CONCLUSION</u>**

For the foregoing reasons, the Government respectfully submits that the Court should grant

the relief requested herein.

Dated: New York, New York
      May 1, 2023

                              Respectfully submitted,

                              DAMIAN WILLIAMS

                              United States Attorney for the
                              Southern District of New York

By:    _____/s/_____
                              Jacob H. Gutwillig
                              David J. Robles
                              Elinor L. Tarlow
                              Kyle A. Wirshba
                              Assistant United States Attorneys
                              212-637-2215 / 2550 / 1036 / 2493

Cc:     Defense Counsel
        (Via ECF & Email)