UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

   - v. -

JUAN ORLANDO HERNANDEZ,       S4 15 Cr. 379 (PKC)
    a/k/a "JOH,"                     S7 15 Cr. 379 (PKC)
JUAN CARLOS BONILLA VALLADARES,   S8 15 Cr. 379 (PKC)
    a/k/a "Tigre," and
MAURICIO HERNANDEZ PINEDA,

         Defendants.


# THE GOVERNMENT'S SUPPLEMENTAL MOTIONS *IN LIMINE*


DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007


Jacob H. Gutwillig
David J. Robles
Elinor L. Tarlow
Kyle A. Wirshba
Assistant United States Attorneys
   *Of Counsel*

# TABLE OF CONTENTS

BACKGROUND .................................................................................................................. 2

ARGUMENT ..................................................................................................................... 2

I. Statements Made to Cooperating Witnesses by the Defendants and Their Co-Conspirators Are Admissible Pursuant to Rules 801(d)(2)(A) and 801(d)(2)(E) .......................................... 2

A. Applicable Law ..................................................................................................... 3

1. Rule 801(d)(2)(A): Statement of a Party Opponent .......................................... 3

2. Rule 801(d)(2)(E): Co-Conspirator Statements ............................................. 4

3. Confrontation Clause ................................................................................... 4

B. Evidence of Statements Made by Co-Conspirators to CW-3 Is Admissible Under the Hearsay Rules ......................................................................................................... 5

C. Evidence of Statements Made by Co-Conspirators to Fernando Chang Monroy Is Admissible Under the Hearsay Rules ...................................................................... 10

D. Evidence of Statements Made by a Co-Conspirator to CW-2 Is Admissible Under the Hearsay Rules ..................................................................................................... 11

E. Evidence of Statements Made by Co-Conspirator Carlos Alberto Valladares Zuniga to Leonel Rivera Is Admissible Under the Hearsay Rules ....................................... 14

F. Evidence of Statements Made by Co-Conspirators to CW-4 Is Admissible Under the Hearsay Rules ..................................................................................................... 17

CONCLUSION ................................................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page(s)**

*Bourjaily v. United States*, 483 U.S. 171 (1987) ......................................................... 7, 14, 16, 18

*Ohio v. Clark*, 135 U.S. 2173 (2015) ........................................................................................ 8

*United States v. Beech-Nut Nutrition Corp.*, 871 F. 2d 1181 (2d Cir. 1989) .............................. 12

*United States v. Bick*, 711 F. App'x 664 (2d Cir. 2017) ............................................................ 8

*United States v. Delligatti*, No. 15 Cr. 491, 2018 WL 1033242 (S.D.N.Y. 2018) ...................... 12

*United States v. Delva*, No. 12 Cr. 802, 2014 WL 4460360 (S.D.N.Y. 2014) ........................... 13

*United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999) .............................................................. 11

*United States v. Giovani Fuentes Ramirez*, S6 15 Cr. 379 (PKC) ............................................ 14

*United States v. Gotti*, 457 F. Supp. 2d 395 (S.D.N.Y. 2006) .................................................... 6

*United States v. Juan Antonio Hernandez Alvarado*, S2 15 Cr. 379 (PKC) ............................... 14

*United States v. List*, 200 F. App'x 535 (6th Cir. 2006) ........................................................... 22

*United States v. Paone*, 782 F.2d 386 (2d Cir. 1986) ................................................................ 7

*United States v. Rahme*, 813 F.2d 31 (2d Cir. 1987) .................................................................. 7

*United States v. Russo*, 302 F.3d 37 (2d Cir. 2002) .................................................................... 6

*United States v. Simmons*, 923 F.2d 934 (2d Cir. 1988) ........................................................ 7, 22

*United States v. Valladares*, 15 Cr. 174 (LGS) ....................................................................... 17

**Rules**

Federal Rule of Evidence 403 ............................................................................................ 16, 19

Federal Rule of Evidence 404 .................................................................................................. 5

Federal Rule of Evidence 801 ......................................................................................... passim

Federal Rule of Evidence 804 .................................................................................................. 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

    - v. -

JUAN ORLANDO HERNANDEZ,          S4 15 Cr. 379 (PKC)
    a/k/a "JOH,"                    S7 15 Cr. 379 (PKC)
JUAN CARLOS BONILLA VALLADARES,   S8 15 Cr. 379 (PKC)
     a/k/a "Tigre," and
MAURICIO HERNANDEZ PINEDA,

          Defendants.

---

The Government respectfully submits this memorandum in support of supplemental motions *in limine* with respect to the upcoming trial of Juan Orlando Hernandez ("Juan Orlando"), Juan Carlos Bonilla Valladares ("Bonilla"), and Mauricio Hernandez Pineda ("Pineda").[1]  As described further below, the Government intends to call additional cooperating witnesses ("CW-3" and "CW-4") at trial and will seek to introduce statements made to CW-3 and CW-4.  The Government further intends to offer additional co-conspirator statements made to cooperating witnesses in this case regarding Bonilla.  Those statements, which were made by the defendants and co-conspirators, are admissible pursuant to Rules 801(d)(2)(A) and 801(d)(2)(E).[2]

---

[1] The Government filed its motions in *limine* as to Pineda on October 28, 2022, (Dkt. 487), and as to Juan Orlando and Bonilla on May 1, 2023, (Dkt. 554), which are incorporated by reference herein.

