**NITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x

UNITED STATES OF AMERICA,                                    15 Cr. 379 (PKC)

    -against-

JUAN ORLANDO HERNANDEZ, ET AL.,

               Defendants.

-----------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF**
**JUAN ORLANDO HERNANDEZ'S**
**MOTION FOR A WRITTEN JUROR QUESTIONNAIRE**

## **<u>TABLE OF CONTENTS</u>**

ARGUMENT ...................................................................................................................... 2

   I.   LEGAL STANDARD ................................................................................................... 2

  II.   A WRITTEN JUROR QUESTIONNAIRE IS THE MOST EFFICIENT METHOD FOR THIS COURT TO IDENTIFY JUROR PREJUDICE AND ENSURE A FAIR AND IMPARTIAL JURY……………………………………………………………………………...6

       A.   A Juror Questionnaire Will Help Ensure a Fair and Impartial Jury…………………..6

       B.   A Juror Questionnaire Will Ultimately Help Expedite the Jury Selection Process…17

CONCLUSION…………………………………………………………………………..20

## TABLE OF AUTHORITIES

**Cases**             **Page(s)**

*United States v. Ashburn*
No. 13-CR-0303 NGG, 2014 WL 5800280 (E.D.N.Y. Nov. 7, 2014) ..............................................9

*United States v. Williams*,
No. 13CR419S2DLI, 2016 WL 4536864 (E.D.N.Y. Aug. 30, 2016)............................3

*McDonough Power Equip., Inc. v. Greenwood*,
464 U.S. 548 (1984) ....................................................................................................2

*Skilling v. United States*,
561 U.S. 358 (2010) ....................................................................................................4

*United States ex rel. Bloeth v. Denno*,
313 F.2d 364 (2d Cir. 1963)........................................................................................2

*United States v. Brown*,
No. 20-CR-293 (WFK), 2022 WL 4586302 (E.D.N.Y. Sept. 29, 2022) .......................3

*United States v. Bruno*,
700 F. Supp. 2d 175 (N.D.N.Y. 2010) ................................................................ 3, 9, 10

*United States v. Cacace*,
No. CR-08-240-14 (BMC), 2013 WL 4775531 (E.D.N.Y. Sept. 6, 2013) .....................3

*United States v. Dervishaj*,
No. 13-CR-668 ENV, 2015 WL 3794803 (E.D.N.Y. June 17, 2015) .................. passim

*United States v. King*,
140 F.3d 76 (2d Cir. 1998)...........................................................................................3

*United States v. Muyet*,
945 F. Supp. 586 (S.D.N.Y. 1996)...............................................................................11

*United States v. Quinones*,
511 F.3d 289 (2d Cir. 2007)...................................................................................... 2, 9

*United States v. Rahman*,
189 F.3d 88 (2d Cir. 1999)................................................................................. 2, 4, 9, 11

*United States v. Stewart*,
433 F.3d 273 (2d Cir. 2006)...................................................................................... 2, 9

*United States v. Wilson*,
  493 F. Supp. 2d 402 (E.D.N.Y. 2006) ......................................................................... 18

*United States v. Wilson*,
  925 F. Supp. 2d 410 (E.D.N.Y. 2013) ......................................................................... 4

Defendant Juan Orlando Hernandez ("Defendant") respectfully submit this memorandum of law in support of his motion for a written juror questionnaire.[1]  A written juror questionnaire tailored to the specific needs of this case is critical to vet out any prejudices amongst prospective jurors and to ensure a fair and impartial jury. The <u>Government</u> recently moved for the use of a written juror questionnaire in the case of a different former President, in *United States v. Donald Trump, et al.*, 23-CR-80101 (S.D. Fl.) (Dkt. No. 240). Many of the arguments made by the Government in *Trump* also apply in this case.

This case has received substantial and, in some instances, sensationalized media coverage in major news outlets for several years. The trial will concern a variety of highly-charged topics about which many jurors may possess biases, including preconceived notions about the ongoing prevalence of narco-trafficking, gang violence, and corruption in Honduras, and the relationship between these issues and the current immigration crisis at our southern border – issues that nearly every juror will have an opinion on and which affects everyone living in the United States, especially those in New York City, which has been hit hard by the immigration crisis.

Finally, the trial will also be relatively lengthy and complex, which will result in legitimate hardship claims and the need for a larger pool of prospective jurors from which to select a qualified panel.

---

[1] Defendant's proposed written juror questionnaire is attached as Exhibit A. Prior to filing this motion, the Defense conferred with the Government regarding whether or not the Government would consent to the use of a written questionnaire. The Government advised that it would like to review the motion once we filed it and then would let the Defense know where the Government stood on the request. Should the Court grant Defendant's request for a questionnaire, the Defendant will work with the Government to finalize a questionnaire.

