

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 20, 2024

Via ECF and Electronic Mail
The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   United States v. Juan Orlando Hernandez, S7 15 Cr. 379 (PKC)

Dear Judge Castel:

The Government respectfully submits this letter to supplement its prior motions *in limine* in the above-captioned case, which the Court granted in relevant part during the January 18, 2024 final pretrial conference. The Government respectfully requests rulings that (i) a former law enforcement officer ("Officer-2") may testify using a pseudonym; and (ii) certain records received from the Government of Honduras are authentic and may be admitted at trial. In particular, and as indicated in the Government's February 7, 2024 motion *in limine* ("February 7 Motion," attached as Exhibit A), the Government intends to offer excerpts of four audio calls that were intercepted by Honduran authorities in or around 2015 in connection with a Honduran investigation into MS-13, as well as limited portions of associated line sheets reflecting the date and time for each call.[1]

## I.  Officer-2 Should Be Permitted to Testify Under a Pseudonym

The Government respectfully submits that Officer-2, ███████████████████████
████████████████████████████████████████████████ should be permitted to testify under a pseudonym, and without disclosing other personally identifiable information in public, to mitigate risks to Officer-2's safety ███████████████████████████
████████████ The Government has conferred with counsel for the defendant, who have received Officer-2's true name and who no objection to this request.

The Government anticipates calling Officer-2 to testify about, as described in more detail below, his involvement in the Honduran investigation of Yulan Adonay Archaga Carias, a/k/a "Porky," a/k/a "Alexander Mendoza" ("Mendoza") and, in particular, his knowledge that, as part

---

[1] Earlier today, the Court granted the February 7 Motion and ruled that the statements in Government Exhibits 403-406 are "presumptively admissible" co-conspirator statements. *See* Tr. 10-11.

of that investigation, Honduran law enforcement intercepted recorded phone conversations in which Mendoza participated. Mendoza has been charged in this District with racketeering, narcotics, and firearms offenses, in connection with his role as the leader of street gang and drug trafficking organization ("DTO") MS-13 in Honduras, but remains at large. *See United States v. Archaga Carías*, et al., S1 21 Cr. 321 (GHW). As described in more detail in the Government's February 7 Motion, Mendoza is a violent drug trafficker and gang member who has previously threatened to kill those he suspected of cooperating with law enforcement. Ex. A at 2. Indeed, at this trial, the Government expects witness testimony that one witness regularly contracted Mendoza and his underlings to commit murders..

As the Court previously found in granting the Government's motions to permit certain other witnesses in this case to testify under pseudonyms, (*see* Dkt. 671 at 8), permitting Officer-2 to also testify under a pseudonym at trial is both appropriate and necessary in light of the serious safety concerns implicated by the public disclosure of Officer-2's identity. For the same reasons, the Government respectfully requests that the Court preclude any person from attempting to sketch or otherwise capture a likeness of Officer-2 during trial ███████████████████████████
████████████████ ███████████████████████████████████████

## II.   The Honduran Records Are Authentic

On February 8, 2024, the Government received, pursuant to a Mutual Legal Assistance Treaty request, four calls from a lawfully intercepted Honduran wiretap on Mendoza and others (the "Mendoza Wiretap") as well as associated line sheets that were all accompanied by a signed Apostille, or certificate of authentication, executed pursuant to the 1961 Hague Convention Abolishing the Requirement of Legalisation for Foreign Public Documents (the "Hague Convention"), T.I.A.S. No. 10072 (U.S. Treaty), 1981 WL 375769 (U.S. Treaty) (attached hereto as Exhibit B).[2] For the reasons described below, these records (the "Honduran Records") are self-authenticating pursuant to the Federal Rules of Evidence and Federal Rules of Criminal Procedure.

Federal Rule of Criminal Procedure 27 states, "A party may prove an official record [or] an entry in such a record . . . in the same manner as in a civil action." The authentication of official foreign records is governed in civil actions by Federal Rule of Civil Procedure 44(a)(2), which provides:

> Each of the following evidences a foreign official record—or an entry in it—that is otherwise admissible: . . . (ii) the record—or a copy—that is attested by an authorized person and is accompanied either by a final certification of genuineness or by a certification

---

[2] As indicated in the Government's January 19, 2024 letter, draft line sheets for the four audio calls in the Mendoza Wire were first produced to the defendant in August 2022 and the four calls were produced to the defendant on December 7, 2023. The audio calls received on February 8, 2024, were identical to those already provided to the defense and the line sheets, which included a more detailed description of the calls than in prior line sheets, was produced to the defendant the same day.

under a treaty or convention to which the United States and the
country where the record is located are parties.

