O2L5her1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                           15 Cr. 379 (PKC)

JUAN ORLANDO HERNANDEZ,

                                   Trial
          Defendant.

------------------------------x

                               New York, N.Y.
                               February 21, 2024
                               10:00 a.m.

Before:

                HON. P. KEVIN CASTEL,

                               District Judge

                    APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  KYLE A. WIRSHBA
     JACOB GUTWILLIG
     ELINOR TARLOW
     DAVID ROBLES
     Assistant United States Attorneys

RENATO CHRISTIAN STABILE
RAYMOND L. COLON
SABRINA P. SHROFF
     Attorneys for Defendant

Also Present:   Francisco Olivero, Interpreter (Spanish)
                  Dagoberto Orrantia, Interpreter (Spanish)
                  Sonia Berah, Interpreter (Spanish)
                  Mercedes Avalos, Interpreter (Spanish)
                  Evan Frierson, Interpreter (Spanish)
                  Matthew Passmore, DEA Special Agent

O2L5her1

1          (Trial resumed; jury not present)

2          THE COURT:  Please, be seated.

3          Present in the courtroom, all trial counsel for

4    government are present and all of the trial counsel for the

5    defendant are present, along with the interpreters and the

6    defendant.

7          I had an issue I wanted to raise before the jury comes

8    in which relates to opening statements and should be

9    self-evident to experienced trial lawyers but I wanted to make

10   it plain and it applies to both sides, that is, that when a

11   party opens to the jury, they implicitly make a promise that

12   the evidence that they are describing will be received at the

13   trial.  Both sides are cautioned that there is no assurance of

14   that.

15         There is a particular risk that arises in the case of

16   the defense.  First of all, the defendant need not decide

17   whether he wishes to testify until the government rests its

18   case, has no obligation to make that decision now.  However, if

19   there is a reference to the expected testimony, I want to

20   remind the defense that they received a document from a

21   screened team in the U.S. Attorney's office that was marked

22   unclassified and is subject to a protective order, as I

23   understand it.  That document has not been seen by the

24   government and should not be seen by the government.  It simply

25   is unclassified information that, as I understand it, the

O2L5her1

1    defense team expressed interest in having the defendant testify

2    to.  There has not been an opportunity to object to any of that

3    material, it's not known to the government.

4            So, I just caution the defense, if they choose to

5    describe testimony from the defendant, and again the defendant

6    need not testify, need not disclose whether he is going to

7    testify, need not decide whether he is going to testify with

8    you if they go that path, they are reminded that there is no

9    assurance that simply because it is on a document provided by

10   the screen team who are unclassified that the testimony on

11   those points will be received into evidence.

12           So, some lawyers will be appropriately circumspect in

13   what they promise to a jury.  I wanted to have that

14   conversation with both sides before opening statements so

15   they're fully apprised of it.  And, there is no such thing as

16   estoppel.  By that I mean, *Well, Judge* -- and this goes for the

17   government as well as the defense -- *I opened to the jury on*

18   *this.  I will look foolish if I can't offer this evidence.  I*

19   *will be prejudiced if I can't offer it.*  The risk is assumed by

20   the party making the opening statement.

21           With that, we will adjourn shortly.  It's now two

22   minutes after 10:00, we will ascertain whether we have our

23   jurors and we will resume when the jury is all here.

24           Thank you very much.

25           (Recess)

O2L5her1

1              THE COURT:  Our jurors are present.  Please remain

2      standing for the jury.

3              Who will be opening for the government?

4              MR. ROBLES:  I will, your Honor.

5              THE COURT:  Thank you, Mr. Robles.

6              And who will be opening for the defendant?

7      Mr. Stabile, thank you.

8              THE COURT:  Is the podium there OK for you?

9              MR. ROBLES:  I might move it back a little bit.

10             THE COURT:  That's fine.

11             Jury entering.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O2L5her1

1          (Jury present)

2          THE COURT:  You sit down as soon as you come in.  We

3   are standing for you, so now when you are all seated:  Ladies

4   and gentlemen, please, be seated.

5          Good morning, ladies and gentlemen.  I hope you had a

6   pleasant evening.  I know yesterday was a very long and

7   somewhat stressful day going through the jury selection

8   process.  I want to review a few principles before the trial

9   and the opening statements begin.

10          As you heard yesterday, my job is to instruct you on

11   the law that applies in this case and it is your duty to follow

12   those instructions.  I will tell you now that at the end of the

13   case when you are deliberating, you will have not only received

14   the oral instructions of the Court, but I will also give you

15   those instructions in a typed text format.  In addition, you

16   will have a copy of the indictment, which is nothing more than

17   an accusation, it is not evidence, and you will have a verdict

18   sheet with you in the jury room.  But there are instructions I

19   want to give you at the outset.

20          This is a criminal case.  An indictment filed by a

21   grand jury sitting in this district has charged the defendant

22   with three counts.  Count One charges Mr. Hernandez with

23   participating in what is called a conspiracy or an agreement to

24   violate the narcotics laws of the United States.  Count One

25   alleges that the agreement had three unlawful objectives or

O2L5her1

goals:  First, to import cocaine into the United States;
second, to manufacture or distribute cocaine knowing or
intending that it would be imported into the United States; and
third, to manufacture, distribute, or possess with intent to
distribute cocaine on board an aircraft registered in the
United States.

Count Two charges the defendant Mr. Hernandez with
knowingly using or carrying firearms in connection with or
possessing firearms in furtherance of the narcotics conspiracy
charged in Count One.  The indictment alleges that the firearms
included machine guns and destructive devices -- and let me
just double-check something here -- yes.

Count Three charges Mr. Hernandez with participating
in a conspiracy to use or carry firearms in connection with, or
to possess firearms in furtherance of the narcotics conspiracy
charged in Count One.  The indictment alleges that the firearms
included machine guns and destructive devices.

The defendant denies the charges and has entered a
plea of not guilty.  The law presumes the defendant innocent of
all charges until such time, if ever, as the government proves
each element of a charge by proof beyond a reasonable doubt.
As I said, the indictment is only an accusation, it's not
evidence.  It lays out the charges that the government is
required to prove beyond a reasonable doubt.  The burden of
proof never shifts to the defendant in a criminal case and the

O2L5her1

law never imposes on the defendant the obligation of doing
anything in a criminal trial.

The presumption of innocence remains with the
defendant throughout the trial unless and until, after hearing
and considering all of the evidence and my final instructions
on the law you, as jurors, unanimously are convinced of the
defendant's guilt beyond a reasonable doubt.

Until it is time to deliberate at the conclusion of
the case, it is important that you keep an open mind.  You must
pay close attention to all of the evidence presented.

Evidence consists only of the testimony of witnesses,
documents, and other things admitted as evidence, or
stipulations agreed to by the parties.  Certain things are not
evidence and must not be considered by you.  I will list them
for you now:  Statements, arguments and questions by lawyers
are not evidence, nor are my own statements to you.

So, in a few moments, you will hear from the lawyers
in this case who will make opening statements.  It will be a
preview of what they believe the evidence in the case will
show.  These statements by lawyers are not evidence, they're a
preview.

Objections to questions are not evidence.  Lawyers
have an obligation to their clients to object to evidence when
they believe it's being offered improperly under the rules of
evidence.  You should not be influenced by the objection or the

O2L5her1

1    Court's ruling on it.  If the objection is sustained, ignore

2    the question and any answer that may have been given.  If it is

3    overruled, treat the answer like any other.  If you are

4    instructed that some item of evidence is received for a limited

5    purpose only, you must follow that instruction.

6        Now, I should make a point about questions are not

7    evidence.  So, somebody could say:  Were you at Yankee Stadium

8    when Aaron Judge hit his last home run of the season?  And you

9    are thinking Aaron Judge, Yankee Stadium.  What does this have

10   to do with anything?  It is a question.  The question is not

11   evidence of anything.  It's only a question.  It's the witness'

12   answer in connection with the question that makes its evidence.

13   So a question is asked and there is an objection sustained.

14   Disregard the question.  If the witness says, I have no idea, I

15   have no recollection of any of this, there is no evidence other

16   than the witness doesn't have a recollection of a thing.  You

17   don't assume that the premise of the question is true.  You

18   don't know until you hear the witness' answer.

19       Testimony that the Court has excluded or stricken or I

20   told you to disregard is not evidence and must not be

21   considered.  Also, anything you may have seen or heard outside

22   the courtroom is not evidence and must be disregarded.

23       You are to decide the case solely on the evidence

24   presented here in the courtroom.  In deciding the facts of the

25   case, you will have to decide the credibility of the witnesses,

that is, how truthful and believable they are.

Now, how do you decide what to believe and what not to believe?  Well, you are going to listen to the witnesses, watch them and observe them, and then decide as you would decide such questions in your ordinary life.  Were they candid?  Honest?  Open?  And truthful?  Did they know what they were talking about?  Did they have a reason to falsify, exaggerate, or distort their testimony?  Sometimes it's not what a witness says but how he or she says it that make you view a clue as to whether or not to accept that witness' version of an incident or an event as credible or believable.

In short, the way a witness testifies may play an important part in your reaching a judgment as to whether or not you can accept the witness' testimony as reliable.  You will use your common sense and good judgment to evaluate their testimony based on all the circumstances.

I cannot emphasize too strongly that you must keep an open mind until the trial is over.  A case can only be presented step by step, witness by witness, and it would be unfair to one side or the other if you made up your mind before you heard all the evidence.

We know from experience that frequently we will hear a person give his version of an event which sounds most impressive and even compelling, and yet when we hear another person's version of the same event, or even the same witness

O2L5her1

cross-examined or questioned regarding what they have said,
what seems so very compelling and impressive may be completely
weakened or disproved.  So, ensure that you decide the case
only on the evidence and that you will not be influenced in any
way by anything that might occur outside the courtroom in your
presence.

        I must give you a specific set of instructions:
First, do not discuss this case among yourselves or with any
other person.  You will have the opportunity and, indeed, the
duty to discuss the case among yourselves only after all the
evidence is in and the case is given to you to discuss and
decide in the jury room.

        I talked to you about this last night before you left.
You will be able to talk about the case when it is over but
don't open that door.  Do not discuss it with anyone, your
loved ones.  I told you, a little mystery in your life is not
the worst thing in the world.  All right?  And the same thing
when you go in the jury room after a break, *Wasn't that witness
interesting?*  No, that's talking about the case.  *Didn't that
witness really screw up on the witness stand or really was
wonderful?*  That's talking about the case.  You do not talk
about the case and don't go down that path at all.  Please.

        Next, you are not to read anything on the internet or
in newspapers or watch anything on TV or listen on the radio if
there is any discussion of this case.  I don't know how much

O2L5her1

discussion there will be or how much will be in print, but do
not do that.  And I told you how unfair that could be to one
side or the other.  You would not want jurors deciding a case
involving your loved one if they were deciding it based on what
they read or heard outside the courtroom where the other side
doesn't get the chance to respond how terribly unfair that is.
It's against my instructions and it should be apparent to you
that it's the wrong thing to do.  Don't do it, it is a
violation of your oath as a juror.

Do not send any electronic communications about the
case.  This includes texting, e-mailing, blogging, posting
information on social network websites, or using any other
electronic communications to discuss or even mention this case.
For example, you may not even post that you are a juror in this
case.  This means no communications.  Also, no communications
about the case with fellow jurors, lawyers, witnesses.  Anyone.

Next, if it becomes necessary to send the court a note
about something you saw or heard or about any other matter, do
not share the content of the note with your fellow jurors.
Some of us learned in school:  Secret secrets are no fun, share
it with everyone.  That rule doesn't apply here.  So let's say
a circumstance arose, something you learned or saw or need to
report.  Don't ask your fellow juror what's that all about.
And, don't tell your fellow jurors.  You are not doing
something disrespectful, you are actually protecting one

O2L5her1

another because it's information that may force a juror to step

aside, for example, and it should not contaminate the rest of

the jury pool.  So, please, follow that instruction.

You are not allowed to speak to anyone about the case.

If you are approached by anyone to speak about it, politely

tell them that the Judge has directed you not to do so.  If any

person seeks to contact you about the case -- and I am sure

that's not going to happen -- you are required to report the

incident promptly to me.  Be sure that I am informed if any

person you know comes into the courtroom.  It's a public trial

so that could happen.  There is nothing wrong with that but it

is important that you do not hear from them what may have

happened in the court while the jury wasn't present.  If you

see a friend or relative come into the court, please, send a

note to me through the clerk at the first opportunity.

Now, the attorneys, the defendant, the witnesses are

not permitted to talk to you outside the courtroom.  They may

not even offer you a friendly greeting.  So, if you happen to

see them outside the courtroom, they will not and should not

speak to you.  Please take no offense at that.  They know who

you are.  They're only acting properly in doing so and you may

do the same thing, just treat it like it's a stranger.  They

know who you are, you may know who they are, but that's it.

Now, let me say a few words about trial procedure.

First, the lawyers have the opportunity but are not required to

O2L5her1                     Opening – Mr. Robles

1    make opening statements.  As I said, they're not evidence,

2    they're a preview.  Also, in the course of this trial you may

3    find that the Court has occasion to instruct or direct a lawyer

4    on a particular matter.  I am going to tell you right now,

5    please, do not think that this means that I have any view on

6    the evidence or how you should decide the case.  It is simply

7    part of my job as trial judge to move the case along fairly and

8    efficiently.

9          After all the evidence has been received, the lawyers

10   have an opportunity to sum up, they may review the evidence and

11   make arguments to you as to what conclusions they think you

12   should or should not draw from the evidence.  These arguments

13   also are not themselves evidence but they may be helpful to you

14   in reviewing the evidence.  After these arguments or summations

15   as they're called, I will give you the detailed instructions on

16   the law that applies in the case and you must follow those

17   instructions, and then and only then not only may you discuss

18   the case, you will have a duty to discuss the case in the

19   deliberation process after all the evidence is in and you have

20   received the Court's instructions.

21         That concludes my preliminary instructions.  Now, I

22   have been advised that Mr. Robles is doing the opening for the

23   government.

24         Whenever you are ready, sir, you may proceed.

25         MR. ROBLES:  Thank you, your Honor.

1          This is a case about power.  About corruption.

2          THE COURT:  Mr. Robles, I just want to let you know,

3     big courtroom, lots of people, your words can get eaten in the

4     size of the room so you really have to keep your voice up.

5          Anybody in the jury who has any difficulty hearing,

6     don't be shy about raising your hand and we will figure

7     something else out or I will get the lawyers to speak louder.

8          MR. ROBLES:  This is a case about power, about

9     corruption, about massive amounts of cocaine, and about the one

10    man who stood at the center of all of it:  The former president

11    of Honduras, that man, Juan Orlando Hernandez, the defendant.

12    For years he worked hand in hand with some of the largest and

13    most violent drug traffickers in Honduras to send ton after ton

14    of cocaine here to the United States.  Traffickers that fueled

15    his rise to power with millions of dollars in bribes.  And in

16    return, he abused the power of his country, the military, the

17    police, the justice system, to protect and support those

18    traffickers.  And because the defendant did these things,

19    because he worked with drug traffickers to flood this country

20    with cocaine, he is charged with federal crimes here in the

21    United States, for agreeing to import cocaine and using

22    firearms during that crime.  That's why we are here today.

23          Ladies and gentlemen, over the next few minutes I am

24    going to tell you what I expect the evidence at this trial will

25    show.  Then I will explain how the government will prove beyond

1    a reasonable doubt that the defendant is guilty as charged.

2              So, first, what will the evidence show?  You are going

3    to learn that Honduras, a country in Central America, sits at a

4    crucial location in the international cocaine trade.  Most of

5    the cocaine that ends up here in the United States is produced

6    in South America, in Colombia.  It then makes its way north to

7    Central America into countries like Honduras.  You are going to

8    learn that Honduras is what is called a transshipment point,

9    basically a country that cocaine has to get transported through

10   on its way to its final destination.  And nearly all the

11   cocaine that goes through Honduras then gets transported into

12   Mexico and ultimately ends up being sold here in the United

13   States.  And you will hear about the devastating effects of

14   this cocaine trade, about the violence and corruption that this

15   flood of cocaine leaves in its wake.

16             Now, getting that cocaine into and out of Honduras is

17   a lucrative and dangerous business, and because of that, drug

18   traffickers spent a lot of money bribing people in Honduras who

19   could help protect their drug operation.  People like

20   politicians, military officials, and police officers.  People

21   who are willing to abuse their official positions for their own

22   gain, people like the defendant; a congressman who rose to the

23   very top of the Honduran government.  How did he do that?  You

24   will learn that he partnered with drug traffickers who bank

25   rolled his political campaigns with millions of dollars in drug

money, with bribes.  Violent drug traffickers from across

Honduras including his own brother whose drug operation was

made possible by the status, protection, and access that this

defendant provided.  Drug traffickers that murdered their

rivals and used military-grade weapons to protect their drug

shipments and drug traffickers who used drug money to buy

votes, take over polling stations, and bribe local politicians,

all to make sure that the defendant got elected.  And you will

learn that the defendant also partnered with notorious criminal

organizations like the Sinaloa Cartel, a powerful drug

trafficking organization based in Mexico that

contributed millions of dollars to his campaign.  And, with

MS-13, a violent gang that carried out murders for the

defendant's drug trafficking allies.

          Ladies and gentlemen, the evidence will show that the

defendant's partnership with these drug traffickers fueled his

rise to power and for over a decade, between 2010 and 2022, the

defendant held two of the most powerful political positions in

Honduras:  President of the Honduran National Congress and then

President of Honduras.  And what did he do with all of that

power?  You will learn that he abused his official positions to

give his drug trafficking allies the protection and the support

that they needed to operate throughout Honduras, access to

sensitive military and law enforcement information, protection

for cocaine shipments that travel across Honduras guarded by

O2L5her1                      Opening - Mr. Robles

police officers armed with machine guns, protection from

investigation and arrest, and protection from extradition, from

being sent here to the United States to face criminal charges,

protection that allowed these drug traffickers to send cocaine

from Honduras to the United States without fear or consequence

because of their relationship with the defendant.  And it's

because this partnership worked so well, because the defendant

became a powerful politician in his country, that you will

learn he also had to maintain an appearance of legitimacy, so

in public the defendant vowed to go after drug traffickers in

Honduras.  He passed laws and at times even worked with the

United States to fight drug trafficking.  But behind the

scenes, he made sure the drug traffickers who stayed loyal to

him were protected so they could keep sending cocaine to the

United States, keep making money, and keep the defendant in

power.

        That is what the evidence at this trial will show,

that the defendant spent years working with drug traffickers to

import cocaine to the United States and that they used the

machine guns and other weapons to protect their drug operation.

        Now, how are we going to prove all of this?

Throughout the course of this trial you are going to hear and

you are going to see a few different types of evidence.  You

will hear testimony from witnesses.  You will see physical

evidence and you will see electronic evidence.  You will hear

from an accountant who witnessed multiple meetings between the

defendant and a violent Honduran drug trafficker, meetings that

took place when the defendant was already a powerful

politician.  And he will tell you about how the defendant

promised that drug trafficker the support of the Honduran

military and the Honduran national police and how the defendant

said in his own words that together, they were going to shove

the drugs right up the noses of the gringos, of the Americans.

You are also going to hear from expert witnesses,

experts that will contextualize some of the evidence that you

will see and hear throughout this trial.

You will hear from a drug trafficking expert with the

Drug Enforcement Administration, the DEA.  She will walk you

through how cocaine is produced in Colombia, how it goes

through Honduras, and how it gets to the United States, the

prices that cocaine is sold for here in the United States and

the massive profits that are made along the way.

You will hear from an expert on machine guns and other

weapons.  He will explain the deadly capabilities of the

weapons that were used to protect this drug operation.

Ladies and gentlemen, you are also going to hear from

some of the largest and most violent drug traffickers in

Honduras, the defendant's own partners.  These witnesses are

going to take that stand and give you an inside look at how

they worked with the defendant to traffic cocaine, a unique

O2L5her1                         Opening – Mr. Robles

1   perspective that nobody else in the world can give you.

2            You will hear from a former mayor in Honduras who

3   shipped massive amounts of cocaine to the United States with

4   the defendant's support.  He will tell you about his meetings

5   with the defendant, about his partnership with the defendant's

6   brother, and about how he helped the defendant buy votes with

7   drug money and get elected.

8            You will hear from a former member of the Sinaloa

9   Cartel.  He will explain how and why the cartel contributed

10  millions to the defendant's campaign.

11           You will hear from witnesses who will explain how

12  heavily armed members of the Honduran national police protected

13  caravans of trucks filled with cocaine as they traveled across

14  Honduras on their way to the United States.

15           Those are just a few of the drug traffickers that you

16  will hear from at this trial.  Witness after witness is going

17  to take the stand and explain how important it was for them to

18  have had the defendant's support, how they got it, how they fed

19  this cycle of corruption that kept the defendant in power and

20  cocaine flowing to the United States.

21           Now, let me stop for a second and make something very

22  clear about these witnesses.  They're criminals.  They've

23  committed horrible crimes and now they're cooperating with the

24  government.  Some of these witnesses have entered into

25  agreements through which they're hoping to get a lower

O2L5her1                          Opening - Mr. Robles

sentence.  Some have committed significant violence.  In some

cases, dozens of drug-related murders.

         Ladies and gentlemen, these are the people that the

defendant chose as his partners, the people that he chose to

work with and chose to protect, and because of that, they're

the only people who can tell you exactly how the defendant

committed his crimes.  And at the end of this trial, the

question for you won't be whether you like these witnesses or

you approve of what they have done.  Of course you won't.  The

question will be whether you believe them, whether they're

telling you the truth about what happened in Honduras.

         So listen carefully to their testimony, ask yourselves

whether it is consistent with all of the other evidence that

you are going to hear and see throughout this trial, like the

testimony of law enforcement witnesses who will walk you

through some of the evidence that was recovered in this case:

The notebooks that you will see that were used by drug

traffickers in Honduras to document their drug payments where

you will see payments to the defendant himself and to his drug

trafficking allies; recordings of meetings between drug

traffickers and corrupt Honduran officials; contact lists

showing you that drug traffickers had the defendant's phone

number at the ready, that he was available to them for whatever

they needed; and the pictures that you will see of cocaine, of

guns, and of the defendant himself smiling, arm in arm, with

1    notorious drug traffickers and corrupt Honduran officials, men

2    who the defendant partnered with to send ton quantities of

3    cocaine to the United States, who made sure that he then got

4    elected and who the defendant then protected in return.

5         Ladies and gentlemen, the evidence in this trial will

6    involve enormous amounts of cocaine, rampant corruption and

7    violence, and the evidence will show that at the heart of that

8    drug conspiracy was the defendant, a man who abused his power

9    for years to flood the United States with cocaine.  And at the

10   end of this trial, once all the evidence is in, we will have

11   another chance to speak to you on how it all fits together and

12   how it proves the defendant guilty beyond a reasonable doubt,

13   but between now and then I'm going to ask that you do three

14   things:  First, pay close attention to the evidence; second,

15   follow Judge Castel's instructions on the law; and third, use

16   your common sense, the same common sense you would use in your

17   everyday lives.  If you do those three things, you will reach

18   the only verdict consistent with the evidence, the law, and

19   your common sense:  That the defendant is guilty.

20        THE COURT:  Thank you, Mr. Robles.

21        Now, as the Court indicated, the defendant has no

22   obligation to do anything in a criminal trial.  I understand

23   that counsel for the defendant wishes to make an opening

24   statement.