[2] The Government is submitting a single consolidated memorandum in support of its supplemental motions *in limine*.

1

## BACKGROUND[3]

The Government assumes the Court's familiarity with the anticipated proof at trial, as set forth in the Government's prior submissions, including the Government's motions *in limine*, (Dkts. 487, 554), opposition to the motions *in limine* filed by Bonilla and Pineda, (Dkt. 586), opposition to the motions for severance filed by Juan Orlando and Bonilla, (Dkt. 538), and response to the discovery demand and motion for a bill of particulars filed by Juan Orlando, (Dkt. 623).

Since filing its motions *in limine*, the Government has continued to meet with witnesses and to identify and marshal additional evidence that it may seek to offer at trial. In order to put the defense on further notice and resolve any potential evidentiary disputes in advance of trial, the Government is submitting these supplemental motions *in limine*. As set forth below, these motions apply the same evidentiary principles described in the Government's prior motions *in limine* and should be granted.

## ARGUMENT

### I. Statements Made to Cooperating Witnesses by the Defendants and Their Co-Conspirators Are Admissible Pursuant to Rules 801(d)(2)(A) and 801(d)(2)(E)

As described in the Government's initial motions *in limine*, several of the defendants' co-conspirators made statements to cooperating witnesses, or other co-conspirators in the presence

---

[3] The Government respectfully submits that all of the evidence described in this brief, including with respect to acts of bribery and corruption, is admissible as direct evidence. The Government hereby provides notice that it also intends to offer this evidence, in the alternative, pursuant to Rule 404(b). In addition, as the Government continues to meet with potential witnesses between now and trial, it will supplement this notice as necessary should the Government learn of any additional evidence that it may seek to offer pursuant to Rule 404(b).

of cooperating witnesses, regarding the drug trafficking conspiracy, their joint efforts to protect themselves and their drug trafficking operation, and their attempts to increase their power in Honduras through corruption and cocaine-fueled bribes.  Evidence of these statements either is not hearsay in the first instance, exempted under the hearsay rules, or both, and has significant probative value.  This evidence includes certain statements made by the defendants themselves which are admissible (i) as statements by a party opponent as to the defendant who made them— Juan Orlando, Bonilla, or Pineda—and (ii) for the reasons set forth below, as co-conspirator statements as to the other defendants.

### A.  Applicable Law

#### 1.  Rule 801(d)(2)(A): Statement of a Party Opponent

Federal Rule of Evidence 801(d)(2)(A) provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party in an individual or representative capacity."  Fed. R. Evid. 801(d)(2)(A); *see also United States v. Russo*, 302 F.3d 37, 43 (2d Cir. 2002) ("Statements made by the defendant may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party.").  Moreover, statements made by a defendant are admissible under this exception even if the statement, on its face, is not incriminating.  *See, e.g.*, *United States v. Gotti*, 457 F. Supp. 2d 395, 401-402 (S.D.N.Y. 2006) ("Cases explaining that an admission must be contrary to a position taken by the party at trial do so to distinguish Rule 801(d)(2)(A) from the more limited  exception for statements against interest under Rule 804(b)(3), which must be against the declarant's interest at the time when made.").

### 2. Rule 801(d)(2)(E): Co-Conspirator Statements

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy."  To admit a statement pursuant to this Rule, the Court must find two facts by a preponderance of the evidence: *first*, that a conspiracy that included the declarant and the defendant existed; and *second*, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

Once a conspiracy is shown to exist, the "evidence sufficient to link another defendant to it need not be overwhelming," and "the 'in furtherance' requirement of Rule 801(d)(2)(E) is satisfied" when, for example, "a co-conspirator is apprised of the progress of the conspiracy, or when the statements are designed to induce his assistance." *United States v. Paone*, 782 F.2d 386, 390 (2d Cir. 1986) (internal quotation marks omitted).  Statements between co-conspirators that "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy," further the conspiracy, *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1988), as do statements "that apprise a co-conspirator of the progress of the conspiracy," *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987).

### 3. Confrontation Clause

Where hearsay is admissible under the Federal Rules of Evidence, it may nevertheless be prohibited by the Confrontation Clause of the Sixth Amendment.  "But a statement 'cannot fall within the Confrontation Clause unless its primary purpose was testimonial'—that is, unless the statement, viewed objectively in light of all the relevant circumstances, was made or procured

with a primary purpose of 'creating an out-of-court substitute for trial testimony.'" *United States v. Bick*, 711 F. App'x 664, 666 (2d Cir. 2017) (summary order) (quoting *Ohio v. Clark*, 135 U.S. 2173, 2180 (2015)).