Permitting the jurors to answer this set of questions in advance of the in-court *voir dire* will help the Court more efficiently manage the jury selection process. As the Government itself recently argued in *Trump*, a written questionnaire will also serve justice by better permitting the parties to identify potential juror prejudice and select a fair and impartial jury.

## ARGUMENT

### I.   LEGAL STANDARD

A defendant's right to a fair and impartial jury is guaranteed by the Constitution and is a fundamental predicate to a fair trial.  *See McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984). As recently argued by the United States Department of Justice in its December 19, 2023 Motion for Written Jury Questionnaire in *United States v. Donald Trump, et al.* 23 Cr. 80101 (S.D. Fl.)), "using a juror questionnaire protects a Defendant's Sixth Amendment rights and facilitates a fair and efficient jury selection process when there is pre-trial publicity." Dkt. No. 240 (citing *United States v. Tsarnaev*, 595 U.S. 302, 312 (2022) (internal citations and quotation marks omitted). The Second Circuit has recognized that "[o]ne cannot assume that the average juror is so endowed with a sense of detachment, so clear in his introspective perception of his own mental processes, that he may confidently exclude even the unconscious influence of his preconceptions as to probable guilt, engendered by a pervasive pre-trial publicity."  *United States ex rel. Bloeth v. Denno*, 313 F.2d 364 (2d Cir. 1963).

*Voir dire* plays a crucial role in protecting the right to a fair trial "by exposing possible biases, both known and unknown, on the part of potential jurors." *Id.*  "[A]s in any case, the district court's duty is to conduct a thorough jury-selection process that allows the judge to evaluate whether each prospective juror is 'to be believed when he says he has not formed an opinion about the case.'" *Trump*, 23 Cr. 80101 (S.D. Fl.), Dkt. No. 240 (Gov. Mot. for Juror Questionnaire) (citing *Tsarnaev*, 595 U.S. at 313).

The use of juror questionnaires "as a preliminary screening tool falls well within the district court's broad discretion in conducting *voir dire*." *United States v. Quinones*, 511 F.3d 289, 300 (2d Cir. 2007).[2] A juror questionnaire is a common tool for efficiently identifying possible biases and prejudices of the venire. *See id.* at 299. Indeed, courts within this Circuit "routinely employ,"[3] *id.,* juror questionnaires in cases where, among other things:

- "there has been extensive pre-trial publicity," *id.*;[4]

- "a large number of prospective jurors must be screened," *id.* (citations omitted);[5]

- "to find out whether the [venire] includes people who have, for example, such strong views about some of the matters that they may be exposed to that they can't be fair,"

---

[2] *See also United States v. Trump*, 23 Cr. 80101 (S.D. Fl.), Dkt. No. 240 (Gov. Mot. for Juror Questionnaire) (Department of justice (acknowledging that "'[w]ritten questionnaires are now a common complement to oral examination when selecting an effective and impartial jury,' . . . and are 'routinely employ[ed] . . . to facilitate *voir dire* in a number of circumstances,' . . . including 'where there has been extensive pre-trial publicity.'" (citing *United States v. Isaacson*, 752 F.3d 1291, 1301 (11th Cir. 2014); *Quinones*, 511 F.3d at 299).

[3] There is abundant precedent in the Second Circuit supporting a district court's decision to use a juror questionnaire as being a determination squarely within the trial court's discretion. *See, e.g.*, *United States v. Rahman*, 189 F.3d 88, 121 (2d Cir. 1999) (approving of district court's use of juror questionnaire and individual *voir dire* after prospective jurors were excused for cause based on answers to the questionnaires); *United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006) (approving use of a juror questionnaire prompted by extensive publicity surrounding the case); *United States v. Cacace*, No. CR-08-240-14 (BMC), 2013 WL 4775531, at *5 (E.D.N.Y. Sept. 6, 2013) (granting juror questionnaire over government's objection).

[4] *See also, e.g.*, *United States v. Dervishaj*, No. 13-CR-668 ENV, 2015 WL 3794803, at *2 (E.D.N.Y. June 17, 2015) (permitting jury questionnaire due to "general concern about the publicity surrounding this case and the life stories of defendants"); *United States v. Cacace*, No. CR-08-240-14 BMC, 2013 WL 4775531, at *5 (E.D.N.Y. Sept. 6, 2013) (permitting jury questionnaire where "there has been extensive pre-trial media coverage").