Fed. R. Civ. P. 44(a)(2). The commentary for Rule 44 describes the Hague Convention, and notes
that apostilles signed pursuant to it "provide[] a reliable method for maintaining the integrity of
the authentication procedure," and the apostille can be accorded greater weight than the normal
authentication procedure." *Id.* cmt. to subdivision (c); *see also Corovic v. Mukasey*, 519 F.3d 90,
93, n2. (2d Cir. 2008) ("An 'apostille' is an international method for verification of foreign
documents similar to notarization."). Honduras and the United States are parties to the Hague
Convention,[3] under which Honduras issued the Apostille. In these circumstances, courts have
routinely held that public records that accompany an apostille are self-authenticating, including in
criminal cases. *See, e.g.*, *United States v. Pintado-Isiordia*, 448 F.3d 1155, 1157 (9th Cir. 2006)
("[T]he birth record and its attestation were certified by an Apostille in accordance with the Hague
Convention Abolishing the Requirement of Legalisation for Foreign Public Document."); *United
States v. Vidrio-Osuna*, 198 F. App'x 582, 583 (9th Cir. 2006) ("Because defendant's birth
certificate had an apostille certification, it was self-authenticating under the [Hague
Convention].").

In light of the signed Apostille, the Honduran Records are self-authenticating and, for the
reasons described below, should be admitted, in relevant part, at trial.

## III.   Portions of the Four Audio Calls from the Mendoza Wiretap and Limited Portions of the Associated Line Sheets Are Admissible

From the self-authenticating Honduran Records, the Government anticipates offering at
trial (i) excerpts of four of the lawfully intercepted calls from the Mendoza Wiretap described in
the February 7 Motion, marked as Government Exhibits 403-406, Ex. A at 7; and (2) redacted
versions of line sheets for those calls from the Mendoza Wiretap, reflecting only information
automatically generated upon interception, reflecting the date, time, and unique identifying
number for each self-authenticating call, marked as Exhibit 415 (attached as Exhibit C). For the
reasons stated below and in the February 7 Motion, the Court should admit Government Exhibits
403-406 and 415.

At trial the Government anticipates calling Officer-2 as a witness. During his employment,
Officer-2 ████████████████████████████████████████████████████. The
Government anticipates that he will testify, in substance and in part, that he is familiar with
Honduran wiretaps of the type utilized in the Mendoza investigation, he was familiar with the
Mendoza Wiretap in particular, and he had reviewed, during the course of his official duties, earlier
versions of line sheets for the Mendoza Wiretap. He will testify to the background of his
investigation, the process in general terms for lawful interception of telephone calls in Honduras,
and the process by which line sheets are created. Those line sheets, he is expected to testify, include
information automatically generated by a computer effectuating the electronic interception,
including for any particular call the date, time, phone numbers involved in the call, and a unique

---

[3]   *See*   https://www.hcch.net/en/instruments/conventions/status-table/?cid=41   (identifying the
parties to the Hague Convention, including Honduras and the United States).

identifier, which in prior wiretaps and with respect to this Mendoza Wiretap, he understood to be accurate. Examining the authentic Honduran document marked Government Exhibit 415, he is expected to testify that they are redacted line sheets reflecting only the automatically generated information produced by the computer. In addition, he would testify that the unique identifiers for the calls listed in Government Exhibit 415 matched the filenames for the authentic calls from the Honduran Records, excerpts of which are marked as Government Exhibits 403-406.

Following the testimony laying the above foundation, the Government respectfully submits that Government Exhibit 415 is admissible because it is authentic, relevant, and does not contain inadmissible hearsay.

As described above, Government Exhibit 415 is authentic because it is accompanied by the Apostille under the Hague Convention. The information within Government Exhibit 415 is authentic pursuant to Federal Rule of Evidence 901, which allows authentication through "evidence sufficient to support a finding that the item is what the proponent claims it is," including, by way of example, "evidence describing a process or system and showing that it produces an accurate result." Fed. R. Evid. 901(a) & (b)(9). In *United States v. Rommy*, 506 F.3d 108, 138 (2d Cir. 2007), the Second Circuit upheld the district court's determination that a transcript of an intercepted call from a foreign wiretap was authentic under Rule 901(b)(9) based on testimony from a Dutch law enforcement officer who was "personally involved in the wiretap investigation from which the transcript derived," but had "no specific present recollection of the . . . call or of preparing the corresponding transcript." *Id*. at 138. The Second Circuit concluded the district court had not abused its discretion in admitting the transcript, citing only that the witness had "testified that it had been her general practice upon listening to calls intercepted during the investigation to prepare a contemporaneous transcript." *Id*. Here, the evidence of an accurate process is stronger, as the witness will testify to his understanding of the accuracy of the process and his understanding that it resulted in the very information at issue.