25        Whenever you are ready, Mr. Stabile.

O2L5her1                           Opening – Mr. Stabile

1          MR. STABILE:  Thank you, your Honor.

2          THE COURT:  Thank you.

3          MR. STABILE:  May it please the Court, counsel,

4     Mr. Hernandez, ladies and gentlemen of the jury:

5          Hell is empty and all the devils are here.  It's a

6     quote from William Shakespeare's *The Tempest*, and I promise you

7     in this case all the devils will be here.  You are going to

8     hear from government witnesses who have killed so many people.

9     So many people.  The number of people they have killed is so

10    high that if you look around this courtroom, the number of

11    people they have killed is probably more than everyone sitting

12    here right now.  So when they get up there on that witness

13    stand, please think about that.  78 murders facing life in

14    prison.  56 murders, facing life in prison.  18 murders, facing

15    life in prison.  Torture.  Killing children.  These are

16    depraved people.  These are psychopaths.  These are people not

17    worthy of your trust and belief.  So when the government comes

18    to you at the end of this case and asks you to declare this man

19    guilty based on the word of these murderers and drug dealers,

20    please remember who they are and what they've done.

21          My name is Renato Stabile, and I, along with my

22    co-counsel Ray Colon, represent the former president of

23    Honduras, Juan Orlando Hernandez Alvarado.  I am going to spend

24    the next few minutes talking to you about what the evidence in

25    this case is going to show but, more importantly, what the

O2L5her1                    Opening - Mr. Stabile

1    evidence in this case is not going to show but let's start at

2    the very beginning.

3            Who is Juan Orlando Hernandez Alvarado?  Well, you are

4    going to learn that he was the president of Honduras from 2014

5    to 2022.  He was also the president of the National Congress,

6    he was a congressman in Honduras, and you are going to learn

7    that he of course went to school in Honduras but he also has

8    his masters degree from SUNY Albany here in the United States.

9    He has a JD degree from the University of Honduras so he is a

10   lawyer.  And then he went on to become the president of

11   Honduras.  You will learn that he is married, he has four

12   children, and you will also learn that he is one of 17 brothers

13   and sisters.  I said that right:  17 brothers and sisters, from

14   a small town in Gracias, Honduras.

15           What you are going to learn in this case is that in

16   the early 2000s, Honduras was a dangerous place.  And I don't

17   just mean a little dangerous.  In 2013, Honduras was the murder

18   capital of the world.  There is no dispute about that.  There

19   are about 10 million people in Honduras, roughly the same

20   population of New York City.  But it had dozens of murders

21   every day.  You are going to learn that 87 percent of the drugs

22   being flown from South America to the United States were

23   stopping off and landing in Honduras.

24           Now, Honduras is a stunningly beautiful place.  It has

25   the Caribbean Sea on one side, it has the Pacific Ocean on the

1    other side.  It has a rich cultural history.  It could be and

2    should be one of the premiere vacation destinations in the

3    world but there was so much violence going on, so much

4    drug-related violence.  And so, Mr. Hernandez ran for Congress,

5    the evidence will show, because he wanted to get rid of the

6    unspeakable violence that drugs brought to Honduras.  The

7    evidence will show that the drug dealers he tried to get rid of

8    are the very people accusing him today.  You will learn that,

9    under Mr. Hernandez, the murder rate went down, drug dealing

10   went down, gangs were on the run, cartels were on the run.

11   People were going to jail and people were being extradited to

12   the United States to face prosecution.

13        Under Mr. Hernandez, the murder rate went down by more

14   than 50 percent.  Under Mr. Hernandez, trafficking through

15   Honduras went down 80 percent from 2009 to 2016.  Those are

16   facts that you are going to learn during this trial.

17        So how did he do it?  How did this lawyer from

18   Gracias, Honduras, who got his masters degree from SUNY Albany

19   manage to get Honduras under control?  The evidence will show

20   that it wasn't by being corrupt, it wasn't by taking bribes.

21   Mr. Hernandez does not sit down with drug dealers, he stands up

22   to drug dealers.  And he did it at great personal risk.  You

23   are going to hear evidence in this case about assassination

24   plots against Mr. Hernandez by the drug dealers, the people he

25   was supposedly protecting.  So what did he do that made the

1    drug dealers and murderers want to kill him?  Well, the

2    evidence in this case is going to show you the following:

3            I put up this timeline for you and you are going to

4    see that he did some things while he was the president of the

5    National Congress and other things while he was the president

6    of Honduras and I'm not going to go through all of these things

7    with you now, one by one, but you are going to hear evidence

8    about the steps he took and the laws, you have the man in the

9    courtroom, who physically signed some of these laws, enacted

10   these laws that enabled the government of Honduras to take

11   action against these drug dealers.  And you will see law after

12   law, initiative after initiative.  He passed dozens of bills

13   freezing assets, allowing the extradition of Honduran nationals

14   to the United States, reforming the police force, creating gang

15   task forces.  And he also did what none of the previous

16   presidents of Honduras had done:  He worked with the United

17   States, the DEA, the U.S. military, the State Department, the

18   Treasury Department, the U.S. Congress, the White House, the

19   Justice Department, Homeland Security.  He worked with them to

20   take down the cartels.  These laws are a matter of public

21   record, there is no dispute that these things happened.  And

22   again, he personally signed many of these laws.

23           So, the government comes in here and says, well, this

24   was all fake, this was all a big show, this was all smoke and

25   mirrors to hide the fact that he was really on the take.  The

O2L5her1                          Opening – Mr. Stabile

1    evidence will show that it is not fake.  There is going to be a

2    lot of talk at this trial and not a lot of concrete evidence,

3    just enough talk to make things sound maybe plausible to get

4    you to wonder about things but, remember, you will be

5    instructed on this.  The legal standard in this case is proof

6    beyond a reasonable doubt and please remember that word

7    "beyond."  The government must prove beyond a reasonable doubt,

8    even if it gets right up to that line, even if the government

9    presents enough evidence for you to get yourselves to say,

10   well, this could have happened.  That is not the legal standard

11   in this country.  Could have happened, maybe happened, even

12   probably happened.  Those are not the standards.  The

13   government must prove its case beyond a reasonable doubt.

14           So, what were the results of the things that

15   Mr. Hernandez did?  Well, people got arrested and were

16   extradited to the United States and I am showing you some of

17   the names and faces that there is going to be evidence about in

18   this trial.  Major, major drug traffickers from Honduras.

19           The United States asked Honduras to extradite 24

20   narco-traffickers during Mr. Hernandez' presidency and he

21   agreed to every single one of those.  He wasn't protecting

22   anyone.  Out of 24 that were requested, 21 were arrested and

23   extradited to the United States.  Three got away -- three

24   escaped -- but he was partnering with the United States.  But

25   you will also hear that some people fled, they ran out of

O2L5her1                          Opening – Mr. Stabile

1    Honduras.  And you will hear that some of them, the people

2    testifying in this courtroom, ran into the arms of the United

3    States and cut deals.

4             So let me tell you what the evidence will show but,

5    again, more importantly, what the evidence will not show.

6             The evidence is not going to show any recordings with

7    Mr. Hernandez talking to drug dealers telling them he is going

8    to protect them, asking them for bribes.  You are not going to

9    see any videos of him taking money or making deals with drug

10   dealers.  You are not going to see text messages between him

11   and the drug dealers talking about, oh, I'm going to give you

12   information about where checkpoints are or we are going to turn

13   off the radar for you, or the coast is clear.  You are not

14   going to see any of that.  You are not going to see any e-mails

15   like that.  You are not going to see bank records of millions

16   of dollars going into his account.  You are not going to see

17   any of that.  You are not going to see any signs of wealth.

18   You are not going to see a McMansion, you are not going to see

19   a Rolls Royce.  You are not going to see any of those things in

20   this case.

21            What are you going to see?  Well, you are going to see

22   a lot of witnesses come into this courtroom who have cut deals

23   with the government.  So you will see Leo Rivera, he has

24   admitted to participating in 78 murders, importing 130 tons of

25   cocaine.  He is facing life plus 30 years.  You will see his

O2L5her1                          Opening – Mr. Stabile

1    brother Javier; 48 murders, 130 tons –– that's not a typo ––

2    not 130 kilos, 130 tons of cocaine.  Alex Ardon Soriano; 56

3    murders, 250 tons of cocaine, life plus 30 years is what he is

4    facing, Hugo Ardón Soriano; 8 murders 150 kilos of cocaine,

5    life plus 30 years, and it goes on.

6                    (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O2LHHer2                         Opening - Mr. Stabile

1          MR. STABILE:  Victor Hugo Diaz Morales, 18 murders,

2     140,000 kilos of cocaine, facing life plus 30 years.

3          Fernando Chang Monroy, 15 murders, 200,000 kilos,

4     sentenced to 21.8 years.

5          Giovanni Rodriguez, one murder, 450 kilos of cocaine,

6     facing life.

7          This is the evidence that you're going to get in this

8     case.

9          Instead of hearing recordings of Mr. Hernandez or

10    seeing videos of Mr. Hernandez or text messages with

11    Mr. Hernandez, what the government is going to show you is a

12    lot of evidence about people talking about Mr. Hernandez,

13    talking about Mr. Hernandez in text and phone conversations.

14    And the evidence will show that during the time when people are

15    talking about him, he is the president of Honduras.  He is the

16    most famous person in Honduras.  He is not some random person.

17         So you are going to hear some recordings.  You're

18    going to see some texts which the government will claim were

19    referring to Mr. Hernandez.  Now, some of these conversations

20    are going to be hard to follow.  Some of them won't make a lot

21    of sense.  They will be in Spanish.  The government is going to

22    provide you with translations, and in some of them you're going

23    to hear people talking about what they heard other people say.

24    It's going to be like a giant game of telephone on the actual

25    telephone.  So you're going to have to decide if the recordings

1    are really about what the government says they are, what

2    exactly people are talking about.  Is it real information?  Is

3    it gossip?

4              Photos, there are going to be a lot of photos in this

5    case.  You are going to see lots and lots and lots of photos.

6    Photos of drugs, photos of guns, photos of planes, photos of

7    houses, photos of restaurants, photos of Mr. Hernandez with

8    lots of people, lots and lots of people.  And the evidence will

9    show that everywhere he goes there are crowds of people.

10   Everywhere he goes people want photos of him, even drug

11   dealers.  So you are going to see lots and lots of photos with

12   all different kinds of people.

13             Now, where are these photos from?  Well, they're from

14   public events.  Mr. Hernandez went to those events and drug

15   dealers went to those events, and, yes, they appear in photos

16   together.  That's what those photos are going to be about.

17             Let me mention a couple of other photos that you're

18   going to see in this case.  You're going to see a photo of what

19   is supposedly a brick of cocaine with a TH stamp.  There's

20   going to be evidence from a witness that, well, TH stands for

21   Tony Hernandez, his brother.  And they're going to say this is

22   the TH, the Tony Hernandez, stamp.  But you're also going to

23   see evidence that that TH stamp on the cocaine is also a Tommy

24   Hilfiger logo.  You're also going to see evidence and hear

25   evidence in this case that drug dealers often stamp their drugs

1    with logos of luxury brands:  Gucci, Prada, Fendi, Dior, Rolex,

2    just to name a few.  These are just some examples.  But this

3    evidence is going to be brought into court and presented to you

4    that evidence —— as evidence that Mr. Hernandez is part of some

5    drug conspiracy.

6            I also expect in this case that you're going to see

7    another photo.  This is of a machine gun with Mr. Hernandez's

8    name and title on it, his full legal name and his title.  I'll

9    just blow it up for you so you can see that it has the flag of

10   Honduras, it has his full legal name, and it has his title as

11   the president.  This will be presented to you as evidence in

12   this case, but you're not going to hear any evidence that

13   Mr. Hernandez is running around the streets of Honduras

14   carrying a machine gun with his name, title, and the flag of

15   Honduras on it.  But this is some of the evidence you're going

16   to see here.

17           Now, you are going to hear from a lot of witnesses, as

18   the government previewed for you, who have cut deals with the

19   government.  I want to tell you a little bit about what that

20   evidence is going to be, and you're going to hear a lot about

21   how cooperation works.  We're going to ask them a lot of

22   questions about how they got their deals, the process for

23   getting their deals.  So I just want to preview that evidence

24   for you because you are going to hear quite a bit about it.

25           So when somebody enters into a cooperation agreement

O2LHHer2                         Opening – Mr. Stabile

1  with the United States government, it starts with a proffer.
2  And you might have heard that word, but it's not a common word
3  that we use a lot.  A proffer is where they go in and it's sort
4  of like an audition.  You are going to hear that these drug
5  dealers meet with the government before they get a deal over
6  and over and over again to try and pitch the government, to
7  tell them what they can say, to try and convince the government
8  to give them that deal.  And there will be proffers that they
9  will have multiple, multiple, multiple times as they're
10  auditioning before the government signs them up.

11          If the government likes what they hear, they give them
12  a deal.  And you're going to see their cooperation agreements
13  in this case.  I'm going to talk about that in just a little
14  bit.

15          So now they're signed up.  They auditioned.  They got
16  their contract.  Great.  Now it's showtime.  They're going to
17  come in here in a few minutes later today, and it's going to be
18  showtime.  They're going to come in here.  They're going to get
19  on that witness stand.  They're going to raise their right
20  hand.  They're going to look you in the eye.  They are going to
21  swear — oh, will they swear — to tell the truth.  And if they
22  do a good job and if they provide substantial assistance —
23  that is a key phrase for you to remember, "substantial
24  assistance" — to the United States government, then they get
25  something called a 5K letter.

1          A 5K letter, you're going to hear a lot about in this

2     case.  What is a 5K letter?  That is the letter they need to

3     not die in jail.  That is the letter they need to get out from

4     sometimes 30-year mandatory minimum, 40-year mandatory minimum

5     sentences.  If you don't get that 5K, you're getting the 40

6     years.  If you don't get that 5K, you're probably going to die

7     in jail.

8          So once they get that 5K, it's time for sentencing.

9     They come before the judge.  They are sentenced.  The

10    government tells them that —— they're going to say, well,

11    they're going to tell the judge the good and the bad.  But

12    they're going to have that 5K in hand, and what's the sentence

13    going to be?  Who knows?  They're going to say, I don't know.

14    I don't know what sentence I could get.  It's up to the judge.

15    That's true, but you're going to learn they could get zero,

16    they could get six months, they could get five years, they

17    could get 20, they could get anything.  They could get

18    anything.

19         So let's talk about these cooperation agreements that

20    the government has signed up with these drug dealers and

21    murderers.

22         So they sit down with the government.  They have a

23    lawyer.  You're going to see their signature on it, their

24    lawyer's signature on it.  And they negotiate this deal with

25    the government.

O2LHHer2                        Opening – Mr. Stabile

1          And here's an example of a signed deal.  You're going

2    to see some of these, and there's certain features to this

3    deal, right, that the government is offering them.

4          You're going to see that they get coverage.  They're

5    not going to be prosecuted anymore for all of the bad things

6    they've done, sometimes over the course of a decade, over a

7    decade, and they get coverage for all of that.

8          You're going to see another feature.  They're being

9    offered witness protection, not just for them but for their

10   families, for their loved ones.  They're going to be able to

11   ask for witness protection and get into the witness protection

12   program.

13         You're going to see another feature that if they want

14   the government for some reason to talk to some other, other

15   prosecutor's office, like not here in New York but someplace

16   else, that the government agrees to do that on their behalf.

17   They'll pick up the phone and they'll call some other

18   prosecutor's office.

19         And of course, the all-important 5K, and this is

20   really what it's all about is getting the 5K letter.

21         Now, another feature I talked to you about is that in

22   the letter you're going to see language that they have to offer

23   substantial assistance.  They're going to get on the stand and

24   they're going to say:  I have to tell the truth.  I have to

25   tell the truth.  If I don't tell the truth, they could rip up

1    the agreement.  I don't get the 5K if I don't tell the truth.

2            Well, yes, there is a provision in the agreement about

3    telling the truth, but the key provision is they have to offer

4    substantial assistance to the government.  And the government

5    decides if they offered substantial assistance, and the

6    government decides whether or not to write that 5K letter.

7            So keep that in mind when they get up there.  What are

8    they really doing?  They're trying to offer substantial

9    assistance to the government.  Now, if they do that, they get

10   their 5K letter.  And that, ladies and gentlemen, is the golden

11   ticket.  That is what they really want.  That is what they are

12   really after.  So when they are brought here into this

13   courtroom from jail and they get on that witness stand and they

14   raise their right hand and they swear to tell you the truth,

15   please remember three things:  How many people they've killed,

16   how much time in jail they're facing, and that golden ticket

17   that they're trying to get, the 5K.

18           Putting murderers and drug dealers on the witness

19   stand who have cut deals and have them point the finger at

20   Mr. Hernandez is not proof beyond a reasonable doubt.

21           So the evidence will show that these witnesses really

22   have two goals.  One, of course, is getting that 5K letter, but

23   the other one is revenge, because it's Mr. Hernandez who signed

24   into law all of those things that put them out of business:

25   The seizure law seizing all their assets.  The extradition laws

O2LHHer2                          Opening – Mr. Stabile

making it possible —— it was never possible before —— making it

possible for Honduran nationals to be extradited to the United

States.  So two goals:  5K, revenge.

        Now I want to preview something else for you, and

that's about Mr. Hernandez's brother.  You're going to hear a

lot in this case about Juan Antonio Hernandez, who does go by

the name Tony.  Throughout this trial you're going to hear a

lot of talk about Tony.  It's going to kind of be like the

Tony, Tony, Tony trial at times.  Some of you might get that

reference from the '90s R&B group.

        But you're going to hear evidence about how Tony

Hernandez supposedly collected money from people and told them

it was buying them protection.  He told people if his brother,

Mr. Hernandez, got elected president, he would help them.

You're going to hear the government's witnesses talk about how

Tony Hernandez was throwing around his brother's name all the

time, collecting money using his brother's name, but there's

going to be zero evidence that Tony actually gave his brother

any money, that Tony actually told Mr. Hernandez what he was

doing as opposed to using his name to get money from people,

but that's neither here nor there.

        You're also going to learn that Tony is ten years

younger than Mr. Hernandez.  They didn't exactly grow up

together.  When Tony Hernandez was ten years old, Mr. Hernandez

was married and out of the house.  Tony is his kid brother, and

they could not be more different.  But, more importantly, this
is not the Tony Hernandez trial.  He's not here, even though
he's going to be talked about a lot, and we're not here to
decide or defend anything about Tony Hernandez.  That is not
this case.

Now, finally, and the government alluded to this, I
expect that you're going to hear some evidence about how
Mr. Hernandez —— Mr. Hernandez's election was rigged or stolen.
Watch that evidence very closely.  See if it makes sense.  What
are the details?  What are the actual details of that?  Or are
these just allegations of a stolen election with zero to back
it up?

Now, there's going to be evidence in this case about
how elections are run in Honduras, and the evidence is going to
show they use paper ballots, paper ballots that can be counted
or recounted or audited.  You can't just come into court and
say "stolen election" without evidence.

We're going to be together for a couple of weeks.  And
after all the witnesses are done, you see the evidence, I'm
going to ask that when you go into that deliberation room, you
use your common sense, but much more importantly, your New York
street smarts.  You will know at the end of this case that what
was given to you was a group of very unhappy drug dealers and
murderers who are angry and are trying not to die in jail.  It
is not proof beyond a reasonable doubt.  At the end of this

O2LHHer2                        Opening – Mr. Stabile

1    case, we're going to ask you to find Juan Orlando Hernandez

2    Alvarado not guilty on all counts.

3            Thank you.

4            THE COURT:  All right.  Thank you, Mr. Stabile.

5            Ladies and gentlemen, we'll take a ten-minute recess,

6    and then we'll start with the first witness.  Please remember,

7    do not discuss the case among yourselves, with anyone else, and

8    keep an open mind.

9            We'll be back in action in ten minutes.  Thank you.

10           Please stand for the jury.

11           (Jury excused)

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O2LHHer2

1          (Jury not present)

2          THE COURT:  All right.  Before we resume, I would like

3    the government to have its first witness in the witness box

4    ready to go.  And you have your own interpreter coming?  Have

5    that all set up, please.

6          Thank you.  We're in recess.

7          (Recess)

8          THE COURT:  I've marked as Court Exhibit No. 2 a note

9    from one of our jurors, a scheduling matter, and I'll invite

10   you to take a look on the lunch break.

11         All right.  Bring our jurors in.

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O2LHHer2                          Sanchez – Direct

1              (Jury present)

2              THE COURT:  Please be seated.

3              The government may call its first witness.

4              MR. GUTWILLIG:  Your Honor, the government calls José

5      Sanchez.

6              THE COURT:  All right.  Mr. Sanchez, please stand,

7      face me, raise your right hand, look at me, sir.

8      JOSÉ SANCHEZ,

9           called as a witness by the Government,

10          having been duly sworn, testified through the

11          Spanish-language interpreter as follows:

12              THE COURT:  Thank you.

13              Mr. Gutwillig, you may inquire.

14              MR. GUTWILLIG:  Thank you, your Honor.

15     DIRECT EXAMINATION

16     BY MR. GUTWILLIG:

17     Q.  Good morning, Mr. Sanchez.

18     A.  Good morning.

19     Q.  How old are you?

20     A.  49 years old.

21     Q.  Where were you born?

22     A.  San Pedro Sula, Honduras.

23     Q.  For approximately how long did you live in Honduras?

24     A.  Forty-one years.

25     Q.  Did you have a job in Honduras?

O2LHHer2                          Sanchez - Direct

1   A.  Yes.

2   Q.  What was that?

3   A.  Accountant.

4   Q.  Where did you work in Honduras?

5   A.  At Graneros Nacionales.

6   Q.  What was Graneros Nacionales?

7   A.  A rice processing plant, company.

8   Q.  Who owned Graneros Nacionales?

9   A.  Mr. Fuad Jarufe.

10  Q.  Approximately how long did you work at Graneros?

11  A.  Around 15 years.

12  Q.  Generally, what were your responsibilities at Graneros?

13  A.  Managing banks, companies' financial statements, and

14  managing personnel.

15  Q.  Do you live in Honduras now?

16  A.  No.

17  Q.  Do you live in the United States?

18  A.  Yes.

19  Q.  Approximately when did you come to the United States?

20  A.  June 1, 2015.

21  Q.  Do you recognize anyone from Honduras in the courtroom here

22  today?

23  A.  Yes.

24  Q.  Where is that individual sitting?

25  A.  He is in front of a computer wearing glasses next to the

O2LHHer2                          Sanchez – Direct

1    gentleman who's wearing the red tie.

2            MR. GUTWILLIG:  Your Honor, if the record would please

3    reflect ——

4            THE COURT:  Identification noted.

5    Q.  What name —— well, who is that individual, Mr. Sanchez?

6    A.  Mr. Juan Orlando Hernandez.

7    Q.  What name, if any, did you know that individual by?

8    A.  Juan Orlando.

9    Q.  I'll refer to him as the defendant during the questioning

10   today, Mr. Sanchez, if that's OK.

11   A.  OK.

12           MR. GUTWILLIG:  Ms. Collins, could you please pull up

13   for the witness, Court, and counsel what's marked as Government

14   Exhibit 113.

15   Q.  Do you recognize that?

16           THE INTERPRETER:  There's nothing on the monitor.

17           MR. GUTWILLIG:  There's nothing on the monitor.  It

18   looks like it's at counsel table.  Is it working for the Court?