### B. Evidence of Statements Made by Co-Conspirators to CW-3[4] Is Admissible Under the Hearsay Rules

Since filing its initial motions *in limine*, (*see* Dkts. 487, 554), the Government has identified another cooperating witness—CW-3—who the Government currently intends to call at trial. CW-3, who had unique access to high-level Honduran government officials, used that access to assist the *Cachiros* drug trafficking organization ("DTO"),[5] by, among other things, (i) providing armed protection for certain of the *Cachiros*' drug loads as they were transported across Honduras, (ii) helping the *Cachiros* obtain government contracts for front companies owned by the *Cachiros* in order to launder drug proceeds, and (iii) exploiting his government and military contacts to protect the *Cachiros*' drug operation. In exchange, CW-3 received millions of dollars in drug proceeds from the *Cachiros*.

Because of CW-3's political connections, he also developed a close personal relationship with Juan Orlando. CW-3 ultimately leveraged this relationship with Juan Orlando to, among

---

[4] In its May 1, 2023 motions *in limine*, the Government identified two unnamed cooperating witnesses as CW-1 and CW-2 and six unnamed co-conspirators as CC-1 through CC-6. (Dkt. 554). For continuity with its prior motion, the Government will continue that numbering sequence for cooperating witnesses and co-conspirators whose identities are not yet public. A key has been provided to the Court and counsel with the identities of the unnamed cooperating witnesses and co-conspirators from the Government's May 1, 2023 motions and this Motion. (*See* Ex. A).

[5] As discussed in more detail in the Government's May 1, 2023 motions *in limine*, the *Cachiros* DTO, which was one of the largest and most violent drug organizations in Honduras during the relevant period, was led by two brothers, Leonel Rivera and Javier Rivera. (*See* Dkt. 554 at 19).

other things, obtain information and protection for the *Cachiros* and to facilitate CW-3's drug trafficking with the *Cachiros*.  In exchange, CW-3 supported Juan Orlando's 2013 presidential campaign with the proceeds of CW-3's drug trafficking with the *Cachiros*, providing multiple bribes of several hundred thousand dollars to Juan Orlando.  CW-3 gave one of those bribes to a family member of Juan Orlando.  CW-3 provided a second bribe directly to Juan Orlando after Juan Orlando told CW-3 that the then-director of a Honduran defense intelligence agency ("CC-8") could provide CW-3 with information to avoid the interdiction of CW-3's drug shipments.  In addition, in advance of the 2013 Honduran presidential elections, CW-3 spoke with Juan Orlando about campaign contributions that Juan Orlando had received from drug traffickers, including from the Sinaloa Cartel.

The Government also will seek to offer statements made to CW-3 by co-conspirators that are admissible against all three trial defendants either as co-conspirator statements under Rule 801(d)(2)(E) or, as to the declaring defendant, statements by a party opponent under Rule 801(d)(2)(A).  Those statements, referred to as "Statement [number]," are summarized below:

1. In or around 2009, CW-3 attended a dinner in Tegucigalpa with Juan Orlando, Juan Antonio Hernandez ("Tony Hernandez"), and a drug trafficker named "El Cinco."[6]  At the dinner, Juan Orlando, Tony Hernandez, and El Cinco discussed who among them would assume the cost of an airplane that had recently been seized in Roatan, Honduras.  Juan Orlando told CW-3, who was a lawyer and had recently served as a judge, that CW-3 would be receiving a call from someone looking for help.  Approximately a few days later, CW-3 received a call from a drug trafficker named Pablo Amilcar, a/k/a "El Sentado," who asked to meet with CW-3 privately.  CW-3 then met with El Sentado, who told CW-3 that he wanted

---

[6] During Tony Hernandez's October 2019 trial, multiple cooperating witnesses testified about Tony Hernandez's relationship with El Cinco, and that Tony Hernandez and El Cinco were partners in a drug laboratory in Colombia.  (*See, e.g.*, Tony Hernandez Trial Tr. at 147-148; 916-920.)

CW-3's help with the judge in Roatan to see if there was anything that could be done about the seizure of the airplane. El Sentado told CW-3 that the airplane had been carrying cocaine that belonged to Juan Orlando, Tony Hernandez, and other drug traffickers, and that the plane had come from Colombia. CW-3 was ultimately unable to help with the seized plane. CW-3 then informed Juan Orlando that he was unable to help with the seized plane and that he had learned the seized plane was carrying drugs. Juan Orlando then told CW-3, in sum and substance, to be discrete.

2. In or around 2011, around the time that CW-3 began working with the *Cachiros* DTO, Leonel Rivera told CW-3, in sum and substance, that the *Cachiros* DTO sold cocaine to the *Valles* DTO,[7] that Tony Hernandez was working with the *Valles* DTO, and that Juan Orlando supported Tony Hernandez's drug trafficking operation in the background.