[5] *See also, e.g.*, *Dervishaj*, 2015 WL 3794803, at *2 (permitting jury questionnaire due to "a potentially large number of venire members during the jury selection process"); *Cacace*, 2013 WL 4775531, at *5 (permitting jury questionnaire where "the Court anticipates that a large number of prospective jurors will be screened"); *United States v. Al Fawwaz*, No. S10 98-1023 LAK, 2015 WL 400621, at *1 (S.D.N.Y. Jan. 23, 2015) (utilizing jury questionnaire for "large number of prospective jurors").

> *United States v. Valle*, No. 12-cr-847 (Jan. 28, 2013), ECF No. 111, Tr. of Hearing
>
> Regarding *Voir Dire* at 3:15-22;[6]

- to "encourage juror candor" *id.* at 4:1-2;[7] and

- to "avoid polluting the [venire] by statements made by certain members of the [venire] about what they've read, seen or heard, and the impact of same experience." *Id.* 4:2-6.

*Accord Rahman*, 189 F.3d at 121-22 (holding that a juror questionnaire "skillfully balanced the difficult task of questioning . . . a large jury pool with the defendants' right to inquire into . . . sensitive issues that might arise in the case").

"If any or all of these circumstances are present, the use of a juror questionnaire, drafted with input from the parties, is appropriate to facilitate the *voir dire* process and help ensure the empanelment of a fair and unqualified jury." *Dervishaj*, 2015 WL 3794803, at *1 (E.D.N.Y. June 17, 2015); *Skilling*, 561 U.S. at 389 (upholding conviction where inspection of the questionnaires and *voir dire* of the individuals who actually served as jurors demonstrated that the selection process successfully secured jurors who were largely untouched by the issues at hand in case).

---

[6] *See also, e.g.*, *Skilling v. United States*, 130 S. Ct. at 2920-21 (describing the use of a written juror questionnaire to determine whether "community prejudice," "sympathy for victims of [company's] bankruptcy," or "speculat[ion] that greed contributed to the corporation's collapse" resulted in "animus toward [the defendant]"); *United States v. Brown*, No. 20-CR-293 (WFK), 2022 WL 4586302, at *7 (E.D.N.Y. Sept. 29, 2022) (finding that "questionnaire will be drafted with input from the parties and will assist the court in screening for juror bias"); *United States v. Williams*, No. 13CR419S2DLI, 2016 WL 4536864, at *5 (E.D.N.Y. Aug. 30, 2016) (using a juror questionnaire to "uncover bias among jurors"); *United States v. Wilson*, 925 F. Supp. 2d 410, 411-13 (E.D.N.Y. 2013) (using a juror questionnaire "to root out any and all bias").

[7] *See also, e.g.*, *United States v. King*, 140 F.3d 76, 80 (2d Cir. 1998) (approving of district court's use of juror questionnaire, among other measures, to "avoid[] inhibitions upon jurors' candor in order to assure that a fair and impartial jury will be selected"); *United States v. Bruno*, 700 F. Supp. 2d 175, 181 (N.D.N.Y. 2010) (approving of juror questionnaires as part of overall selection process in order to 'encourag[e] the candor of impaneled and prospective jurors and future venire")

Notably, judges in this circuit have routinely employed jury questionnaires in high-profile and ultra-high-profile criminal cases.  For example, in the "Bear Stearns Case," a multi-defendant trial that received significant media attention, Judge Block utilized a lengthy questionnaire over the Government's objection.  *United States v. Chioffi*, 1:08-cr-415-FB (E.D.N.Y. July 14, 2009) (Dkt. No. 142).  Similarly, Judge Seybert used a questionnaire to select a jury in the David Brooks trial.  *United States v. Brooks*, 1:06-cr-550-JS (E.D.N.Y. Dec. 21, 2009). And Judge Vitaliano employed a jury questionnaire, again over the Government's objection, in a two-defendant securities fraud trial.  *United States v. Discala*, 14-cr-399-EN (E.D.N.Y. Feb. 2, 2018) (Dkt. No. 490).  *See also*:

- *United States v. Maxwell*, 20-cr-330-AJN (S.D.N.Y.). The Court issued a 31-page questionnaire and jury selection lasted 3 days. Juror questionnaires were mailed out to batches of prospective jurors in advance for voir dire two weeks after.

- *United States v. Guzmán*, 09-cr-0466-BMC (E.D.N.Y.). The Court issued a 41-page questionnaire and jury selection lasted 3 days. Batches of prospective jurors filled out the juror questionnaire each day in court for voir dire the following month.

- *United States v. Full Play, et al.* 15-cr-252-PKC (E.D.N.Y.) (FIFA corruption case). The Court issued a 29-page questionnaire and jury selection lasted 2 days. Batches of prospective jurors filled out the juror questionnaire each day in court for voir dire the following week.