As further detailed in the February 7 Motion, Government Exhibit 415 is also relevant because it describes the dates and times of intercepted phone calls made in furtherance of the charged conspiracy, including about how the defendant had assigned an elite team of police to try to kill a drug trafficker, Bayron Ruiz, who had worked with the defendant and his brother, Tony Hernandez, in order to prevent that trafficker from being arrested by U.S. authorities and potentially exposing them if he chose to cooperate against them. *See* Ex. A at 7.

Finally, Government Exhibit 415 does not contain hearsay. Courts have repeatedly held that "machine statements aren't hearsay." *United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1110 (9th Cir. 2015) (collecting cases); *United States v. El Gammal*, 831 F. App'x 539, 543 (2d Cir. 2020) ("[A] machine-generated record . . . is unlikely to be considered hearsay.); *see also* 30 Fed. Prac. & Proc. Evid. § 6532 (2d ed.) ("Machine-generated statements are not 'hearsay' for purposes of evidence law nor are they 'testimonial hearsay' for confrontation purposes.").[4] As the witness

---

[4] *See also, e.g.*, *United States v. Channon*, 881 F.3d 806, 811 (10th Cir. 2018) (machine-generated transaction records in Excel spreadsheets not hearsay); *United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1109–10 (9th Cir. 2015) (a Google Earth "tack" placed at labeled GPS coordinates not hearsay); *United States v. Lamons*, 532 F.3d 1251, 1263–64 (11th Cir. 2008) (machine-generated

Hon. P. Kevin Castel                                                                                           Page 5
February 20, 2024

will testify, Government Exhibit 415 contains only those portions of the line sheets that are automatically generated by the computer and therefore does not contain hearsay.[5]

Accordingly, for the reasons set forth above, the Government respectfully requests that the Court permit Officer-2 to testify under a pseudonym and that the Court, in advance of trial, find that the testimony and Government Exhibits described above are admissible at trial.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:    /s/    _____
Jacob H. Gutwillig
David J. Robles
Elinor L. Tarlow
Kyle A. Wirshba
Assistant United States Attorneys
(212) 637-2215 / -2550 / -1036 / -2493

Cc:    Defense Counsel
        (Via ECF and Email)

---

data collected from calls made at airline's corporate toll-free number not hearsay statement, for Confrontation Clause purposes); *United States v. Khorozian*, 333 F.3d 498, 506 (3d Cir. 2003) (header information generated by fax machine not a hearsay statement because it is not "uttered by 'a person' [and] nothing 'said' by a machine ... is hearsay").

[5] Nor would the line sheets in Government Exhibit 415 violate the Confrontation Clause "because they were not made by a human witness, but by a machine incapable of answering to cross-examination." *Stultz v. Artus*, No. 04-CV-3170 (RRM), 2013 WL 937830, at *10 (E.D.N.Y. Mar. 8, 2013); *see also Lizarraga-Tirado*, 789 F.3d at 1110 (finding no Confrontation Clause violation for computer generated records).

# Exhibit A



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 7, 2024

<u>Via ECF and Electronic Mail</u>
The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:     <u>United States v. Juan Orlando Hernandez</u>, S7 15 Cr. 379 (PKC)

Dear Judge Castel:

The Government respectfully submits this letter to supplement its prior motions *in limine* in the above-captioned case, which the Court granted in relevant part during the January 18, 2024 final pretrial conference.  Specifically, the Government respectfully requests the following additional rulings in advance of trial: ██████████████████████████████████████████████████████████████████████████████ (ii) certain statements that were made by members and associates of La Mara Salvatrucha, commonly known as "MS-13," and Juan Carlos Bonilla Valladares ("Bonilla"), are admissible as co-conspirator statements pursuant to Federal Rule of Evidence 801(d)(2)(E); and (iii) portions of four audio calls between members and associates of MS-13 that were lawfully intercepted by Honduran authorities in or around 2015 are admissible as co-conspirator statements pursuant to Rule 801(d)(2)(E).

Hon. P. Kevin Castel
February 7, 2024

Page 2



Hon. P. Kevin Castel                                                                                     Page 3
February 7, 2024

## II.      Statements Made by MS-13 Members and Associates and Bonilla Are Admissible Under the Hearsay Rules

As described in the Government's prior motions *in limine*, several of the defendant's co-conspirators made statements to witnesses, or to other co-conspirators in the presence of witnesses, regarding the drug trafficking conspiracy, their efforts to protect themselves and their drug trafficking operation, and their attempts to increase their power in Honduras through corruption and cocaine-fueled bribes. (*See, e.g.*, Dkt. 554 at 39-63.) As the Court found at the January 18, 2024 final pretrial conference, evidence of these types of statements is admissible under the hearsay rules. (*See, e.g.*, Dkt. 671 at 11-26.)