19           THE COURT:  It's working for me.  It does not seem to

20   be on the defendant's screen.  If you have a hard copy, that

21   would be best.

22           Ladies and gentlemen, before an item can be shown to

23   you, it must be offered into evidence and received by the Court

24   into evidence, then it may be published to the jury.  So just

25   for the moment having technical difficulties.

O2LHHer2                          Sanchez – Direct

1            MR. GUTWILLIG:  Your Honor, may I approach?

2            THE COURT:  You may.

3            This has been marked as Government Exhibit 113 for

4       identification.  Go ahead.

5       BY MR. GUTWILLIG::

6       Q.  Mr. Sanchez, I've just handed you something marked

7       Government Exhibit 113.  Do you recognize that?

8       A.  Yes.

9       Q.  What is it?

10      A.  Mr. Geovanny Daniel Fuentes Ramirez.

11      Q.  Is it an accurate representation of Geovanny Daniel Fuentes

12      Ramirez?

13      A.  Yes.

14            MR. GUTWILLIG:  Your Honor, the government offers

15      Government Exhibit 113.

16            MR. COLON:  No objection.

17            (Government's Exhibit 113 received in evidence)

18            MR. GUTWILLIG:  Ms. Collins, could you please publish

19      that for the jury.

20            Is the image appearing?

21      BY MR. GUTWILLIG:

22      Q.  By what name did you know that person?

23      A.  Geovanny.

24      Q.  When you lived in Honduras, did you ever see the defendant

25      and Geovanny Fuentes together?

O2LHHer2                          Sanchez - Direct

1    A.  Yes.

2    Q.  Approximately how many times did you see them together?

3    A.  On two occasions.

4    Q.  Approximately when did those occasions take place?

5    A.  In the year 2013.

6    Q.  At that time was the defendant running for political office

7    in Honduras?

8    A.  Yes.

9    Q.  What office?

10   A.  President of the republic.

11   Q.  Where did the meetings you just described take place?

12   A.  At Graneros Nacionales in my boss' office.

13   Q.  What was your boss' name?

14   A.  Mr. Fuad Jarufe.

15   Q.  Were you there for both meetings?

16   A.  Yes.

17   Q.  During these meetings, generally what did the defendant and

18   Geovanny Fuentes discuss?

19            And I apologize.  If I could strike that.

20            Directing your attention to the first meeting, at that

21   meeting, what generally did the defendant and Geovanny Fuentes

22   discuss?

23   A.  The ability to freely traffic drugs and transportation of

24   same.

25            THE INTERPRETER:  Interpreter correction.  "And

O2LHHer2                          Sanchez - Direct

1    protection of same."

2    Q.   Who, if anyone, would provide the drugs?

3    A.   Mr. Geovanny Fuentes.

4    Q.   And who, if anyone, would protect the drugs?

5    A.   Mr. Juan Orlando Hernandez.

6    Q.   During that meeting, did the defendant say where the drugs

7    would go?

8    A.   Yes.

9    Q.   What did the defendant say?

10   A.   He said we are going to shove the drugs up the noses of the

11   gringos, and they're not even going to realize it.

12   Q.   We'll come back to those meetings later.

13            Approximately when did you first meet Geovanny

14   Fuentes?

15   A.   Around 2003, 2004.

16   Q.   Did Geovanny Fuentes come to Graneros?

17   A.   Yes.

18   Q.   Did you personally see Geovanny Fuentes when he came to

19   Graneros?

20   A.   Yes.

21   Q.   At the beginning, approximately how often did he come to

22   Graneros?

23   A.   Once, two times per week.

24            MR. GUTWILLIG:  Ms. Collins, I apologize.  If you

25   could please take down the exhibit.

O2LHHer2                          Sanchez - Direct

1   Q.  Did the frequency of Geovanny Fuentes' visits to Graneros

2   increase over time?

3   A.  Yes.

4   Q.  When Geovanny Fuentes came to Graneros, was he armed?

5   A.  Yes.

6   Q.  With what?

7   A.  A semiautomatic handgun.

8   Q.  Where did you see that?

9   A.  He would carry it at his waist.

10  Q.  When Geovanny Fuentes came to Graneros, did he typically

11  come alone?

12  A.  No.

13  Q.  When he first started coming to Graneros, approximately how

14  many people would be with him?

15  A.  One or two people.

16  Q.  Over time did he begin coming with more people?

17  A.  Yes.

18  Q.  How did those individuals and Geovanny Fuentes arrive at

19  Graneros?

20  A.  Geovanny Fuentes would arrive in an F-350 pickup, white,

21  and his companions on occasion would come on a Nissan Frontier

22  pickup, white, and on other occasions in a Nissan Frontier

23  pickup black.

24  Q.  Were the people who came with Geovanny Fuentes armed?

25  A.  Yes.

O2LHHer2                        Sanchez - Direct

1   Q.  With what?

2   A.  AK-47s and AK-15 rifles.

3            THE INTERPRETER:  Interpreter correction.  "AR-15

4   rifles."

5   Q.  Did Geovanny Fuentes bring money to Graneros?

6   A.  Yes.

7   Q.  How do you know that?

8   A.  I would exchange it.

9   Q.  When you say "exchange," what do you mean by that?

10  A.  From dollars to the equivalent in lempiras.

11  Q.  How was the money packaged?

12  A.  In $20 bills in bundles that were wrapped in rubber bands.

13  Q.  When you say "dollars," are you referring to U.S. dollars?

14  A.  Yes.

15  Q.  Initially, approximately how much at a time would Geovanny

16  Fuentes bring?

17           MR. COLON:  Objection.

18           THE COURT:  Basis?

19           MR. COLON:  Does he have personal knowledge?

20           THE COURT:  All right.  Lay a foundation, please.

21  Q.  Mr. Sanchez, when Geovanny Fuentes came to Graneros, who

22  received money that he brought?

23  A.  I did.

24  Q.  And when you received that money initially, approximately

25  how much at a time would Geovanny Fuentes bring?

O2LHHer2                          Sanchez - Direct

1    A.  10,000 to $15,000.

2    Q.  What did you do with the money you received from Geovanny

3    Fuentes?

4    A.  I would deposit it at the banks and I would pay him the

5    equivalent in lempiras.

6    Q.  Did you ever deliver money to Geovanny Fuentes or his

7    workers outside Graneros?

8    A.  Yes.

9    Q.  Who, if anyone, asked you to do that?

10   A.  My boss, Mr. Fuad Jarufe.

11            MR. COLON:  Objection.  Could we approach, your Honor?

12            THE COURT:  What's the basis?

13            MR. COLON:  His status, the witness' status and the

14   status of Mr. Jarufe as to whether they're coconspirators.

15            THE COURT:  It's overruled.  It's subject to

16   connection.  Thank you, Mr. Colon.

17            MR. COLON:  Yes, sir.

18   BY MR. GUTWILLIG::

19   Q.  All right.  Apologies if I've already asked this,

20   Mr. Sanchez, but what, if anything, did Fuad Jarufe say the

21   money was for?

22   A.  To pay Mr. Geovanny Fuentes' employees.

23   Q.  Approximately how many times did you deliver money to

24   Geovanny Fuentes or his workers outside Graneros?

25   A.  On two occasions.

O2LHHer2                        Sanchez - Direct

1    Q.  In approximately what year was that?

2    A.  In 2010.

3    Q.  Did you deliver the money to the same place on both

4    occasions?

5    A.  Yes.

6    Q.  Where did you deliver the money?

7    A.  Cerro Negro.

8            MR. GUTWILLIG:  Your Honor, may I please approach?

9            THE COURT:  You may.

10           MR. GUTWILLIG:  Ms. Collins, understanding that

11   Mr. Sanchez's monitor is not working, could you please pull up

12   Government Exhibit 12 for the Court and counsel.

13   Q.  Mr. Sanchez, I've just handed you what's marked as

14   Government Exhibit 12.  Do you recognize that?

15   A.  Yes.

16   Q.  What is it?

17   A.  It's a map of the route to Cerro Negro.

18   Q.  When you say "route to Cerro Negro," route from where to

19   Cerro Negro?

20   A.  From Choloma to Cerro Negro.

21   Q.  Is it a fair and accurate depiction of the route from

22   Choloma to Cerro Negro?

23   A.  Yes.

24           MR. GUTWILLIG:  Your Honor, the government offers

25   Government Exhibit 12.

O2LHHer2                        Sanchez - Direct

 1                MR. COLON:  No objection.

 2                THE COURT:  Received.

 3                (Government's Exhibit 12 received in evidence)

 4                MR. GUTWILLIG:  Ms. Collins, could you please publish.

 5     BY MR. GUTWILLIG::

 6     Q.  Mr. Sanchez, could you please indicate by telling us where

 7     on this map Graneros is located.

 8     A.  In the city of Choloma.

 9     Q.  And directing your attention there to the center of the

10     map, is that where Choloma is?

11     A.  Yes, Choloma.

12     Q.  When you delivered the money to Cerro Negro, where did you

13     go on the map?

14     A.  I headed towards Cerro Negro through the area of the

15     neighborhood of La Justosa.

16                MR. GUTWILLIG:  If the record could please reflect,

17     La Justosa is identified on the map as well by the witness.

18     Q.  And how did you get from Choloma to La Justosa?

19     A.  I would leave the company, take a left at the light.  I

20     would go down the main street of La Justosa, past the police

21     outpost, and take the road up to Cerro Negro.

22     Q.  Did you drive to La Justosa?

23     A.  Yes.

24     Q.  Approximately how long did that take you?

25     A.  Twenty-five, 30 minutes.

O2LHHer2                          Sanchez – Direct

1   Q.  Is there a port near Cerro Negro?

2   A.  Yes.

3   Q.  What is it called?

4   A.  Puerto Cortes.

5   Q.  Where on the map is Puerto Cortes located?

6   A.  At the end of it.

7          MR. GUTWILLIG:  If the record could please reflect

8   that the witness is indicating where Puerto Cortes is on the

9   map.

10  Q.  And where ——

11         THE COURT:  So noted.

12  Q.  What is Puerto Cortes, Mr. Sanchez?

13  A.  It's the most important port of Honduras.

14  Q.  Directing your attention to the first time you delivered

15  money, what happened when you arrived at Cerro Negro?

16  A.  When I arrived at the property, I went in with my car.  An

17  employee of Geovanny Fuentes' got in front of me and asked me

18  what I wanted.

19  Q.  Was that individual armed?

20  A.  Yes.

21  Q.  With what?

22  A.  A semiautomatic handgun and an AK-47 rifle.

23  Q.  Did you see other individuals at Cerro Negro that day?

24  A.  Yes.

25  Q.  Approximately how many?

O2LHHer2                          Sanchez - Direct

1    A.  Four people.

2    Q.  Were they armed?

3    A.  Yes.

4    Q.  With what?

5    A.  AK-47s and AR-15s.

6    Q.  Directing your attention to the second time, did you also

7    deliver money to the same location at Cerro Negro?

8    A.  Yes.

9    Q.  Did you see armed individuals then also?

10   A.  Yes.

11   Q.  Did you later learn that law enforcement had raided the

12   Cerro Negro property where you had delivered the money?

13   A.  Yes.

14   Q.  Approximately when did you learn that?

15   A.  March of 2011.

16           MR. COLON:  Sorry, your Honor, could the interpreter

17   speak a little louder, get closer to the mic, please?

18           THE COURT:  Yes.  Take a moment.  Don't rush.  That's

19   fine.

20           MR. COLON:  Could we get that question repeated,

21   please?

22           THE COURT:  Madam Reporter, if you would kindly read

23   back the last question.

24           (Record read)

25           THE COURT:  Next question, please.

O2LHHer2                            Sanchez - Direct

1   BY MR. GUTWILLIG::

2   Q.  After you learned about the law enforcement action,

3   approximately when did you next see Geovanny Fuentes?

4   A.  Between 30 and 40 days passed.

5   Q.  Where did you see Geovanny Fuentes at that time?

6   A.  In my boss' office.

7   Q.  When you say your "boss' office," whose office?

8   A.  At Graneros Nacionales, Mr. Fuad Jarufe's office.

9   Q.  Why were you in Fuad Jarufe's office that day?

10  A.  Because my boss was signing some checks for me.

11  Q.  While you were there, who else was there?

12  A.  Mr. Geovanny Fuentes and later Mr. Julio Cesar Barahona

13  arrived.

14          MR. GUTWILLIG:  Your Honor, may I approach?

15          THE COURT:  You may.

16  Q.  Mr. Sanchez, I've just handed you what's marked as

17  Government Exhibit 341.  Do you recognize that?

18  A.  Yes.

19          MR. GUTWILLIG:  Ms. Collins, if you could please pull

20  that up for counsel and the Court.

21  Q.  What is that, Mr. Sanchez?

22  A.  Excuse me?  I didn't hear.

23  Q.  Sure.  What is that?

24  A.  It's Mr. Julio Cesar Barahona.

25  Q.  Is it a fair and accurate depiction of Julio Cesar

O2LHHer2                          Sanchez - Direct

1    Barahona?

2    A.   Yes.

3            MR. GUTWILLIG:  The government offers Exhibit 341.

4            MR. COLON:  No objection.

5            THE COURT:  Received.

6            (Government's Exhibit 341 received in evidence)

7    BY MR. GUTWILLIG::

8    Q.   At the time, do you know whether Julio Cesar Barahona had a

9    position within the Honduran government?

10           MR. COLON:  Objection.  Hearsay.

11           THE COURT:  I haven't heard the question.

12           THE INTERPRETER:  Your Honor, may the interpreters

13   take a minute to see if the witness' mic is malfunctioning?

14           THE COURT:  I wonder if it's the speaker here.  See

15   the speaker on the witness stand.  It may be the volume on that

16   causing the feedback.  If you could either tilt it or adjust

17   it, I would appreciate that.

18           THE INTERPRETER:  The interpreter has adjusted the

19   volume.  Hopefully that will suffice.

20           THE COURT:  And the question, please?  The question

21   has been —— I guess it was an answer you were objecting to.  Is

22   that what it was, Mr. Colon?

23           MR. COLON:  The basis for his knowledge, Judge.

24           THE COURT:  Were you objecting to a question or to an

25   answer?

O2LHHer2                              Sanchez - Direct

1          MR. COLON:  To an answer.

2          THE COURT:  OK.  Can I have the answer translated,

3    please.

4          THE INTERPRETER:  No answer was given yet, your Honor.

5          THE COURT:  I'll tell you what, Mr. Gutwillig, please

6    back up and re-ask your question.

7          MR. GUTWILLIG:  Yes, your Honor.

8          THE COURT:  Obviously, that's not it.  Shut off the

9    microphone.  If you could turn it down.  Actually, the witness'

10   microphone here is irrelevant because —— no, I'm just going to

11   ask you to shut it off.

12         MR. COLON:  Judge, the problem may be here.  When we

13   hit mute, the interference stopped.

14         THE COURT:  I think the proximity of one of the

15   speaker boxes to a microphone would be a likely suspect.  So if

16   you have —— do you have a speaker box on your table?

17         MR. COLON:  No.

18         THE COURT:  All right.  Let's try it now.

19   BY MR. GUTWILLIG:

20   Q.  The question was, at the time do you know whether Julio

21   Cesar Barahona had a position within the Honduran government?

22   A.  Yes.

23         MR. GUTWILLIG:  Ms. Collins, could you please publish

24   Government Exhibit 341.

25   Q.  What position was that?

O2LHHer2                          Sanchez - Direct

1          MR. COLON:  Objection.  Same basis.  It's hearsay.  He

2  has no idea of who this person is or the title or position in

3  the government, unless it's spoken to him, unless he has

4  personal knowledge of it.

5          MR. GUTWILLIG:  Your Honor, I believe the witness has

6  personal knowledge of it.  He's testified that he lived in

7  Honduras for almost four decades.

8          MR. COLON:  I'm sorry, Judge.  How does that answer

9  the question?

10         MR. GUTWILLIG:  Your Honor, I believe the witness

11  knows who this person is from his own personal knowledge of his

12  position, the question he's about to answer, the position he

13  had in the Honduran government.

14         THE COURT:  All right.  Do you know who the person is

15  based on your own personal knowledge?

16         THE WITNESS:  Yes.

17         THE COURT:  All right.  You may answer.

18  A.  At that time, he was president of the judiciary.

19         (Continued on next page)

20

21

22

23

24

25

O2L5her3                         Sanchez - Direct

1   BY MR. GUTWILLIG:

2   Q.  Do you know what part of the Honduran government appoints

3   the president of the judiciary?

4            MR. COLON:  Objection.

5            THE COURT:  Overruled.

6   A.  Yes.

7   Q.  What part?

8   A.  The national Congress.

9   Q.  In 2011, do you know who the president of the Honduran

10  national Congress was?

11  A.  Yes.

12  Q.  Who was that?

13  A.  Mr. Juan Orlando Hernandez.

14  Q.  Did you hear Julio Cesar Barahonas say anything when he

15  entered your boss' office?

16           MR. COLON:  Objection.

17           THE COURT:  One moment, please.  Overruled.

18  A.  Yes.

19  Q.  What did you hear him say?

20  A.  Mr. Julio Cesar Barahona said the boss has sent me here to

21  help the guy with whatever is possible.

22  Q.  In context, what did you understand "the boss" to mean?

23  A.  Mr. Juan Orlando Hernandez.

24  Q.  What did you understand "the guy" to mean?

25           MR. COLON:  Objection, Judge.

O2L5her3                        Sanchez – Direct

1           THE COURT:  You are objecting to the answer?

2           MR. COLON:  The answer, yes.

3           THE COURT:  I don't know what the answer is.

4    A.  Mr. Geovanny Fuentes.

5           THE COURT:  Overruled.  Go ahead.

6    Q.  I don't have the exact words, but when he entered and said,

7    I think it was to help the guy; what did you understand that to

8    mean?

9    A.  To expunge Mr. Geovanny Fuentes' record regarding the drug

10   lab case.

11   Q.  What happened next?

12   A.  Mr. Julio Cesar Barahona asked for an up-front payment of

13   30,000 lempiras.

14   Q.  Who did you understand he was asking for the up-front

15   payment from?

16   A.  He asked Mr. Geovanny Fuentes for it.

17   Q.  What happened after that?

18   A.  Mr. Geovanny Fuentes asked my boss, Mr. Fuad Jarufe, to

19   lend it to him.

20   Q.  What did Mr. Fuad Jarufe say?

21   A.  My boss gave me instructions to make out the check to

22   Mr. Julio Cesar Barahona, and to charge it to Mr. Geovanny

23   Fuentes' account.

24   Q.  Did you do that?

25   A.  Yes.

O2L5her3                          Sanchez – Direct

1    Q.   What did you do with the check?

2    A.   I gave it to Mr. Julio Cesar Barahona.

3    Q.   In what denomination was the check?

4    A.   Lempiras.

5    Q.   And what are lempiras?

6    A.   The currency of my country.

7    Q.   Of Honduras?

8    A.   Honduras.

9    Q.   You testified earlier that your boss, Fuad Jarufe, owned

10   Graneros.  Was Fuad Jarufe involved in politics?

11   A.   Yes.

12   Q.   Did he support a particular political party?

13   A.   Yes.

14   Q.   Which one?

15   A.   The national party.

16   Q.   Did he also provide political donations to members of other

17   parties?

18   A.   Yes.

19   Q.   Which ones?

20   A.   He also made contributions to the candidates Manuel Zelaya

21   Rosales and Porfirio Lobo Sosa.

22   Q.   We will come back to that in a moment.

23            INTERPRETER:  Interpreter correction.  In case it was

24   unclear, the first name was Porfirio.

25            MS. TARLOW:  Understood.

O2L5her3                         Sanchez - Direct

1    Q.  Did Fuad Jarufe support a particular official during the

2    2013 Honduran presidential elections?

3    A.  Yes.

4    Q.  Who?

5    A.  Mr. Juan Orlando Hernandez.

6    Q.  While the defendant was running for president in

7    approximately 2013, did he come to Graneros?

8    A.  Yes.

9    Q.  Did you see the defendant at Graneros?

10    A.  Yes.

11    Q.  How did he travel to Graneros?

12    A.  On occasion he would arrive in a blue helicopter that was

13    escorted by a military helicopter, and on other occasions he

14    would arrive directly in the military helicopter.

15    Q.  And during that time period in 2013 what, if anything,

16    would the defendant receive at Graneros?

17    A.  A company check.

18    Q.  How do you know that?

19    A.  I would give it to him.

20    Q.  How frequently did you give checks to the defendant when he

21    was running for president in 2013?

22    A.  Once a month.

23    Q.  Approximately how much -- well, were the amounts of the

24    check, each check, approximately the same?

25    A.  Yes.

O2L5her3                          Sanchez - Direct

1    Q.  How much were the checks for?

2    A.  250,000 lempiras.

3    Q.  Who were the checks from?

4    A.  From the company.

5    Q.  And what was the company?

6    A.  Graneros Nacionales.

7    Q.  You mentioned this a moment ago.  In addition to the

8    defendant, did other politicians receive political

9    contributions from Graneros?

10   A.  Yes.

11   Q.  Did you personally provide some of those?

12   A.  Yes.

13   Q.  A moment ago you mentioned Jose Manuel Zelaya Rosales.  Do

14   you know who that person is?

15   A.  Yes.

16   Q.  Was he a politician in Honduras?

17   A.  Yes.

18   Q.  Did he receive political contributions from Graneros?

19   A.  Yes.

20   Q.  Approximately when?

21   A.  In the year 2005.

22   Q.  At that time, do you know whether he was running for a

23   political office?

24   A.  For president.

25   Q.  Was he a member of a particular political party?

O2L5her3                          Sanchez - Direct

1    A.  Yes.

2    Q.  Which one?

3    A.  The liberal party.

4    Q.  Approximately how often would he receive campaign

5    contributions?

6    A.  He was being given a check every month.

7    Q.  Was that check for approximately the same amount each

8    month?

9    A.  Yes.

10   Q.  How much?

11   A.  30,000 lempiras.

12   Q.  You also mentioned another individual earlier.  Do you know

13   someone named Porfirio Lobo Sosa?

14   A.  Yes.

15   Q.  Do you know that person by any other names?

16   A.  Yes.

17   Q.  What name?

18   A.  Pepe.

19   Q.  Was Mr. Lobo a politician in Honduras?

20   A.  Yes.

21   Q.  Did he receive political contributions from Graneros?

22   A.  Yes.

23   Q.  Approximately when did he receive those contributions?

24   A.  In 2005 and in 2009.

25   Q.  Directing your attention to 2005, in 2005 was Pepe Lobo

O2L5her3                              Sanchez – Direct

1    running for political office in Honduras?

2    A.  Yes.

3    Q.  What office?

4    A.  For president.

5    Q.  Was he a member of a particular political party?

6    A.  Yes.

7    Q.  Which party?

8    A.  The national party.

9    Q.  Approximately how often during that time period did Pepe

10   Lobo receive contributions from Graneros?

11   A.  One check per month.

12   Q.  And approximately how much were those checks for?

13   A.  100,000 lempiras.

14   Q.  Do you know whether Pepe Lobo was elected president in

15   2005?

16   A.  He was not elected.

17   Q.  Now directing your attention to 2009, was Pepe Lobo running

18   for political office in that year?