3. In or around 2012 or 2013, CW-3 had multiple meetings with (i) Fredy Renan Najera Montoya, a Honduran Congressman and drug trafficker,[8] (ii) CC-1, a high-ranking member of the Sinaloa Cartel, and (iii) an associate of CC-1, regarding CW-3's help in facilitating the control of Puerto Cortes—a port in Honduras—for drug trafficking purposes. CW-3 was paid a total of approximately $150,000 to help facilitate control of the port. During one of these meetings, which occurred in San Pedro Sula, CC-1 told CW-3 that he would be supporting Juan Orlando's presidential campaign.

4. In or around 2013, at Tony Hernandez's request, CW-3 accompanied Tony Hernandez to a gas station in Honduras after Tony Hernandez requested CW-3's help with "an errand." After arriving at the gas station, a man walked out of a truck, talked with Tony Hernandez, and placed a blue bag in Tony Hernandez's vehicle, stating, in sum and substance, "here is what they sent you." CW-3 learned during that exchange that the man's name was "Wilson." On the drive back to Tony Hernandez's residence, Tony Hernandez told CW-3, in sum and substance, that the bag had approximately $4 million dollars from the *Valles* DTO, which was for Juan Orlando's campaign. CW-3 also observed that the bag was filled with U.S. currency. Tony Hernandez called Juan Orlando in CW-3's presence and said, in sum and substance, "I have what our friends sent," which Juan Orlando acknowledged. Both Tony Hernandez and CW-3 were armed with

---

[7] As discussed in more detail in the Government's May 1, 2023 motions *in limine*, the *Valles* DTO was led by two brothers, Miguel Arnulfo Valle Valle, a/k/a "Colocho," and Luis Antonio Valle Valle (the "Valles"). (*See* Dkt. 554 at 11.)

[8] As described in the Government's first *motions in limine*, Najera is a convicted drug trafficker who was sentenced to 360 months' imprisonment in 2022. (*See* Dkt. 554 at 59 n.18.)

their personal handguns during this trip.

5.  In or around 2013, CW-3 had a conversation with Juan Orlando about obtaining radar information to facilitate CW-3's drug trafficking with the *Cachiros* DTO. As described above, Juan Orlando told CW-3 to get in touch with CC-8. Thereafter, on multiple occasions, CW-3 spoke with CC-8 about obtaining such information, which CC-8 agreed to provide in exchange for payment. On one occasion, in or around 2014, CW-3 unwittingly brought two DEA confidential sources to meet with CC-8. During the meeting, which was recorded, one of the sources told CC-8 that they wanted his consent and authorization to bring drugs into Honduras. CC-8 abruptly ended the meeting and walked out. Thereafter, Juan Orlando told CW-3, in sum and substance, that CW-3 needed to be more careful not to expose Juan Orlando or CC-8.

Each of the statements summarized above is admissible under Rule 801(d)(2)(E) as to the trial defendants and, for statements made by Juan Orlando, as to him under Rule 801(d)(2)(A). To start, and as a general matter, the conversations occurred between CW-3 and his drug trafficking co-conspirators and were about their ongoing drug trafficking activity. The statements made during those conversations were thus clearly "in furtherance" of their drug trafficking conspiracy. *See* Fed. R. Evid. 801(d)(2)(E). For example, Statement 1 involved a conversation in which CW-3 was ultimately asked to reach out to a judge in Roatan to see if there was anything that could be done about the seizure of the cocaine-laden plane. CW-3's discussions with Juan Orlando and El Sentado about the seized airplane—including its contents and who the drugs belonged to—were both intended to "induce a conspirator's assistance," *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999), and to identify members of the conspiracy, *see, e.g.*, *United States v. Delligatti*, No. 15 Cr. 491, 2018 WL 1033242, at *6 (S.D.N.Y. Feb. 23, 2018) ("[S]tatements that convey information about others in the same organized crime syndicate are considered to be during and in furtherance of a conspiracy."). Similarly, Statement 2 involved Leonel Rivera informing his co-conspirator at the time, CW-3,

that the *Valles* DTO, Tony Hernandez, and Juan Orlando were all involved in their drug trafficking operation, thereby also serving the purpose of identifying co-conspirators.  *See, e.g.*, *Delligatti*, 2018 WL at *6.

Statements 3, 4, and 5 are admissible under Rule 801(d)(2)(E) for similar reasons.   In addition to identifying co-conspirators, these conversations involve statements about the payment or collection of bribes to facilitate drug trafficking and were therefore intended to "prompt the listener to respond in a way that facilitates the carrying out of criminal activity." *United States v. Beech-Nut Nutrition Corp*., 871 F. 2d 1181, 1199 (2d Cir. 1989).  Indeed, as described in the Government's prior motions *in limine*, (*see* Dkts. 487, 554), the drug trafficking conspiracy charged in this case was made possible, in large part, by large-scale corruption, including the payment of bribes from drug traffickers to Honduran politicians and law enforcement officials.  That is precisely what these conversations were about.  For example, Statement 3 involved conversations about bribes to CW-3 to help facilitate control of a maritime port for drug trafficking purposes, as well as the Sinaloa Cartel's support for Juan Orlando's upcoming presidential campaign.  Statement 4 involved conversations about an approximately $4 million bribe consisting of drug trafficking proceeds from the *Valles* DTO to Juan Orlando's presidential campaign.  Statement 5 involved conversations between CW-3 and CC-8 about obtaining radar information in exchange for payment.  Statements made between and among co-conspirators during those conversations were thus plainly in furtherance of the charged drug conspiracy in this case and admissible under Rule 801(d)(2)(E).  Moreover, with respect to Statement 5, Juan Orlando's statements to CW-3 about needing to be more careful after having brought the confidential sources to meet with CC-8, in addition to being admissible as party