- *United States v. Basciano*, 05-cr-060-NGG (E.D.N.Y.). The Court issued a 67-page questionnaire and jury selection lasted 42 days. Batches of prospective jurors filled out the juror questionnaire each day in court for voir dire later that week.

- *United States v. Paul Manafort*, 1:18-cr-00083-TSE (E.D.V.A.). The Court issued a 20-page questionnaire and jury selection lasted 3 days. Prospective jurors filled out the juror questionnaire in court for voir dire the following week.

**II.    A WRITTEN JUROR QUESTIONNAIRE IS THE MOST EFFICIENT METHOD FOR THIS COURT TO IDENTIFY JUROR PREJUDICE AND ENSURE A FAIR AND IMPARTIAL JURY**

This is exactly the type of ultra-high-profile case where a case-specific jury questionnaire is warranted. The charges have garnered significant media attention. It involves two co-defendants, including the former two-term President of Honduras, allegations of running a "narco-state," and alleged ties to El Chapo himself. The conduct alleged by the Government directly correlates to the current immigration crisis in the United States and New York City, partially caused by asylum seekers fleeing drug and gang violence in Latin America that the Government accuses the defendants of facilitating. In this presidential election year, immigration may be the number one issue deciding the election.

And, trial is set for two to three weeks, which is likely to increase the number of hardship claims within the jury pool. Under these conditions, a larger number of prospective jurors will need to be screened, and a written juror questionnaire in advance of *voir dire* is the most efficient method to identify potential juror prejudice.

### A.    <u>A Jury Questionnaire Will Help Ensure a Fair and Impartial Jury</u>.

A jury questionnaire will safeguard Defendants' Sixth Amendment right to an impartial jury free from impermissible bias.  Such a tool is commonly used in ultra-high-profile cases such as this one where the Court and counsel face the difficult task of eliciting sufficient information from the potential jurors about their experiences and opinions concerning polarizing issues touching on numerous issues receiving daily media attention.

Mr. Hernandez has received significant negative media attention because of this case.  A Google News search of Juan Orlando Hernandez yielded approximately 1,820 articles spanning New York local news sources as well as other state, national, and international news sources. A Google search of "Juan Orlando Hernandez" returns over 20 million results. Further searching the terms Juan Orlando Hernandez and drug trafficking yielded over 200 articles from news sources that have reported on Mr. Hernandez's trial in New York and the drug and weapons charges at issue as well as related persons of interest like Mr. Hernandez's brother who was convicted and sentenced to life in prison. A chart collecting articles related to this case is attached hereto as Exhibit B.

The articles about Mr. Hernandez are overwhelmingly negative and inflammatory, having covered prosecutorial allegations and witness testimony tied to this case for over six years. Local news coverage started its coverage with the indictment of Mr. Hernandez's brother, Juan Antonio Hernandez Alvarado ("Tony Hernandez"), in 2018 for charges related to drug trafficking and weapons.[8]  Throughout the trial in 2019, local news covered both prosecutorial claims[9] and witness testimony which falsely alleged "Mexican drug lord Joaquin 'El Chapo' Guzman deliver[ed] a $1 million bribe to the political campaign of current Honduran President Juan Orlando Hernández."[10,11]  In 2020, "drug kingpin" Geovanny Daniel Fuentes Ramirez was arrested and local coverage of the court statements and documents emphasized the relationship between Mr. Hernandez and Mr. Ramirez highlighting allegations that "[t]he Honduran president agreed to shield a drug trafficker from prosecution and offered to let him use the country's armed forces for security in exchange for a $25,000 bribe" and that "Hernandez allegedly spoke to Ramirez about the cocaine 'laboratory' he developed near a commercial shipping port…"[12]  During Mr. Ramirez's trial, further witness testimony was published including false allegations that Mr. Hernandez stated "he would eliminate his country's extradition treaty with the United States, rendering his associates 'untouchable' and that 'We are going to stuff drugs up the gringos' noses, and they're never even going to know it.'"[13]

---

[8] Isabel Vincent, *Brother of Honduran president used speedboats, submarines to smuggle cocaine: courts*, New York Post (December 2, 2018), https://nypost.com/2018/12/02/brother-of-honduran-president-used-speedboats-submarines-to-smuggle-cocaine-courts/.

[9] Emily Saul, *El Chapo personally gave Honduras president $1M bribe: prosecutor*, New York Post (October 2, 2019), https://nypost.com/2019/10/02/el-chapo-personally-gave-honduras-president-1m-bribe-prosecutor/.