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████ In addition, as referenced in the Government's January 19, 2024 letter, (*see* Dkt. 664 at 2), the Government also seeks to offer portions of certain audio calls between members or associates of MS-13 that were lawfully intercepted by Honduran authorities and that concern the defendant's and Bonilla's involvement in the charged conspiracy. As set forth below, the same reasoning that guided the Court's prior evidentiary rulings applies with equal force here and the Court should admit the statements described herein.

### A.  Applicable Law

#### 1.  Rule 801(d)(2)(E): Co-Conspirator Statements

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement pursuant to this Rule, the Court must find two facts by a preponderance of the evidence: *first*, that a conspiracy that included the declarant and the defendant existed; and *second*, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

Once a conspiracy is shown to exist, the "evidence sufficient to link another defendant to it need not be overwhelming," and "the 'in furtherance' requirement of Rule 801(d)(2)(E) is satisfied" when, for example, "a co-conspirator is apprised of the progress of the conspiracy, or when the statements are designed to induce his assistance." *United States v. Paone*, 782 F.2d 386, 390 (2d Cir. 1986) (internal quotation marks omitted). Statements between co-conspirators that "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy," further the conspiracy, *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1988), as do statements "that apprise a co-conspirator of the progress of the conspiracy," *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987).

Hon. P. Kevin Castel                                                                         Page 4
February 7, 2024

     Where hearsay is admissible under the Federal Rules of Evidence, it may nevertheless be prohibited by the Confrontation Clause of the Sixth Amendment.  "But a statement 'cannot fall within the Confrontation Clause unless its primary purpose was testimonial'—that is, unless the statement, viewed objectively in light of all the relevant circumstances, was made or procured with a primary purpose of 'creating an out-of-court substitute for trial testimony.'"  *United States v. Bick*, 711 F. App'x 664, 666 (2d Cir. 2017) (summary order) (quoting *Ohio v. Clark*, 135 U.S. 2173, 2180 (2015)).

## B.   Discussion

### 1.   Statements Made by Members and Associates of MS-13 and Bonilla are Admissible ▮▮▮▮▮▮▮▮▮▮▮▮



As set forth below, these categories of statements are admissible ▮▮▮▮▮▮▮▮▮▮▮▮, pursuant to Rule 801(d)(2)(E).  These categories of statements, referred to as "Statement [number]," are summarized below:[3]



Hon. P. Kevin Castel                                                                                 Page 5
February 7, 2024

 

 

Each of the three categories of statements summarized above is admissible under Rule 801(d)(2)(E) against the defendant. Statements during those conversations were made both by a member of the conspiracy and were "in furtherance" of their drug trafficking conspiracy. *See* Fed. R. Evid. 801(d)(2)(E). As set forth in the Government's prior motions *in limine*, the Government anticipates that Leonel Devis Rivera Maradiaga ("Leonel Rivera"), one of the former leaders of the *Cachiros* DTO, will testify about the *Cachiros* DTO's involvement in the charged narcotics and firearms conspiracies. (*See, e.g.*, Dkt. 554 at 46-54.)  The Government also expects that Leonel Rivera will testify that the *Cachiros* DTO used MS-13 both to protect the conspiracy's drug shipments in Honduras and to carry out acts of violence on behalf of the *Cachiros* DTO. *See, e.g.*, *Rahme*, 813 F.2d at 36 (statements "that apprise a co-conspirator of the progress of the conspiracy" are in furtherance of the conspiracy).

Hon. P. Kevin Castel                                                                                Page 6
February 7, 2024



*See, e.g.*, *United States v. Kuthuru*, 665 Fed. App'x. 34, 38
(2d Cir. 2016) ("Questions and commands are ordinarily not hearsay because they are not offered
for the truth of the matter asserted."). In any event, these statements were clearly intended to
"prompt the listener to respond in a way that facilitates the carrying out of criminal activity," and
are therefore admissible as co-conspirator statements for this reason, as well. *United States v.
Beech-Nut Nutrition Corp.*, 871 F. 2d 1181, 1199 (2d Cir. 1989).