19   A.  Yes.

20   Q.  Which office?

21   A.  For president.

22   Q.  Did he receive campaign contributions from Graneros then?

23   A.  Yes.

24   Q.  How often?

25   A.  One check per month.

O2L5her3                         Sanchez - Direct

 1   Q.  And approximately how much were those checks for?

 2   A.  The same amount, 100,000 lempiras.

 3   Q.  Mr. Sanchez, I would like to switch gears now.  During the

 4   time period when the defendant was running for president, did

 5   you ever see him talking with Fuad Jarufe?

 6   A.  Yes.

 7   Q.  Did you hear some of those conversations?

 8   A.  Yes.

 9   Q.  On one of those occasions did the defendant talk about what

10   he would do if he became president of Honduras?

11   A.  Yes.

12   Q.  What did he say?

13   A.  Mr. Juan Orlando told my boss, Mr. Fuad Jarufe, that he had

14   a plan to remain in power for five, 10, 15, 20, 25 years,

15   however long it took, and then he said to my boss, he said, can

16   you imagine Mr. Fuad, having the national party in power for 50

17   years?

18   Q.  Were you there when he said that?

19   A.  Yes.

20   Q.  And specifically about remaining in power, what, if

21   anything, did the defendant say?

22   A.  He wanted help to remain in power.

23   Q.  And what, if anything, did he say about why he wanted to

24   remain in power?

25   A.  Mr. Juan Orlando Hernandez said that the business was going

O2L5her3                          Sanchez - Direct

1    too well to let it go in four years.

2    Q.   Do you know who Rafael Leonardo Callejas Romero is?

3    A.   Yes.

4    Q.   Was he previously the president of Honduras?

5    A.   Yes.

6    Q.   While the defendant was running for president in 2013, did

7    you ever hear him talk about Callejas?

8    A.   Yes.

9    Q.   Where were you?

10   A.   Across from my boss' desk.

11   Q.   In your boss' office?

12   A.   Yes.

13   Q.   Who was there?

14   A.   My boss was there and Mr. Juan Orlando Hernandez was at the

15   round table with members of the national party.

16   Q.   What, if anything, did the defendant say about Callejas?

17   A.   Mr. Juan Orlando Hernandez said we are stealing better than

18   in Callejas' times and nobody can touch us.

19   Q.   Do you know who Leopoldo Crivelli is?

20   A.   Yes.

21   Q.   At that time, in approximately 2013, do you know whether

22   Crivelli held a position in the Honduran government?

23   A.   Yes.

24   Q.   What position?

25   A.   He was a mayor in the City of Choloma.

O2L5her3                          Sanchez – Direct

1  Q.  Did Crivelli have a nickname?

2  A.  Yes.

3  Q.  What was that?

4  A.  Polo.

5  Q.  In 2013, while the defendant was running for president, did

6  you ever see the defendant with Crivelli?

7  A.  Yes.

8  Q.  Where were they?

9  A.  At the round table in my boss' office.

10 Q.  Where were you?

11 A.  Across from my boss' desk.

12 Q.  Why were you there?

13 A.  Because he was signing the check that I was going to be

14 giving to Mr. Juan Orlando Hernandez.

15 Q.  Did you hear part of their conversation?

16 A.  Yes.

17 Q.  Generally, what were they talking about?

18         MR. COLON:  Objection.  In general.

19         THE COURT:  I will allow it.

20         This is the general topic of the conversation,

21 correct?

22         MR. GUTWILLIG:  Yes, your Honor.

23         THE COURT:  Go ahead.

24         INTERPRETER:  What was the question again?

25         THE COURT:  What was the general topic of the

1    conversation.

2    A.  The political campaign.

3    Q.  And what political campaign?

4    A.  Polo's, to become mayor.

5    Q.  Mayor of what?

6    A.  From the City of Choloma.

7    Q.  What, if anything, did the defendant say about that

8    campaign?

9    A.  Mr. Juan Orlando Hernandez told Polo in his own words:  So,

10   Polo, are you going to snag it this time again?

11   Q.  In context, what did you understand "snag" to mean?

12   A.  If he was going to win the mayoral position again.

13   Q.  What, if anything, did Crivelli say in response?

14   A.  Polo said, believe me, things are tough now.

15   Q.  Did the defendant respond to that?

16   A.  Yes.

17   Q.  What did he say?

18   A.  Mr. Juan Orlando Hernandez said to him:  Believe me, the

19   indio is a dumb ass.  Give him a piece of meat, a piece of

20   steak, a beer, and he will give you his vote.

21   Q.  I believe I just heard you use the Spanish term "indio"; is

22   that correct?

23   A.  Correct.

24   Q.  Is that a phrase you used in Honduras?

25   A.  Yes.

O2L5her3                              Sanchez - Direct

1   Q.  What do you understand that phrase to mean?

2   A.  The Honduran people.

3   Q.  Mr. Sanchez, you testified earlier that you were present

4   for two meetings between the defendant and Geovanny Fuentes in

5   2013 while the defendant was running for president.  Let's

6   focus on the first meeting.

7   A.  OK.

8   Q.  On the day of the first meeting, did you learn earlier that

9   day that the defendant was coming to Graneros?

10  A.  Yes.

11  Q.  How did you learn that?

12  A.  My boss told me.

13  Q.  What did your boss tell you?

14          MR. COLON:  Objection.

15          THE COURT:  Basis.

16          MR. COLON:  Hearsay.  What his boss told him.

17          THE COURT:  Overruled.

18  A.  My boss told me Juan Orlando Hernandez is coming this

19  afternoon and he wants us to purchase some dollars from him.

20  Q.  What do you understand "purchase some dollars" to mean?

21  A.  That he would be bringing dollars for us to exchange them

22  into lempiras.

23  Q.  Where, within Graneros, did the first meeting take place?

24  A.  In my boss' office.

25  Q.  Who did you see when you arrived at your boss' office?

1    A.  My boss, Mr. Juan Orlando Hernandez, and Mr. Geovanny

2    Fuentes were there.

3    Q.  Could you please describe for me what the office looked

4    like?

5    A.  When you walk in the door, to the right is my boss' desk,

6    to the left there is a filing cabinet, then there is also a

7    blue armchair.  Also on the right there is the round table,

8    across from it is the sink, a coffee machine, a minibar, and

9    then on the left is the bathroom.

10   Q.  When you walked in, where did you see the defendant?

11   A.  At the round table.

12   Q.  Where did you see Geovanny Fuentes?

13   A.  At the round table.

14   Q.  Where did you see Fuad Jarufe?

15   A.  He was at his desk.

16   Q.  Where did you sit or stand?

17   A.  I was asked to wait so I sat in the blue armchair.

18   Q.  About how close were you to the defendant?

19   A.  A meter, a meter and a half.

20   Q.  Did Geovanny Fuentes address the defendant?

21   A.  Yes.

22   Q.  By what name?

23   A.  Juancho.

24   Q.  Did you call the defendant Juancho?

25   A.  No.

O2L5her3                                    Sanchez - Direct

1    Q.  Did you hear other people call the defendant Juancho?

2    A.  Yes.

3    Q.  Who?

4    A.  His -- those close to him.

5    Q.  Generally, what topic did the defendant, did Geovanny

6    Fuentes, discuss during this meeting?

7    A.  Mr. Juan Orlando Hernandez told Geovanny Fuentes that he

8    was interested in having him and his drug lab work for him.

9    Q.  Whose drug lab?

10   A.  Mr. Geovanny Fuentes'.

11   Q.  Did the defendant talk about Puerto Cortes?

12   A.  Yes.

13   Q.  What did he say?

14   A.  He said that he was interested in the lab given its

15   proximity to the port.

16   Q.  You mentioned protection earlier.  What, if anything, did

17   the defendant say about protection?

18   A.  Mr. Juan Orlando Hernandez said that he need not worry

19   about the transportation and protection of the drugs because

20   the military and police would take care of it.

21   Q.  You testified earlier that the defendant said he wanted the

22   drug lab to work for him.  Who did you understand that to mean?

23   A.  For them to work for Juan Orlando Hernandez.

24   Q.  During the meeting, what, if anything, did the defendant

25   say about extradition?

O2L5her3                          Sanchez - Direct

```
 1   A.  Mr. Juan Orlando Hernandez said that by the time the
 2   gringos find out, we will have eliminated extradition.
 3   Q.  During the meeting, did the defendant talk about Tony
 4   Hernandez?
 5   A.  Yes.
 6   Q.  Do you know who Tony Hernandez is?
 7   A.  Yes.
 8   Q.  Who is Tony Hernandez?
 9   A.  Mr. Juan Orlando Hernandez' brother.
10   Q.  What did the defendant say about Tony Hernandez?
11   A.  Mr. Juan Orlando Hernandez told Mr. Geovanny Fuentes that
12   he would give him Tony's cell phone number so that he could put
13   himself at his disposal.
14   Q.  Who could put himself at whose disposal?
15   A.  So that Mr. Geovanny Fuentes could put himself at Mr. Tony
16   Hernandez' disposal.
17   Q.  What did you understand "put at his disposal" to mean?
18   A.  That Tony Hernandez was going to coordinate the way in
19   which they would work in the trafficking of the drugs.
20   Q.  Coordinate with who to do that?
21   A.  With Mr. Geovanny Fuentes.
22   Q.  During the meeting, did the defendant say where those drugs
23   would go?
24   A.  Yes.
25   Q.  Where?
```

O2L5her3                              Sanchez - Direct

1    A.  Mr. Juan Orlando Hernandez said we are going to shove the
2    drugs up the gringos' noses and they won't even realize it.
3    Q.  What is your understanding of what "gringos" meant in that
4    context?
5    A.  The American people.
6    Q.  Did Geovanny Fuentes have anything with him during this
7    meeting?
8    A.  Yes.
9    Q.  What did he have with him?
10   A.  A black brief case.
11   Q.  Did Geovanny Fuentes open the brief case?
12   A.  Yes.
13   Q.  Where were you when he opened the brief case?
14   A.  In the blue airmen chair.
15   Q.  At what point during the meeting did he open the briefcase?
16   A.  After the phrase about shoving the drugs up the gringos
17   noses.
18   Q.  Where were you when Geovanny Fuentes opened the briefcase?
19   A.  In the blue armchair.
20   Q.  Did you see what was inside the briefcase?
21   A.  Yes.
22   Q.  What was inside?
23   A.  Dollars in twenty-dollar bills.
24   Q.  How was it packaged?
25   A.  In bundles, wrapped with rubber bands.

O2L5her3                         Sanchez - Direct

1  Q.  What, if anything, did Geovanny Fuentes do with the money?

2  A.  He took a bundle and handed it to Mr. Juan Orlando

3  Hernandez and said:  Take this to help in your campaign.

4  Q.  What, if anything, did the defendant then do?

5  A.  Mr. Juan Orlando Hernandez handed me the dollars and said

6  to me:  Jose, exchange these for me.

7  Q.  What did you understand "exchange" to mean?

8  A.  That I was to give him the equivalent of the dollars in

9  lempiras.

10  Q.  After the defendant handed you the money, what did you do

11  right after that?

12  A.  I counted the money.

13  Q.  Where did you count the money?

14  A.  On the round table.

15  Q.  Approximately how long did it take you to count the money?

16  A.  Three to five minutes.

17  Q.  Where was the defendant while you were counting the money?

18  A.  At the round table enjoying his drink, stirring it with his

19  finger.

20  Q.  When he finished counting the money, what did you do?

21  A.  I asked Mr. Juan Orlando Hernandez whom he wanted the check

22  made out to.

23  Q.  How much money was there?

24  A.  $15,000.

25  Q.  What did defendant say next?

O2L5her3                            Sanchez - Direct

1    A.  He said that he wanted cash.

2    Q.  What happened after that?

3    A.  They asked me to make the check out to myself and I

4    refused.

5    Q.  And after that, what happened?

6    A.  My boss asked me to make the check out to his name,

7    Mr. Fuad Jarufe.  I left and went to my office, I wrote the

8    check, I returned -- I went back again and took the check to my

9    boss for him to sign it.

10   Q.  What happened at that point?

11   A.  My boss endorsed the check and asked for someone to be sent

12   to him to cash the check.

13   Q.  Cash the check into what?

14   A.  The check to cash.

15   Q.  Of what denomination?

16   A.  Lempiras.

17   Q.  Directing your attention to the second meeting, did you

18   learn that the defendant was coming to Graneros that day?

19   A.  Yes.

20   Q.  Approximately how long after the first meeting was the

21   second?

22   A.  Around two months.

23   Q.  Was that still during the period where the defendant was

24   running for president in 2013?

25   A.  Yes.

1    Q.  And what did your boss tell you?

2    A.  He told me that Juan Orlando was arriving in the afternoon

3    and that he wanted us to purchase some dollars from him again.

4    Q.  Did you see the defendant at Graneros that day?

5    A.  Yes.

6    Q.  Where did you see the defendant?

7    A.  At the round table in my boss' office.

8    Q.  Who else, if anyone, did you see when you arrived?

9    A.  My boss, Mr. Fuad Jarufe, and Mr. Geovanny Fuentes were

10   there.

11   Q.  In general, what topic were they discussing?

12   A.  The political campaign.

13   Q.  Any political campaign in particular?

14   A.  Mr. Juan Orlando Hernandez' presidential campaign.

15   Q.  What happened next?

16   A.  Mr. Geovanny Fuentes opened his briefcase, took a bundle,

17   and handed it to Mr. Juan Orlando Hernandez.

18   Q.  A bundle of what?

19   A.  Dollars in twenty-dollar bills.

20   Q.  Did you count the money?

21   A.  Yes.

22   Q.  How much was there?

23   A.  $10,000.

24   Q.  What happened next?

25   A.  Mr. Juan Orlando Hernandez handed them to me and said to

1   me:  Jose, exchange these for me.

2   Q.  When you say "these" are you referring to the United States

3   dollars?

4   A.  Exactly.

5   Q.  What happened after that?

6   A.  They asked me to make the check out to my boss' name.  I

7   went back to my office and made out the check.  I went back to

8   my boss' office, handed him the check, and left.

9   Q.  After these two meetings, did you ever see Geovanny Fuentes

10  with members of the Honduran national police?

11  A.  Yes.

12  Q.  Any in particular?

13  A.  Yes.

14  Q.  Who?

15  A.  Mr. Nelvin Rolando Sauceda.

16  Q.  Where did you see Nelvin Sauceda with Geovanny Fuentes?

17  A.  In my boss' office at the round table.

18  Q.  Did Nelvin Sauceda have a position within the Honduran

19  police?

20  A.  Yes.

21  Q.  And at that time, what was his position?

22  A.  He was chief of police of the City of Choloma.

23  Q.  And Choloma is where Graneros is located, correct?

24  A.  Correct.

25  Q.  Did you ever find a box at Graneros containing military

1   supplies?

2   A.  Yes.

3   Q.  Was that after the two meetings you saw between the

4   defendant and Geovanny Fuentes?

5   A.  Yes.

6   Q.  Where did you find the box?

7   A.  In my boss' office.

8   Q.  What did the box look like?

9   A.  A normal sized cardboard box.

10  Q.  Did you open it?

11  A.  Yes.

12  Q.  What was inside?

13  A.  Military uniforms, police uniforms, bullet-proof vests, and

14  police badges.

15  Q.  Why did you open the box?

16  A.  I was expecting some stationery that I had ordered, I saw

17  that box, took it back to my office, and when I opened it I saw

18  what was inside.

19          MR. GUTWILLIG:  Your Honor, may I approach?

20          THE COURT:  You may.

21          MR. GUTWILLIG:  Ms. Collins, can you please put up for

22  the Court and counsel what is marked as Government Exhibit 902?

23  Q.  Do you recognize this?

24  A.  Yes.

25  Q.  What is it?

O2L5her3                          Sanchez - Direct

1    A.  Mr. Geovanny Fuentes.

2    Q.  Is it a fair and accurate picture of Geovanny Fuentes?

3    A.  Yes.

4              MR. GUTWILLIG:  Your Honor, the government offers

5    Government Exhibit 902.

6              MR. COLON:  No objection.

7              THE COURT:  Received.

8              (Government's Exhibit 902 received in evidence)

9              MR. GUTWILLIG:  Ms. Collins, can you please publish?

10   BY MR. GUTWILLIG:

11   Q.  Directing your attention to what Geovanny Fuentes is

12   wearing, did that vest look like the ones you found in the box?

13   A.  Yes.

14   Q.  And directing your attention to the rectangle in the center

15   of the vest; what is that?

16   A.  The flag of Honduras.

17   Q.  When you opened the box, was there anything written on the

18   inside?

19   A.  Yes.

20   Q.  What was that?

21   A.  A type of stamp that read:  105th Infantry Brigade.

22   Q.  Do you know what the 105th Infantry Brigade is?

23   A.  Yes.

24   Q.  What is that?

25   A.  A military brigade located in the City of San Pedro Sula.

O2L5her3                          Sanchez – Direct

1    Q.  Do you know whether Geovanny Fuentes had any official

2    position within the 105th Military Brigade?

3    A.  No.

4              MR. GUTWILLIG:  Your Honor, may I approach?

5              THE COURT:  You may.

6              MR. GUTWILLIG:  Ms. Collins, can you please pull up

7    for the Court and counsel what is marked Government Exhibit

8    334?

9    Q.  Mr. Sanchez, do you recognize that?

10   A.  Yes.

11   Q.  What is it?

12   A.  Mr. Ponce Fonseca.

13   Q.  Is it a fair and accurate depiction of Mr. Ponce Fonseca?

14   A.  Yes.

15             MR. GUTWILLIG:  The government offers Government

16   Exhibit 334.

17             MR. COLON:  No objection.

18             THE COURT:  Received.

19             (Government's Exhibit 334 received in evidence)

20   BY MR. GUTWILLIG:

21   Q.  At approximately that time, did Ponce Fonseca hold a

22   position in Honduras?

23   A.  Yes.

24   Q.  What position was that?

25   A.  He was commander of the 105th Brigade.

O2L5her3                          Sanchez - Direct

1    Q.  The one you just mentioned; correct?

2    A.  Correct.

3    Q.  Did there come a time when you were in Geovanny Fuentes'

4    vehicle?

5    A.  Yes.

6    Q.  Was that after you found the box at Graneros containing

7    military supplies?

8    A.  Yes.

9    Q.  Why were you in Geovanny Fuentes' vehicle?

10   A.  I needed to pick up some money from the bank for payroll

11   payment and there was no bodyguard at the company to accompany

12   me to the bank.

13   Q.  Did you typically go with a bodyguard from Graneros?

14   A.  Yes.

15   Q.  What kind of vehicle was it?

16   A.  That day we went on a white F 350 pickup.

17   Q.  The same type of vehicle you would see Geovanny Fuentes

18   arrive in at Graneros; correct?

19   A.  Correct.

20   Q.  When you got into the car who, if anyone else, was there?

21   A.  The driver was there, I sat in the front passenger seat,

22   and Mr. Geovanny Fuentes got in behind me.

23   Q.  Did the driver have any weapons?

24   A.  Yes.

25   Q.  What kind?

O2L5her3                           Sanchez – Direct

1   A.  He had a rifle, an AK-47, and in the compartment in the

2   middle he had a semi-automatic handgun.

3           MR. GUTWILLIG:  Ms. Collins can you please publish

4   what is in evidence as Government Exhibit 902?

5   Q.  When you were in the car what, if anything, did Geovanny

6   Fuentes show you?

7   A.  A military-grade rifle.

8   Q.  What did that rifle look like?

9   A.  It was olive green in color.

10  Q.  What, if anything, did Geovanny Fuentes say about that

11  rifle?

12  A.  Holding it in his hands he said:  I wish somebody got in

13  front of us on the road.  That way I could use this little toy

14  that my military friends gave me.

15  Q.  You testified earlier that you met Geovanny Fuentes in

16  approximately 2003 or 2004.  Did you also meet members of his

17  family?

18  A.  Yes.

19          MR. GUTWILLIG:  Your Honor, permission to approach?

20          THE COURT:  Granted.

21          MR. GUTWILLIG:  And your Honor, apologies, because the

22  screen isn't working, I'm going to use a handful of paper

23  copies here.

24          THE COURT:  All right.  That is perfectly fine.  I

25  remember the days when there were no screens.  Somehow we

O2L5her3                          Sanchez - Direct

1   managed to get by.  If you wanted to show something to the

2   jury, you could go and get it blown up on a foam board and put

3   it on an easel.  That was about the best you could do.  And if

4   you had things you wanted the jury to see, you passed them

5   around the jury box.  It sounds like ancient times.  Anyway.

6          Go ahead, Mr. Gutwillig.

7          MR. GUTWILLIG:  Yes, your Honor.

8   BY MR. GUTWILLIG:

9   Q.  Mr. Sanchez, I have just handed you a handful of pages.  I

10  would like to go through them and ask a few questions.  Do you

11  see what is marked in front of you as Government Exhibit 806?

12  A.  Yes.

13         MR. GUTWILLIG:  Ms. Collins, can you please pull up

14  for the Court and counsel what is marked Government Exhibit 806

15  and, Ms. Collins, if you can please hold them up as I go

16  through them?

17  BY MR. GUTWILLIG:

18  Q.  Mr. Sanchez, do you recognize what is 806?

19  A.  Yes.

20  Q.  What is it?

21  A.  Christian Fuentes.

22  Q.  Who is Christian Fuentes?

23  A.  He is Geovanny Fuentes' son.

24  Q.  Is it a fair and accurate picture of Christian Fuentes?

25  A.  Yes.

O2L5her3                            Sanchez – Direct

1    Q.   Moving on to Government Exhibit 807; do you recognize that?

2    A.   Yes.

3    Q.   What is it?

4    A.   Christian Fuentes together with Geovanny Fuentes.

5    Q.   Is it a fair and accurate picture of Christian Fuentes and

6    Geovanny Fuentes?

7    A.   Yes.

8    Q.   Now moving on to Government Exhibit 901; do you see that in

9    front of you?

10   A.   Yes.

11   Q.   What is that?

12   A.   Mr. Juan Orlando Hernandez with Christian Fuentes.

13   Q.   Is it a fair and accurate picture of the defendant and

14   Christian Fuentes?

15   A.   Yes.

16   Q.   Now Government Exhibit 910.  What is that?

17   A.   It's Mr. Juan Orlando Hernandez with Geo and Christian

18   Fuentes.

19   Q.   You said Geo.  Who does Geo refer to?

20   A.   Geovanny Fuentes' younger son.

21   Q.   Do you know that person's full name?

22   A.   Geovanny Fuentes.

23   Q.   Is it a fair and accurate picture of those individuals?

24   A.   Yes.

25   Q.   And last one, Mr. Sanchez, Government Exhibit 204-R-154.

O2L5her3                              Sanchez – Direct

1    Do you know what that is?

2    A.  Yes.

3    Q.  What is it?

4    A.  Mr. Juan Orlando Hernandez and Geo.

5    Q.  And when you say "Geo", do you mean one of Geovanny

6    Fuentes' sons?

7    A.  Yes.  I apologize.  That's what I knew him by, "Geo."

8    Q.  No problem.

9            Is it a fair and accurate picture of those two

10   individuals?

11   A.  Yes.

12   Q.  Mr. Sanchez --

13           MR. GUTWILLIG:  Thank you, Ms. Collins.  You can take

14   that down.