opponent statements of Juan Orlando, were clearly intended to conceal the illegal activity of the conspiracy.  *See United States v. Delva*, No. 12 Cr. 802, 2014 WL 4460360, at *10 (S.D.N.Y. Sept. 10, 2014) ("Statements made to hide the existence or activities of a conspiracy are made in furtherance of it.").  Accordingly, the Government submits that the statements described above, and any similar statements made among CW-3 and his co-conspirators, are admissible.

### C.  Evidence of Statements Made by Co-Conspirators to Fernando Chang Monroy Is Admissible Under the Hearsay Rules

Fernando Chang Monroy ("Chang Monroy"), who testified at Tony Hernandez's trial, is a former large-scale Guatemalan drug trafficker who worked with Tony Hernandez and with the *Valles* DTO.  Beginning in approximately 2010, the Valles worked in coordination with Tony Hernandez and Alex Ardon to provide the leader of the Sinaloa Cartel Joaquín Archivaldo Guzmán Loera, a/k/a "El Chapo," and the Sinaloa Cartel with massive quantities of cocaine and with heavily armed security for the transport of those drug shipments through western Honduras, with an ultimate destination of the United States.  (*See* Dkt. 554 at 14).  Indeed, El Chapo met with Tony Hernandez, Alex Ardon, and the Valles at a ranch that the Valles owned.  (*Id.*).  In turn, the Valles relied on high-ranking members of the Honduran National Police ("HNP"), including Bonilla, to protect El Chapo and their cocaine.  At trial, the Government expects that Chang Monroy will testify that Miguel Arnulfo Valle-Valle ("Miguel Valle"), one of the leaders of the *Valles* DTO, told him the following about payments that the *Valles* DTO made to Bonilla and the HNP.  In particular, Miguel Valle told Chang Monroy that the Valles paid Bonilla roughly every three months to protect their narcotics loads.  The payments, which would vary in frequency and amount, were paid by the Valles either directly to Bonilla or two lower ranked HNP officers.

These statements, by a member of the *Valles* DTO, are admissible against each defendant as co-conspirator statements because the statements were made in furtherance of a conspiracy to which each defendant belonged.  *See Bourjaily*, 483 U.S. at 175; Fed. R. Evid. 801(d)(2)(E).  The Government anticipates that multiple witnesses will describe, as they have at other trials involving members of this conspiracy, the Valles' participation in the conspiracies with which the defendants have been charged.  For example, during the trial in *United States v. Juan Antonio Hernandez Alvarado*, S2 15 Cr. 379 (PKC), Alex Ardon, who will again testify at this trial, testified about trafficking drugs to the Sinaloa Cartel with the Valles and Tony Hernandez, (*see* Tony Hernandez Tr. at 382), and during the trial in *United States v. Giovani Fuentes Ramirez*, S6 15 Cr. 379 (PKC), Leonel Rivera, who will again testify at this trial, testified that Fuentes Ramirez worked with the Valles to also deliver cocaine to the Sinaloa Cartel for delivery to the United States, (Fuentes Ramirez Trial Tr. at 311-12).  These statements are also in furtherance of the defendants' conspiracy.  For example, at the Tony Hernandez trial, Chang Monroy testified that he distributed large quantities of cocaine with the Valles, including by transporting drugs stamped with a "TH," indicating that the drugs belonged to Tony Hernandez.  (*See* Tony Hernandez Tr. at 914, 929).  Chang Monroy's discussion with Miguel Valle about how the Valles would protect those drugs helps further their joint narcotics trafficking.

Accordingly, the statements described above are admissible as co-conspirator statements.

### D.  Evidence of Statements Made by a Co-Conspirator to CW-2 Is Admissible Under the Hearsay Rules

The Government also seeks to offer at trial certain statements made by Miguel Valle to CW-2.  As described in the Government's initial motions *in limine*, CW-2 was a member of the Sinaloa Cartel who trafficked cocaine with CC-1 throughout Central America.  (*See* Dkt. 554 at

58-60).  In 2012, CW-2 was working with CC-1 to send airplanes loaded with cocaine on behalf of the Sinaloa Cartel from Venezuela to Honduras, for further distribution north through Mexico to the United States.  Miguel Valle purchased some of those shipments, flew them to airstrips operated by another co-conspirator ("CC-7"), and then had them transported to one of the Valles' ranches.  During that transport, CC-7 coordinated protection of the shipments by armed security provided by Bonilla.  CW-2's testimony about his conversations with Miguel Valle regarding those shipments is admissible under Rule 801(d)(2)(E).