More recent coverage in the past couple of years has closely followed Mr. Hernandez's extradition to the U.S. following the "[a]llegations [that] have loomed over Mr. Hernandez for years" and the celebrations of Hondurans like Wendy Sierra who posited, "Justice was done…He left us poor here, he stole everything and favored drug traffickers, and no one ever touched him. But with the gringos you cannot play."[14] Alleged ties to "El Chapo" have been prominent and numerous statements made by U.S. attorneys and officials have been published including the following:[15]

- "Hernandez 'abused his position as President of Honduras from 2014 through 2022 to operate the country as a narco-state.'" – U.S. Attorney General Merrick Garland

- "Hernandez 'partnered with some of the world's most prolific narcotics traffickers to build a corrupt and brutally violent empire…'" – U.S. Attorney, S.D.N.Y., Damian Williams

---

[10] Emily Saul, *El Chapo gave $1M bribe to Honduran president: testimony*, New York Post (October 7, 2019), https://nypost.com/2019/10/07/el-chapo-gave-1-million-bribe-to-honduran-prez-manhattan-court-witness/.

[11] Emily Saul, *Prosecutor urges jury to convict brother of Honduran president for drug trafficking*, New York Post (October 16, 2019), https://nypost.com/2019/10/16/prosecutor-urges-jury-to-convict-brother-of-honduran-president-for-drug-trafficking/.

[12] Ben Feuerherd, *President of Honduras took bribes to protect cocaine kingpin, feds say*, New York Post (March 3, 2020), https://nypost.com/2020/03/03/president-of-honduras-took-bribes-to-protect-cocaine-kingpin-feds-say.

[13] Benjamin Weiser and Joan Suazo, *Ex-Honduran President Extradited to United States to Face Drug Charges*, The New York Times (April 21, 2022), https://www.nytimes.com/2022/04/21/nyregion/honduras-juan-orlando-hernandez-extradition.html.

[14] *Id.*

[15] Jonathan Dienst and Pete Williams, *Handcuffed Ex-Head of State Extradited to NYC in Sweeping Federal Trafficking Case*, NBC New York (April 22, 2022), https://www.nbcnewyork.com/investigations/handcuffed-ex-head-of-state-extradited-to-nyc-in-sweeping-federal-trafficking-case/3658084/.

- "[A] central figure in one of the largest and most violent cocaine-trafficking conspiracies in the world" and "used drug-trafficking proceeds to finance his political ascent and, once elected President, leveraged the Government of Honduras' law enforcement, military, and financial resources to further his drug-trafficking scheme." – DEA Administrator Anne Milgram

As the former President of Honduras, Mr. Hernandez is a prominent public figure whose media coverage is immense. But the coverage surrounding his brother's case and now this case has led to inflammatory headlines and the possibility of a jury pool biased by the outpouring of allegations and false testimony that have come to light over the last several years in the media – driven in large part by the fact that there are few instances where a foreign former head of state has been the subject of U.S. charges.

National news coverage has also been overwhelming, providing sweeping coverage since the indictment of Mr. Hernandez's brother in 2018. Reader comments to these articles reveal a host of prejudicial concerns that would be pre-empted and alleviated by a juror questionnaire. For instance, the following is a sampling of reader comments to the 2019 Fox News article, "Honduras president targeted in DEA drug-trafficking and money laundering investigation":[16]

- "Are we supposed to be surprised by this? It only makes sense that he's a drug peddler considering he has done nothing to dissuade drug lords and other criminals (parading as refugees in a caravan) from heading to the US. It's good for his business." – conservativeandreasonable

- "Nearly all these presidents in these Latin countries are tied to drug trafficking and gangs." – FireChap

- "At least China is doing one thing right. DEATH penalty for anyone guilty of trafficking drugs." – rockyrealm992

- "A crooked Honduran president? The hell you say…" – chargermikec

---

[16] Kaylie Piecuch, *Honduras president targeted in DEA drug-trafficking and money laundering investigation*, Fox News (May 31, 2019), https://www.foxnews.com/world/honduras-president-juan-orlando-hernandez-drug-trafficking-money-laundering.

Moreover, the following is a sampling of reader comments to the 2021 The Washington Post article, "Honduran president, a Trump ally implicated in drug trafficking, tries to win over Biden":[17]

- "Hernandez, breaking news for you- the insurrection coup failed- so, trot on over with your grift and corruption to Moron Lago where you'll feel right at home." – DrollMeister

- "Toss a rock in South and Central America you will hit a Narco trafficking political official." – Morning Colors

- "There's a reason why one nickname in Spanish for the president of Honduras is Juan 'Robando' Hernandez. 'Robando' means 'is stealing.'" – Publius38

- "A '…trump ally.' Well, that's all we need to know. The crooked con doesn't associate with anyone who doesn't break the law." – democracy49