Here,
the defendant and Bonilla were part of the same conspiracy; for example, the Court has already
ruled that evidence relating to Bonilla's involvement in a murder at the direction of the defendant's
brother, Tony Hernandez, is admissible as "evidence of the operations of the conspiracy, and it
bears on the nature, structure, roles in the conspiracy." (Dkt. 671 at 9-10). These conversations
are thus plainly in furtherance of the charged narcotics and firearms conspiracies, of which the
defendant and Bonilla were members. *See, e.g.*, *Simmons*, 923 F.2d at, 945 (statements meant to
"provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other
of the current status of the conspiracy" are in furtherance of the conspiracy).

Hon. P. Kevin Castel                                                                            Page 7
February 7, 2024

### 2. Four Audio Calls between Members and Associates of MS-13 are Admissible

As referenced in the Government's January 19, 2024 letter, (*see* Dkt. 664 at 2), the Government also seeks to offer portions of certain audio calls that were lawfully intercepted by Honduran authorities in or around 2015 in connection with a Honduran investigation into MS-13, and specifically, Mendoza. The relevant portions of these calls, which are between Mendoza and other members and associates of MS-13 ██████████████████████, are admissible as co-conspirator statements pursuant to Rule 801(d)(2)(E) and are summarized below and referenced by their Government Exhibit number:[6]

1. **GX 403.** On or about June 5, 2015, Mendoza and an unidentified female ("CC-1") had a call during which Mendoza discussed that the defendant's presidency was not going to last for much longer because a phone conversation had been intercepted with "Bonilla" [*i.e.*, Tigre Bonilla] during which it was discussed that the defendant had received millions of dollars from Hector Emilio and the *Valles*.

2. **GX 404.** On or about June 19, 2015, Mendoza and Campbell had a call during which Mendoza told Campbell, in sum and substance, that the defendant had assigned an elite team of police to try to kill a drug trafficker, Bayron Ruiz, who had worked with the defendant and his brother, Tony Hernandez, in order to prevent that trafficker from being arrested by U.S. authorities and potentially exposing them if he chose to cooperate against them.

3. **GX 405.** On or about September 29, 2015, Mendoza, Campbell, and Anwar had a call during which they discussed that the *Cachiros* were now in custody in New York and were playing a "cat and mouse" game because they had given up all the "routes" that "the President" (i.e., the defendant) had given them as part of "the deal."

4. **GX 406.** On or about November 18, 2015, Mendoza, Anwar, and others had a call in which they discussed, in sum and substance, a particular route that they could use to send money and other items in trucks across the border and stated that "Tigre Bonilla" previously had let "contraband" cross the border for $5,000.

For substantially the same reasons as those discussed above with respect to statements the Government seeks to offer ██████████████████, each of the portions of the intercepted audio calls described above is admissible pursuant to Rule 801(d)(2)(E). As described above, MS-13 worked with members of the charged conspiracy, including Bonilla and members of the *Cachiros* and *Valles* DTO, to traffic drugs. The participants on these four calls, who include Mendoza, Campbell, and Anwar, are thus the defendant's co-conspirators, satisfying the requirement that the statement(s) be made by a member of the conspiracy. *See* Fed. R. Evid. 801(d)(2)(E).

---

[6] The Government has provided these marked audio calls to the defense, along with translations.

Hon. P. Kevin Castel                                                                    Page 8
February 7, 2024

The substance of each of the calls also supports that they were made in furtherance of the charged conspiracies.

First, GX 403 is admissible under Rule 801(d)(2)(E). In GX 403, Mendoza described to CC-1 that the defendant's presidency might end soon because "Bonilla"—a reference to Tigre Bonilla—had been intercepted on another call discussing that the defendant had received millions of dollars in bribes from Hector Emilio and the *Valles*, Honduran drug traffickers. As described above, and in the Government's initial motions *in limine*, the Government expects that the evidence at trial will show that Bonilla and the *Valles* worked with the defendant and his co-conspirators to traffic narcotics throughout Honduras and into the United States and, in return, the defendant received bribes from the *Valles* for the defendant's first presidential campaign. The Government further intends to offer evidence that MS-13 and its gang members helped protect the defendant's co-conspirators and their drug trafficking activities. Mendoza's update to CC-1, therefore, was plainly meant to "apprise a co-conspirator of the progress of the conspiracy," *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987), and to advise CC-1 that the defendant's administration, and the protection for their drug trafficking activities, may soon come to an end.