15   Q.  Approximately when was the last time you saw Geovanny

16   Fuentes?

17           THE COURT:  Ladies and gentlemen, that looks like a

18   good place for our mid-day break.  We are going to break for

19   lunch and I ask that you are ready so that we can resume

20   testimony at 2:00.  Please do not discuss the case among

21   yourselves or with anyone else, keep an open mind, and have a

22   very pleasant lunch.

23           (Continued on next page)

24

25

O2L5her3                          Sanchez – Direct

1              (Jury not present)

2              THE COURT:  Please be back at 5 minutes to 2:00 with

3    the witness in the witness box.  Thank you.

4              (Continued next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O2LHHer4

```
 1                          AFTERNOON SESSION

 2                               2:10 p.m.

 3              (In open court; jury not present)

 4              THE COURT:  First of all, I want to make sure

 5    everybody's seen the juror note.  Well, it was made available.

 6    I referred to it before the lunch break, Court Exhibit No. 2.

 7    You're welcome to look at it.  Look at it after court, then.

 8              Ms. Shroff, you have a complaint about the size and

 9    the artwork in the room that I got for you?

10              MS. SHROFF:  Yes, your Honor, but we can put that one

11    aside.

12              THE COURT:  OK.

13              MS. SHROFF:  I want to tell the Court that when we

14    were in that —— I have to have a talk with Ed about that ——

15    when I was in the room there, the door opened and a person

16    followed me in, or was trying to enter, and said something to

17    the effect of it was his jury room.  I didn't recognize that

18    the person because I had not taken in everybody's visage, but I

19    just directed exactly this way rather strongly so that I didn't

20    have to speak.  And I was —— I didn't want to have a

21    conversation with the gentleman.  It turns out that he is, in

22    fact, a juror in this trial.  I didn't want him to perceive me

23    as being rude for not having spoken to him or telling him to go

24    to the opposite side.  And then I think he figured out he was

25    at the wrong end, and he went.
```

O2LHHer4

1          So if, just out of sheer paranoia, in case he thought

2    I should be verbal in communicating with him, maybe you can

3    tell him there was no disrespect meant or I was just trying to

4    do my best.

5          THE COURT:  Well, first of all, thank you, Ms. Shroff.

6    It's an appropriate thing to do.  Second of all, unless you

7    disagree with me, unless the juror sends to me some sort of a

8    note, I don't plan to do anything about it.  Do you want me to

9    do something about it?  I just think it's highlighting, making

10   more out of it than it is.

11         MS. SHROFF:  I think Mr. Stabile had a concern that he

12   might misperceive it as being harsh or rude.  So that's why if

13   you could just generally say if that happened ——

14         MR. STABILE:  I think all we would ask is if your

15   Honor reminds the jurors I understand that one of you might

16   have bumped into some of the lawyers, and I just want to remind

17   you that the lawyers are not being rude to you if they don't

18   speak to you or if they turn away.

19         THE COURT:  That's fine.  And I'm going to be telling

20   the jurors that they can go in the entrance at 200 Worth rather

21   than go through the pavilion henceforth.

22         So bring our jurors in, please.

23         (Continued on next page)

24

25

O2LHHer4

1        (Jury present)

2        THE COURT:  Ladies and gentlemen, I hope you had a

3   nice lunch.

4        Just one programming reminder and one programming

5   development.  The reminder is if anybody associated with the

6   trial should happen inadvertently to come face to face with a

7   juror and doesn't say, "Hey, how are you?" and give you a big

8   smile, that's because they're following my instructions.

9   Please don't hold that against anyone.  That's what they're

10  supposed to do.  So I just remind you of that.

11       One thing I wanted to tell you is I've worked it out

12  to maybe expedite your getting into the courthouse in the

13  morning and after lunch.  So instead of going through the

14  pavilion, you will be able to enter on the Worth Street side

15  where it says 200 Worth Street, attorneys only.  Please take no

16  offense.  You're going to be honorary attorneys for the

17  duration of the trial.  Show your white card.  Make sure they

18  know that Judge Castel has said you can bring your cell phone

19  up to the jury room, and that should do it.  You'll go through

20  security there in that section.  All right.  So I hope that

21  works smoothly for you tomorrow.

22       You may continue, Mr. Gutwillig.

23       MR. GUTWILLIG:  Thank you, your Honor.

24  JOSÉ SANCHEZ, resumed.

25  BY MR. GUTWILLIG::

O2LHHer4

1    Q.  Mr. Sanchez, before we left off, I handed you a series of

2    pictures marked Government Exhibit 806, 807, 901, 910 and 204R,

3    154.

4           At this time, your Honor, the government would

5    formally offer those.

6           THE COURT:  Any objection?

7           MR. COLON:  No objection.

8           THE COURT:  Received.

9           (Government's Exhibits 806, 807, 901, 910 and 204R-154

10   received in evidence)

11   BY MR. GUTWILLIG::

12   Q.  Mr. Sanchez, you testified about Geovanny Fuentes Ramirez.

13   Was Geovanny Fuentes a member of the Honduran military?

14   A.  No.

15   Q.  Was Geovanny Fuentes a member of the Honduran police?

16   A.  No.

17   Q.  Approximately when was the last time you saw Geovanny

18   Fuentes?

19   A.  Easter week in 2015.

20   Q.  Where did you see him?

21   A.  In Puerto Cortes.

22   Q.  What was he doing?

23   A.  He was getting ready to board his yacht, together with his

24   family.

25   Q.  Mr. Sanchez, have you murdered anyone?

O2LHHer4

1   A.  No.

2   Q.  Are you here testifying under a cooperation agreement with

3   the government?

4   A.  No.

5   Q.  You testified earlier about the 2013 Honduran elections.

6   Do you know when approximately in 2013 those elections took

7   place?

8   A.  The last Sunday of November.

9   Q.  The last Sunday of November in 2013, correct?

10  A.  2013, yes.

11  Q.  Who was elected president of Honduras?

12  A.  Mr. Juan Orlando Hernandez.

13  Q.  After he was elected, did you later see the defendant?

14  A.  Yes.

15  Q.  Approximately how long after the election was that?

16  A.  About two weeks later.

17  Q.  Where did you see him?

18  A.  In my boss' office.

19  Q.  In Fuad Jarufe's office?

20  A.  Yes.

21  Q.  At Graneros?

22  A.  At Graneros Nacionales.

23  Q.  Who was there?

24  A.  My boss and Mr. Juan Orlando Hernandez were there.

25  Q.  Why were you there?

O2LHHer4

1   A.  Because my boss was signing some checks for me.

2   Q.  What topic were the defendant and Fuad Jarufe discussing?

3   A.  The results of the election.

4   Q.  What, if anything, did Fuad Jarufe say?

5   A.  In his vulgar way of speaking that he had, he said, "Fuck

6   Juan Orlando.  I didn't really think that shit was going to

7   happen."

8   Q.  What did you understand was going to happen then?

9   A.  That Mr. Juan Orlando Hernandez would win.

10   Q.  Did the defendant respond?

11   A.  Yes.

12   Q.  What did he say?

13   A.  Mr. Juan Orlando said, "Just so you can see, Mr. Fuad, when

14   there's a will, there's a way."

15   Q.  Was that the last time you saw the defendant in person

16   until today?

17   A.  That's correct.

18         MR. GUTWILLIG:  Your Honor, may I have a moment,

19   please?

20         THE COURT:  You may.

21         MR. GUTWILLIG:  No further questions, your Honor.

22         THE COURT:  All right.  You may cross-examine.

23         MR. COLON:  Judge, may I just consult here?

24         THE COURT:  Sure.

25         MR. COLON:  Thank you, your Honor.

O2LHHer4                          Sanchez – Cross

1   CROSS-EXAMINATION

2   BY MR. COLON:

3   Q.  Mr. Sanchez, can you hear me?

4   A.  Yes.

5   Q.  I'm going to ask you a series of questions on different

6   topics, and I want you to keep your voice up, because sometimes

7   it's difficult for me to hear.  And also be alerted that the

8   judge will guide you in terms of the protocol.  OK?

9   A.  OK.

10  Q.  So I'd like to start with your career or your professional

11  title.  You have indicated to the jury that you're an

12  accountant, correct?

13  A.  That's correct.

14  Q.  Can you tell the jury whether you have any specific

15  professional education that would lead you to claim that

16  profession as your profession, that of an accountant, like, for

17  instance, a college certification, university certification,

18  whereby you have to take accounting courses and you get that

19  moniker of an accountant?

20              MR. GUTWILLIG:  Objection, your Honor.

21              THE COURT:  Overruled.  I'll allow it.

22  A.  I received a degree from the Instituto Departamental

23  San Pedro Sula Debe y Haber, and I received a degree in public

24  accounting.

25  Q.  So you're ——

1              THE INTERPRETER:  May the interpreter consult with her

2     colleague?

3              "In finance and accounting."

4     Q.  So can you show the jury anything that you did besides ——

5     I'm sorry, Judge.  He put his hands up, the witness.

6     A.  Yes.  I'm not done.

7              THE COURT:  There's no question pending.

8              MR. COLON:  He put up his hand, Judge.

9              THE COURT:  Ask your next question.

10    BY MR. COLON:

11    Q.  So you are a ——

12             THE COURT:  Listen, if he waves his hand, ask your

13    next question.

14    Q.  So you are a certified accountant?

15    A.  Correct.

16    Q.  And so along with those duties of being an accountant, you

17    also undertook other duties, like depositing checks, dealing

18    with cash, either lempiras or dollars, correct?

19    A.  Correct.

20    Q.  And when was it that you became aware of the fact that

21    money that was being presented, whether it was lempiras or

22    dollars, were part —— were, let's say, part or the result of

23    some sort of narcotics trafficking activity?

24    A.  In 2004.

25    Q.  So when you were taking money to the bank and depositing

O2LHHer4                        Sanchez – Cross

1    money, whether it was cash or lempiras, there was a strong

2    probability that that money might have been the proceeds of

3    narcotics activity, correct?

4    A.   Dollars, yes.

5    Q.   So you believe — or you're telling the jury that the

6    dollars that you were dealing with were part and parcel of the

7    narcotics activity, correct?

8    A.   That's correct.

9    Q.   You would take those dollars and you would convert it to

10   lempiras, correct?

11   A.   Correct.

12   Q.   By depositing them in Honduran financial institutions or

13   banks, right?

14   A.   Right.

15   Q.   So that was your role, to take money that was narcotics

16   trafficking proceeds and put it into a financial institution.

17   You cooperated with whoever it was that was doing the drug

18   dealing like, for instance, Geovanny Fuentes and other people?

19            MR. GUTWILLIG:   Object.

20   Q.   You actually took that money knowing that that money was

21   illicit narcotics proceeds?

22            MR. GUTWILLIG:   Objection.

23            THE COURT:   Let me look at the question again.

24            Sustained as to form.

25   Q.   So you were participating in money laundering, correct?

O2LHHer4                          Sanchez – Cross

A.  One could say so.

Q.  So you were part of this conspiracy, right?

        MR. GUTWILLIG:  Objection.

        THE COURT:  Sustained.  Calls for a legal conclusion.

Q.  Did you agree with Mr. Fuentes to take that money and

deposit it into a Honduran financial institution, those

dollars?

A.  No.

Q.  Well, who gave you the order to do that, to deposit those

dollars in a financial institution based in Honduras?

A.  My boss, Mr. Fuad Jarufe.

Q.  And your testimony was that Mr. Fuentes had provided some

of those dollars, correct?

A.  Right.

Q.  You did that from 2004 to approximately what year?

A.  2014.

Q.  So your compensation from Mr. Jarufe included not only your

accounting work but your being the messenger of those deposits

that were created out of really, essentially, illicit gain?

A.  No.  I only had my salary.

Q.  So you only got paid for your accounting salary, not for

being the messenger and the carrier of dollars that came from

drug trafficking and depositing them in a bank; that's what

you're telling the jury?

A.  That's correct.

O2LHHer4                        Sanchez - Cross

1  Q.  Nevertheless, you did undertake that messenger type or

2  depositor as one of your chores during the day, your workday,

3  correct?

4  A.  Right.

5  Q.  You did that willingly, correct?

6  A.  I followed instructions.  I was an employee.

7  Q.  Even though it was drug money?

8         THE COURT:  Wait a minute.  That's not a question.

9  Make it a full question.

10 Q.  Even though you knew that that was drug money or drug

11 proceeds, correct?

12        THE COURT:  No, no, ask a question.

13 Q.  Did you know?  I mean, you knew that those were drug

14 proceeds.  Didn't you know that?

15 A.  That's correct.

16 Q.  All right.  So I'm going to get to another subject that has

17 to do with your travel to the United States.

18        You did at one time apply for asylum here in the

19 United States, correct?

20 A.  That's correct.

21 Q.  And if I stand corrected, you —— before you came to the

22 United States, you had to apply for a United States visa at the

23 consulate in Tegucigalpa, correct?

24 A.  That's correct.

25 Q.  My understanding is that when you did that, first time was

O2LHHer4                          Sanchez – Cross

1   like 2012 or so?

2   A.   Correct.

3   Q.   Before that you had never gone to the United States or

4   requested entry into the United States?

5   A.   I don't understand the question.

6   Q.   I'm sorry?

7   A.   I don't understand the question.

8   Q.   Withdrawn.

9          You needed to go to —— can I continue?

10         You needed to go to the U.S. consulate in Tegucigalpa

11  in order to obtain a nonimmigrant visa and request entry into

12  the United States, correct?

13  A.   That's correct.

14  Q.   And a visa was issued to you on May 18, 2012, more or less?

15  A.   No.

16  Q.   When was the first visa issued to you, if you remember?

17  A.   March 22.

18  Q.   March 22.

19         So your testimony is that you never requested a visa

20  —— rather, you did not request a visa that was issued on

21  May 18, 2012?  Do you recall?

22         MR. GUTWILLIG:  Objection, your Honor.

23         THE COURT:  Basis?

24         MR. GUTWILLIG:  Relevance.

25         THE COURT:  One second, please.

O2LHHer4                           Sanchez - Cross

1          Yes, you have to rephrase.

2     Q.  You don't remember obtaining a U.S. visa on or about

3     May 18, 2012?

4     A.  It was the 22nd of March of 2012.

5               THE COURT:  You have to go back to the microphone.

6               MR. COLON:  I'm sorry, Judge.

7     Q.  Is that when you requested it or when you received it?

8     A.  When I received it, when I went to the embassy and they

9     approved it for me.

10    Q.  All right.  You say that's March of what year?

11              MR. GUTWILLIG:  Objection, your Honor.  Asked and

12    answered.

13              THE COURT:  Yes, it has been asked and answered.

14    Q.  So that was a B-2 visa, correct, a visitor's visa?

15              THE INTERPRETER:  For the interpreter, counsel, B-2,

16    as in boy?

17              MR. COLON:  B, as in bravo, 2.

18    A.  B-1 or B-2.

19    Q.  And what was your understanding of what the B-1/B-2 visa

20    allowed you to do?

21              MR. GUTWILLIG:  Objection, your Honor.

22              THE COURT:  Basis?

23              MR. GUTWILLIG:  Relevance.

24              THE COURT:  Relevance?

25              MR. GUTWILLIG:  Relevance.

1          THE COURT:  I'll sustain that.  Maybe you can lay a

2     foundation.

3     BY MR. COLON:

4     Q.  So what was your purpose in going to the United States in

5     March or May of 2012?

6     A.  I came for work-related matters.

7     Q.  Work-related matters?  Like what kind of work?  Could you

8     tell the jury.

9          MR. GUTWILLIG:  Objection, your Honor.  Relevance.

10         MR. COLON:  I'm sorry, Judge.

11         THE COURT:  It's an objection on the grounds of

12     relevance.  Sustained.

13    Q.  So what was it that you did in the United States during

14    that time, and how long were you in the United States after you

15    were issued that visa?

16         MR. GUTWILLIG:  Objection, your Honor.  Form.

17         THE COURT:  Sustained.

18         MR. COLON:  Judge, I think I can connect this to

19    something else.

20    Q.  How long was your trip in the United States?

21         MR. GUTWILLIG:  Objection.

22         THE COURT:  Basis?

23         MR. GUTWILLIG:  Relevance again, your Honor.

24         THE COURT:  No, I'm going to allow that one.

25    A.  Ten days.

O2LHHer4                         Sanchez - Cross

1    Q.  And you returned to Honduras at that point?

2    A.  Yes.

3    Q.  Were you issued a visa on or about October 14, 2013, an

4    American visa, to enter the United States?

5    A.  Another visa issued?  No.

6    Q.  Do you remember whether you received a visa on or about

7    October 14, 2013?

8              MR. GUTWILLIG:  Objection.  Asked and answered.

9              THE COURT:  Let's see.  I'll allow it.  Go ahead.

10             Well, actually, he's been asked the question:  "Were

11   you issued a visa on or about October 14, 2013, an American

12   visa, to enter the United States?  Answer:  Another visa

13   issued?  No."

14             Asked and answered.

15             MR. COLON:  All right.

16   BY MR. COLON:

17   Q.  You don't remember whether you were issued one?

18             THE COURT:  Sustained.

19   Q.  Do you remember ⸺ strike that, or withdraw it.

20             On June 1, 2015, you were issued a visa to enter the

21   United States, correct?

22   A.  That's correct.

23             MR. COLON:  Judge, it's a yes or no.  I don't know

24   what else he just said.

25   A.  The thing is that, in my opinion, issuing is that there ⸺

O2LHHer4                              Sanchez - Cross

1   is that I receive another visa.  I think that's where the

2   question was asked incorrectly.

3   Q.  So we ——

4           THE COURT:  That's what the witness said?

5           THE INTERPRETER:  Yes, your Honor.

6           THE COURT:  OK.  Next question.

7   Q.  So we know that you received —— or were issued at least two

8   visas.

9           THE COURT:  Speak into the microphone.

10  Q.  You were issued or received at least two visas to go to the

11  United States, correct?

12  A.  I received one visa, and with that visa I entered three

13  times before the date in June of 2015.

14  Q.  Thank you.

15          So when you went to the consulate, did you have an

16  interview with a vice consul or a consular officer?

17  A.  Yes.

18  Q.  And did you fill out an application?

19          MR. GUTWILLIG:  Objection, your Honor.

20          MR. COLON:  I'll withdraw.

21          THE COURT:  Yes.  I don't know what the relevance of

22  the question is.

23          MR. COLON:  I can connect it, Judge.  I can connect

24  it.

25  Q.  Was it an application or just an interview that you had

O2LHHer4                          Sanchez - Cross

1   with a vice consul for your visa?

2   A.  I had two interviews at the embassy, one for my visa and

3   another for my family's visa.

4   Q.  When did you get the visas for yourself and your family?

5               MR. GUTWILLIG:  Objection.

6               THE COURT:  Basis?

7               MR. GUTWILLIG:  Asked and answered.  We've gone over

8   the dates.

9               MR. COLON:  I'm talking about the family now, Judge,

10  as well.

11              THE COURT:  That's what I thought.

12              MR. GUTWILLIG:  Your Honor, when or whether his family

13  was issued visas is not relevant is the government's position.

14              THE COURT:  One second, please.

15              Well, when did you get the visas for yourself I

16  believe you've asked, right?

17              MR. COLON:  Yes.

18              THE COURT:  OK.  And as to your family, I agree, it's

19  not relevant and sustain the objection.

20  BY MR. COLON:

21  Q.  Let me just go back to the interviews you said that you had

22  or you had.

23              Did you tell the vice consul that you had carried or

24  at least had been a messenger for illicit gains or narcotics

25  trafficking proceeds?  Did you tell him that at all, or her?

O2LHHer4                        Sanchez - Cross

1              MR. GUTWILLIG:  Objection.

2              THE COURT:  You can rephrase it.  If you want to ask

3    were you asked about that, that's a different story.

4    Q.  Were you asked by a vice consul whether you had any sort of

5    criminal record or had committed any crimes anywhere in the

6    world, not just the United States but anywhere in the world?

7    Were you asked that question by a vice consul, which is the

8    normal procedure in an investigation?

9              THE COURT:  No, no, you can't testify.

10             MR. COLON:  I'm sorry, Judge.

11   Q.  Were you asked any questions ——

12             THE COURT:  Were you asked that question?

13   Q.  —— about criminal history or criminal conduct or having

14   committed a crime even though you weren't arrested or

15   convicted?

16   A.  I've committed no crimes.

17   Q.  You mean the money laundering or the depositing of

18   illicitly —— illicit narcotics trafficking proceeds, you don't

19   think —— you don't think that was a crime?

20   A.  As I said, I was following instructions, and I received no

21   benefit from that activity.

22   Q.  So if Mr. Jarufe told you to go shoot somebody and he just

23   gave you instructions ——

24             MR. GUTWILLIG:  Objection, your Honor.

25   Q.  —— you would do it because, you know, you're just taking

1    orders from him.  Is that it?

2              THE COURT:  Sustained.

3    Q.  Did you overstay your visa in the United States at any

4    time?

5    A.  I don't understand the question.

6    Q.  Well, when you entered the visa —— the United States with

7    that visa, you understand that you weren't going to be there as

8    a resident; you were just going to be a visitor, correct?

9    A.  Correct.

10   Q.  Do you recall how much time you were given to stay in the

11   United States?

12   A.  Six months.

13   Q.  And you're telling this jury that you didn't overstay that

14   six-month deadline?

15             MR. GUTWILLIG:  Objection.  Mischaracterizing the

16   testimony.

17             THE COURT:  Yes, rephrase the question, please.

18   Q.  Did you overstay your visit?  You went beyond that time

19   frame that you were supposed to leave?

20   A.  That's correct.

21   Q.  And how much time did you overstay?

22   A.  With my visa I exceeded the six months.

23   Q.  Was that sometime in June, after June 1, 2015, when you

24   testified you left Honduras?

25   A.  Exactly.  After entering on that date, I did not go back to

1   my country.

2   Q.  I see.  Then at one time, this is four years later, you

3   actually applied for political asylum, sometime in 2019.  Do

4   you remember?

5   A.  That's correct.

6   Q.  And the reason you applied for political asylum is because

7   you were fearing persecution or, let's say, physical harm or

8   even murder at the hands of individuals in Honduras, right?

9   A.  That's correct.

10  Q.  And when you had that interview with that vice consul

11  somewhere between 2012 and 2015, you did not tell the vice

12  consul or consular officer you were fearful of persecution or

13  physical harm to yourself?

14          MR. GUTWILLIG:  Objection.

15          THE COURT:  Basis?

16          MR. GUTWILLIG:  Form, your Honor.

17          THE COURT:  Rephrase it.

18  Q.  When you had that interview with that consular officer,

19  isn't it a fact that you did not tell them anything about the

20  fact that you feared persecution and needed an asylum request?

21          MR. GUTWILLIG:  Objection to form again, your Honor.

22          THE COURT:  Which interview are we talking about,

23  Mr. Colon.

24          MR. COLON:  He said he only had one interview and

25  given one visa, and during the course of that visa, he might

O2LHHer4                          Sanchez - Cross

```
 1   have gone to the United States at least two times.  There would

 2   have been one interview.

 3            THE COURT:  You're not talking about an asylum

 4   application?

 5            MR. COLON:  The asylum application is 2019.

 6            THE COURT:  OK.  I'm sustaining the objection.

 7            MR. COLON:  I went back to the visa in which he had to

 8   have an interview.

 9            THE COURT:  I'm sustaining the objection.

10            MR. COLON:  May I ask him whether or not he actually

11   advised them that he had an asylum claim when he asked for the

12   visa?

13            THE COURT:  Now I'm confused.  The asylum application

14   was 2019?

15            MR. COLON:  Right.

16            THE COURT:  And the visa application was when?

17            MR. COLON:  Anywhere from 2012 to 2015.

18            THE COURT:  All right.  So the asylum application was

19   after the visa?

20            MR. COLON:  Four years after that last trip.

21            THE COURT:  OK.  And you're asking him, on the visa

22   application, whether he was asked about the asylum application?

23            MR. COLON:  Whether he had any fear of persecution or

24   some sort of reprisal.

25            THE COURT:  I sustained the objections to that.  I
```

O2LHHer4                         Sanchez - Cross

1    thought you then said to me that you were going to ask him

2    about the asylum application, and that's what confused me.