In particular, the Government expects that CW-2 will testify that, in approximately 2012, Miguel Valle informed CW-2 that Miguel Valle had sent two King Air airplanes, loaded with thousands of kilograms of cocaine supplied by CW-2, to airstrips that CC-7 operated in Honduras.  Miguel Valle further stated that CC-7 transported those cocaine loads by land to a ranch owned by Miguel Valle in Copan, Honduras and that HNP officers provided armed security during their transportation.  CC-7 advised Miguel Valle that Bonilla had provided that security and that Bonilla also had provided security during the landing of those cocaine-laden airplanes.  Miguel Valle, in turn, informed CW-2 about his conversations with CC-7 and that he liked working with CC-7 because CC-7 had Bonilla's protection for their drug shipments.

These statements, by a leader of the *Valles* DTO to CW-2, are admissible against each defendant as co-conspirator statements because the statements were made in furtherance of a conspiracy to which each defendant belonged.  *See Bourjaily*, 483 U.S. at 175; Fed. R. Evid. 801(d)(2)(E).  As described in the Government's initial motions *in limine*, (Dkt. 554 at 58-60), the Government expects to establish through CW-2's testimony that CW-2 and CC-1 were members of the narcotics conspiracy in this case and they coordinated cocaine shipments through

Honduras, into Mexico, and then into the United States with other members of this conspiracy. The Government expects that CW-2 will explain that he worked for CC-1, as a conduit between the Sinaloa Cartel leadership and the Honduran drug trafficker co-conspirators.  As described in part above, the Government further expects that the evidence at trial will show that Miguel Valle and his brother—Luis Valle—trafficked drugs in Honduras as part of the same conspiracy, including by working in coordination with Tony Hernandez and Alex Ardon to provide El Chapo with massive quantities of cocaine and with security for the transport of those drug shipments through western Honduras.  (*See* Dkt. 554 at 14).

CW-2's conversations with Miguel Valle about their drug shipments (and Miguel Valle's conversations with CC-7 about those drug shipments) are, therefore, admissible as co-conspirator statements under Rule 801(d)(2)(E).  The statements each relate to drug trafficking activities in Honduras and were in furtherance of the charged drug trafficking conspiracy, because they were intended to ensure that cocaine transiting through Honduras to Mexico, and ultimately to the United States, would be protected.  The statements, therefore, are admissible under the hearsay rules.  The statements also are not unduly prejudicial under Rule 403.  The probative value of those statements—which describe Bonilla's protection for CW-2's and the Valles' drug loads— is significant.  The statements are evidence that Bonilla took steps to ensure the success of the charged conspiracy and concern conduct that is central to Bonilla's charge.  That significant value is not substantially outweighed by any prejudice to Bonilla.  Accordingly, the statements are admissible at trial.

**E.   Evidence of Statements Made by Co-Conspirator Carlos Alberto Valladares Zuniga to Leonel Rivera Is Admissible Under the Hearsay Rules**

The Government will seek to offer statements made to Leonel Rivera by Carlos Alberto Valladares Zuniga ("Carlos Valladares"),[9] a corrupt HNP official who conspired with Leonel Rivera and the defendants.  Specifically, Carlos Valladares, who participated in *Los Cachiros* DTO, led by Leonel Rivera, by supporting its drug trafficking activities and engaging in acts of violence.  In particular, in approximately 2011 or 2013, Leonel Rivera facilitated a drug shipment from Venezuela to Honduras of approximately 375 kilograms of cocaine.  The drug shipment ultimately was delivered to the *Valles* in exchange for approximately $2.5 million. While that money was being transported back to Leonel Rivera, it was seized by HNP officers. Leonel Rivera's associates then paid, at his direction, a portion of the money to Bonilla and others, as a bribe for its release.  Leonel Rivera's testimony about his conversations with Carlos Valladares regarding the bribe paid to Bonilla to release the drug money is admissible under Rule 801(d)(2)(E).

In particular, the Government expects that Leonel Rivera will testify that, approximately three days after the narcotics shipment described above was delivered to the *Valles*, they provided one of Leonel Rivera's workers ("CC-8") with $2.5 million in cash in exchange for that shipment.  CC-8 then stashed the money in a sport utility vehicle (the "SUV") and, riding in a different, lead vehicle as part of a caravan, transported the drug money.  Not long after, CC-8

---

[9] In April 2018, Carlos Valladares pled guilty to participating in a cocaine-importation conspiracy and participating in a conspiracy to use and carry machineguns and destructive devices in connection with the drug conspiracy.  *See United States v. Valladares*, 15 Cr. 174 (LGS).  In September 2018, Judge Schofield sentenced Carlos Valladares principally to 168 months' imprisonment.

called Leonel Rivera to inform him that CC-8 had learned from the driver of the SUV that HNP officers had stopped the SUV at gunpoint and had informed the driver of the SUV that they had done so at the direction of Bonilla.  According to the driver of the SUV, the HNP officers advised that Bonilla had directed the HNP officers to stop the SUV because there was money inside.