Another 2022 The Washington Post article, "Former Honduras president Juan Orlando Hernandez arrested; U.S. seeks extradition on drug trafficking charges," yielded the following reader comments:[18]

- "Justice to those who have abused the Hondurans and trafficked drugs to America using their power." – markwater

- "'Hernandez was a longtime U.S. ally and a particularly close partner of the Trump administration' Really? I do not think trumpo had partners from *****countries ;-) On the other hand, if the brother of J.O.H. is now in jail, chances are Juan is also guilty, and then again, all them governors/presidents of poor Honduras." – Rara Avis

- "So many peoples lives in the US are being destroyed by drugs. Those who traffic drugs around the world are harming people internationally. The effect is violence,

---

[17] Kevin Sieff, *Honduran president, a Trump ally implicated in drug trafficking, tries to win over Biden*, The Washington Post (February 12, 2021), https://www.washingtonpost.com/world/the_americas/honduras-president-narcotrafficking-hernandez/2021/02/11/1fa96044-5f8c-11eb-ac8f-4ae05557196e_story.html.

[18] Keven Sieff, *Former Honduras president Juan Orlando Hernández arrested; U.S. seeks extradition on drug trafficking charges,* The Washington Post (February 15, 2022), https://www.washingtonpost.com/world/2022/02/15/honduras-juan-orlando-hernandez-extradition/.

crime, poor health, discrimination, child abuse, and the list goes on. Taking these initiatives to stop corruption and the drug industry is important so that people can live, peaceful, honorable, and prosperous lives and not be forced out of their beloved home countries." – Azelea

- "Another corrupt tyrant friend of trump. How surprising." – Harry Zimm

These reader comments illustrate the effect of widespread coverage surrounding this trial and related national issues concerning the divisive topics of immigration and responsibility for drug violence and consequently, highlight the need to discern potential juror sentiments that may impede Mr. Hernandez's right to a fair trial by an impartial jury.

Unfortunately, bias against Latin Americans regarding corruption is not merely speculative and recently occurred during jury selection in *United States v. Full Play, et al.* 15-cr-252-PKC (E.D.N.Y.), one of the FIFA corruption cases. There, several jurors reported in their questionnaires that they had the general view that soccer and Latin America were inherently "corrupt" and the use of a written juror questionnaire was instrumental in getting jurors to candidly reveal those biases. For example, jurors in *Full Play* made the following statements during the Court's individual sidebar follow-ups to their written questionnaires and were all struck for cause (some in combination with hardship):

**<u>Juror 1</u>**

PROSPECTIVE JUROR:   No. I think in South America the people don't abide by the law.

THE COURT:   Because?

PROSPECTIVE JUROR:   Because they can go away from that. There is a lot of corruption. This is what I hear on the news.

*United States v. Full Play, et al.*, January 12, 2023 Voir Dire Transcript, 55:17-22.

**Juror 2**

THE COURT:                  Are you predisposed to thinking that corruption is planted in the
                           professional soccer world, including FIFA?

PROSPECTIVE JUROR:          Yes, kind of. Yes.

*United States v. Full Play, et al.*, January 13, 2023 Voir Dire Transcript, 16:6-9.

**Juror 3**

THE COURT:                  Yes. I see that in the responses. So the questions I wanted to follow
                           up with you on are specific to Latin America countries and I guess
                           your statement that there's a high risk jurisdiction that Latin
                           America is a high risk jurisdiction for corruption and bribery. Can
                           you elaborate on that answer?

PROSPECTIVE JUROR:          So in my line of work we have a department that I manage that is
                           responsible for receiving applications from customers and we
                           delineate against them based on risk of the jurisdiction that they
                           come from, and for AML, which is the category that we're looking
                           at when we're looking at anti-money laundering risk. We consider
                           LAC a degree high risk of --

THE COURT:                  LAC being Latin America.

PROSPECTIVE JUROR:          Latin America Caribbean.

THE COURT:                  Caribbean, okay. And there's a presumption that there's greater
                           risk of corruption when you're dealing with Latin American and
                           Caribbean countries.

PROSPECTIVE JUROR:          This is not me saying this. This is like guidance. These are the
                           standard bodies that set, you know, degree of risk associated with
                           various countries.

THE COURT:                  And you apply that risk analysis.

PROSPECTIVE JUROR:          Correct.

THE COURT:                  And do you believe it yourself that there is a higher risk of
                           corruption as a result of all of the work you've been doing?

PROSPECTIVE JUROR:          I believe so.

*United States v. Full Play, et al.*, January 13, 2023 Voir Dire Transcript, 33:16 to 34:18.

**Juror 4**

THE COURT:      You tend to believe that corruption is rife through FIFA; is that right?