Second, in GX 404, Mendoza provided Campbell with an update on the status of the conspiracy; in particular, that the defendant had arranged for a particular drug trafficker, Bayron Ruiz, to be killed so that he would not be arrested and cooperate with U.S. authorities, thereby exposing the defendant and his brother, Tony Hernandez, to criminal liability.[7] On its face, this conversation, in which Mendoza described that Ruiz had worked with the defendant and his brother, and the defendant's efforts to ensure that the conspiracy's operations were not exposed, was plainly meant to "apprise a co-conspirator of the progress of the conspiracy," *Rahme*, 813 F.2d at 36, and also to identify members of the conspiracy, *see, e.g.*, *United States v. Delligatti*, No. 15 Cr. 491, 2018 WL 1033242, at *6 (S.D.N.Y. Feb. 23, 2018) ("[S]tatements that convey information about others in the same organized crime syndicate are considered to be during and in furtherance of a conspiracy."). Moreover, this intercepted conversation was exchanged and discussed by two other members of the conspiracy, Geovanny Fuentes Ramirez and "Comisionado Martinez," a corrupt former Honduran National Police official. More specifically, in electronic communications between Fuentes Ramirez and Martinez, which took place on or about February 25, 2020 and which the Government introduced at the *Fuentes Ramirez* trial and the Court already ruled are admissible at this trial, (*see* Dkt. 554 at 88-90; Dkt. 671 at 30-31), the two discuss how the wiretaps became public and Martinez sent Fuentes Ramirez a voice note containing a portion of GX 404. In discussing the call, Martinez said "it's a shitshow," to which Ramirez responded, "Yes, it's going to be a disaster. It's going to be a f*cking disaster." This conversation between co-conspirators, approximately five years after the date of GX 404 and when that intercepted call became public, further demonstrates the connection between what is discussed on this call and the conspiracy, particularly given that Fuentes Ramirez and Martinez are discussing the negative impact that this call could have on the conspiracy itself.

---

[7] On March 30, 2017, Ruiz was charged in the Eastern District of New York with cocaine importation and firearms charges. *See United States v. Ruiz*, 17 Cr. 172 (ILG), Dkt. 1 (Mar. 30, 2017). Ruiz pled guilty to the charges in his indictment and was sentenced on September 10, 2021 to five years' imprisonment. (*See id*. at Dkt. 55, 56.)

Hon. P. Kevin Castel                                                                                        Page 9
February 7, 2024

Third, GX 405 is admissible for similar reasons.  In GX 405, as described above, members and associates of MS-13 were discussing the status of the *Cachiros*, who had been taken into custody in the United States, and they appear to be referencing drug routes that "the President," (i.e., the defendant), had previously given to the *Cachiros* as part of their "deal."  As described in the Government's prior motions *in limine*, the *Cachiros* paid bribes to the defendant to obtain control of certain drug routes.  The reference to a "cat and mouse" game appears to be a reference to the *Cachiros*' cooperation.  Here, too, the purpose of the call was plainly to provide an update on the status of the conspiracy to members of MS-13 and to "convey information about others in the same organized crime syndicate."  *Delligatti*, 2018 WL 1033242, at *6.

Fourth, GX 406 is also admissible under Rule 801(d)(2)(E) because it is between members of the conspiracy discussing how to send trucks with contraband across the Honduran border.  In doing so, the participants identify Bonilla as an individual that would previously permit contraband to cross the border in exchange for money.  These statements, which concern how the gang would get contraband from one place to another and who the gang could rely on for that purpose, were therefore intended to "prompt the listener to respond in a way that facilitates the carrying out of criminal activity."  *Beech-Nut Nutrition Corp.*, 871 F. 2d at.  Indeed, by identifying Bonilla as a corrupt officer who had previously assisted MS-13 (███████████████████████████████████ ████████████████████████████████), members of the conspiracy could know who to trust to carry out their criminal activity.  These statements were thus clearly in furtherance of the conspiracy.

Finally, each of the portions of the calls summarized above is highly probative and their probative value far outweighs any potential for unfair prejudice that may result from their admission.  The defendant is charged with participating in a large-scale international drug conspiracy that involved the highest levels of Honduran government and law enforcement officials who conspired with drug traffickers to send drugs to the United States.  The first two calls, which squarely relate to the defendant's involvement in the charged drug conspiracy, could not be more probative: GX 404 concerns the defendant's efforts to conceal his involvement in the drug conspiracy by attempting to kill a drug trafficker that could cooperate with U.S. authorities and GX 405 concerns drug routes that the defendant had given to the *Cachiros*.  GX 406, which concern's Bonilla's involvement in accepting corrupt payments to abuse his official position and allow contraband to cross the border, also directly implicates Bonilla—a former Chief of the Honduran National Police, who the Government alleges committed a murder to protect Tony Hernandez's drug territory—in precisely the type of conduct alleged by the Government that facilitated this drug conspiracy. As such, the probative value of each of these calls is significant. On the other hand, the potential for unfair prejudice is minimal, particularly given the other evidence the jury will hear in this case concerning murders carried out in furtherance of the drug conspiracy, including by cooperating witnesses, and corrupt payments made to high-level government officials. *See, e.g.*, *United States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997) (evidence of uncharged violent acts not unfairly prejudicial); *see also* Dkt. 671 at 9-10, 25-26 (finding that evidence of bribes paid to protect drug shipments is admissible and also that "evidence that Bonilla murdered Victim-1 at Tony Hernandez's direction" is not "excludable under 403 because it's evidence of the operations of the conspiracy, and it bears on the nature, structure, roles in the conspiracy").  As such, in addition to being admissible under the hearsay rules, these calls also unquestionably pass a Rule 403 balancing test.