3           MR. COLON:  Yes, the asylum application, Judge, is

4    filed in 2019.

5           THE COURT:  Which is after the visa application.

6           MR. COLON:  Right.  He was already in the United

7    States.

8           THE COURT:  Ask your next question.

9           MR. COLON:  OK.

10   BY MR. COLON:

11   Q.  So when you filed that application ——

12          THE COURT:  For what?

13          MR. COLON:  For asylum.

14          THE COURT:  Yes.

15   Q.  —— is that the first time that you filed an application for

16   asylum or indicated to any government official that you wanted

17   to file for asylum?

18          MR. GUTWILLIG:  Objection, your Honor.  Form.

19          THE COURT:  I'm going to allow it.  Go ahead.  It's

20   compound, but I'll allow it.

21   A.  In 2015, I appeared before a Chicago court to submit my

22   first application, and it was denied.  And then in 2019, I

23   submitted another application because there was no lawyer that

24   wanted to take my case given the —— how sensitive the situation

25   was.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O2LHHer4                            Sanchez - Cross

1    Q.  And 2019 was essentially when you started to cooperate with

2    the United States government, correct?

3            MR. GUTWILLIG:  Objection, your Honor.

4            THE COURT:  I'll allow it.

5    A.  Correct.

6    Q.  You had mentioned in your testimony about a raid that

7    occurred on — on or about — well, in Honduras at Cerro Negro.

8    I believe it's C-e-r-r-o, N-e-g-r-o.

9    A.  That's correct.

10   Q.  You testified earlier that the first time you found out

11   about that was sometime in 2011, correct?

12   A.  That's correct.

13   Q.  Now, do you recall having a proffer session with the

14   Federal Bureau of Investigation sometime around October 25,

15   2019?  Do you recall what you told them in terms of that raid

16   and when you got notice or informed of that raid?

17           MR. GUTWILLIG:  Objection.  Form.

18           THE COURT:  Yes, rephrase please.

19   Q.  Do you recall telling the FBI that on or about October 25,

20   2019, in reference to that raid in Cerro Negro, that what you,

21   in fact, said on that particular date, which you recall, was

22   that that raid occurred on March — in March 2014?

23           MR. GUTWILLIG:  Objection, your Honor.

24           THE COURT:  You can translate the question, and my

25   question to the witness after the question is, do you

O2LHHer4                           Sanchez – Cross

1  understand the question?

2              THE WITNESS:  I understand it.

3              THE COURT:  You can answer the question.

4  A.  We discussed several dates.  They took notes.  If they made

5  mistakes on their notes, I do not believe that that is the

6  responsibility of mine.

7  Q.  Do you remember meeting with —— on or about October 25,

8  2019, in —— and having a discussion about ——

9              MR. GUTWILLIG:  Objection, your Honor.

10             THE COURT:  All right.

11             MR. GUTWILLIG:  May we approach?

12             THE COURT:  I'm going to sustain the objection.  You

13  can't read from a document not in evidence.

14             And, Mr. Colon, we're all subject to the following.  I

15  do the same thing.  If there's a microphone and then I'm

16  looking at a document, I put my head down, and I'm now away

17  from the microphone so it can't —— you can't be heard.  So I

18  would ask you to be attentive to the microphone.

19             MR. COLON:  I'm sorry, Judge.

20             MR. GUTWILLIG:  May I have a brief moment to consult?

21             THE COURT:  Pardon me?

22             MR. GUTWILLIG:  Can I have a brief moment to consult

23  with Mr. Colon, please?

24             THE COURT:  Yes.

25             (Counsel confer)

O2LHHer4                        Sanchez - Cross

1   BY MR. COLON:

2   Q.  My question is do you remember meeting with agents of the

3   FBI on or about October 25, 2019?

4   A.  Correct.

5   Q.  Do you recall what you told them about the raid?

6   A.  Yes.

7   Q.  What was it that you told them on or about October 25,

8   2019?

9            Your testimony is ——

10           THE COURT:  Stop, Mr. Colon.  You can't interrupt.

11           MR. COLON:  I'm sorry.  I'm listening to the Spanish,

12   so it's my fault.

13   A.  I told them that the raid was in 2011 and that I had seen

14   it on TV and the news.

15   Q.  So you referred to the report that they were writing.

16   You're saying that that might have been a mistake on whoever

17   the author was?

18           MR. GUTWILLIG:  Objection.

19           THE COURT:  Sustained.  You're not allowed to refer to

20   the contents of a document not in issue.  Do you want to offer

21   the document into evidence?

22           MR. COLON:  I guess I'll do that, Judge.

23           THE COURT:  All right.

24           MR. COLON:  It's —— it's defense DX 3536-01.  It's a

25   government exhibit.

1          MR. GUTWILLIG:  Your Honor, we object to it.  It's not

2     a government exhibit.  It's 3500 material.

3          THE COURT:  All right.  It's not a government exhibit?

4          MR. GUTWILLIG:  It is not a government exhibit.  It's

5     3500 material.  To the extent that he wishes to try to refresh

6     the witness ——

7          THE COURT:  Has the witness ever seen this document

8     before?  I don't know whether he's seen it.  Or did he see it

9     at or about the time it was written?

10          MR. GUTWILLIG:  Your Honor, that's not my

11     understanding.  It's a report that was written.  I doubt he saw

12     it at the time it was written.  And it's in English.

13          THE COURT:  Do you have a basis for a foundation with

14     this witness?

15          MR. COLON:  Well, if he doesn't recall exactly what he

16     said about a day, I'd ask him if there's something that can

17     refresh his recollection.

18          THE COURT:  That's a different story.  It's not

19     offering a document.  Come up.  You can ask him if it refreshes

20     his recollection.

21     BY MR. COLON:

22     Q.  I'm going to let you —— I'm going to come over here.  I'm

23     going to have the interpreter interpret this paragraph.  It's

24     the second paragraph on page 2.

25          THE INTERPRETER:  Counselor, for the interpreter, is

1   it the entire paragraph starting on page 2 and continuing?

2              MR. COLON:  Just the first line.

3              THE INTERPRETER:  Thank you.

4              THE COURT:  Just the first line of what?

5              MR. COLON:  It's the second paragraph on page 2 of 4.

6              THE COURT:  Mr. Colon.

7              MR. COLON:  Yes, sir.

8              THE INTERPRETER:  Done, counselor.

9   BY MR. COLON:

10  Q.  Does that refresh your recollection as to what you told the

11  agents back in October 2019?

12  A.  I know what I told them, and what I said was 2011.

13  Q.  So that's a mistake, then?

14             THE COURT:  No, no, no.  What's a mistake?  The

15  document is not in evidence, sir.

16             MR. COLON:  I'll take the document back, sir.

17             THE COURT:  Does the document refresh your

18  recollection?

19             THE WITNESS:  No.

20             THE COURT:  Next question.

21             MR. COLON:  Thank you.  I'll take that back.

22  BY MR. COLON:

23  Q.  When that raid occurred back 2011, Mr. Juan Orlando

24  Hernandez was not the president of the country, was he?

25  A.  No.

O2LHHer4                          Sanchez – Cross

1    Q.  Who was the president at that time?

2    A.  Mr. Porfirio Lobo Sosa.

3    Q.  Are you aware that by 2011 and going into 2012, Juan

4    Orlando Hernandez actually proposed a legislation to create the

5    extradition treaty that involved extraditing Honduran

6    nationals?  If you're aware.

7              MR. GUTWILLIG:  Objection, your Honor.  Objection.

8              THE COURT:  Basis?

9              MR. GUTWILLIG:  Form, relevance, scope.

10             THE COURT:  Well, it does — I think it's beyond the

11   scope of the direct examination, so I'll sustain it on that

12   basis.

13   BY MR. COLON:

14   Q.  And you testified at one point that some three weeks later

15   — not testified.

16             You made a statement that a few weeks later

17   Mr. Orlando — Juan Orlando Hernandez actually went and sought

18   a meeting with Mr. — I believe it was Mr. Jarufe or

19   Mr. Fuentes.

20             MR. GUTWILLIG:  Objection, your Honor.

21   Mischaracterizing the testimony.

22             THE COURT:  Please rephrase the question.

23             (Continued on next page)

24

25

O2L5her5                         Sanchez - Cross

1   BY MR. COLON:  (Continuing)

2   Q.  OK.  I believe you testified that Juan Orlando wanted to

3   invest in that laboratory, Negro?

4   A.  Yes.

5   Q.  And were you present when he made that statement?

6   A.  That's right.

7   Q.  And what year was that or what year, what month and year

8   was it that he made that statement in front of you?

9   A.  I do not remember in what month.  It was in 2013.

10  Q.  Was it before the election or after the election?

11  A.  Before the election.

12  Q.  And he said that in your presence?

13  A.  That's correct.

14  Q.  Who else was there?

15  A.  Mr. Geovanny Fuentes Ramirez and my boss Mr. Fuad Jarufe.

16  Q.  Can you tell the jury why you were such a confidant of

17  Mr. Ramirez, Mr. Juan Orlando Hernandez, and Mr. Fuad Jarufe?

18          MR. GUTWILLIG:  Objection, your Honor.

19          THE COURT:  You can ask the question but you have to

20  rephrase it.

21  BY MR. COLON:

22  Q.  Why were you allowed entry into that world of the three

23  individuals that you allegedly claim that they were drug

24  traffickers?

25          THE COURT:  If you know.

O2L5her5                              Sanchez - Cross

1   A.  Because I was the one who was going to be handling the

2   financial transaction.

3   Q.  You are saying the illegal drug financial transactions?

4   A.  Dollars, not drugs, sir.

5   Q.  But you knew that the dollars had something to do with

6   narcotics proceeds or narcotics trafficking?

7   A.  Correct.  Correct.

8   Q.  So why was it that you were allowed just, you know, what

9   gave you the impression that they confided in you or trusted

10  you?  What brought you to that sense?

11          MR. GUTWILLIG:  Objection.

12          THE COURT:  I will allow it.

13  A.  Both Mr. Geovanny Fuentes and Mr. Juan Orlando Hernandez

14  spoke very openly when I was in the office.

15  Q.  You mean Mr. Juan Orlando Hernandez that you actually

16  refused to shake his hand and you called him a thief, not only

17  to him but also to his security guard?

18          MR. GUTWILLIG:  Objection.

19          THE COURT:  It's a question.  I will allow it.

20  A.  That's correct.  I did call him a thief.

21  Q.  So, you were concerned, right, that Juan Orlando might do

22  some harm to you; correct?

23  A.  No.

24  Q.  Wasn't that the basis for your asylum claim?

25  A.  I was afraid of Geovanny Fuentes.

O2L5her5                         Sanchez – Cross

1   Q.  Not Juan Orlando Hernandez?

2   A.  He had a lot of respect for my boss and my boss had told me

3   that for as long as I was working for him, no one would touch

4   me.

5   Q.  The issue is whether or not you felt any fear or threat

6   from Juan Orlando Hernandez?

7   A.  He thought it was funny when I called him a thief.

8   Q.  So you did not believe that he was capable or wanting to

9   murder you then?

10  A.  As I said, it was mostly Geovanny Fuentes, the one who was

11  by his side.

12          MR. COLON:  Move to strike as unresponsive.  I am just

13  asking, your Honor, whether he was fearful or afraid of Juan

14  Orlando causing him harm and murdering him.

15          THE COURT:  All right.  So the question was:  So you

16  did not believe that he was capable or wanting to murder you

17  then; is that correct?

18  A.  They did want to murder me.

19  Q.  I didn't ask you they.  About Juan Orlando.

20  A.  Yes.

21          THE COURT:  I will allow it.  Go ahead.

22  Q.  You were fearful of him?

23          MR. GUTWILLIG:  Objection, your Honor.

24          THE COURT:  Basis?

25          MR. GUTWILLIG:  It doesn't identify a time frame.  If

O2L5her5                          Sanchez - Cross

1   he wants to ask when he was fearful of him, at what point?

2              THE COURT:  Why don't you put a time frame in your

3   question, Mr. Colon.

4              MR. COLON:  About the time you met him in 2013.

5              THE COURT:  So now complete the question with the time

6   period.

7   BY MR. COLON:

8   Q.  2013.  We are talking about 2013 when you met with him at

9   least two meetings, one of which you told him -- you called him

10  a thief.  You said he laughed; correct?

11  A.  Correct.

12  Q.  So is it fair that you were not fearful of him murdering

13  you?

14             THE COURT:  Again, you have to fix the time in the

15  question.

16  Q.  In 2013 you were not fearful of him murdering you, causing

17  you harm?

18             THE COURT:  In 2013.

19             MR. COLON:  Yes.

20             THE COURT:  That's the question.

21  A.  Not in 2013.

22  Q.  In fact, there were no attempts on your life between 2013

23  and 2015 when you left for the United States, were there?

24             MR. GUTWILLIG:  Objection, your Honor.

25             THE COURT:  Basis?

1           MR. GUTWILLIG:  It calls for -- I don't know how he

2    necessarily would know the answer to that question.

3           THE COURT:  Well, if you know.  You can answer it if

4    you know.  If you don't know, you don't know.

5    A.  In 2015 my life was already in danger due to situations

6    that I would not like to discuss here and that have to do with

7    the government.

8    Q.  The point is you didn't think that Juan Orlando was going

9    to do anything to you; correct?

10          THE COURT:  At what point in time?

11          MR. COLON:  From 2013 to 2015.

12   A.  Correct.  In 2013, yes.

13   Q.  And by 2015 you were safely residing in the United States;

14   correct?

15   A.  By June.

16   Q.  And you filed your asylum application in 2019, four years

17   later?

18   A.  Correct.

19   Q.  Even though you hadn't been in Honduras for four years?

20   A.  That's correct.

21   Q.  You testified today that at one point during those meetings

22   with Geovanny Hernandez and Mr. Fuad Jarufe, that Juan Orlando

23   actually said something about that he wanted to remain in power

24   5, 10, 15, or 20 years.

25          THE COURT:  Is that a question?

O2L5her5                         Sanchez - Cross

1           MR. COLON:  Yes.

2           THE COURT:  What's the question?

3           MR. COLON:  Did he say that.

4    A.  That's correct.

5           MR. GUTWILLIG:  Your Honor, no objection to the

6    question.  Just to note for the transcript, I think counsel

7    said "Geovanny Hernandez" and I think the question meant to be

8    "Juan Orlando Hernandez."

9           THE COURT:  Yes.  The question came out Geovanny

10   Hernandez --

11          MR. COLON:  It is about Juan Orlando saying that.

12          THE COURT:  Put a full question.

13          MR. COLON:  Sure.

14   Q.  You testified earlier that at one point Juan Orlando said

15   that he wanted to remain in power for five, 10, 15 or 20 years;

16   correct?

17   A.  20 or 25 years; correct.

18   Q.  And that's the first time you have ever said that in public

19   or for a jury; correct?

20   A.  No.  I already said that in the other trial.

21   Q.  You did.  That's your testimony, that you had testified

22   that way back in the trial of Geovanny Fuentes, 2019?

23   A.  Correct.

24   Q.  Was that at the first meeting with him or the second

25   meeting?

O2L5her5                         Sanchez - Cross

1    A.  In those meetings, Geovanny Fuentes was not there, only

2    Juan Orlando Hernandez and people from his party were.

3            INTERPRETER:  And interpreter correction:  Only Juan

4    Orlando Hernandez, my boss, and people from his party were

5    there.

6    Q.  Is it your testimony that there were video and audio

7    equipments installed in Mr. Fuad Jarufe's office?

8            MR. GUTWILLIG:  Objection, your Honor.  Beyond the

9    scope and also mischaracterizing the testimony.

10           MR. COLON:  I will withdraw that.

11           THE COURT:  I will allow it.

12           MR. COLON:  OK.  Thank you, Judge.

13           INTERPRETER:  May the interpreter have repetition of

14   the question?

15           THE COURT:  Is it your testimony that there were video

16   and audio equipments installed in Mr. Fuad Jarufe's office?

17   A.  That's correct.

18   Q.  And did you provide any of that video or audio, those

19   communications, recordings, to the prosecutors?

20   A.  No.

21   Q.  In fact, you didn't do that and you couldn't do that

22   because those recordings didn't exist?

23   A.  They did exist.  I delivered -- I provided two in Honduras.

24   Q.  So one was a prosecutor, a Honduran prosecutor,

25   Ms. Vanegas?

O2L5her5                          Sanchez - Cross

```
1    A.  For prosecutor Marlen Vanegas.

2    Q.  Right.  In fact, that was never published or shared with

3    anyone or produced for any sort of prosecution in Honduras, was

4    it?

5            MR. GUTWILLIG:  Objection.

6            THE COURT:  Basis.

7            MR. GUTWILLIG:  Beyond the scope of his knowledge.  If

8    he knows.

9            THE COURT:  If you know.  Do you know?  Do you know

10   what happened in Honduras with any such tapes?

11   A.  Prosecutor Marlen Vanegas said that she had delivered the

12   recordings to Attorney General Chinchilla and one month later

13   she was killed.

14   Q.  So you don't know what happened to that USB you gave her?

15   A.  I don't know what was done with it.

16   Q.  And you also gave one to, I believe, a gentleman by the

17   name of Christian Ayala?

18   A.  That's correct.

19   Q.  And you don't know what happened to that USB?

20   A.  No.

21   Q.  And then at one point you had the recording or the,

22   whatever it was, a USB of all these conversations that you said

23   that you taped or that were recorded on the video and audio and

24   you had that in your possession, right?  There was one more of

25   those?
```

O2L5her5                          Sanchez - Cross

1              MR. GUTWILLIG:  Objection.

2     Q.  USBs or recordings?

3              THE COURT:  Yes.  You have to rephrase the question.

4              MR. COLON:  I will, Judge.  I'm sorry.

5     Q.  You had the last one, USB or whatever it was --

6              THE COURT:  Come on.  You have to ask a question that

7     is reasonably precise so that the witness can answer.  If he

8     says yes or no we know what that means, yes or no.

9              MR. COLON:  I'm sorry, Judge.

10    BY MR. COLON:

11    Q.  There was one more version of that, correct, that had been

12    recorded or that you kept for yourself?

13    A.  Yes.

14    Q.  And you had that with you when you were traveling to the

15    United States; correct?

16    A.  That's correct.

17    Q.  In fact, it was in your luggage; correct?

18    A.  Correct.

19    Q.  Right.

20              Can you tell the jury how big that recorded device or

21    that instrument was that had those communications, audio and

22    video communications?  How big was it?

23    A.  A USB that was this size and it was in the luggage that was

24    confiscated from me in the airport in Honduras.

25    Q.  Actually, you don't know whether it was confiscated.  It

1    just didn't arrive with you.

2    A.   Correct.  My luggage, my suitcase did not arrive.

3    Q.   And that's what that USB was in your luggage?

4    A.   That's correct.  The drive was together with several

5    documents, copies of checks, and other documents.

6    Q.   You could put that drive in your pocket; correct?

7              INTERPRETER:  For the interpreter:  You could have?

8    Q.   Yes, you could have.

9    A.   No.

10   Q.   It was too big?

11   A.   No.  But losing it was too risky.

12   Q.   So you risked it being lost by putting it in your luggage

13   and it being separated from you during the trip?

14   A.   It was together with a tablet, a laptop computer that I

15   had, and other drives.

16   Q.   Anybody prevent you from taking those articles with you on

17   the plane?

18             INTERPRETER:  May the interpreter ask for

19   clarification?

20   A.   I checked the bags in one day before my trip.

21   Q.   Now, the information contained in there was very important

22   to you; correct?

23   A.   Correct.

24   Q.   And you made the decision to separate yourself from that

25   drive?

O2L5her5                          Sanchez - Cross

1   A.  Correct.

2   Q.  Now, you were also concerned at the time that there might

3   have been an alert or they call it a BOLO -- be on the lookout

4   for you -- around that time, around 2015 when you left?

5   A.  Yes.

6   Q.  In fact, you were concerned that you might be detained and

7   not let out of the country; correct?

8   A.  That's correct.

9   Q.  Nevertheless, you were free to leave Honduras and you left?

10  A.  Thank God I did.

11  Q.  And so, you weren't able to give all of that vital, crucial

12  let's say evidence, right, or damaging evidence to the law

13  enforcement officials or prosecutors here in the United States;

14  were you not?

15  A.  That's correct.

16          INTERPRETER:  The interpreter would like to correct

17  not the last answer but the one prior to that:  Instead of "I

18  did," "I was."

19  BY MR. COLON:

20  Q.  So in those videos or audios that were captured by Mr. Fuad

21  Jarufe's recording devices all the information and all the

22  statements and transactions that were made, none of that was

23  available to law enforcement or prosecutors with respect to

24  this case?

25          THE COURT:  If you know.

O2L5her5                          Sanchez - Cross

1  A.  That's correct.

2  Q.  So, in addition to not having any of that evidence to

3  provide, you didn't give them any sorts of bank receipts or

4  transaction -- financial transactions that occurred between

5  Mr. Juan Orlando Hernandez and Mr. Geovanny Fuentes and

6  Mr. Jarufe?

7  A.  That's correct.

8  Q.  You were the accountant; correct?

9  A.  Correct.

10  Q.  And you didn't keep any records of those transactions

11  whether it was receipts, some sort of ledger, an accounting

12  book.  You didn't keep any of that?  You didn't preserve any of

13  that, did you?

14  A.  Just a list of contacts on a phone that I gave to the

15  government where I gave them phone numbers.

16  Q.  And you didn't provide any -- withdrawn.

17          Did that phone have the ability to take photographs?

18  A.  The phone?  Which phone?

19  Q.  The phone that -- you just testified that you had a

20  telephone --

21          INTERPRETER:  May the interpreters confer?

22          THE COURT:  Yes.

23          INTERPRETER:  The interpreter would like to correct

24  the prior answer about the list of contacts.  The answer was:

25  A list of telephone numbers that I delivered to the

O2L5her5                          Sanchez – Cross

1   prosecutor's office.

2   BY MR. COLON:

3   Q.  My question was you had a camera, a photographic component

4   in that phone; correct?

5              MR. GUTWILLIG:  Objection, your Honor.

6              MR. COLON:  Withdrawn.

7   Q.  You were able to take pictures with that phone; correct?

8              MR. GUTWILLIG:  Objection, your Honor.

9              THE COURT:  Basis.

10             MR. GUTWILLIG:  He has testified that he provided a

11  list of contacts, not a phone.  I am not sure why counsel is

12  asking about a phone.

13             THE COURT:  I will allow it.

14             Did your phone have a camera in it?

15  A.  Yes.

16  Q.  Did you have any pictures of Juan Orlando on that phone?

17  A.  On my computer.

18  Q.  I asked you about your phone.

19  A.  No.

20  Q.  You had no pictures of any of the documentation or

21  paperwork that you testified about, right?  The checks, deposit

22  slips, withdrawal slips?