The Government anticipates that Leonel Rivera will further testify that, upon learning the SUV had been stopped, he called Carlos Valladares, who he knew was in the area.  Carlos Valladares told Leonel that his choices were to bribe Bonilla or attempt to swap the SUV for another similar vehicle, because Bonilla was en route to the police station where the SUV was being held.  Leonel told Carlos Valladares that he would bribe Bonilla.  Minutes later, Carlos Valladares called Leonel Rivera back, and relayed that Bonilla had conveyed—through an intermediary—that he wanted $500,000 for himself in order to release the SUV to Leonel Rivera. Carlos Valladares told Leonel Rivera that approximately $500,000 as provided to Bonilla and other HNP officers.

These statements by Carlos Valladares to Leonel Rivera are admissible against each defendant as co-conspirator statements because the statements were made in furtherance of the drug trafficking conspiracy to which each belonged.  *See Bourjaily*, 483 U.S. at 175; Fed. R. Evid. 801(d)(2)(E).  The Government will establish through Leonel Rivera's testimony that Carlos Valladares was a member of the narcotics conspiracy in this case who, in his role as an HNP official, protected drug shipments through Honduras and committed acts of violence in furtherance of that drug trafficking conspiracy.  As described above, the Government further expects that the evidence at trial will show that the *Valles* were also Honduran drug traffickers

who were part of that same conspiracy.  Moreover, as also set forth above, the Government expects that Leonel Rivera will testify that the drug shipment of approximately 375 kilograms of cocaine came from members of the Sinaloa Cartel who, as the Government anticipates will be established through the testimony of Alex Ardon, CW-2, and others, also were part of the charged conspiracy.

Specifically, the relevant statements relate to the seizure of money resulting from a drug load sent by the Sinaloa Cartel that Leonel Rivera caused to be delivered to the *Valles* in exchange for approximately $2.5 million, and was in furtherance of the charged drug trafficking conspiracy.  Leonel Rivera's testimony about the bribe paid to Bonilla in connection with the attempted seizure of the drug shipment is also plainly relevant, as it implicates Bonilla's role specifically and generally indicates the relationship between drug traffickers and corrupt HNP officials who protected them.  Accordingly, the statements are admissible under the hearsay rules.  The statements also are not unduly prejudicial under Rule 403, in light of the substantial testimony described herein and in the Government's initial motions *in limine* about protection Bonilla provided for drug trafficking activities.  The statements Carlos Valladares made to Leonel Rivera about Bonilla requiring payment in order to return Leonel Rivera's drug money are consistent with other testimony about Bonilla profiting through drug trafficking bribes; moreover, these statements are no more prejudicial than other allegations against Bonilla, including testimony that he committed acts of violence in furtherance of the drug trafficking conspiracy.

**F.   Evidence of Statements Made by Co-Conspirators to CW-4 Is Admissible Under the Hearsay Rules**

As described in detail in the Government's initial motions *in limine*, the defendants' drug conspiracy involved the trafficking of cocaine through Honduras to members of the Sinaloa Cartel in Mexico for eventual delivery to the United States.   (*See* Dkt. 554 at 16).   The Government anticipates calling at trial CW-4, a former member of the Sinaloa Cartel who provided security for Sinaloa members, such as El Chapo, and for Tony Hernandez when Tony Hernandez visited Mexico.   CW-4 also will testify about El Chapo's travel to Honduras and CW-4's own interactions with Bonilla.   The following statements of co-conspirators to CW-4, in furtherance of their conspiracy, including the following referred to below as "Statement [number]," are admissible through testimony of CW-4, pursuant to Rule 801(d)(2)(E):

1. Starting in or about 2008, CW-4 overheard leaders of the Sinaloa Cartel, including El Chapo, discussing the logistics of receiving loads of cocaine from the "Hernandezes," the "Hernandez Brothers," "Don Antonio Hernandez," in Honduras while CW-4 stayed at El Chapo's property in Mexico and providing security to shipments of cocaine that CW-4 understood came from Honduras.

2. In or about 2010, CW-4 was guarding an airstrip in Mexico at the behest of El Chapo's security and Sinaloa Cartel member, Jorge Ivan Gastelum Avila, a/k/a "Cholo Ivan," a/k/a "50" ("Cholo Ivan"), when a jet arrived that Sinaloa Cartel members said was carrying Tony Hernandez from Honduras.   Cholo Ivan, on that occasion, referred to the individual arriving as "Don Antonio."   At the direction of Cholo Ivan, CW-4 then transported Tony Hernandez to one of El Chapo's properties to attend meetings.