THE PROSPECTIVE JUROR:  Yes, through the media, what was sort of investigated.

*United States v. Full Play, et al.*, January 13, 2023 Voir Dire Transcript, 55:23 to 56:1.

**Juror 5**

THE COURT:      So you have a view that FIFA is relatively corrupt and bribes happen.

THE PROSPECTIVE JUROR:  Yes.

THE COURT:      Can you explain why you have that view?

THE PROSPECTIVE JUROR:  Just based on certain different certain sports pod-casts or sports programming or news articles I read, based on allegations in there.

*United States v. Full Play, et al.*, January 13, 2023 Voir Dire Transcript, 94:19 to 95:1.

**Juror 6**

THE COURT:      Do you have any view about the prevalence of bribery in this country?

THE PROSPECTIVE JUROR:  I mean, I know in the United States, it's not part of culture, put it this way. Maybe it happens, I never saw it, but it's not part of culture. But it is part of the cultures.

THE COURT:      In Ukraine?

THE PROSPECTIVE JUROR:  Yes.

*United States v. Full Play, et al.*, January 13, 2023 Voir Dire Transcript, 104:7-14.

**Juror 7**

THE COURT:      I want to follow up on a couple responses you gave in your questionnaire. In particular, you said that you would be skeptical, very skeptical of anyone -- sorry, let me start that again. Even if there's a hint of bribery, I would be skeptical of the defendants. Can you elaborate on that answer.

| PROSPECTIVE JUROR: | Yeah, I guess I'm an avid sports fan and I've just seen what money does to sports and I'm just skeptical as when I hear -- the phrase where there's smoke there's fire. When I here impropriety I tend to err on the side of somebody is up to something. |

*United States v. Full Play, et al.*, January 13, 2023 Voir Dire Transcript, 116:16 to 117:1.

A copy of all relevant transcript pages from *Full Play* is attached hereto as Exhibit C.

In addition to negative media attention focused on Mr. Hernandez and the allegations in this case and biases jurors might have about corruption in Latin America, another important issue that may unfairly affect juror decision-making is immigration through the southern border.

Recent polling data from Quinnipiac show that immigration from the southern border is a top concern for New Yorkers. *See NYC Mayor Adams' Approval Sinks To Record Low, Under Fire On Several Fronts, Quinnipiac University New York City Poll Finds; Most Voters worry Budget Cuts Will Affect Their Daily Lives*, Quinnipiac University (December 06, 2023), https://poll.qu.edu/poll-release?releaseid=3886, revealing:

- "More than 8 in 10 voters (85 percent) are either very concerned (64 percent) or somewhat concerned (21 percent) that the city will not be able to accommodate the surge of migrants that have made their way to New York City since the spring of 2022, while 14 percent are either not so concerned (7 percent) or not concerned at all (7 percent)."

- "A majority of voters (62 percent) agree with a statement Mayor Adams made a few months ago that the surge of migrants seeking sanctuary in New York City could destroy the city, while 33 percent disagree."

- "Eight in 10 voters (80 percent) think the federal government is doing too little to help New York City deal with the surge of migrants seeking sanctuary there, 8 percent think the government is doing about the right amount, and 6 percent think the federal government is doing too much to help the city deal with the situation."

A Siena College poll shows similarly concerning trends. See *Majorities Support: Using Federal Properties to Shelter Migrants, Easier Work Authorizations & Comprehensive Immigration Reform; Oppose Border Wall*, Siena College Research Institute (September 12,

2023), https://scri.siena.edu/wp-content/uploads/2023/09/Attitudes-Towards-Migrants-_Final.pdf:

- "By 48-42%, New Yorkers disagree that immigrants take more in resources than they return in economic activity."

- "Still, 31% of New Yorkers say that many of the people trying to immigrate to the U.S. are dangerous, potentially criminal people, and 38% say that migrants are the source of illegal drugs."

- "Over 40% of all New Yorkers believe that immigrants take more than they offer society."

It is absolutely critical to protect Mr. Hernandez's right to a fair and impartial jury that the Court take additional steps to identify and strike jurors that hold these biases, many of whom will not admit them in open court.

Extensive pre-trial publicity, as exists here, increases the difficulty of finding an objective jury pool and creates the risk that jurors will not be candid because they are embarrassed or unwilling to acknowledge potential biases in open court or afraid that their answers will be reported to the press—let alone the likelihood that potential jurors will taint the venire with statements about the press reports that they have seen. *See, e.g.*, *Bruno*, 700 F. Supp. 2d at 178-79; *Stewart*, 317 F. Supp. 2d at 435. There is also the practical consideration that selecting an impartial jury in a well-publicized case will require a more extensive examination of a larger pool of potential jurors. *See, e.g.*, *Rahman*, 189 F.3d at 121-22; *Bruno*, 700 F. Supp. 2d at 178-79. For all of these reasons, a juror questionnaire is a helpful "pre-screening measure" that will "expedite selection." *Quinones*, 511 F.3d at 299; *Dervishaj*, 2015 WL 3794803, at *1.