Hon. P. Kevin Castel                                                              Page 10
February 7, 2024

      Accordingly, for the reasons set forth above, the Government respectfully requests that ██
██████████████████████ the Court, in advance of trial, find
that the statement and calls described above are admissible at trial.

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney

                       By:     /s/
                              Jacob H. Gutwillig
                              David J. Robles
                              Elinor L. Tarlow
                              Kyle A. Wirshba
                              Assistant United States Attorneys
                              (212) 637-2215 / -2550 / -1036 / -2493

Cc:      Defense Counsel
        (Via ECF and Email)

# Exhibit B

  

# Apostille Oficial

### *Convention de La Haye du 5 Octobre 1961*

1. **País:** Honduras
   Country / Pays

   **El presente documento público**
   This public document / Le présent acte public

2. **Ha sido firmado por:** JOHEL ANTONIO ZELAYA ALVAREZ
   Has been signed by / a été signé par

3. **Quien actúa en calidad de:** FISCAL GENERAL DE LA REPÚBLICA DE HONDURAS
   Acting in the capacity of / agissant en qualité de

4. **Y esta revestido del sello/timbre de:** MINISTERIO PUBLICO
   Bears the seal / stamp of / est revêtu du sceau / timbre de

**Certificado / Certified / Attesté**

5. **En:** Tegucigalpa, M. D. C., Honduras, C. A.,   6. **El día:** El día martes, 6 de febrero de 2024
   A+   / à                                                      the / le

7. **Por:** EMILSON DANIEL DURON
   By / Par

8. **Bajo el número:** 1430764
   Number / Sous N°

9. **Sello/Timbre:**        10. **Firma:**
   Seal / Stamp              Signature / Signature



**EMILSON DANIEL DURON**
Encargado de la Secretaría General
In Charge of the General Secretary
Chef Titulaire de la Section des Légalisations et Apostilles

**Esta Apostilla es válida únicamente para el documento adjunto ya registrado.**
**ASISTENCIA JURIDICA INTERNACIONAL**

Esta Apostilla certifica únicamente la autenticidad de la firma, la calidad en que el signatario del documento haya actuado y, en su caso, la identidad del sello o timbre del que el documento público esté revestido.

Esta Apostilla no certifica el contenido del documento para el cual se expidió.

Esta Apostilla se puede verificar en la dirección siguiente:
http://servicios.sreci.gob.hn/TramitesV3.0/CertificadoAutenticaApostillaSRECI.aspx

This Apostille only certifies the authenticity of the signature and the capacity of the person who has signed the public document, and, where appropriate, the identity of the seal or stamp which the public document bears.

This Apostille does not certify the content of the document for which it was issued.

To verify the issuance of this Apostille, see
http://servicios.sreci.gob.hn/TramitesV3.0/CertificadoAutenticaApostillaSRECI.aspx

Cette Apostille atteste uniquement la véracité de la signature, la qualité en laquelle le signataire de l'acte a agi et, le cas échéant, l'identité du sceau ou timbre dont cet acte public est revêtu.

Cette Apostille ne certifie pas le contenu de l'acte pour lequel elle a été émise.

Cette Apostille peut être vérifiée à l'adresse suivante:
http://servicios.sreci.gob.hn/TramitesV3.0/CertificadoAutenticaApostillaSRECI.aspx

**Libre de Derechos / No Fees / Pas de Frais**

Elaborado por / By / Par : Hilda Patricia Pavon          N° 10984          06/02/2024 02:13:27 p.m.