23  A.  That's correct.

24  Q.  Did you think it would be important, possibly, to use your

25  phone to take pictures of Juan Orlando, Geovanny Fuad, and the

1    documents that were used or the receipts that were created out

2    of these transactions?

3              MR. GUTWILLIG:  Objection.

4              THE COURT:  Basis?

5              MR. GUTWILLIG:  Argumentative.

6              THE COURT:  I will allow it.

7    A.  Not on my personal telephone.

8    Q.  Do you recall providing spreadsheets to the government?

9    A.  Financial statements, I believe.

10   Q.  Any sort of spread sheets?

11   A.  I do not recall.

12   Q.  May I refresh your recollection?

13             THE COURT:  I don't know.  If you want to show him a

14   document to endeavor to refresh his recollection, I will allow

15   it.

16             MR. COLON:  Thank you, Judge.

17             May I approach, sir?

18             THE COURT:  You may.

19   Q.  I'm referring to 3536 --

20             (Counsel conferring)

21             MR. COLON:  I don't think I need that question.  I'm

22   going to withdraw that.

23   Q.  You did provide spreadsheets to the government though;

24   correct?

25             MR. GUTWILLIG:  Your Honor, objection.  Asked and

1  answered.  He said he doesn't recall.

2                THE COURT:  Sustained.

3  Q.  Did you have any spreadsheets available to you from your

4  work as an accountant?

5  A.  I had a copy on an e-mail.

6  Q.  And you will agree with me that there was no evidence on

7  those spreadsheets with respect to the transactions that Juan

8  Orlando undertook?

9                MR. GUTWILLIG:  Objection, your Honor.  I'm not sure

10  what "transactions that Juan Orlando undertook" means here.

11                MR. COLON:  I will withdraw it and rephrase that.

12  Q.  Those transactions involving deposits, withdrawals, checks,

13  you don't have any evidence or you didn't have any evidence of

14  those transactions with respect to what you testified to

15  earlier, the transactions between yourself and Juan Orlando for

16  cash, dollars, you had no evidence on those spreadsheets

17  whatsoever?

18                INTERPRETER:  Counselor, respectfully, the interpreter

19  was unable to hear the second half of the question.

20  Q.  OK.  I will try to rephrase it.

21                With respect to spreadsheets that you had created,

22  isn't it a fact that you had no evidence whatsoever of those

23  transactions involving dollars and lempiras and checks, there

24  was no evidence in those spreadsheets that you had with respect

25  to Juan Orlando and what you testified to earlier, the

O2L5her5                              Sanchez - Cross

1  transactions between Geovanny and Juan Orlando, Fuad and the

2  back and forth to the bank?

3          MR. GUTWILLIG:  Objection, your Honor.  I think the

4  witness testified that there was a spreadsheet in his e-mail.

5  I don't recall that he had testified that he had created

6  spreadsheets here.

7          THE COURT:  Well, I'm going to require a rephrasing of

8  the question, please.

9  BY MR. COLON:

10 Q.  The spreadsheets that you said that you had at one time,

11 was there any evidence of these transactions involving Juan

12 Orlando?

13 A.  That spreadsheet was only to prove that I had worked for

14 Graneros Nacionales.

15 Q.  So there was nothing connecting Juan Orlando to that

16 spreadsheet?

17 A.  My work as an accountant was to make evidence disappear.

18 Q.  So what did you make disappear from that spreadsheet?

19 A.  The transaction was handled as the purchase of dollars.

20 Q.  But it didn't indicate who it was handled for or on behalf

21 of anyone.

22 A.  The voucher did indicate it.  It said purchase of dollars

23 from Juan Orlando Hernandez.

24 Q.  And where are those spreadsheets that indicate that the

25 purchaser of the dollars was Juan Orlando?  Where is that

O2L5her5                              Sanchez - Cross

1   spreadsheet that indicates that?

2   A.   At the company.

3   Q.   At the company in Honduras?

4   A.   In Honduras.

5   Q.   So you can't provide that right now to the prosecutors or

6   the defense; can you?

7              MR. COLON:  Your Honor, I have --

8              INTERPRETER:  The interpreter has not been given the

9   opportunity to interpret.

10             THE COURT:  Absolutely.

11             INTERPRETER:  Thank you, Judge.

12  A.   In 2015, when I had three days off, I was going to return

13  from the United States because I had a return ticket but I did

14  not because I was told that Christian Ayala had been murdered

15  and that people were inquiring about me, about where I had gone

16  and where I was.  And so, I decided not to go back to Honduras,

17  to pick up the evidence that the Chicago Court had requested of

18  me.

19             MR. COLON:  I move to strike as unresponsive.  I asked

20  whether or not he could provide that information in those

21  spreadsheets to the jury or the prosecution or the defense.  I

22  didn't ask why, Judge.

23             MR. GUTWILLIG:  Your Honor, the counsel has asked a

24  number of questions about evidence saying where is it, why

25  isn't it here.  The witness has answered.

1    THE COURT:  This is what I am going to do.  I am going

2    to strike the answer and tell the jury to disregard it, and you

3    will have your opportunity on redirect to do what you wish to

4    do.

5         So please disregard that last answer from the witness.

6         Go ahead.  Next question.

7    BY MR. COLON:

8    Q.  Mr. Sanchez, you have no access to that information and you

9    are unable right now, as we stand in this trial, to provide

10   that information as evidence?

11   A.  Correct.

12   Q.  And you didn't have any copies of cancelled checks or bank

13   records and you don't have those today that you can provide?

14        INTERPRETER:  For the interpreter:  You didn't have

15   copies of cancelled checks?

16        MR. COLON:  Yes.  You don't have.

17   A.  No.

18   Q.  Do you know when Juan Orlando Hernandez became president of

19   Honduras?

20   A.  Yes.

21   Q.  Were you continuing to work for Mr. Jarufe from 2014 to

22   2015?

23   A.  Yes.

24   Q.  Is it safe to say that you suffered no harm or threat -- I

25   mean direct, that could be at least confirmed?  Any attempts on

O2L5her5                              Sanchez – Cross

1  your life or danger of reprisals in that year and a half from

2  2013 to 2015?

3          INTERPRETER:  Counselor, respectfully, the interpreter

4  was unable to hear the second half of the question.  Thank you.

5  Q.  Between 2013 and 2015 or 2014 and 2015 when he became

6  president that whole year, year and a half, almost, you did not

7  receive any threats, any sort of reprisals, any sort of

8  assaults, attempts at murdering you in that one and a half year

9  that you remained while he was president in Honduras; correct?

10 A.  That's correct.

11 Q.  And I think you mentioned at one point when you testified

12 earlier that there was an issue with respect to election fraud?

13 A.  That's correct.

14 Q.  Do you have any proof of that, sir?  I'm sorry.  And I mean

15 scientific proof, something that is physical.

16         MR. GUTWILLIG:  Objection, your Honor.

17         THE COURT:  Ask a clear, one question if you would,

18 please.

19         MR. COLON:  I apologize, Judge.

20 Q.  You don't have any sort of proof, physical proof,

21 electronic, scientific, of election fraud, during Juan Orlando

22 Hernandez's 2014 campaign; do you?

23         MR. GUTWILLIG:  Objection, your Honor.

24         THE COURT:  Basis.

25         MR. GUTWILLIG:  The same one.

1           THE COURT:  Which is?

2           MR. GUTWILLIG:  Does he have any type of electronic

3    scientific proof of election you fraud.  It is a compound

4    question --

5           THE COURT:  I will allow it.  Go ahead.

6    A.  I have no physical evidence but I was present there.

7    Q.  You were present during the course of election fraud in

8    2014?

9    A.  I was involved in polling people on the streets to see what

10   they were saying about him.  He himself would ask me what

11   people were saying when I would get back to the office.

12   Q.  But, again, you have no documentation to prove that there

13   was electoral fraud during that 2014 presidential campaign?

14   A.  No, I have no evidence, but the fraud did take place.

15   Q.  So the question is yes or no.  Do you have any evidence?

16          THE COURT:  Well, evidence is a legal term.  If you

17   want to say do you have any physical or documentary materials

18   that tend to prove something you can ask that question.

19          MR. COLON:  Thank you, Judge.

20   Q.  Do you have, once again, any documentation, physical proof

21   of electoral fraud that you just testified that you believe

22   occurred?

23   A.  No.

24   Q.  I want to go back to one issue with the prosecutor Vanegas.

25          THE COURT:  Ladies and gentlemen, we are going to take

O2L5her5                         Sanchez – Cross

1    our mid-afternoon break.  Please do not discuss the case among

2    yourself or with anyone.  We will be back in action in 10

3    minutes.

4              Thank you.

5              Silence leaving the courtroom, please.

6              (Jury not present)

7              THE COURT:  See you in 10 minutes.  Thank you.

8              (Recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O2LHHer6                         Sanchez - Cross

1                (Jury present)

2                THE COURT:  All right.  Please be seated.

3                You may continue.

4                MR. COLON:  I don't have that much left.

5                THE COURT:  Go ahead.

6     BY MR. COLON:

7     Q.  Mr. Sanchez, do you recall sending an email to a prosecutor

8     in Chile with respect to the Ms. Vanegas matter?  That's a yes

9     or no.

10    A.  Ms. Vanegas?  No.

11    Q.  You did not send an email to a Chilean prosecutor —

12    rather, an individual that was in Chile?

13    A.  Yes.  Yes, I did do that.

14    Q.  In fact, you actually don't have any evidence of that

15    because you deleted the email?

16    A.  That's correct.

17    Q.  All right.  Do you recall how many times you met in

18    preparation —

19                THE COURT:  Approximately when was that email, sir?

20                THE WITNESS:  It was at the beginning — the end of

21    2014 or beginning of 2015, I believe it was.  They were in the

22    process of extradition of Natalia —

23                THE COURT:  You answered my question.  My question was

24    simply the year, that's it.  The rest of it is stricken.  Thank

25    you.

O2LHHer6                         Sanchez - Cross

BY MR. COLON:

Q.  Do you recall having a meeting with the U.S. Attorney's

Office, agents, U.S. Attorneys in preparation for this

testimony today with respect to this case?

A.  Yes.

Q.  And is it true that you met at least 20 times over the last

couple of years in preparation for your testimony today?

A.  No.

Q.  How many would you say you met?  How many times would you

say you met with prosecutors or agents in preparation for this

case?

A.  I've met around three or four times at most.

Q.  So you didn't meet with any officers or agents of the

United States government with respect to the prosecution of the

case.  You didn't meet with anyone on October 25, 2021?

A.  October 25, 2021, I don't remember.

Q.  And I'm sorry, I would add also any Zoom meetings or

contacts with prosecutors or agents.

        THE COURT:  The question is have you ever had any Zoom

calls with prosecutors or agents, is that the question?

        MR. COLON:  Yeah, that's the question, Judge.  Thank

you.

        THE COURT:  Go ahead.

BY MR. COLON:

Q.  Have you ever had those Zoom meetings or at least

O2LHHer6                         Sanchez - Cross

1   interactions with prosecutors or agents, Zoom including

2   meetings?

3   A.  Yes.

4   Q.  And would you agree there were about at least maybe 15 to

5   20 of those Zoom meetings?

6   A.  No.

7   Q.  So whether it's Zoom or meeting, can you tell the jury

8   whether you met with somebody or Zoomed with somebody from the

9   government on January 5, 2021?

10  A.  January 5, 2021, no, I don't remember.

11  Q.  How about January 13, 2021?

12  A.  I honestly don't remember.

13  Q.  How about January ——

14  A.  I don't remember.

15  Q.  —— 18, 2021?

16  A.  I did have meetings by Zoom, one weekly meeting, but I

17  don't remember the dates.

18  Q.  All right.  How about January 18, 2021?

19  A.  As I said, I don't remember the dates.

20  Q.  How about February 1, 2021?

21  A.  The 1st of February of 2021, I think that that was only to

22  give me my flight itinerary for the trial and everything.

23  Q.  Is there something that could refresh your recollection,

24  since you don't remember, that I could show you?

25          THE COURT:  Is there something you want to show the

O2LHHer6                          Sanchez - Cross

 1    witness —

 2              MR. COLON:  Yes.

 3              THE COURT:  — to refresh his recollection?

 4              MR. COLON:  Yes, Judge.  Thank you.

 5              THE COURT:  Go ahead.

 6              MR. COLON:  So I'm going to, if I may, bring this

 7    folder up.

 8              MR. GUTWILLIG:  Can I see it first?

 9              (Counsel confer)

10              MR. COLON:  We're at 3536-03 to 3536 —

11              (Counsel confer)

12              MR. COLON:  All right.  So if I may, Judge, make a

13    little room here.

14    Q.  I'm going to give you — show you this binder.  It

15    indicates, I believe, dates that you might have had contact

16    with the prosecution.

17              Now, showing him 3536-02, eight pages, but there's no

18    date on it.  So I'm going to move on to 3536-02, which is kind

19    of long.  I'm sorry, Judge.

20              I'm moving on to 3536-03.  Like you to take a look at

21    that document.  Does it remind you whether you had any

22    conversations or meetings or Zoom interaction with the

23    government?

24              THE COURT:  One second, please.

25              MR. COLON:  You want me to step away?

1          THE COURT:  Yes.

2          MR. COLON:  I'm going to ask him to look at it, then.

3          THE COURT:  OK.  Thank you.

4          Sir, let me explain to you the concept of refreshing

5   your recollection.  You should look at the document and read as

6   much of it as you like, and after you read it, in your own mind

7   mentally close the document and ask yourself the question:  Do

8   I have a new and refreshed recollection from reading the

9   document?  And if you do, you should give that new and

10  refreshed recollection.  If you don't, you should say it

11  doesn't refresh your recollection.

12         Do you understand?

13         THE WITNESS:  Yes.

14         THE COURT:  Does it refresh your recollection?

15         THE WITNESS:  Yes.

16  BY MR. COLON:

17  Q.  If you would just continue to turn —— there's about 21

18  dates there, Judge.

19         THE COURT:  What's the question?

20         MR. COLON:  Does that refresh his recollection in

21  terms of the dates that he met or Zoomed with the government in

22  preparation for this testimony?

23         THE COURT:  For all meetings, is that your question?

24         MR. COLON:  Yes.  He only said three.  There's 21.

25         THE COURT:  I'm sorry?

O2LHHer6                         Sanchez - Cross

1          MR. COLON:  He said three on testimony.  That's all he
2     could recall.
3          THE COURT:  The dates?  And what's your question?  I'm
4     not — tell me what the question is.
5          MR. COLON:  Does that refresh his recollection in
6     terms of how many times he had interactions, meetings, Zooms
7     with the prosecution in preparation for this case?
8          THE COURT:  So what have you given him?  How many
9     pages have you given him?
10          MR. COLON:  There's probably about 30 pages, but it's
11     broken up.
12          THE COURT:  I didn't ask you whether it's broken up.
13     I asked you approximately how many pages.  You said — you
14     answered.
15          MR. COLON:  About 30, 40.
16          THE COURT:  Thank you.  Thank you.
17          You can look at the pages.  And the question is —
18     tell me what the question that he's supposed to think about,
19     whether it refreshes him.
20          MR. COLON:  Does reviewing that file, that folder
21     there, does that refresh his recollection as to how many times
22     he met with the prosecutors or agents in preparation for this
23     case?
24          THE COURT:  OK.  So do you understand what you're
25     supposed to do?  Look at the binder and then close the binder,

O2LHHer6                              Sanchez – Cross

1    and the question is:  Do you now have a new and refreshed

2    recollection as to the number of pages?  OK.  So take your

3    time.  Take as much time as you like.

4              THE INTERPRETER:  Your Honor, just for the

5    interpreters, the interpreters are to interpret nothing in this

6    binder?

7              THE COURT:  You haven't been asked to.

8              THE INTERPRETER:  Thank you, Judge.

9              MR. COLON:  Judge, may I just say that if he looks at

10   the top of the pages and keeps on scrolling, that that

11   information would be on the top.

12             THE COURT:  That's improper what you just did.  That's

13   improper, sir.  You know you can't do it.

14             MR. COLON:  I'm sorry, Judge.

15             THE COURT:  Well, you know you can't do that, correct?

16             MR. COLON:  Yes, sir.

17             THE COURT:  OK.  So don't.

18   BY MR. COLON:

19   Q.  You can continue, if the judge allows you to, trying to

20   refresh your recollection.  Look at those documents, those

21   pages.

22   A.  Wasn't ——

23             THE INTERPRETER:  May the interpreter please clarify

24   with the witness?

25   A.  This document is not related to this current trial.  It was

O2LHHer6                          Sanchez – Cross

1   for a prior trial, the trial of Mr. Geovanny Fuentes.

2   Q.  I'm just looking at the dates that you met with the

3   prosecutors, sir.

4   A.  May I explain to you why?

5   Q.  No.  I'm just asking you the dates, not what it was related

6   to.  But with respect to the ——

7              THE COURT:  No, that's not a question.  "I'm just

8   asking you the dates" is not a question.  What's the question?

9              MR. COLON:  He made a statement.

10             THE COURT:  Pardon me?

11             MR. COLON:  He made a commentary or a statement about

12  this had to do with Geovanny.

13             THE COURT:  Don't worry about that.  I'm worried about

14  your question, then I'll worry about the witness' answer to

15  your question so we make sure that your question, a

16  non-objectionable question, is answered by the witness.

17             Go ahead.

18  BY MR. COLON:

19  Q.  Does that refresh your recollection the times that you met

20  or Zoomed with the prosecutors, the dates that you met with the

21  prosecutors or Zoomed with the prosecutors in relation to this

22  case or this conspiracy?

23  A.  Yes.

24  Q.  Now that you've reviewed that folder, does it refresh your

25  recollection that you met at least 20 times ——

1            THE COURT:  Whoa, whoa.  Hang on.  Let's find out the

2    refreshed recollection.

3    Q.  Does it refresh your recollection?

4            THE COURT:  Unless you want to testify here.

5            What's your refreshed recollection?

6    A.  This talks about how I discovered that Mr. Geovanny Fuentes

7    was a drug trafficker, and it discusses the situation with

8    another drug trafficker.

9            THE COURT:  I don't want to know what's in the

10   documents.  They're not in evidence.  They have not been

11   offered by anyone into evidence, and they haven't been received

12   into evidence, so they're not evidence.  The witness can't talk

13   about what's in the documents, and nor can Mr. Colon.  If

14   somebody wants to offer the documents, that's a different

15   story.

16           MR. COLON:  Your Honor, if I'm allowed ——

17           THE COURT:  If you have a refreshed recollection as a

18   result of reviewing the documents, tell Mr. Colon and the jury

19   what that refreshed recollection is.

20           MR. COLON:  Your Honor, I'm sorry, I don't see him

21   scrolling through any of the pages at all.  I'm not sure he's

22   even making an effort to do so, unless the government wants to

23   stipulate that he met.

24           MR. GUTWILLIG:  Your Honor, for the record, what

25   counsel has handed up is a binder containing 3500 material for

O2LHHer6                         Sanchez – Cross

1    the witness.  It appears that counsel wants him to flip through

2    and identify certain things in that, and that's entirely proper

3    if he would like to ask whether his recollection's refreshed,

4    but I would like the record to be clear about what that binder

5    is for purposes of the transcript.

6              THE COURT:  All right.  So look through the binder.

7              And the question is going to be what, Mr. Colon?  It's

8    going to be how many times ⸺ does it refresh your recollection

9    how many times you met the government with regard to this case,

10   or what?

11             MR. COLON:  With regard to this case and in

12   preparation for this case.

13             THE COURT:  OK.  So look at the binder and see whether

14   it refreshes your recollection on how many times you met with

15   the government in connection with this case, and I ask you to

16   please look at the binder and see if it refreshes your

17   recollection, sir.

18             THE WITNESS:  OK.

19   BY MR. COLON:

20   Q.  Having reviewed that document now, does that refresh your

21   recollection as to how many times you met with respect to

22   preparation on this case and your testimony?

23   A.  That's correct, but that was related to the Geovanny

24   Fuentes case.  This is a different case, right?

25             THE COURT:  Sir, sir, the question you've been asked

O2LHHer6                          Sanchez - Cross

1    is, looking at that binder, does it refresh your recollection

2    as to how many times you met with the government on this case?

3    You should be able to answer that question yes or no in the

4    first instance.

5              THE WITNESS:  OK.

6              THE COURT:  And your answer?  OK.  Can you answer the

7    question yes or no whether it refreshes your recollection?

8              THE WITNESS:  No.  Honestly, no.

9              THE COURT:  All right.  Next question.

10   BY MR. COLON:

11   Q.  Do you believe that you met at least 20 times with the

12   prosecution?

13             MR. GUTWILLIG:  Objection, your Honor.  Asked and

14   answered.

15   Q.  Or on Zoom?

16             THE COURT:  I'll allow it.  Go ahead.

17             THE INTERPRETER:  May the question please be repeated?

18             THE COURT:  Do you believe that you met at least 20

19   times with the prosecution?

20   A.  Counting all of the meetings recently, yes.

21             MR. COLON:  Thank you, Judge.  I have no further

22   questions.  Thank you.

23             THE COURT:  All right.  Thank you.  Collect your

24   binders, sir.

25             Redirect?

1            MR. GUTWILLIG:  Yes, your Honor.  Briefly.

2            THE COURT:  Sure.

3   REDIRECT EXAMINATION

4   BY MR. GUTWILLIG:

5   Q.  Mr. Sanchez, when you lived in Honduras, you were an

6   accountant for Graneros, correct?

7   A.  That's correct.

8   Q.  And Graneros was the largest rice processing company in

9   Honduras, correct?

10  A.  That's correct.

11  Q.  You made a good living, right?

12  A.  That's correct.

13  Q.  And you worked for an influential and wealthy boss, right?

14           MR. COLON:  Objection.  Leading, sir.

15           THE COURT:  This is redirect.

16           Go ahead.

17  Q.  You worked for an influential and wealthy boss, right?

18  A.  That's correct.

19  Q.  And your boss had political connections, right?

20  A.  Right.

21  Q.  You were born in Honduras, right?

22  A.  Right.

23  Q.  And you lived there for most of your life, right?

24  A.  Correct.

25  Q.  Do you work as an accountant now?

1    A.  No.

2    Q.  What do you do for a living?

3    A.  I work at a factory.

4    Q.  Did the government pay for your asylum application?

5    A.  No.

6    Q.  Has the government paid for your legal fees?

7    A.  No.

8    Q.  You testified that you came to the United States

9    permanently in 2015, right?

10   A.  Right.

11   Q.  Did you want to leave Honduras?

12   A.  No.

13   Q.  Why did you leave Honduras?

14   A.  Out of fear.

15   Q.  The defense asked you on cross-examination about receipts,

16   vouchers, documents.  Do you remember that?

17   A.  Yes.

18   Q.  They asked you about recordings of videos, right?

19   A.  Right.

20   Q.  Videos of the defendant, correct?

21   A.  Correct.

22   Q.  Video of the defendant accepting drug money, right?

23   A.  Correct.

24   Q.  And you testified on cross-examination that you gave a copy

25   of one video to a prosecutor named Marlen Vanegas, correct?

O2LHHer6                         Sanchez - Redirect

1   A.  Correct.

2   Q.  And you testified also that you gave a copy of another

3   video to someone named Christian Ayala, correct?