3. In or about 2012, CW-4 was ordered by Cholo Ivan to provide security for El Chapo as he flew from Sinaloa, the stronghold of the Sinaloa Cartel, to Tapaculo, near Mexico's border with Guatemala.   According to Cholo Ivan, CW-4 was to provide security while El Chapo crossed from Mexico into Guatemala for meetings.   After the plane ride to Tapaculo, however, Cholo Ivan informed CW-4 that other Sinaloa Cartel security was already in Guatemala and so CW-4 would remain in Tapaculo and wait for El Chapo to return.   While awaiting El Chapo's return, CW-4 heard updates from

members of El Chapo's security team over the radio, including that El Chapo had left Guatemala by helicopter for Honduras, and that El Chapo had arrived at his final destination in Honduras: a ranch owned by the Hernandez brothers.

4.   While CW-4 was living in Costa Rica and working for the Sinaloa Cartel, CW-4 twice received messages from Ivan Archivaldo Guzman Salazar ("Ivan"), El Chapo's son and a current leader of the Sinaloa Cartel, instructing CW-4 to travel to Honduras to pay a bribe to a particular lieutenant in the Honduran security forces.  CW-4 understood this payment to be for the purpose of securing, among other things, safe passage for Sinaloa Cartel members through Honduras. The second message from Ivan about these bribes, in or about 2018, included an instruction to tell the lieutenant that the lieutenant should await further instructions because a go-fast boat carrying narcotics was on its way from Colombia to Honduras.  After receiving both messages, CW-4 traveled to Honduras and paid the lieutenant the bribe.  On the second occasion, CW-4 also delivered Ivan's message to the lieutenant while the lieutenant was sitting at a table with Bonilla. During their conversation in front of Bonilla, the lieutenant told CW-4 that he should feel free to speak freely in front of Bonilla, and CW-4 provided Ivan's instructions that the lieutenant should await further instructions because a go-fast boat carrying narcotics was on its way from Colombia to Honduras.

Each of the above-described statements is admissible as a co-conspirator statement pursuant to Rule 801(d)(2)(E).  Statements 1-4, and Ivan's statements in Statement 5, were made by members of the Sinaloa Cartel to further their efforts to secure cocaine from the defendants and their co-conspirators in Honduras.  The individuals making the statements were members of the same conspiracy with which the defendants are charged.  In Statement 1, El Chapo discussed drugs from the "Hernandezes" in Honduras; in Statement 2, Cholo Ivan referred directly to Tony Hernandez; in Statement 3,  Cholo Ivan and El Chapo's security gave instructions to CW-4 and then coordinated over the radio to ensure El Chapo's safety during his journey to meet with Tony Hernandez in Honduras; and in Statement 4, Ivan ordered CW-4 to pay a bribe to an associate of Bonilla, in furtherance of the drug trafficking conspiracy.  Each of these statements also furthered the charged conspiracy through discussions about the logistics of those drug loads

(Statements 1), logistics of meetings to further drug negotiations (Statements 2 and 3), and the payments of bribes for the protection of drug traffickers (Statement 4).

The statements of the Honduran lieutenant in Statement 4 also meet the criteria of Rule 801(d)(2)(E).  He accepted bribes from the Sinaloa Cartel related to safe passage for Sinaloa Cartel members and a go-fast boat with Sinaloa Cartel cocaine that would be arriving in Honduras from Colombia.  The Government expects that Diaz Morales and Alex Ardon will testify at trial that, years earlier, they were involved in sending maritime shipments to Honduras in go-fast boats for the eventual benefit of the Sinaloa Cartel.  (*See* Tony Hernandez Tr. 162, 417).  During the meeting when Statement 4 was made, Bonilla was present with the lieutenant and a member of the Sinaloa Cartel, CW-4, who had previously provided security to El Chapo and Tony Hernandez when they met in Mexico.  The lieutenant's statement in Statement 5 that CW-4 could discuss their business in front of Bonilla is also in furtherance of their conspiracy, as it provided CW-4 the comfort required to speak freely and discuss cocaine trafficking.  *See Simmons*, 923 F.2d at 945 (finding statements that "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy," further the conspiracy under Rule 801(d)(2)(E)); *United States v. List*, 200 F. App'x 535, 543 (6th Cir. 2006) (admitting as co-conspirator statement out-of-court statement that the defendant "was 'all right' and . . . involved in the cocaine trade reassured [the witness] about [the defendant]'s trustworthiness and furthered the conspiracy").

As such, the statements described above are admissible as co-conspirator statements.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that the Court should grant the relief requested herein.

Dated: New York, New York
January 16, 2024

Respectfully submitted,

DAMIAN WILLIAMS

United States Attorney for the
Southern District of New York

By:     <u>/s/</u>
Jacob H. Gutwillig
David J. Robles
Elinor L. Tarlow
Kyle A. Wirshba
Assistant United States Attorneys
212-637-2215 / 2550 / 1036 / 2493

Cc:    Defense Counsel
(Via ECF & Email)

20