### B. A Jury Questionnaire Will Ultimately Help Expedite the Jury Selection Process.

A jury questionnaire will conserve the Court's and the jurors' time and resources and ultimately streamline the jury selection process by allowing the parties to analyze potential

jurors' answers in advance of *voir dire*.  *See, e.g.*, *United States v. Ashburn*, No. 13-CR-0303 NGG, 2014 WL 5800280, at *18 (E.D.N.Y. Nov. 7, 2014) ("[T]he court finds that utilizing a questionnaire will conserve judicial resources by saving a substantial amount of time relative to a jury selection process in which the entire *voir dire* is conducted orally."); *Dervishaj*, 2015 WL 3794803, at *1 (same); *Bruno*, 700 F. Supp. 2d at 178-79 (finding that a juror questionnaire will "expedite selection"); *United States v. Trump*, 9:23-cr-80101-AMC, Dkt. No. 240 (Gov. Mot. for Juror Questionnaire) (Department of Justice arguing that juror questionnaire "will make jury selection more efficient and effective by allowing the parties and Court [1] to identify uncontested strikes for cause and hardship before in-person *voir dire* begins, [2]  . . . to conduct informed individual questioning of a winnowed venire" and "[3][to] aid . . . in identifying potential bias in the jury venire").

This is a case where the parties have estimated a trial lasting two to three weeks. Inevitably, many prospective jurors will have legitimate hardship claims and the parties will need a large pool of prospective jurors from which to select a qualified panel.  The use of a written questionnaire will truncate the jury selection process and save the Court and the parties a significant amount of time in screening those jurors who are unable to sit for such a lengthy trial. By having the questionnaire completed in advance of jury selection, the parties will be able to discuss those jurors who assert a financial or other hardship incurred sitting on a trial of this anticipated length and simply agree to excuse the likely many on the venire that will have legitimate claims.

The proposed juror questionnaire here is relatively short, balanced, and neither prying nor unduly burdensome to the venire and does not "seek to discover in advance what a prospective juror's decision will be under a certain state of the evidence."  *Dervishaj*, 2015 WL 3794803, at

*2.  *See* Ex. A. It posits narrowly tailored questions about relevant areas of potential prejudice stemming from this case's pre-trial media attention and other relevant issues, including the potential jurors' knowledge of the trial participants and knowledge of this case and reactions thereto. *United States v. Wilson*, 493 F.Supp.2d at 404-05 ("[Q]uestions may be proper [and] indeed necessary[] if they deal with subject matter that would demonstrate impermissible bias on the part of a juror.").  The remainder of the questionnaire asks for routine background information and potential hardships for serving as a juror. This questionnaire will assist the Court and provide "sufficient information about each potential juror to allow [the government and defendants] to exercise their challenges in an intelligent manner."  *Muyet*, 945 F. Supp. at 595; *accord Rahman*, 189 F.3d at 121-22 (holding that a juror questionnaire "skillfully balanced the difficult task of questioning . . . a large jury pool with the defendants' right to inquire into . . . sensitive issues that might arise in the case").

Now that Mr. Hernandez's codefendant, Mauricio Hernandez Pineda, has pled guilty and is no longer part of the trial, the trial may be slightly shorter, which affords the Court time to spend on *voir dire* and the use of a written questionnaire, without extending the estimated length of the trial. A written questionnaire can be filled out by jurors on February 12, 2024, with the parties conferring overnight to supply the Court with a list of agreed upon cause and hardship excusals the morning of February 13 and then proceed with more limited follow up questioning of the remaining jurors, based on whatever limited number of questionnaire responses require follow up. This will result in a more fair and efficient process for both parties and will conserve judicial resources.

## **CONCLUSION**

For the reasons stated herein, Mr. Hernandez respectfully requests that the Court grant

this motion and approve the use of the prospective juror questionnaire, attached to this motion as

Exhibit A.

Dated:  New York, New York
        February 4, 2024

Respectfully submitted,

/s/

Renato C. Stabile, Esq.

580 Broadway, Suite 400
New York, NY  10017
212-619-1469 (phone)
renato.c.stabile@gmail.com

Raymond Colon, Esq.
131 Pugsley Ave.
Bronx, NY  10473
917-418-4701 (phone)
914-218-6999 (fax)
Rlcolonesq@aol.com

*Attorneys for*
*Juan Orlando Hernandez*

19