MINISTERIO PUBLICO
REPUBLICA DE HONDURAS
FISCALIA ESPECIAL CONTRA EL CRIMEN ORGANIZADO
FESCCO
ARCHIVO UNICO
FOLIO No. 66

USAO_408365

Exhibit C



| AGENCIA TÉCNICA DE INVESTIGACIÓN CRIMINAL | | |
|---|---|---|
| UNIDAD ESPECIAL ANTIPANDILLAS TRANSNACIONAL | | |
| OFICIO ATIC-CAT- UE-N° 32-2024 | 02 DE FEBRERO DE 2024 | |



1505070173017654531   06/05/2015 07:30:06 p.m.   9897-1261   50494974713   00:09:31   Pato 010 - ALEXANDER MENDOZA

ID/ 1505070173017654531

ALEXANDER llamó a FEM 4713

El presente informe debe tener 12,283 se entrega a la entidad solicitante, exonerando a esta unidad de cualquier responsabilidad por la reproducción total o parcial del mismo.
Impreso el 02 de febrero de 2024
Antiguo Edificio del Anexo del Banco Central de Honduras C. A. PBX: 2221-3167, 2221-3187, 2221-3198
Pág. 1/30

MINISTERIO PUBLICO
FISCALIA ESPECIAL CONTRA EL CRIMEN ORGANIZADO
FESCCO
ARCHIVO UNICO
30

GOVERNMENT
EXHIBIT
415
15 Cr. 379 (PKC)



| | AGENCIA TÉCNICA DE INVESTIGACIÓN CRIMINAL | |
|---|---|---|
| MINISTERIO PÚBLICO REPÚBLICA DE HONDURAS | UNIDAD ESPECIAL ANTIPANDILLAS TRANSNACIONAL |  |
| | OFICIO ATIC-CAT- UE-N° 32-2024 | 02 DE FEBRERO DE 2024 |

| 1506192173019658845 | 19/06/2015 04:11:32 p.m. | 🔊 | 50495862375 | 📱 | 50495571575 | 00:07:52 | Pato 024 ALEXANDER MENDOZA |
|---|---|---|---|---|---|---|---|

ID/1506192173019658845

Expediente Juzgados de Garantía Penal N° 159-2015

El presente informe debe tener 12,283 se entrega a la entidad solicitante, exonerando a esta unidad de cualquier responsabilidad por la reproducción total o parcial del mismo.

Antiguo Edificio del Anexo del Banco Central de Honduras C. A. PBX: 2221-3167, 2221-3187, 2221-3198

Impreso el 02 de febrero de 2024
Pág. 3/30

MINISTERIO PÚBLICO
REPÚBLICA DE HONDURAS
FISCOD
ARCHIVO UNICO
34
FOLIO No.



| MINISTERIO PÚBLICO<br>REPÚBLICA DE HONDURAS | AGENCIA TÉCNICA DE INVESTIGACIÓN CRIMINAL<br>UNIDAD ESPECIAL ANTIPANDILLAS TRANSNACIONAL |  |
|---|---|---|
| | OFICIO ATIC-CAT- UE-Nº 32-2024 | 02 DE FEBRERO DE 2024 | |

| 1509292073023974579 | 9/29/2015 2:53:54 PM | | 50497323111 | | 50499724764 | 00:05:13 | Pato 049-Alexander Mendoza |

**ID/1509292073023974579**

ALEXANDER llamo a MAS4764

El presente informe debe tener 12,283 se entrega a la entidad solicitante, exonerando a esta unidad de cualquier responsabilidad por la reproducción total o parcial del mismo.
Impreso el 02 de febrero de 2024
Antiguo Edificio del Anexo del Banco Central de Honduras C. A. PBX: 2221-3167, 2221-3187, 2221-3198.
Pág. 9/30

MINISTERIO PUBLICO
REPÚBLICA DE HONDURAS
FESCCO
ARCHIVO UNICO
FOLIO No. 38



| AGENCIA TÉCNICA DE INVESTIGACIÓN CRIMINAL | |
|---|---|
| UNIDAD ESPECIAL ANTIPANDILLAS TRANSNACIONAL | |
| OFICIO ATIC-CAT- UE-N° 32-2024 | 02 DE FEBRERO DE 2024 |



1511190373026078795   18/11/2015 10:12:01 p.m.   9976-1426   50496505982   00:35:03   Palo 078 - ALEXANDER MENDOZA

ID/1511190373026078795

JAIRO llamó a ALEXANDER

El presente informe debe tener 12,283 se entrega a la entidad solicitante, exonerando a esta unidad de cualquier responsabilidad por la reproducción total o parcial del mismo.   Impreso el 02 de febrero de 2024

Antiguo Edificio del Anexo del Banco Central de Honduras C. A. PBX: 2221-3167, 2221-3187, 2221-3198   Pág. 13/30

FISCCO
ARCHIVO UNICO
FOLIO No. 42