4            MR. COLON:  Your Honor, I'm going to object.  I think

5   this is improper.  He's not clarifying anything.  He's just

6   going over his testimony and doing it in a leading manner.

7            THE COURT:  All right.

8            MR. COLON:  It shouldn't be this leading.

9            THE COURT:  Pardon me?

10            MR. COLON:  I don't think it should be this leading.

11            THE COURT:  Misleading?

12            MR. COLON:  I don't believe it should be so leading at

13   this point that he's actually putting words in his mouth.

14            THE COURT:  All right.  Thank you.

15            Objection's overruled.  Go ahead.

16   A.  That's correct.

17   Q.  Did you later learn anything about Christian Ayala?

18   A.  Yes.

19   Q.  What did you learn?

20   A.  That he had been murdered as he was getting home.

21   Q.  Approximately how long after you gave Christian Ayala the

22   recording did that happen?

23   A.  It was around two weeks later.

24   Q.  You were asked on cross-examination about recordings and

25   other evidence.  Do you recall that?

O2LHHer6                    Sanchez – Redirect

1   A.  Yes.

2   Q.  And why did those not —— why did you not bring those to the

3   United States?

4   A.  Because, unfortunately, my suitcase did not make it into

5   this country.

6   Q.  Did you return to Honduras to try to get that —— those

7   materials?

8   A.  I wanted to go back, but when I was informed about

9   Christian, I didn't dare go back.

10  Q.  Mr. Sanchez, you testified on cross-examination that you

11  were not scared of the defendant in approximately 2013, is that

12  correct?

13  A.  Right.

14  Q.  Were you scared when you came to the United States in 2015?

15  A.  Yes.

16  Q.  Were you scared of the defendant in 2015 when you came to

17  the United States?

18  A.  Yes.

19  Q.  Are you scared of the defendant now?

20  A.  Yes.

21  Q.  Why are you testifying today, Mr. Sanchez?

22  A.  Voluntarily —— I'm here voluntarily.

23  Q.  Why are you here voluntarily?

24  A.  Because I want the Honduran people to know the truth.

25          MR. GUTWILLIG:  No further questions, your Honor.

O2LHHer6                         Sanchez - Redirect

1              THE COURT:  All right.  You may step down.

2              Call your next witness.

3              (Witness excused)

4              MR. WIRSHBA:  Your Honor, the government calls

5    Alexander Ardón Soriano.

6              THE COURT:  All right.  Please remain standing.  Sir,

7    please raise your right hand.

8    AMILCAR ALEXANDER ARDÓN SORIANO,

9         called as a witness by the Government,

10        having been duly sworn, testified through the

11        Spanish-language interpreter as follows:

12             THE COURT:  All right.  Please be seated.

13             State your first and last name and spell both of them.

14             THE WITNESS:  Amilcar Alexander Ardón Soriano.

15             THE COURT:  Spell it, please.

16             THE WITNESS:  No, I can't.

17             MR. WIRSHBA:  Your Honor, perhaps I could spell the

18   witness' name for the record.

19             THE COURT:  All right.

20             MR. WIRSHBA:  Your Honor, that is A-m-i-l-c-a-r;

21   Alexander, A-l-e-x-a-n-d-e-r; Ardon, A-r-d-o-n; Soriano,

22   S-o-r-i-a-n-o.

23             THE COURT:  All right.  You may inquire.

24             MR. WIRSHBA:  Thank you, your Honor.

25   DIRECT EXAMINATION

O2LHHer6                     Ardon Soriano - Direct

```
 1    BY MR. WIRSHBA:
 2    Q.  Sir, do you go by Alex Ardon?
 3    A.  Yes.
 4    Q.  Where are you from, sir?
 5    A.  From Honduras.
 6    Q.  Did you hold any political positions in Honduras while you
 7    were living there?
 8    A.  Yes.
 9    Q.  What position was that?
10    A.  Municipal mayor.
11    Q.  Where do you live now?
12    A.  In a prison that's called Bergen County.
13    Q.  And before you were in jail, what did you do to make money?
14    A.  I worked in drug trafficking.
15    Q.  Do you see anyone in the courtroom who helped protect your
16    drug trafficking operations?
17    A.  Yes.
18    Q.  Who is that?
19    A.  Juan Orlando Hernandez.
20    Q.  Can you identify Juan Orlando Hernandez by an article of
21    clothing that he is wearing?
22         THE COURT:  And where he is seated.
23    A.  Yes.
24    Q.  Please identify him.
25    A.  He's sitting in that same line of people over there with a
```

O2LHHer6                          Ardon Soriano - Direct

1   jacket and blue tie.

2             THE COURT:  The first table here?  The second table?

3   The third table?  Which table, sir?  Or maybe in the back of

4   the courtroom?  I don't know.

5             THE WITNESS:  In the line of people where the

6   prosecutor is, there in that same line of people.

7             THE COURT:  All right.  So in the first table right

8   here?

9             THE WITNESS:  One, two, three —— four, the number four

10  over there.

11            THE COURT:  Which table?  Which table?

12            THE WITNESS:  One, two —— the third person after the

13  prosecutor here, the third person.

14            MR. WIRSHBA:  Perhaps I could help, your Honor.

15            THE COURT:  Go ahead.

16  BY MR. WIRSHBA:

17  Q.  Mr. Ardón, when you say "the prosecutor," are you referring

18  to me?

19  A.  Yes.

20  Q.  So can you identify where the individual that helped

21  protect narcotics trafficking is in relation to me?

22  A.  Yes.

23  Q.  Please do so.

24  A.  After where you are, there's one person, there's a woman,

25  and then there's Juan Orlando Hernandez.

1      THE COURT:  All right.  Identification noted.

2      Go ahead.

3  Q.  All right.  Mr. Ardón, have you had private meetings with

4  Juan Orlando Hernandez, the defendant?

5  A.  Yes.

6  Q.  In approximately what year did you first meet with the

7  defendant in private?

8  A.  Around the year 2009.

9  Q.  In short, how did Juan Orlando Hernandez assist your drug

10 trafficking operations?

11 A.  He helped me with the prosecutor's office so that they

12 would not investigate me.

13 Q.  What did you do in exchange for this help with the

14 prosecutor's office so that you would not be investigated?

15 A.  I helped politically and financially.

16 Q.  When you say "financially," approximately how much

17 financial support do you estimate that you provided to the

18 defendant?

19 A.  In that meeting, I helped them — I helped him with a

20 million dollars.

21 Q.  And in total, can you estimate approximately how much?

22 A.  I don't remember, but the amount was higher.

23 Q.  And when you say "dollars," do you mean U.S. dollars?

24 A.  Yes.

25 Q.  Did you traffic narcotics with anyone else in the

O2LHHer6                         Ardon Soriano – Direct

1    defendant's family?

2    A.  Yes.

3    Q.  Who was that?

4    A.  Tony Hernandez.

5    Q.  And what narcotic was it that you trafficked with Tony

6    Hernandez?

7    A.  Cocaine.

8    Q.  What is Tony Hernandez's relationship to the defendant?

9    A.  They are brothers.

10   Q.  Were you present when other individuals paid bribes to Juan

11   Orlando Hernandez's political campaign?

12   A.  Yes.

13   Q.  Who paid that bribe?

14   A.  Chapo Guzman.

15   Q.  Who is Chapo Guzman?

16   A.  A Mexican drug trafficker.

17   Q.  What, if any, organization is Chapo Guzman the leader of?

18   A.  The Sinaloa Cartel.

19   Q.  Mr. Ardón, have you pleaded guilty here in the United

20   States to committing crimes?

21   A.  Yes.

22   Q.  What crimes have you pled guilty to here in the United

23   States?

24   A.  Being the leader of a gang of drug traffickers, laundering,

25   drug trafficking, weapons, murder, and conspiring with other

O2LHHer6                          Ardon Soriano - Direct

1    drug trafficking groups.

2    Q.  And as part of accepting responsibility for these crimes,

3    did you sign an agreement with the government?

4    A.  Yes.

5    Q.  What is the most important thing that that agreement

6    requires you to do?

7    A.  Tell the truth.

8    Q.  You mentioned that the defendant provided protection from

9    investigation for your cocaine trafficking.  During the time

10   that your drug trafficking was protected by the defendant, how

11   many times were your drugs seized by Honduran authorities?

12   A.  Not once.

13   Q.  All right.  Mr. Ardón, let's take a step back.

14          Ms. Collins, if we could show just the witness and the

15   judge and the parties what's been marked for identification as

16   Government Exhibit 13.

17          Mr. Ardón, we were having some problems with the

18   technology earlier.  Can I confirm that you can see something

19   on your screen?

20   A.  Yes.

21   Q.  All right.  May I ask you, sir, what is on the screen

22   that's been marked as Government Exhibit 13?

23   A.  I see a map of Central America.

24   Q.  Is it a fair and accurate map, sir?

25   A.  Yes.

1          MR. WIRSHBA:  Your Honor, the government seeks to

2     admit Government's 13.

3          MR. COLON:  No objection, your Honor.

4          THE COURT:  Received.

5          (Government's Exhibit 13 received in evidence)

6          MR. WIRSHBA:  Ms. Collins, if you could publish that

7     for the jury.

8     BY MR. WIRSHBA:

9     Q.  Now, Mr. Ardón, you mentioned that this was a map of

10    Central America.  Does this map also contain the United States

11    of America and Mexico?

12    A.  Yes.

13    Q.  Is the United States up at the top?

14    A.  Yes.

15    Q.  Can you identify on this map where Honduras is located, the

16    place where you're from?

17    A.  Yes.

18    Q.  Can you try to circle it with your finger, sir.

19    A.  Yes.

20         MR. WIRSHBA:  Let the record reflect the defendant has

21    indicated the part of the map marked "Honduras."

22         Ms. Collins, could we focus in on that part of Central

23    America, please.

24    Q.  Now, Mr. Ardón, can you identify the countries that border

25    Honduras?

O2LHHer6                        Ardon Soriano – Direct

1  A.  Yes.

2  Q.  What are those?

3  A.  Nicaragua, El Salvador, and Guatamala.

4          MR. WIRSHBA:  All right, Ms. Collins, if we can take

5  that down and show just the witness and the parties and the

6  bench what has been marked as Government Exhibit 3.

7  Q.  Mr. Ardón, do you recognize this?

8  A.  Yes.

9  Q.  What is it?

10  A.  The map of Honduras.

11  Q.  Is it fair and accurate?

12  A.  Yes.

13          MR. WIRSHBA:  Your Honor, the government seeks to

14  admit Government Exhibit 3.

15          MR. COLON:  No objection.

16          THE COURT:  All right.  Received.

17          (Government's Exhibit 3 received in evidence)

18          MR. WIRSHBA:  Ms. Collins, could we publish that for

19  the jury.

20  BY MR. WIRSHBA:

21  Q.  Mr. Ardón, you said that this was a map of Honduras.  Where

22  on the map, where in Honduras, are you from?

23  A.  From the department of Copan.

24  Q.  When you say "the department," is the department in

25  Honduras the same as a state here in the United States?

O2LHHer6                          Ardon Soriano - Direct

1   A.  Yes.

2   Q.  Could you identify on the map by circling it where the

3   Copan department is?

4   A.  Yes.

5   Q.  Please do so.

6           Let the record reflect the witness has circled the

7   area on the left side that is labeled "Copan."

8           Mr. Ardón, while growing up in Copan, how far did you

9   go in school?

10  A.  Fifth grade.

11  Q.  You mentioned earlier that you made money by trafficking

12  cocaine.  When did you begin trafficking cocaine?

13  A.  Around 2000.

14  Q.  And how old were you in 2000, approximately?

15  A.  Like some 21 years old or 19 years old.  I don't exactly

16  know.

17  Q.  When did you stop trafficking cocaine, Mr. Ardón?

18  A.  When I surrendered to the United States.

19  Q.  During the time that you were trafficking cocaine,

20  approximately how much cocaine would you estimate that you

21  trafficked in total?

22  A.  Around some 250 tons.

23  Q.  Is that the equivalent of 250,000 kilograms of cocaine?

24  A.  Yes.

25  Q.  What, if any, nicknames did you have?

A.   The periodical referred to me as "AA," and in politics, I
was known as "Chande."

Q.   When you say "the periodical," what do you mean by that?

A.   The newspaper in Honduras, a newspaper that was called
*La Prensa*.

Q.   When trafficking this cocaine, what, if any, firearms did
you carry?

A.   A 9 millimeter AR-15 and AK-47.  And on occasions when we
would pass through a mountainous area between Guatamala and
Honduras, we would carry what we refer to as a bazooka.

Q.   What's a bazooka?

A.   A bazooka is a large weapon with something on the tip of it
that is used to blow up armored cars.

Q.   You mentioned several firearms there.  Which of those, if
any, are automatic weapons?

A.   The M16 and the AK-47.

          MR. WIRSHBA:  Ms. Collins, if we could put back up
Government Exhibit 3.

Q.   Mr. Ardón, if you could indicate by way of this map when
you would traffic cocaine, to which departments would the
cocaine arrive in Honduras?

A.   It would arrive to El Paraíso, Copan.

Q.   Mr. Ardón, when the cocaine would first get to Honduras,
which departments would it first enter Honduras in?

A.   It would arrive to the departments of Gracias a Dios,

1    Colon, and Atlantida.

2    Q.  Mr. Ardón, can you identify those by circling them on the

3    map, Gracias a Dios.

4    A.  OK.

5    Q.  And then Colon and Atlantida.

6          Let the record reflect that the witness has identified

7    three areas above the words "Gracias A Dios" to the right of

8    the word "Colon" and part of the word "Atlantida," along the

9    blue part of the map at the top.

10          Now, Mr. Ardon, how would cocaine arrive in these

11    three departments?

12    A.  It would arrive by air and by sea.

13    Q.  Who, if anyone, in your family helped with your cocaine

14    trafficking?

15    A.  Hugo Ardón.

16    Q.  And who is Hugo Ardón?  What is his relation to you?

17    A.  We are brothers.

18          MR. WIRSHBA:  Ms. Collins, if we could put up, just

19    for the witness and the Court and the parties, Government

20    Exhibit 116 on the left and Government Exhibit 348 on the

21    right.

22    Q.  Mr. Ardón, do you recognize these on the screen?

23    A.  Yes.

24    Q.  What are they?

25    A.  The photograph of my brother Hugo and Juan Orlando

Hernandez.

Q.  Are they fair and accurate photos of your brother and the defendant, Juan Orlando Hernandez?

A.  Yes.

           MR. WIRSHBA:  Your Honor, the government seeks to admit Government Exhibits 116 and 348.

           MR. COLON:  No objection.

           THE COURT:  Received.

           (Government's Exhibits 116 and 348 received in evidence)

           MR. WIRSHBA:  Ms. Collins, please publish for the jury.

BY MR. WIRSHBA:

Q.  Mr. Ardón, let's begin with the photo on the left.

           THE COURT:  Stop, stop.

           With that, ladies and gentlemen, we're going to call it a day.  So please have a pleasant evening.  Please do not discuss the case among yourselves or with anyone.  I'll be back to the one juror who sent me a note.

           We're going to start 10 o'clock tomorrow morning, which means you have to arrive here earlier, although I'm hoping that with the plan of action, you're going to go through the Worth Street entrance, and it says attorneys only, 200 Worth Street, right around from the pavilion, go in there, and don't forget to tell them that you're allowed to bring your

1   cell phones up.  Any problems, they'll call upstairs to

2   chambers.

3           See you tomorrow morning.  Do not discuss the case

4   among yourselves or with anyone else.  Thank you very much.

5           (Jury excused)

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O2LHHer6

1        (Jury not present)

2        THE COURT:  All right.  I'm going to ask the parties

3    to be in court each morning 20 to 10:00 so that we can address

4    any issues that come up, and if there can be a change in that,

5    earlier or later or needs to be a change in that earlier or

6    later, I'll let you know.  OK.

7        All right.  Thank you all very much.

8        MR. GUTWILLIG:  Your Honor, I apologize.  If there's

9    just one matter we could take up at the sidebar quickly.

10        THE COURT:  Sure.

11        MS. SHROFF:  Actually, your Honor, I also had one

12    matter to raise.

13        THE COURT:  I'm sorry?

14        MS. SHROFF:  I also had one matter to raise.

15        THE COURT:  OK.  Please be seated.

16        MR. GUTWILLIG:  For the government's issue, we need to

17    come to the sidebar.

18        THE COURT:  All right.  Sure.

19        (Continued on next page)

20        (Pages 190 through 191 SEALED)

21

22

23

24

25

O2LHHer6

1          (At sidebar)

2          THE COURT:  We can take —— do you want to take yours

3     here?

4          MS. SHROFF:  Sure.  Your Honor, I don't have the

5     statute in front of me, but I just wanted to —— because this is

6     coming up with the first and second witness, under Federal Rule

7     of Evidence 611(c), I know it's awkwardly worded the statute

8     itself, but the statute, when read in conjunction with the

9     exceptions, makes clear that on redirect the government may not

10    lead.  Leading questions should be ——

11         THE COURT:  What statute?  Do you have the rule?  What

12    statute are you referring to?  Are you talking about the rule

13    or the statute?

14         MS. SHROFF:  Yes, your Honor, the rule, 611(c).  May I

15    just go grab my book?

16         THE COURT:  Yes, sure, because I don't agree with you.

17         MS. SHROFF:  So I do acknowledge, your Honor, that the

18    way the rule is written, subsection (c) says leading questions

19    should not be used on direct examination except as necessary.

20    One could read subsection (c) as eliminating redirect.

21    However, if you follow ——

22         THE COURT:  As eliminating redirect?  It doesn't

23    eliminate redirect.

24         MS. SHROFF:  No, I'm saying ——

25         THE COURT:  I'm sorry, go ahead.

O2LHHer6

1    MS. SHROFF:  I'm saying they should not be allowed to

2    lead on redirect.

3    THE COURT:  I understand that's your position.

4    MS. SHROFF:  Right, right.  And I'm saying subsection

5    (c) on leading questions is written in an awkward way.  It

6    doesn't say direct comma redirect, but if you read the other

7    two exemptions below where it says ordinarily, the court should

8    allow leading questions on cross-examination and when a party

9    calls a hostile witness or an adverse party or a witness

10    identified with an adverse party.  That is not the government's

11    witnesses that were called.

12    And then if you read the commentary, which is

13    reflected where it says notes to subdivision (C) ——

14    THE COURT:  Go ahead.

15    MS. SHROFF:  —— the commentary also makes clear that

16    the tradition is because of the suggestive powers of leading

17    questions, those should be, because they're undesirable in

18    their effect, should be limited to cross.

19    I ask the Court to just consider this overnight.  It

20    does not have to be resolved today because it goes on to say:

21    And it's clear that the rulings of the district court are

22    awarded great weight on appeal.  So to the extent that the

23    Court rules that I'm wrong, Mr. Hernandez will most certainly

24    have no remedy.  And given the number of witnesses that are

25    going to testify and the fact that we do not have re-recross

O2LHHer6

1    and the ambiguity of the rule, I ask the Court to limit the

2    government to asking direct questions on redirect.

3        THE COURT:  All right.  Thank you.  You're doing the

4    right thing in raising this, but I read it differently.

5        So leading questions should not —— as the comments

6    say, there are numerous exceptions, but leading questions

7    should not be used on direct examination except as necessary to

8    develop the witness' testimony.  So we know that.  That's

9    direct.  Ordinarily, the Court should allow leading questions

10    on cross-examination.  And I agree with you that the subsection

11    (c)(2) has no application here whatsoever to these witnesses.

12        So the rule leaves it open, agnostic, if you will, or

13    just does not speak to redirect.  The whole concept of

14    redirect, though, is to point the witness efficiently to an

15    area that the questioner wishes to examine on.  It's very

16    different than direct examination.  And there's a need to get

17    to the heart of what it is you're questioning about.  You're

18    not asking, necessarily, open-ended questions.  You're now

19    going back and going into a particular area, and it becomes

20    necessary for the party conducting the redirect to direct the

21    questioner to a particular area that was covered, for example,

22    on cross-examination.  And that would be a leading question.

23    And the rule, therefore, doesn't speak to it.

24        Now, I could be wrong.  This would be news to me, and

25    I invite you to take a look and see whether you have precedent

O2LHHer6

1    in this district or this circuit on the point you've made,

2    because it's not my understanding.  It doesn't mean you can't

3    object to leading.  You can say, because it's —— in my view the

4    rule is silent on it, the Court could prohibit it or could

5    allow it.  It's not like prohibiting defense counsel from

6    leading on cross-examination.  The rule tells me that the party

7    cross-examining definitely can redirect, and it tells me that

8    ordinarily on the direct examination, they can't lead.

9              MS. SHROFF:  So, your Honor, I have no objection to

10   the government leading to the topic, but the fact that the

11   government constantly loops every answer given by the witness

12   into the next question and they are leading, I raise this issue

13   here.

14             THE COURT:  Right.

15             MS. SHROFF:  And I will try and find you some case

16   law.

17             THE COURT:  And the other thing is, just so it's clear

18   to you, I am definitely not saying you can't object on the

19   grounds of leading during redirect.  I'm just saying that it

20   stands, in my view, in a different posture than leading on

21   direct examination.

22             MS. SHROFF:  I understand, your Honor.

23             THE COURT:  I'd be curious to hear the views of the

24   government on this subject.

25             MR. GUTWILLIG:  The government's understanding is

O2LHHer6

1    consistent with the Court's, which is that there is broader

2    discretion and ability on redirect, especially given that

3    redirect covers topics by definition only covered previously

4    either on direct or cross, and directing the witness to those

5    things is, in the government's view, entirely proper.  Of

6    course, defense can object when they feel that's required, and

7    the Court will rule.

8            THE COURT:  All right.  So what I will say is I will

9    ask the government to avoid needless leading on redirect.

10   There's necessary leading on redirect and then there is

11   redirect that does not really have the same purpose as pointing

12   the witness in a direction of a certain item of evidence.  All

13   right?

14           MR. GUTWILLIG:  Understood, your Honor.

15           THE COURT:  Thank you.

16           All right.  Anything else from anybody?

17           MR. COLON:  No, your Honor.

18           MS. SHROFF:  No, your Honor.

19           THE COURT:  See you tomorrow.  And that portion was

20   not sealed.

21           (Adjourned to February 22, 2024, at 9:40 a.m.)

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2  Examination of:                              Page

 3  JOSÉ SANCHEZ

 4  Direct By Mr. Gutwillig . . . . . . . . . . .66

 5  Cross By Mr. Colon . . . . . . . . . . . . . 118

 6  Redirect By Mr. Gutwillig . . . . . . . . . 172

 7  AMILCAR ALEXANDER ARDÓN SORIANO

 8  Direct By Mr. Wirshba . . . . . . . . . . . 177

 9                    GOVERNMENT EXHIBITS

10  Exhibit No.                             Received

11   113   . . . . . . . . . . . . . . . . . . .69

12   12    . . . . . . . . . . . . . . . . . . .76

13   341   . . . . . . . . . . . . . . . . . . .80

14   902   . . . . . . . . . . . . . . . . . . 104

15   334   . . . . . . . . . . . . . . . . . . 105

16   806, 807, 901, 910 and  . . . . . . . . . . 115

17        204R-154

18   13    . . . . . . . . . . . . . . . . . . 182

19   3     . . . . . . . . . . . . . . . . . . 183

20   116 and 348   . . . . . . . . . . . . . . . 187

21

22

23

24

25
```