UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

      - v. -

JUAN ORLANDO HERNANDEZ,
    a/k/a "JOH,"

               Defendant.

S7 15 Cr. 379 (PKC)

# THE GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S RULE 33 MOTION

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
26 Federal Plaza
New York, New York 10278

Jacob H. Gutwillig
David J. Robles
Elinor L. Tarlow
Kyle A. Wirshba
Assistant United States Attorneys
   *Of Counsel*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................................... 1

THE TRIAL EVIDENCE .............................................................................................................. 2

    I.    2009 to 2011: The Defendant Partners with Drug Traffickers ............................................ 4

    II.   2012 to 2013: The Defendant Campaigns for President of Honduras with the Support of His Drug Trafficker Partners ................................................................................................ 8

    III.  2014 to 2022: The Defendant Continues to Accept Bribes and Protects Drug Traffickers as President ..................................................................................................................... 10

    IV.  The Defense Case ........................................................................................................... 12

Procedural History ..................................................................................................................... 15

ARGUMENT ............................................................................................................................. 15

    I.    A New Trial Is Not Warranted ......................................................................................... 15

       A.   Applicable Law ........................................................................................................ 15

          1.   Rule 33 ............................................................................................................. 15

             i.    General Standard .................................................................................... 15

             ii.   Newly Discovered Evidence ................................................................... 15

             iii.  Alleged False Testimony ....................................................................... 15

          2.   Waiver of Venue .............................................................................................. 19

       B.   The Defendant's Challenge Based on Taul's Testimony Should be Denied ................ 22

          1.   Relevant Facts ................................................................................................. 22

          2.   Discussion ....................................................................................................... 26

             i.    The Defendant Has Failed to Show that Taul Testified Falsely ....................... 27

             ii.   The Government Did Not Engage in Misconduct ............................................. 30

             iii.  No Manifest Injustice Occurred from Taul's Testimony ................................. 32

       C.   The Defendant's Venue Challenge Should be Denied ................................................ 34

          1.   Relevant Facts ................................................................................................. 34

          2.   Discussion ....................................................................................................... 39

             i.    The Defendant's Venue Challenge is Untimely .............................................. 40

             ii.   The Defendant Waived Any Challenge to Venue by Entering the Stipulation . 45

             iii.  A New Trial is Not Warranted as a Result of the Stipulation ......................... 47

CONCLUSION ........................................................................................................................... 54

**TABLE OF AUTHORITIES**

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ................................................................. 49

*Chandler v. United States*, 171 F.2d 921 (1st Cir. 1948) ................................................ 52

*Fisher v. First Stamford Bank and Trust Co.*, 751 F.2d 519 (2d Cir. 1984) ................................. 45

*Hoodho v. Holder*, 558 F.3d 184 (2d Cir. 2009) ................................................................. 45

*Stanley Works v. F.T.C.*, 469 F.2d 498 (2d Cir. 1972) ........................................................ 45

*United States v. Acosta*, 595 F. Supp. 2d 282 (S.D.N.Y. 2009) .............................................. 20

*United States v. Aquart*, 912 F.3d 1(2d Cir. 2018) .......................................................... 18

*United States v. Archer*, 977 F.3d 181 (2d Cir. 2020) ..................................................... 15, 16

*United States v. Bala*, 236 F.3d 87 (2d Cir. 2000) ........................................................ 21, 43

*United States v. Boney*, 572 F.2d 397 (2d Cir. 1978) ....................................................... 43

*United States v. Boothman*, 654 F.2d 700 (10th Cir. 1981) .................................................. 45

*United States v. Celaj*, 649 F.3d 162 (2d Cir. 2011) ......................................................... 46

*United States v. Cestero*, 767 F. Supp. 500 (S.D.N.Y. 1991) .............................................. 19, 20

*United States v. Chavez-Amaro*, 228 F. App'x 648 (9th Cir. 2007) ........................................... 46

*United States v. Conteh*, 2 F. App'x 202 (2d Cir. 2001) ..................................................... 44

*United States v. Cordero*, 668 F.2d 32 (1st Cir. 1981) ..................................................... 21, 42

*United States v. Davis*, 689 F.3d 179 (2d Cir. 2012) ....................................................... 44, 49

*United States v. Elias,* 285 F.3d 183 (2d Cir. 2002) ........................................................ 31

*United States v. Elliott*, 2023 WL 5623847 (11th Cir. 2023) ................................................ 20

*United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2001) ................................................ 15, 16, 26

*United States v. Gambino*, 59 F.3d 353 (2d Cir. 1995) ..................................................... 15, 17

*United States v. Ghanem*, 993 F.3d 1113 (9th Cir. 2021) .................................................... 52

*United States v. Gillette,* 189 F.2d 449 (2d Cir. 1951) ...................................................... 49

*United States v. Grammatikos*, 633 F.2d 1013 (2d Cir.1980) .............................................. 21, 22

*United States v. Gwaltney*, 790 F.2d 1378 (9th Cir. 1986) .................................................. 45

*United States v. Han*, 199 F. Supp. 3d 38 (D.D.C. 2016) ..................................................... 52

*United States v. Harrison*, 204 F.3d 236 (D.C. Cir. 2000) .................................................. 46

*United States v. Hart-Williams*, 967 F. Supp. 73 (E.D.N.Y. 1997) ........................................... 49

*United States v. Kanu*, 695 F.3d 74 (D.C. Cir. 2012) ....................................................... 45

iii

*United States v. Kaufman*, 2023 WL 4493499 (S.D.N.Y. 2023)............................................*passim*

*United States v. Keck*, 773 F.2d 759 (7th Cir. 1985) ................................................... 46

*United States v. Kelly*, 535 F.3d 1229 (10th Cir. 2008)............................................... 50

*United States v. Kelly*, 609 F. Supp. 3d 85 (E.D.N.Y. 2022)....................................... 20

*United States v. Kenner*, 2019 WL 6498699 (E.D.N.Y, 2019)..................................... 19

*United States v. Lester*, 1997 WL 321809,(2d Cir. 1997) ........................................... 21

*United States v. Liu*, 515 Fed. App'x 49 (2d Cir. 2013)............................................... 49

*United States v. Mancebo–Santiago*, 1996 WL 560754 (2d Cir. 1996) ...................... 21

*United States* v. *McCourty*, 562 F.3d 458 (2d Cir. 2009)............................................ 16

*United States v. Menendez*, 612 F.2d 51 (2d Cir.1979) .............................................. 21

*United States v. Monteleone*, 257 F.3d 210 (2d Cir. 2001) .................................. 18, 30

*United States v. Moslem*, 2023 WL 5610297 (S.D.N.Y. 2023)................................... 27

*United States v. O'Brien*, 926 F.3d 57 (2d Cir. 2019) ................................................ 20

*United States v. Owen*, 500 F.3d 83 (2d Cir. 2007)..................................................... 17

*United States v. Pan*, 2015 WL 13016355 (S.D.N.Y. 2015) .................................. 17, 50

*United States v. Parrilla*, 2014 WL 7496319 (S.D.N.Y. 2014)................................... 49

*United States v. Paulino*, 445 F.3d 211 (2d Cir. 2006)............................................... 33

*United States v. Pierre*, 525 Fed. App'x 237 (4th Cir. 2013) .................................... 50

*United States v. Potamitis*, 739 F.2d 784 (2d Cir. 1984)....................................... 22, 43

*United States v. Price*, 447 F.2d 23 (2d Cir. 1971)...............................................*passim*

*United States v. Pughe*, 441 Fed. App'x 776 (2d Cir. 2011) ...................................... 43

*United States v. Rodriguez*, 2007 WL 2908246 (E.D.N.Y. 2007)............................... 19

*United States v. Roldan-Zapata*, 916 F.2d 795, 807 (2d Cir. 1990) ........................... 31

*United States v. Rommy*, 506 F.3d 108 (2d Cir. 2007) ..................................... 44, 49, 53

*United States v. Sanchez*, 969 F.2d 1409 (2d Cir. 1992) .................................. 16, 32, 54

*United States v. Saunders*, 2023 WL 3220460 (2d Cir. 2023) .................................... 31

*United States v. Schohn*, 602 F. Supp. 3d. 447 (W.D.N.Y. 2022)............................... 19

*United States v. Scott*, 2022 WL 3370096 (S.D.N.Y 2022)........................................ 22

*United States v. Smith*, 198 F.3d 377  (2d Cir. 1999) ................................................. 44

*United States v. Starzecpyzel*, 1995 WL 640507 (S.D.N.Y. 1995)........................ 19, 41

*United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006) ........................................................... 18, 27

*United States v. Tocco*, 135 F.3d 116 (2d Cir. 1998) .................................................................... 31

*United States v. Trzaska*, 111 F.3d 1019 (2d Cir. 1997) ............................................................... 46

*United States v. Tzolov*, 642 F.3d 314 (2d Cir. 2011) .................................................................. 44

*United States v. Vinieris*, 606 F. Supp. 1390 (S.D.N.Y. 1985) ............................................... *passim*

*United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991) .......................................................... 18, 33

United States v. White, 972 F.2d 16 (2d Cir. 1992) ...................................................................... 18

*United States v. Wilkerson*, 444 Fed. App'x 708 (4th Cir. 2011) ................................................. 49

*United States v. Wong*, 78 F.3d 73 (2d Cir. 1996) .............................................................. 17, 18, 32

*United States v. Yannai*, 791 F.3d 226 (2d Cir. 2015) .................................................................. 16

*United States v. Zagari*, 111 F.3d 307 (2d Cir. 1997) .................................................................. 17

## PRELIMINARY STATEMENT

On March 8, 2024, following a nearly three-week jury trial, defendant Juan Orlando Hernandez ("Hernandez" or the "defendant") was convicted of the narcotics and firearms offenses contained in Counts One through Three of Indictment S7 15 Cr. 379 (PKC) (Dkt. 423, the "Indictment").  The defendant now moves, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, for a new trial.  (Dkt. 765, the "Motion").  He offers two bases in support of his motion: first, that testimony from Drug Enforcement Administration ("DEA") Intelligence Research Specialist Jennifer Taul misled the jury and the Government improperly referenced that testimony in its rebuttal summation, despite knowing it was false; and second, that venue was not proper in the Southern District of New York.  Both arguments are without merit.

*First*, with respect to Taul, there is no evidence that, as the defendant baselessly argues, Taul's testimony about the amount of drugs transiting through Honduras was inaccurate, let alone that Taul committed perjury, or that the Government engaged in any misconduct.  The Court correctly rejected the defendant's motions relating to Taul's testimony that the defendant made orally after the Court had finished instructing the jury and in writing after the jury had begun deliberations, and his meritless argument falls well short of demonstrating that a new trial is required under Rule 33.

*Second*, with respect to venue, the parties entered into a stipulation at trial that the defendant was first brought, for purposes of 18 U.S.C. § 3238, to this District.  (*See* GX 1010; Tr. 1074-75).  After the defendant filed the Motion, the Government reviewed discovery materials it had produced to the defendant and determined that, on its way to White Plains, the aircraft carrying the defendant made an approximately half hour-long stop in Fort Lauderdale, Florida, to refuel,

during which the defendant briefly exited the plane to use the restroom.  While the Government now recognizes that the stipulation, which was entered under the parties' good faith (but mistaken) belief that the defendant first landed in this District, was inaccurate, the defendant's venue challenge has been waived both procedurally and by entering the stipulation, and, regardless, he cannot establish, for the multiple reasons set forth below, that this amounts to a manifest injustice warranting relief under Rule 33.

Accordingly, and for the reasons set forth below, the Government respectfully submits that the Court should deny the defendant's motion.

## THE TRIAL EVIDENCE

The trial evidence overwhelmingly established that the defendant was at the center of a massive and violent cocaine trafficking conspiracy.  He abused his power as the President of Honduras to, in his own words, "shove the drugs up the gringos' noses."  (Trial Transcript ("Tr.") at 71, 98).  The defendant accepted millions of dollars in bribes from his drug trafficking partners and, in return, protected their drugs with the full power of the state, including the Honduran police, military, and justice system.  With the defendant's backing and protection, his drug trafficking partners sent at least approximately 400 tons of cocaine to the United States, causing untold damage in this country and leaving a wake of suffering.  The defendant did all this while falsely publicly proclaiming that he was fighting drug trafficking.

The evidence at trial included testimony from two cooperating witnesses, Alexander Ardon Soriano ("Ardon") and Fabio Lobo, who had multiple, face-to-face meetings with the defendant, during which they discussed drug trafficking and paid the defendant, in total, millions of dollars in drug-fueled bribes.  The Government also offered testimony from (1) Jose Sanchez, a Honduran

2

accountant, who witnessed two meetings between the defendant and a violent Honduran drug trafficker, Geovanny Fuentes Ramirez, during which the defendant entered into a drug trafficking partnership with Fuentes Ramirez and accepted tens of thousands of dollars in bribes; (2) Devis Leonel Rivera Maradiaga ("Rivera"), a massive narcotics trafficker and leader of *Los Cachiros*, a major drug trafficking organization, who described how he and his drug-trafficking partners supported the defendant in exchange for his protection; (3) Luis Perez, a former member of the Sinaloa Cartel, who testified that he provided millions of dollars of bribes to benefit the defendant; and (4) Giovanni Rodriguez, a former member of the Honduran National Police ("HNP") who worked with the defendant's cousin to protect drug loads owned by the defendant's brother and protected by the defendant and his co-conspirators.

In addition to those witnesses, the Government also offered testimony from Jennifer Taul, an Acting Group Supervisor and Intelligence Research Specialist with the DEA, who testified about the drug trafficking routes and pricing in Honduras; a Firearms Enforcement Officer from the Bureau of Firearms, Alcohol, Tobacco, and Explosives, who testified about the features of firearms used by the defendant and his co-conspirators; and from Miguel Reynoso, a Honduran law enforcement officer who testified about the seizure of drug ledgers bearing the defendant's initials, "JOH," which had been seized along with multiple firearms, grenades, and nearly $200,000 in cash. The evidence also included the ledgers themselves; wire interceptions capturing Yulan Adonay Archaga Carias, a/k/a "Porky," ("Porky") the leader of Mara Salvatrucha ("MS-13") in Honduras, talking about the defendant accepting bribes, gifting drug routes, and assigning a police team to kill a drug trafficker so that the drug trafficker wouldn't be able to cooperate and

3

expose the defendant's involvement in trafficking; and electronic evidence, including messages, pictures, location data, and contact information seized from co-conspirators' electronic devices.

In short, the trial evidence was overwhelming and established the defendant's guilt beyond a reasonable doubt.  The jury convicted the defendant on all three counts in the Indictment on the second day of deliberations—March 8, 2024.

### I.    2009 to 2011:  The Defendant Partners with Drug Traffickers

The defendant's political career in Honduras spanned more than two decades.  In 1998, he was elected as a Congressman.  (Tr. 1466).  By 2009, the defendant began campaigning to become President of the Honduran National Congress ("HNC") and Porfirio Lobo Sosa ("Pepe Lobo"), the defendant's close political ally and fellow National Party member, began to campaign to become President of Honduras.  (*See* Tr. 208-10, 1105-06, 1113, 1468-1473).  It was also in 2009 when the defendant met Ardon, who had already established himself as a major drug trafficker, for the first time in person.  (Tr. 179, 210-11).  Over the course of multiple in-person meetings, the defendant and Pepe Lobo obtained approximately $2 million in drug trafficking proceedings for their respective campaigns from Ardon, then the mayor of El Paraiso, a municipality in Honduras close to the Guatemalan border.  (Tr. 179-80, 211-13).

Before meeting the defendant, in approximately 2008, Ardon met privately with Pepe Lobo.  (Tr. 207-08).  During that meeting, Ardon requested from Pepe Lobo protection from arrest and extradition; a position in the Honduran government for his brother, Hugo Ardon; and government assistance in paving roads in El Paraiso.  (Tr. 208).  In exchange, Pepe Lobo requested $2 million from Ardon.  (Tr. 209).  During that meeting, Pepe Lobo also told Ardon that, were Pepe Lobo to be elected President, the defendant would become the President of the HNC.  (Tr.

208).  Shortly after that meeting, Ardon sent approximately $1 million to Pepe Lobo.  (Tr. 209-210).  Thereafter, in approximately 2009, Ardon met with the defendant and Pepe Lobo about similar topics.  (Tr. 210-13).  During that meeting, the defendant confirmed that he would grant Ardon's requests made to Pepe Lobo, and told Ardon "not to worry about the prosecutor's office, about them investigating me; that I would be given protection."  (Tr. 212).  After reaching this agreement with the defendant and Pepe Lobo, Ardon provided them with a second payment of $1 million.  (Tr. 213).  Thereafter, with the defendant's protection, Ardon became a more powerful drug trafficker, ultimately responsible for importing approximately 250 tons of cocaine to the United States.  (Tr. 184).  Among others, Ardon trafficked drugs with Juan Antonio Hernandez Alvarado, a/k/a "Tony Hernandez," the defendant's brother, as well as with the prolific cartel led by brothers Miguel Arnulfo Valle and Luis Valle ("*Los Valles*").  (*See, e.g.*, Tr. 215-20).

In 2009, there was a coup in Honduras, and then-President Jose Manuel Zelaya Rosales was removed from power.  (Tr. 213).  Following the coup, Tony Hernandez informed Ardon that the coup would make it easier for the defendant to become President of the HNC, after which "he would have access to government information . . . such as radar information, which is what the government uses to identify aircrafts."  (Tr. 220-21).  As Tony Hernandez promised, their drug trafficking partnership flourished after the defendant became President of the HNC, and Ardon detailed his subsequent drug trafficking with Tony Hernandez.  (*See, e.g.*, Tr. 222-24).  Ardon also explained that he saw Tony Hernandez armed with firearms during their cocaine trafficking partnership, and identified particular firearms he saw Tony Hernandez carrying, including an AR-15 and 9-millimeter semiautomatic handgun. (Tr. 222-24, GX 201R-62).

It was also in approximately 2009 that the defendant first spoke with cooperating witness Fabio Lobo about drug trafficking. (Tr. 1108-09). Lobo testified that he met the defendant through his father, became friends with the defendant, and that, over time, he asked the defendant for both personal and political favors. (Tr. 1106-07). Eventually, their relationship developed into a cocaine trafficking partnership. In 2009, the defendant invited Fabio Lobo to a restaurant in Tegucigalpa, where the two had dinner along with Tony Hernandez and a Colombian drug trafficker, identified by the defendant as "Cinco." (Tr. 1108-11). During the dinner, the defendant, Tony Hernandez, and Cinco discussed who would assume responsibility for a seized plane that had "merchandise" and asked Fabio Lobo, who was then a judge, for help with the plane. (Tr. 1110-11). Two days after this dinner, Fabio Lobo received a call from an individual who identified himself as "El Sentado." (Tr. 1111). Fabio Lobo then agreed to meet with Sentado, and during their subsequent meeting, Sentado told Fabio Lobo that a plane had crashed in Roatan, Honduras, loaded with approximately 1,200 kilograms of cocaine that "belonged to a partnership between the Hernandez brothers, *Los Valles*, and another person who was Colombian." (Tr. 1111-13).[1] Sentado asked Fabio Lobo to "help him to recover" the plane. (Tr. 1112). Fabio Lobo ultimately was unable to help due to his concerns over the scrutiny it would bring to his father's campaign, and, days later, discussed the matter with the defendant. (Tr. 1113-15). During their subsequent conversation in Fabio Lobo's home, Fabio Lobo reported back to the defendant, "that the plane

---

Rivera testified that he knew "Sentado" and that the Valles had told him that Sentado was a drug trafficker. (Tr. 766-67).

that had been seized was carrying cocaine," and the defendant asked Fabio Lobo to "be discrete." (Tr. 1114-15).   They never discussed the plane seizure again.  (Tr. 1115).

In November 2009, Pepe Lobo was elected as President of Honduras and the defendant was re-elected as a Congressman, and, shortly thereafter, became the President of the HNC, a position he held until he was inaugurated as president of Honduras in January 2014.  (*See, e.g.*, Tr. 1468).   With his increased political power, the defendant continued to help his drug trafficking partners, including Ardon and Tony Hernandez, and also continued to protect and support Fuentes Ramirez.  For example, testimony at trial established that, in approximately 2011, Honduran law enforcement raided Fuentes Ramirez's cocaine laboratory.  (Tr. 78).  Approximately 30 to 40 days after the raid, Fuentes Ramirez met with Julio Cesar Barahona, then the President of the Judiciary in Honduras, a position appointed by the HNC.  (Tr. 79-85).  Upon his arrival, Barahona stated that he had been sent by the "boss" so that he could "help" Fuentes Ramirez, meaning "[t]o expunge [Fuentes Ramirez's] record regarding the drug lab case."  (Tr. 83-84).  Following that meeting, Fuentes Ramirez continued to operate with impunity and, as described further below, in partnership with the defendant with protection from the Honduran military.  The evidence at trial also established the defendant's growing ties to other members of the conspiracy during this time period and the defendant's ongoing demands that his partners continue to fund his political ascension.  For example, during his testimony, Ardon also identify a picture of the defendant alongside Miguel Valle, who was at the time one of the largest cocaine traffickers operating in Honduras.  (*See* Tr. 217-19, GX 309).  Later in trial, Rivera testified that, in approximately 2010, Miguel Valle showed Rivera that same photograph on his phone, explained that he had attended the 2010 World Cup with the defendant, and told Rivera that during their time together at the

7

World Cup, the defendant requested that Miguel Valle support his campaign for President of the HNC. (Tr. 760-64). And, of course, the trial was replete with evidence of the Valles cocaine trafficking and financial support of the defendant through cocaine trafficking proceeds. (*See, e.g.*, Tr. 631-33 (Perez testimony about providing bribes, with the Valles, to the defendant); Tr. 825 (Rivera testimony that the Valles had told him that the defendant was protecting them, they had made "a lot of money thanks to that protection" and they had "bribed him several times."); Tr. 1020 (Santos testimony about the Valles supplying MS-13 with cocaine)).

II.    **2012 to 2013:  The Defendant Campaigns for President of Honduras with the Support of His Drug Trafficker Partners**

Prior to the 2013 presidential election, the defendant privately solicited and accepted millions of dollars from drug traffickers for his campaign. As further detailed below, multiple witnesses testified at trial about these bribes, including Ardon and Fabio Lobo, who personally paid bribes to the defendant, and Jose Sanchez, who witnessed Fuentes Ramirez do so. Additionally, both Rivera and Luis Perez, a former member of the Sinaloa Cartel, testified about drug-fueled bribes paid to the defendant during this time period, which fueled his rise to become President.

In approximately 2012, the defendant attended a birthday party for Pepe Lobo's brother, Ramon "Moncho" Lobo, along with numerous Honduran drug traffickers. As described by Rivera, the attendees included Javier Rivera Maradiaga, who, along with Rivera, led *Los Cachiros*, Neftali Duarte Mejia, Ramon Mata, Wilter Blanco, Ton Montes, and Chinda Montes, all major Honduran traffickers. (Tr. 789-794). Javier Rivera reported to his brother that he spoke to the defendant at this birthday party and the defendant told him that if *Los Cachiros* supported the defendant's campaign, "we could count on him" for protection from arrest and extradition. (Tr. 790-91).

Similarly, Chinda Montes (leader of the Montes Bobadilla drug trafficking organization) told Rivera that she had given the defendant $300,000 because the defendant was "going to be the next president of the republic." (Tr. 794). And another major trafficker identified by Rivera, Neftali Duarte, paid the defendant $100,000 and provided the defendant with access to his helicopter for the campaign after this party. (Tr. 812). Finally, not long after the birthday party, Javier Rivera, on behalf of *Los Cachiros*, provided $250,000 to Hilda Hernandez, the defendant's sister, for the defendant's campaign. (Tr. 797-800).

The defendant also accepted numerous other bribes from drug traffickers throughout the course of 2013, among them: $1 million from Joaquin Guzman Loera, a/k/a "El Chapo," the leader of the Sinaloa Cartel, that Chapo paid directly to Tony Hernandez (Tr. 262-65, 638); a total of approximately $2.4 million from the Sinaloa Cartel (Tr. 626; *see also* Tr. 1116); and $200,000 paid by Fabio Lobo and Javier Rivera to Hilda Hernandez (Tr. 1119-11120). The defendant also received millions of dollars from *Los Valles*, paid to Tony Hernandez by an individual who identified himself as "Wilson," an alias for a Honduran drug trafficker named Nery Lopez Sanabria, or Magdaleno Meza. (Tr. 1124-27; *see also* Tr. 441, 470; GX 319).[2] After receiving the duffel bag from "Wilson," Tony Hernandez told Fabio Lobo that it contained $4 million. (Tr. 1125). This bribe was further corroborated by an intercepted call, dated June 19, 2015, in which Porky said, "it appears that . . . El Valle gave him 5." (GX 403-T, Line 31).

---

[2] As proved at trial and described in more detail below, the drug ledgers with the defendant's, and Tony Hernandez's, initials in them, seized in June 2018 by Honduran law enforcement, belonged to Sanabria.

Also in 2013, the defendant received two bribes, totaling approximately $25,000, during meetings with Fuentes Ramirez.  During the first of these meetings, the defendant told Fuentes Ramirez that he "was interested in having him and his drug lab work for him" because of its proximity to Puerto Cortes, Honduras' largest port; said that Fuentes Ramirez, "need not worry about the transportation and protection of the drugs because the military and police would take care of it"; gloated that, "by the time the gringos find out, we will have eliminated extradition"; gave Tony Hernandez's cellphone number to Fuentes Ramirez so that he, "could put himself at Mr. Tony Hernandez's disposal"; and declared that they would "shove the drugs up the gringos' noses and they won't even realize it." (Tr. 96-98).  Following those meetings, Fuentes Ramirez in fact received support from the Honduran military for his cocaine trafficking.  (Tr. 107; *see also* GX 902; Tr. 1058).

In November 2013, bought and paid for by millions of dollars from his drug trafficking partners, the defendant was elected President of Honduras.

### III.    2014 to 2022:  The Defendant Continues to Accept Bribes and Protects Drug Traffickers as President

As President, the defendant continued to support his drug trafficking partners.  He also kept them in line in an effort to ensure he would not be exposed.  By 2013, Ardon, both the National Party Mayor of El Paraiso and a major drug trafficker, was attracting too much attention for the defendant's liking, so the defendant "told [him] not to go for re-election as mayor because the media were talking a lot about how [he] was a drug trafficker and how [he] financed part of [the defendant's] campaign."  (Tr. 253).  Ardon acquiesced and, in return, continued to receive the defendant's protection.  (Tr. 253-54).  Conversely, Arnaldo Urbina Soto, also a drug-trafficking and political partner of the defendant's—as the National Party Mayor of Yoro—failed to heed that

warning.  Indeed, despite being cautioned by the defendant that as long as he was "discrete" in his drug trafficking there would be no problems (GX 409-T, Tr. 831-35) and "ordered" by the defendant to no longer participate in politics, Urbina again ran for Mayor in the 2013 elections and, subsequently, was arrested (Tr. 840-42).

The defendant also did more than exact political retribution on his drug trafficking partners who became too visible.  For example, on a call intercepted in June 2015, Porky told David Campbell, another member of MS-13, that the defendant had "assigned an elite police team to kill" a drug trafficker named Byron Ruiz, who had worked with Tony Hernandez, "because it's inconvenient if the Americans catch him and take him away."  (GX 404-T, Lines 9-13; *see also* Tr. 768).  The opposite was true for the defendant's drug trafficking allies.  For example, on an intercepted call from September 2015, Porky described how "the president," *i.e.*, the defendant, had "gifted" a drug route to *Los Cachiros*.  (GX 405-T, Line 23).

The defendant's partnerships continued through his second election and second term as President.  For example, in 2018, during the defendant's second term as President, Honduran law enforcement recovered drug ledgers, which the trial evidence showed belonged to Sanabria, in a hidden compartment of a vehicle, located next to firearms, almost $200,000 in cash, and two grenades.  (Tr. 439-41).  Inside certain of the ledgers were notations to "JOH," the defendant, and his brother, "TH."  (*See* GXs 250A-2, 250C-2; *see also* Tr. 448-49).

The defendant's relationship with his other drug trafficking partners also continued.  In 2019, evidence from Fuentes Ramirez's cellphone, seized by law enforcement in connection with his March 2020 arrest, showed that Fuentes Ramirez visited *Casa Presidencial*, the Honduran Presidential Palace, twice in 2019.  (*See* GX 204-200).  Both meetings were on days significant to

11

this prosecution: the first on May 29, 2019, the day after the defendant was first identified as a co-conspirator in a public filing in this case; and then again on June 12, 2019, on the date of a similar filing in the case. (Tr. 1039, 1044-47). Fuentes Ramirez also admitted to Rivera, in approximately 2020 while both were in custody in the Metropolitan Correctional Center, that prior to his arrest he had paid the defendant two additional bribes, one of approximately 450,000 lempiras, prior to his arrest in exchange for protection. (Tr. 868-69).

### IV.    The Defense Case

The defense called three witnesses and the defendant himself also elected to testify.

The first three defense witnesses were current and former members of the Honduran military: Brigadier General of the Army Tulio Armando Romero Palacios; Brigadier General of the Air Force, retired, Xavier Rene Barrientos; and Advisor to the Joint Chiefs of Staff General Willy Joel Oseguera Rodas. All three were long-time associates of the defendant, certain of whom were classmates of the defendant in the military academy located at Liceo Militar del Norte, Honduras. (*See, e.g.*, Tr. 1330). They testified about, among other topics, military initiatives purportedly taken at the defendant's direction, protection provided to the defendant, and personal matters. Palacios testified, among other things, that he visited Graneros Nacionales—the location of the defendant's two meetings in 2013 with Fuentes Ramirez—on two occasions, where the defendant met with Fuad Jarufe, the owner of Graneros Nacionales (Tr. 1340-1343); that he traveled with the defendant to DEA headquarters in the United States (Tr. 1345); and that he sometimes communicated with Tony Hernandez, including by text message (*see, e.g.*, Tr. 1350). On cross-examination, Palacios admitted that, prior to Tony Hernandez's arrest in Miami in November 2018, Palacios checked whether it was safe for Tony Hernandez to travel to the United

States (Tr. 1389, 1393-94); and that, in addition to the defendant, Palacios provided protection certain of the defendant's family members, including Tony Hernandez (Tr. 1397-98). Barrientos, previously the head of the Honduran Air Force, testified, among other things, that between 2004 and 2015 there was no functioning radar system in Honduras to track planes. (Tr. 1446).

The defendant also testified in his own defense, over the course of two trial days. He admitted, among other things, that: he attended Moncho Lobo's birthday party in 2012 (Tr. 1503-04); that he "heard rumors" that Alex Ardon was a drug trafficker as early as 2013 (Tr. 1539); that Hilda Hernandez, his sister, was involved in his presidential campaign (Tr. 1527); and that he visited Fuad Jarufe at Graneros Nacionales (Tr. 1505). After questioning on cross-examination, the defendant ultimately identified himself in a photograph with Miguel Valle. (Tr. 1560-64; GX 309). When asked whether narcotics traffickers sometimes supported political candidates in Honduras, the defendant answered, "They support all of them, or at least they try." (Tr. 1559).

### Procedural History

On January 27, 2022, the defendant was charged in the Indictment, then filed under seal, with narcotics and firearms offenses in three counts. Count One charged the defendant with conspiring to import cocaine to the United States; to manufacture, distribute, or possess with intent to distribute cocaine knowing, intending, or having reasonable cause to believe it would be imported to the United States; and to distribute or possess with intent to distribute cocaine on board a U.S.-registered aircraft, in violation of Title 21, United States Code, Section 963. Count Two charged the defendant with possessing machineguns and destructive devices during and in relation to the drug trafficking crime charged in Count One, in violation of Title 18, United States Code, Section 924(c). Count Three charged the defendant with conspiring to possess machineguns and

13

destructive devices during and in relation to the drug trafficking crime charged in Count One, in violation of Title 18, United States Code, Section 924(o).

On April 22, 2022, the defendant arrived in this District and was presented, in a remote proceeding, before this Court. During a status conference on November 15, 2022, in response to the Court's question whether, "[w]ith regard to the material that's been produced" counsel anticipated "any suppression motions . . . or any motions addressed to the face of the indictment or anything of the like," defense counsel stated he did not anticipate making any such motions. (Dkt. 494 at 16-17). Consistent with that position, the defendant did not file any motions addressed to the Indictment or the propriety of the charges in this District. He did, however, file other pre-trial motions in February, May, and December of 2023, respectively: a motion to sever, pursuant to Federal Rule of Criminal Procedure 8(b) (Dkt. 515); a motion to compel additional discovery and for a bill of particulars (Dkt. 559); and another motion for additional discovery (Dkt. 650). There also was extensive pre-trial litigation in this case under the Classified Information Procedures Act ("CIPA"). (*See, e.g.*, Dkts. 549, 556, 605, 610, 643, 644, 645, 646, 652, 659, 661, 715, 720, 721). None of those motions included any objection or challenge to venue being proper in this District; nor could they, as venue plainly was proper and had been established at two prior trials for the defendant's joint offenders in this case. No other motions, written or verbal, were made challenging venue prior to or during trial.

Trial commenced on February 20, 2024. The Government concluded its case-in-chief on March 4, 2024. At the close of the Government's case, the defendant moved, pursuant to Federal Rule of Criminal Procedure 29, for a verdict of acquittal. (Tr. 1325). Specifically, the defendant "move[d] for the Court to dismiss the entire indictment, each and every element of it, each and

14

every charge, for failure on the government's part via Rule 29 to make a – for judgment of acquittal . . . ." (*Id.*). The Court denied the defendant's motion, subject to renewal after the verdict. (Tr. 1327). At the conclusion of the defense case, the defense renewed its Rule 29 motion. In full, the defense "move[d] for a judgment of acquittal pursuant to Federal Rule 29," the Government relied on its argument from after the conclusion of its direct case, and the Court again denied the Rule 29 motion. (Tr. 1646-47). On March 8, 2024, the jury convicted the defendant on all counts. (Dkt. 765). For both Counts Two and Three, the jury found that the offenses involved both a machinegun and a destructive device. (*Id.*).

## ARGUMENT

**I.    A New Trial Is Not Warranted**

**A.    Applicable Law**

**1.    Rule 33**

**i.    General Standard**

Federal Rule of Criminal Procedure 33 provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "[M]otions for a new trial are disfavored in this Circuit," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and are granted "sparingly and in only the most extraordinary circumstances." *See also United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001); *see also United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020). To find that a "manifest injustice" has occurred and thus grant a motion under Rule 33, the district court must conclude, taking into account all of the facts and circumstances of the case, that there is "a real concern that

an innocent person may have been convicted." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).

"The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134; *see also United States v. Yannai*, 791 F.3d 226, 242 (2d Cir. 2015) ("A defendant's motion for a mistrial may be granted where something has occurred to interfere with the defendant's right to a fair trial."). A new trial should not be granted when the court is "satisfied that competent, satisfactory, and sufficient evidence in the record supports the jury verdict." *Ferguson*, 246 F.3d at 134. Moreover, "a district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020). In *Archer*, the Second Circuit explained further:

> We stress that, under this standard, a district court may not 'reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.' To the contrary, absent a situation in which the evidence was 'patently incredible or defie[d] physical realities,' or where an evidentiary or instructional error compromised the reliability of the verdict, a district court must 'defer to the jury's resolution of conflicting evidence.' And, as it must do under Rule 29, a district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis.

*Id.* at 188-89 (internal quotations and citations omitted).

The defendant bears the burden of proving that he is entitled to a new trial under Rule 33. *See United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).

### ii. Newly Discovered Evidence

Where, as here, a motion for a new trial is based on a claim of newly discovered evidence, the defendant bears a particularly high burden, and must establish that: (1) the evidence is "new,"

*i.e.*, it was discovered after trial; (2) the evidence could not have been discovered before or during trial with the exercise of due diligence; and (3) the evidence is "so material and noncumulative that its admission 'would probably lead to an acquittal.'"  *United States v. Kaufman*, 19 Cr. 504 (LAK), 2023 WL 4493499, at *1-2 (S.D.N.Y. 2023) (citing *United States v. Zagari*, 111 F.3d 307, 322 (2d Cir. 1997)).  Rule 33 motions based on newly discovered evidence "are disfavored in this Circuit and 'should be granted only with great caution.'"  *Id.*  (quoting *United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996)); *see also United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995) ("Because motions for a new trial are disfavored in this Circuit the standard for granting such a motion is strict; that is, newly discovered evidence must be of a sort that could, if believed, change the verdict.").  In addition, the Second Circuit has held that it is "axiomatic" that "[o]ne does not 'discover' new evidence after trial that one was aware of prior to trial."  *United States v. Owen*, 500 F.3d 83, 89-90 (2d Cir. 2007); *see also Kaufman*, 2023 WL 4493499, at *2 (denying Rule 33 motion based on "newly discovered" venue evidence because the defendant "had direct knowledge of the location" of the meeting at issue (which he attended), and, "given [the defendant's] personal knowledge, it simply cannot be that the location of the [meeting] could not have been discovered before trial with the exercise of due diligence"); *United States v. Pan*, 12 Cr. 153 (RJS), 2015 WL 13016355, at *3-4 (S.D.N.Y. 2015) (denying Rule 33 motion for new trial based on factual inaccuracy in a stipulation concerning the jurisdictional element of wire fraud charges where it was "by no means obvious that the factual error contained in the stipulation could not have been discovered with the exercise of due diligence before trial" and the defense failed to demonstrate that the purportedly newly discovered evidence "would probably lead to an acquittal").

### iii.    Alleged False Testimony

When, as here, a defendant seeks a new trial under Rule 33 by arguing that a witness allegedly testified falsely at trial, "a threshold inquiry is whether the evidence demonstrates that the witness in fact committed perjury." *United States v. Stewart*, 433 F.3d 273, 297 (2d Cir. 2006). A defendant "must make a threshold showing that" a witness "in fact willfully testified falsely and that the falsehoods were not known to [the defendant] at the time of trial." *United States v. Aquart*, 912 F.3d 1, 20 (2d Cir. 2018).  But "[s]imple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001). Nor does "incorrect testimony resulting from confusion, mistake, or faulty memory." *Id.*

Even when a defendant demonstrates that a witness committed perjury, "[p]erjury in and of itself is insufficient to justify relief under Rule 33." *Stewart*, 433 F.3d at 297; *see also United States v. White,* 972 F.2d 16, 22 (2d Cir. 1992) ("[T]he mere fact that [the witness] lied on the witness stand does not automatically entitle [the defendant] to a new trial.").  "If newly discovered evidence indicates that testimony given at trial was perjured, the grant of a new trial depends on 'the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury.'" *United States v. Wong*, 78 F.3d 73, 81 (2d Cir. 1996) (quoting *United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991)).  A court's analysis is more or less strenuous depending on the Government's knowledge of the perjury: if the Government knew or should have known of the perjury, "a new trial is warranted if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury," whereas, if the Government was unaware of the perjury at trial, "a new trial is warranted only if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have

18

been convicted." *Wong*, 78 F.3d at 81 (alteration in original) (internal quotation marks omitted) (quoting *Wallach*, 935 F.2d at 456).

### 2. Waiver of Venue

"It is axiomatic that questions of venue can be waived." *United States v. Cestero*, 767 F. Supp. 500, 501 (S.D.N.Y. 1991). An allegation that the Government has failed to prove venue cannot be asserted for the first time after a verdict has been reached. *See, e.g.*, *United States v. Starzecpyzel*, 93 Cr. 552 (LMM), 1995 WL 640507, at *1 (S.D.N.Y. 1995) (noting that a venue argument was "not frivolous[ ]" but declining to reach the argument because it was "asserted for the first time after [the] verdict"); *United States v. Vinieris*, 606 F. Supp. 1390, 1396 (S.D.N.Y. 1985); *United States v. Rodriguez*, 05 Cr. 630 (SJF), 2007 WL 2908246, at *3 (E.D.N.Y. 2007). A claim that evidence is insufficient to sustain venue, if not raised in a pre-trial motion or as a specific basis for a judgment of acquittal at the close of the Government's case-in-chief, is deemed waived. *See, e.g.*, *United States v. Price*, 447 F.2d 23, 27 (2d Cir. 1971) (collecting cases establishing that a "finding of waiver is proper … when, after the government has concluded its case, the defendant specifies grounds for acquittal but is silent as to venue."); *United States v. Schohn*, 602 F. Supp. 3d. 447, 455 (W.D.N.Y. 2022) ("Here, when the Government rested, Defendant moved for a directed judgment of acquittal but made no mention of venue. As such, Defendant has waived the issue of venue."); *United States v. Kenner*, No. 13-CR-607 (JFB)(AYS), 2019 WL 6498699, at *2 (E.D.N.Y. Dec. 3, 2019), *aff'd*, No. 21-2289, 2023 WL 4692508 (2d Cir. July 24, 2023) (holding that the defendant, who moved for acquittal pursuant to Rule 29 after the Government rested its case but did not argue there was no venue, had waived that issue); *United States v. Rodriguez*, No. 05-CR-630 (SJF), 2007 WL 2908246, at *1 (E.D.N.Y. Oct. 5, 2007); *see*

19

*also Cestero*, 767 F. Supp. at 501 ("Here, [the defendant] knew of the issue long before trial and as a matter of strategy chose to ignore it.  This waiver, by itself, is grounds to deny the motion."); *United States v. Elliott*, 2023 WL 5623847, at *3 (11th Cir. 2023) (holding that a claim of improper venue is deemed waived "unless asserted prior to trial" in a pretrial motion, "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits").  Indeed, Federal Rule of Criminal Procedure 12 states, in relevant part, that "a motion alleging a defect in instituting the prosecution," such as a motion for "improper venue . . . must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits."  Fed. R. Crim. P. 12 (b)(3); *see also*, *e.g.*, *United States v. O'Brien*, 926 F.3d 57, 83 (2d Cir. 2019) ("If a motion falling within Rule 12(b)(3) is not made before trial (or before such pretrial deadline as may be set by the court for such motions), it is 'untimely'" (citing Fed. R. Crim. P. 12(c)(3))); *United States v. Kelly*, 609 F. Supp. 3d 85, 139 (E.D.N.Y. 2022).

The Second Circuit has held that there are "two situations where a finding of waiver is proper: (a) when the indictment or statements by the prosecutor clearly reveal this defect but the defendant fails to object; and (b) when, after the government has concluded its case, the defendant specifies grounds for acquittal but is silent as to venue." *Price*, 447 F.2d at 27-28.  Where, as here, venue was never contested until the defendant's present, post-trial motion, the Circuit is clear that any challenge to venue is waived. *See, e.g.*, *United States v. Acosta*, 595 F. Supp. 2d 282, 288 (S.D.N.Y. 2009) (finding that the defendant had "waived any challenge to venue by not raising a specific objection to venue until after the jury returned its verdict" and noting that Second Circuit caselaw "requires that a defendant's objection to venue must be specifically articulated by the

20

close of evidence."); *see also United States v. Lester*, No. 96–1519, 1997 WL 321809, at *2 (2d Cir. June 13, 1997) (holding that under the Second Circuit's "longstanding doctrine," a defendant's failure to specifically object to venue at the close of evidence constitutes a waiver of objection to venue); *United States v. Mancebo–Santiago*, No. 96–1128, 1996 WL 560754, at *1 (2d Cir. Oct. 3, 1996) ("Because Mancebo–Santiago failed to challenge the proof of venue prior to the conclusion of the government's case, he waived his objection to venue."); *United States v. Menendez*, 612 F.2d 51, 54–55 (2d Cir.1979) ("[A] finding of waiver is proper ... when, after the government has concluded its case, the defendant specifies grounds for acquittal but is silent as to venue." (quoting *Price*, 447 F.2d at 27 (2d Cir.1971))); *Vinieris*, 606 F. Supp. 1390, 1396 (S.D.N.Y.1985) ("The failure of defense counsel 'specifically [to] articulate [ ]' improper venue as a basis for a judgment of acquittal at the close of either the Government's or the entire case constituted a waiver of the issue . . . ." (citing *United States v. Grammatikos*, 633 F.2d 1013, 1022 (2d Cir.1980))); *United States v. Cordero*, 668 F.2d 32, 44 (1st Cir. 1981) (Breyer, J.) (rejecting as untimely a venue challenge made after trial, noting that "the courts have consistently ruled that a claim of improper venue must be raised at least prior to a verdict" and that, "[s]ince defendants may waive venue and since it is not an element of the offense, the government will not necessarily seek to prove the necessary connection unless the defense warns the government that the matter is at issue") (internal citations omitted).

Thus, where counsel makes a motion for a judgment of acquittal after the Government has rested its case but fails to specifically articulate venue as a basis for the motion, any venue challenge is deemed waived. *See, e.g.*, *United States v. Bala*, 236 F.3d 87, 96 (2d Cir. 2000) (holding that defendant had waived his venue challenge when, at the close of trial, he did not raise

21

the issue in his Rule 29 motion for a judgment of acquittal, and after the court concluded its instructions to the jury, defense counsel requested and received an instruction from the district court relating to venue); *see also Price*, 447 F.2d at 27; *United States v. Scott*, 21 Cr. 429 (AT), 2022 WL 3370096, at *4 (S.D.N.Y. Aug. 16, 2022) ("Objections to venue are waived unless specifically articulated in defense counsel's motion for acquittal." (quoting *United States v. Potamitis*, 739 F.2d 784, 791 (2d Cir. 1984))); *see also United States v. Grammatikos*, 633 F.2d 1013, 1022 (2d Cir. 1980); *Vinieris*, 606 F. Supp. at 1396 ("The failure of defense counsel 'specifically [to] articulate[]' improper venue as a basis for a judgment of acquittal at the close of either the Government's or the entire case constituted a waiver of the issue.").

### B.       The Defendant's Challenge Based on Taul's Testimony Should be Denied

#### 1.   Relevant Facts

On December 22, 2023, the Government notified the defendant that it intended to call Jennifer Taul, an Acting Group supervisor and intelligence research specialist with the DEA, to testify as an expert witness at trial.  (See Exhibit A).  The Government's notice stated that Taul would testify about, among other things, the drug trafficking routes commonly used to transport cocaine from South America to the United States, the operations employed by narcotics traffickers along those routes, and the wholesale prices of cocaine.  (*See id.*).  The Government further described in its expert notice Taul's qualifications for providing such testimony, including her experience at the DEA and involvement in multiple international narcotics trafficking investigations.  (*See id.*).  The defendant did not move to preclude Taul's testimony.

Taul testified on February 26, 2024.  First, consistent with its expert notice, the Government qualified Taul as an expert on "cocaine manufacturing processes, as well as drug

22

trafficking routes and pricing." (Tr. 566). Defense counsel did not object to that qualification. (*Id.*). Taul then testified on direct examination about the topics for which the Government provided expert notice in December 2023. (Tr. 567-91). On cross-examination, defense counsel asked Taul, among other things, about the volume of cocaine that was transported through Honduras during the defendant's presidency:

> Q. Between 2014 and 2022, did the flow of cocaine through Honduras go up or down?
>
> A. Between 2014 and 2022 it did both, but overall it did increase; yes.
>
> Q. Well, did it go down in the beginning?
>
> A. There were certain time frames where other environmental factors or COVID perhaps paused things for a little bit, but in a general trend over those years, cocaine trafficking did increase through that Central American route which includes through Honduras.
>
> Q. Well, just putting COVID aside because that was -- so let's do between -- because you raise a good point. Between 2014 and let's say 2019, did cocaine trafficking through Honduras go up or down?
>
> A. Up.
>
> Q. You say it went up between 2014 and 2019?
>
> A. I believe so.

(Tr. 614). Defense counsel went on to probe the basis for the testimony that counsel had elicited:

> A. There are statistics reported by a number of different bodies, both private and governmental, DEA reporting mostly.
>
> Q. Can you tell us what statistic you are relying on?
>
> A. No, I can't, because I haven't isolated those particular years.

(Tr. 614-15). Defense counsel did not ask any additional questions about the bases for Taul's knowledge and did not call their own expert witness, or offer any other evidence, to challenge Taul's testimony on that topic.

23

On March 6, 2024, the parties gave their summation arguments. During the defendant's summation, defense counsel cited to Taul's testimony as evidence that the prices of cocaine had gone up during periods of the defendant's presidency and argued that those prices had increased because the defendant had made the transportation of cocaine more difficult through Honduras. (Tr. 1732-33). On the same day, in the Government's rebuttal summation, the Government responded to defense's counsel argument by stating that Taul also had testified that "the volume of cocaine through Honduras went up during the defendant's presidency, from 2014 through 2022." (Tr. 1757).

On March 6 and March 7, 2024, the Court charged the jury. After finishing its jury charge, the Court invited the parties to sidebar to ask if the parties had any objections to the Court's instructions as read to the jury—*i.e.*, whether the Court had deviated from the written charge. Defense counsel then raised for the first time, 10 days after Taul had testified, an objection to Taul's testimony on cross-examination and the Government's rebuttal summation that referenced that testimony. (Tr. 1832). Defense counsel argued that Taul's testimony was "false and misleading" because there were purportedly "several reports . . . that drug trafficking through Honduras actually went down from 2014 to 2022," and that defense counsel was only raising the matter at that time because he was "just realizing this issue" and that he had "overlooked these reports." (Tr. 1833-34). Defense counsel further asserted that the Government's "doubling down" on that testimony in its rebuttal summation was "false and misleading." (Tr. 1834). Defense counsel therefore requested "either an instruction or stipulation from the government that, in fact, drug trafficking through Honduras went down between 2014 and 2022" or that the Court allow the

24

defendant to reopen the record. (Tr. 1834-40). The Court then denied the defendant's application, finding that:

> First of all, I don't find a basis to conclude that you had an inopportunity to cross-examine this witness. . . . [Y]ou doubted the truth of the evidence, and, therefore, you cross-examined her on the point. It would have been incumbent on you, Mr. Stabile, at that point to do something about it, like do your own research and raise it in a timely fashion. . . . You had the opportunity to bring this up at an earlier point in time, and you didn't while the evidence was open. So your application is denied.

(Tr. 1836-1838; *see also* Tr. 1840-42).

The next morning, on March 8, 2024, the defendant filed a letter requesting that the Court instruct the jury that the volume of cocaine through Honduras went down during the defendant's presidency. (Dkt. 733). In support of that request, the defendant cited to the Court four International Narcotics Control Strategy Reports (the "INCSR Reports"). (*Id.*). The defendant claimed that the INCSR Reports contradicted Taul's testimony because they stated that: (i) the volume of cocaine transited from Honduras to the United States decreased by 40 percent from 2014 until 2016; (ii) in 2016, the U.S. government estimated that the number of aircraft suspected of smuggling cocaine into Honduras had decreased; (iii) that approximately four percent of cocaine shipments from South America with a stop in Honduras occurred in 2019; and (iv) that during the first nine months of 2021, the Government of Honduras had reported seizing four times the quantity of cocaine than in all of 2020. (*Id.*). The defendant further argued in his March 8, 2024 letter that the Government knew Taul's testimony was false because another expert witness—Dr. Dario Euraque—testified on cross-examination during another trial before this Court, (*United States v. Geovanny Fuentes Ramirez*, S6 15 Cr. 379 (PKC)), that the amount of cocaine through Honduras decreased from approximately 2014 through 2021. (Dkt. 733 at 3-4).

On March 8, 2024, the Court heard oral argument on the defendant's letter and denied the defendant's application in a written order. (Dkt. 734). The Court noted that the defendant, despite apparently clearly believing that Taul's testimony was inaccurate during Taul's testimony (*i.e.*, not just after the fact), did not take any steps to challenge Taul's testimony, including by seek to recall Taul or call any of its own expert witnesses to testify on the topic. (*Id.* at 2). The Court further concluded that, in any event, "the evidence of whether drug trafficking went up or down during the defendant's administration was of minimal probative value that was substantially outweighed by the risk of jury confusion of the issues," in part, because "[t]he government's theory of the case was not that all drug traffickers in Honduras were members of the conspiracy, but that [the] defendant conspired with certain drug traffickers to assist their drug trafficking activities." (*Id.* at 2-3).

## 2. Discussion

The defendant now seeks a new trial under Rule 33, arguing that Taul falsely testified that the volume of narcotics transported through Honduras increased during the defendant's presidency, that the Government knew or should have known that Taul's testimony was false, and that the Government improperly referenced Taul's testimony in its rebuttal summation. (Dkt. 765-1 at 2-9). The Court should reject that argument. There is no evidence that Taul's testimony was inaccurate, let alone that Taul committed perjury. Nor did the Government engage in any misconduct; indeed, it could not have given that Taul's testimony was accurate. The defendant has fallen far short of demonstrating that a new trial is warranted under Rule 33. *See Ferguson*, 246 F.3d at 134.

### i.    The Defendant Has Failed to Show that Taul Testified Falsely

As a threshold matter, there is simply no evidence that Taul testified falsely. *See Stewart*, 433 F.3d at 297.   Taul carefully qualified her statements, noting that she "believe[d]" that the volume cocaine had gone up between 2014 and 2019, but that she had not "isolated those particular years."  (Tr. 614-15).  The defense elicited that testimony on cross-examination and did not offer any evidence at trial that Taul's testimony was inaccurate, including by calling an expert witness, to contradict Taul's testimony.   To the contrary, during his summation, defense counsel cited approvingly to Taul's testimony on other points, arguing that her testimony about the price of cocaine increasing during the defendant's presidency was a fact that the jury should rely on, and did not challenge the credibility of her other statements.  (Tr. 1733).  The defendant now attempts to rely on certain materials (eight documents and two social media posts) to argue that Taul's statements about the increase of cocaine transiting through Honduras were inaccurate.  This effort is unavailing on both the law and the facts.

First, on the law, the materials offered by the defendant are "[p]ublicly available information that could have been discovered before or during trial with due diligence," and therefore are not "newly discovered evidence" that can "provide the basis for a Rule 33 motion for a new trial." *United States v. Moslem*, No. 19 Cr. 547 (CS), 2023 WL 5610297, at *5 (S.D.N.Y. Aug. 30, 2023).  In any event, as a factual matter, those materials do not demonstrate that Taul's testimony was inaccurate.  The defendant, for example, cites to the four INCSR Reports that he initially raised in his March 8, 2024 letter to the Court.  Only one of the reports even arguably relates to her disputed testimony and states that, in the first half of 2015, the volume of cocaine that transited through Honduras to the United States decreased by 40 percent from 2014.  (*See* Dkt.

27

765-1 at 4-5 (citing "2016 International Narcotics Control Strategy Report," Bureau of International Narcotics and Law Enforcement Affairs)). That report is not inconsistent with Taul's testimony. Taul testified about the volume of narcotics transported through Honduras during a broader time range—from 2014 through 2022—and stated that although the total volume of narcotics increased during that period, there were certain intervals in which the volume decreased, which is consistent with that INCSR report's findings.

The defendant also cites to several additional documents and social media posts, which also do not contradict Taul's testimony. The defendant points to (i) a 2015 INCSR report, which states that, as of 2014, the U.S. government estimated that cocaine smuggling flights that departed from South America and first landed in Honduras had declined from 2013; (ii) a 2018 report from the Council of the European Union that, according to U.S. government estimates, the volume of cocaine transiting Honduras in 2017 was lower than in 2016; (iii) remarks from former President Trump in 2019 that the defendant was working with the United States and "stopping drugs at a level that has never happened"; and (iv) a State Department report that discusses, among other things, the murder rates in Honduras and efforts to reform the Honduran National Police. (Dkt. 765-1 at 5-6). The first and second documents, which do not reference the complete timeframe about which Taul testified, are not inconsistent with her testimony. The third document merely memorializes a remark made by then-President Trump about joint counter-narcotics efforts that were taken and is not an assessment of whether the volume of any narcotics trafficking decreased through Honduras, let alone during the relevant time period. The fourth document, concerning Honduras's murder rates and reforms to the Honduran National Police, does not bear at all on the topic of Taul's now-disputed testimony.

The defendant also claims that publicly available posts from a DEA social media account are "newly discovered" evidence warranting a new trial. The defendant points to a 2018 posting that states the defendant's "[c]ooperation . . . will be critical to reducing violence and addiction caused by drug trafficking that afflicts both our nations" and a 2019 post that documents the fact that the defendant met with DEA officials to "build upon the relationship with the #DEA, as we work jointly to combat drug trafficking." (Dkt. 765-1 at 7-8). Those social media posts—which are generalized descriptions of the DEA's then-anticipated, future work with Honduras—also do not contradict Taul's testimony. They are merely generalized postings and, as was proven during the trial, the defendant took significant steps to cultivate a public image that was at odds with his behind-the-scenes years of drug trafficking.

Moreover, even if these materials contained any arguable inconsistency with Taul's testimony, which they do not, those inconsistencies still are not proof that Taul testified falsely. Taul stated that her opinion rested on both public and private sources, but was based on "DEA reporting mostly." (Tr. 614-15). Taul did not cite to any of the eight documents or two social media posts, to which the defendant refers in his motion, as the basis for her testimony, and different sources of information of course can disagree on their conclusions. Therefore, even if there were a report from some other entity that cocaine trafficking through Honduras decreased overall between 2014 and 2022, which the defendant has not offered, it still would not contradict Taul's testimony based on her review of DEA reporting to which she testified.

Finally, the defendant argues that Taul's testimony was false because it contradicted Dr. Euraque's testimony in the trial of Geovanny Fuentes Ramirez, a co-conspirator in this case. In that trial, which was held in March 2021, Dr. Euraque testified, on cross-examination, that the flow

29

of narcotics in Honduras had decreased over the last seven to eight years. *See United States v. Geovanny Fuentes Ramirez*, 15 Cr. 379 (PKC). (*Fuentes Ramirez* Trial Tr. at 628-29). But Dr. Euraque, who is a professor of Central American and Latin American History at Trinity College, was not qualified as an expert on the transshipment of narcotics through Honduras. *See id.* at Tr. 578. He was an expert witness on Honduran history and its social and political systems. *See id.* at Tr. 585. Dr. Euraque's testimony on this topic, which was elicited during cross-examination, therefore fell outside of the scope of his qualifications. Dr. Euraque further did not cite the basis for his statement and may have relied on any number of sources independent from the ones that Taul used to formulate her own opinion. But even to the extent there were inconsistencies between their testimony, and even if it were proper for the Court to consider another witness's testimony from another trial in this analysis, "[s]imple inaccuracies or inconsistencies in testimony do not rise to the level of perjury" warranting a new trial. *Monteleone*, 257 F.3d at 219. Dr. Euraque's testimony does not demonstrate that Taul testified falsely in the defendant's trial.

### ii.    The Government Did Not Engage in Misconduct

The defendant further asserts that the Government engaged in certain misconduct in connection with Taul's testimony. First, the defendant claims that the Government intentionally did not call Dr. Euraque because it did not want to elicit testimony that would contradict Taul. But that claim is wrong. The Government advised the defendant of its intention not to call Dr. Euraque as a witness in its case-in-chief on or prior to February 17, 2024, well before Taul testified.[3] Moreover, the testimony at issue from Taul was elicited on cross-examination. It is therefore

---

[3] At that time, the Government indicated that it reserved the right to call Dr. Euraque as a rebuttal witness, if needed.

absurd to suggest that the Government abandoned Dr. Euraque's testimony, before trial even began, for Taul's testimony that it did not even elicit on direct examination.

Second, the defendant claims that the Government engaged in misconduct because it should have corrected Taul's testimony on redirect and not referenced it in its rebuttal summation. As described above, Taul did not testify falsely, intentionally or otherwise, and the Government had no reason to believe that her testimony was inaccurate (because it was not). Moreover, the Government plainly is not required to ask any questions on redirect and is allowed to summarize evidence at trial in its summation arguments. *United States v. Tocco*, 135 F.3d 116, 130 (2d Cir. 1998) (noting parties "are generally entitled to wide latitude during closing arguments, so long as they do not misstate the evidence"); *United States v. Saunders*, No. 22 Cr. 569, 2023 WL 3220460, at *2 (2d Cir. May 3, 2023) (summary order) (affirming denial of defendant's challenge to propriety of summations where "the prosecutors' descriptions of the events on the night at issue accurately summarized the evidence that was presented to the jury"); *see also United States v. Roldan-Zapata*, 916 F.2d 795, 807 (2d Cir. 1990) ("In summation counsel are free to make arguments which may be reasonably inferred from the evidence presented."). Here, in its rebuttal remarks, the Government merely described the evidence at trial—Taul's testimony that was elicited by defense counsel on cross-examination. Thus, the defendant has failed to meet his "heavy burden" of demonstrating that there were any improper remarks, let alone remarks that show "absent the isolated impropriety of the prosecutor in summation (taken in the context of the entire trial), [the defendant] would not have been convicted." *United States v. Elias,* 285 F.3d 183, 192 (2d Cir. 2002).

31

### iii.    No Manifest Injustice Occurred from Taul's Testimony

At bottom, there is no "manifest injustice" caused by Taul's testimony. *Sanchez*, 969 F.2d at 1413. The defendant elicited the testimony at issue on cross-examination. The Government did not ask Taul any questions about the volume of drugs that were transported through Honduras during the defendant's presidency. When defense counsel realized that the testimony did not support his arguments, including arguments that he had made in his opening statements, defense counsel then took steps to try and undermine the credibility of her statement, probing about the sources of her testimony and attempting to clarify that, for certain intervals during the relevant period, the flow of narcotics did not increase.

Despite that testimony, which clearly did not support the defendant's arguments, the defendant did not confront Taul with any evidence suggesting that her testimony was false, call its own expert witness, or otherwise introduce evidence that would have contradicted her conclusions. The defendant had ample opportunity to do so given that Taul testified on the fifth day of trial and, indeed, provided notice of other expert witnesses to the Government mid-trial. But it was not until 10 days later, after the jury was deliberating, that the defendant first raised the issue of the veracity of her testimony. The defendant decision to belatedly raise that argument was plainly strategic, as this Court found, (*see* Dkt. 734), and his failure to offer any evidence to rebut Taul's testimony, which he elicited at trial, further undercuts his claim that a manifest injustice occurred.

In any event, even if the testimony *had* been false, and it was not, there is no "reasonable likelihood that [any purportedly] false testimony could have affected the judgment of the jury," or that the "testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Wong*, 78 F.3d at 81

32

(alteration in original) (internal quotation marks omitted) (quoting *Wallach*, 935 F.2d at 456).  As described above, the Government's evidence overwhelmingly demonstrated that the defendant conspired with others to traffic cocaine into the United States and Taul's testimony was a relatively small part of the Government's case.  By way of just a few examples, Ardon and Fabio Lobo testified about their meetings with the defendant, during which they discussed drug trafficking and paid the defendant, in total, millions of dollars in bribes; Jose Sanchez testified about meetings between the defendant and Fuentes Ramirez, during which the defendant entered into a drug trafficking partnership with Fuentes Ramirez and accepted tens of thousands of dollars in bribes; Rivera testified about how he and his drug-trafficking partners supported the defendant in exchange for protection; Luis Perez testified that he provided millions of dollars of bribes to benefit the defendant; and Giovanni Rodriguez testified about how he worked with the defendant's cousin to protect drug loads owned by the defendant's brother and protected by him.  (*See, e.g.*, Tr. 1205-08, 1212-19). Whether the volume of narcotics that was transported through Honduras increased during the defendant's presidency does not alter the evidence that the defendant agreed to protect the drug trafficking activities of his co-conspirators.  Taul's testimony, therefore, was immaterial to the jury's guilty verdict and does not pose any "real concern that an innocent person may have been convicted." *See Kaufman*, 2023 WL 4493499 at *2; *see also United States v. Paulino*, 445 F.3d 211, 219 (2d Cir. 2006) (even if evidence is erroneously admitted, it is harmless if the court can determine with "fair assurance that the jury's judgment was not substantially swayed by error").

### C.     The Defendant's Venue Challenge Should be Denied

The defendant also argues, for the first time in his Rule 33 motion, that venue is improper in the Southern District of New York and seeks to dismiss the Indictment in this case. (*See* Mot. at 10-11). The defendant argues that this relief is warranted because "it has now come to [counsel's] attention" that the stipulation entered by the parties and admitted at trial as GX 1010, attached hereto as Exhibit B, which stated that the defendant was "first brought" to this District, was inaccurate because the DEA airplane transporting the defendant from Honduras briefly stopped in Florida on its way to White Plains. (*Id*. at 10). As set forth below, the defendant's challenge to venue should be denied for three independent reasons: (i) the defendant's challenge is untimely and has been waived because he did not challenge venue at any point during the pendency of the case, including in pre-trial motion practice, during trial, or at the close of the Government's case, *or* specifically raise venue in either of his Rule 29 motions; (ii) he also waived the ability to challenge venue by stipulating at trial to (inadvertently inaccurate) facts establishing the existence of venue; and (iii) even if the defendant's venue challenge were timely and not otherwise waived, he cannot meet the high burden of establishing that a new trial is warranted under Rule 33, let alone that the Indictment should be dismissed, because there is no manifest injustice in allowing the guilty verdict to stand, particularly given that venue is proper in this District, venue was never contested at any stage of this case prior to the Rule 33 motion, and the proof of the defendant's guilt presented at trial was overwhelming.

### 1. Relevant Facts

As described above, the Indictment charged the defendant in three counts with conspiracy to import cocaine and related firearms offenses. As to each count, the Indictment alleged that

venue was proper under 18 U.S.C. § 3238, which states, in relevant part, that "[t]he trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought." 18 U.S.C. § 3238. In addition to citing 18 U.S.C. § 3238 as the venue basis for each count, the statutory allegations specifically referenced that the charges were based on "others known and unknown" or "joint offenders" being "first brought to and arrested in the Southern District of New York." (Indictment ¶¶ 6, 12, 14).

In June 2022, as part of its first production of Rule 16 material to the defense, the Government produced the trial transcripts from the October 2019 trial in *United States v. Juan Antonio Hernandez Alvarado*, S2 15 Cr. 379 (PKC), and the March 2021 trial in *United States v. Geovanny Fuentes Ramirez*, S6 15 Cr. 379 (PKC). Both defendants were arrested while transiting Miami International Airport, not extradited from Honduras. At both of those trials, therefore, the Government established venue based on "joint offenders" of those defendants—specifically, Ardon, Fabio Lobo, and Rivera, as well as Victor Hugo Diaz Morales, Hector Emilio Fernandez Rosa, Juan Avila Meza, Fredy Renan Najera Montoya, and Alfonso Sierra-Vargas—having been first brought to this District. *See* 18 U.S.C. § 3238. It also was clear, from the *Tony Hernandez* and *Fuentes Ramirez* trial transcripts produced to the defendant, that venue was proper for co-conspirators, like the defendant, in this District. At the *Tony Hernandez* trial, the parties entered a stipulation that stated, in part and with respect to the narcotics and firearms offenses, "venue is appropriate in [this District] as to [Tony Hernandez], pursuant to Title 18, United States Code, Section 3238, because Victor Hugo Diaz Morales, Hector Emilio Fernandez Rosa, Amilcar Alexander Ardon Soriano, Fabio Porfirio Lobo, and Devis Leonel Rivera Maradiaga are joint

35

offenders who were first brought to and arrested in [this District] upon arriving in the United States for prosecution." (*See* GX 1007, *Tony Hernandez* Trial Tr. 909).  Similarly, at the *Fuentes Ramirez* trial, the Government established through the testimony of DEA Special Agent Sandalio Gonzalez that Rivera and Fabio Lobo, as well as Juan Avila Meza, Hector Emilio Fernandez Rosa, Victor Hugo Diaz Morales, Fredy Renan Najera Montoya, and Alfonso Sierra-Vargas, were first brought to the United States after being extradited.  (*See* GX 504, *Fuentes Ramirez* Trial Tr. 861-63).  After producing the transcripts of the *Tony Hernandez* and *Fuentes Ramirez* trials in June 2022, in September 2022 the Government produced the exhibits from those trials, including the *Tony Hernandez* venue stipulation (GX 1007) and the *Fuentes Ramirez* chart identifying joint offenders (GX 504, attached hereto as Exhibit C).

In August 2022, the Government produced DEA reports memorializing the defendant's transport from Honduras to this District in April 2022, which reflected that the airplane transporting the defendant from Honduras made an approximately 30 minute stop in Florida before arriving in this District.  (*See* USAO_111763-66 and USAO_111760-61, attached hereto as Exhibits D and E).  Exhibit D, a DEA report, states in relevant part, that on April 21, 2022 at approximately 2:15 p.m., the defendant was aboard an airplane departing from Tegucigalpa, Honduras; at approximately 8:10 p.m., the airplane carrying the agents and the defendant landed in Fort Lauderdale, Florida in order to refuel and where the defendant was permitted to exit the airplane to use the bathroom; at approximately 8:40 p.m., the airplane departed Fort Lauderdale; and on April 22, 2022, at approximately 12:50 a.m., the airplane landed in White Plains, New York, where the defendant was processed through United States immigration.  Exhibits D and E were produced to the defense in discovery in August 2022.

36

The pretrial motions filed by the defendant, described above, included motions to sever, to compel additional discovery, and for bill of particulars, as well as extensive motion practice under CIPA.  None included any objection or challenge to venue being proper in this District; likely because, as set forth above, venue plainly was proper in this District.

Trial in this matter commenced on February 20, 2024.  On February 23, 2024, the parties entered into a stipulation that read, in relevant part, "On April 21, 2022, Juan Orlando Hernandez, the defendant, was flown from Tegucigalpa, Honduras, to Westchester County Airport, where he was first brought into the United States." (Ex. B).  The parties signed the stipulation while Ardon, the Government's second witness, was testifying.  The Government read the stipulation into the record and the Court admitted it into evidence on February 29, 2024, during the testimony of DEA Special Agent Daniel McNamara.  (Tr. 1074-75).

At the time the parties entered the stipulation, the undersigned believed that it was accurate, *i.e.*, that the defendant first landed in the United States in White Plains.  Additionally, three of the defendant's co-conspirators and joint offenders testified at his trial—Ardon, Rivera, and Fabio Lobo—who were first brought to the United States, and there was testimony at trial from multiple witnesses about certain of the defendant's other co-conspirators who were also first brought to this District.  That included co-conspirators and joint offenders previously identified in the two prior trials in this matter, (*see* Tr. 814, 819, 885, 887-89, 1197, 1224 (Avila Meza); Tr. 406, 990-91, 1479, 1483, 1496 (Fernandez Rosa); Tr. 1201-02, 1204-07, 1227, 1230, 1252-53, 1274-75 (Diaz Morales); Tr. 630, 705, 726-31, 769-70 (Najera Montoya)), as well as Juan Carlos Bonilla Valladares, a/k/a "Tigre Bonilla," the former Chief of the Honduran National Police who was extradited from Honduras in May 2022, a few months after the defendant's extradition in February

37

2022, first brought to this District, and who before pleading guilty on February 6, 2024 was scheduled to proceed to trial alongside the defendant (*see* Tr. 247-52). The defense did not cross-examine any witnesses about venue, nor did they make any arguments to the jury or the Court suggesting that venue was improper in this District. At the close of the Government's case, and then again after the defense rested, the defense made motions for a judgment of acquittal under Rule 29, neither of which included any reference to venue as a basis for the motions. (Tr. at 1325, 1646-47).

Nor did the defense raise venue with respect to the proposed jury instructions. On February 28, 2024, while Rivera was on direct examination, the Court distributed proposed jury instructions, and directed the parties to submit letters setting forth any desired changes by the morning of Monday, March 4, 2024. (*See* Tr. 914, Court Ex. 4). The Court's draft proposed jury instructions read that, "[T]he Government need not prove that the crime was committed in this District or that the defendant himself was present here. Instead, it is enough if you find that the point of entry where any co-conspirator of the defendant was first brought into the United States was in [this District]." (Court Ex. 4 at 52-53). This language was similar to what the Government had proposed on May 1, 2023. (*See* Dkt. 553, Ex. A at 44). By letter dated March 3, 2024, the Government requested that the venue instruction be modified to reflect that the defendant had been first brought to this District; based on the stipulation, GX 1010, and on the mistaken belief that was accurate. (*See* Dkt. 730). The defense also submitted requests to revise the Court's proposed charge, none of which addressed venue (*see* Dkt. 732), and at the charge conference held on March 5, 2024—which occurred after the trial day, while the defendant was on cross-examination—both sides consented to the Government's proposed revision to the venue instruction and the defendant,

38

when asked specifically, did not object. (*See* Tr. 1586). Following the Court's delivery of the jury charge, the defense also made two motions—one oral (Tr. 1839) and one written (Dkt. 733)—to reopen the record, on the basis of Taul's testimony, *see supra* B.1, both of which the Court denied and neither of which raised venue.

On March 22, 2024, two weeks after the jury returned a verdict of guilty on all counts, the defendant filed the Motion, alleging, for the first time in this case and contrary to the signed stipulation GX 1010, that venue was not proper in this District. Specifically, the Motion stated that the defendant had, in fact, first landed in Fort Lauderdale, Florida, before continuing to White Plains, New York. (Mot. at 10). The Motion further stated that, "[t]he source of [counsel's] information is [the defendant] and a news article that was provided to me by others[.]" (*Id.*) As described above, the Government reviewed its records upon receiving the Motion and determined that there had been a brief stop in Florida before the defendant arrived in the Southern District of New York. (*See* Exs. D and E).

### 2. Discussion

While the Government now recognizes that the stipulation, which was entered under the parties' good faith (but mistaken) belief that the defendant first landed in this District, was inaccurate, the defendant's venue challenge should be denied for at least three independent reasons.

*First*, the defendant's challenge to venue has been waived because it is untimely. Throughout this case, from pre-trial motions to the defendant's Rule 29 motions, the defendant never sought to challenge venue, and is only doing so now, after stipulating to facts establishing

39

venue and the jury returning a guilty verdict.  Under binding Second Circuit law, because venue was never in dispute or contested, the defendant's post-trial venue challenge has been waived.

*Second*, having freely entered into a stipulation establishing venue, the defendant is bound by that stipulation and has thus waived the ability to contest venue at this late stage, regardless of whether the stipulation contained a factual inaccuracy.

And *third*, to the extent the defendant seeks a new trial based on the inaccuracy in the stipulation, he can neither demonstrate that his brief landing in Florida for approximately 30 minutes to refuel and use the restroom on the way to this District, where he was processed by U.S. immigration and where multiple of his co-conspirators, including three who testified at trial, were first brought, is "newly discovered evidence," nor that allowing his convictions to stand in light of the inaccuracy in the stipulation would result in anything approaching a manifest injustice.  That is particularly true where, as here, proof of the defendant's guilt was overwhelming and the defendant never challenged that venue was appropriate under 18 U.S.C. § 3238, and the legal issue at play, venue, does not go to the defendant's guilt or innocence at all.  Nor could he credibly claim such an injustice.  As counsel knows, several of the defendant's co-conspirators were first brought to this District, making venue proper here regardless of where the defendant himself was first brought.  Accordingly, the defendant's venue challenge, whether construed as a motion to dismiss the Indictment or a motion for a new trial, should be denied.

### i.    The Defendant's Venue Challenge Is Untimely

The defendant's venue challenge has been waived because it is untimely, and his motion should be denied on that basis alone.  At no point during the pendency of this case, including prior to and throughout trial, did the defense ever contest venue.  Instead, two weeks after the jury

returned a verdict, the defense now argues, for the first time, that venue is improper and that "the indictment should be dismissed for that reason." (Mot. at 11). The law in this Circuit is clear, however, that failure to prove venue cannot be asserted for the first time after the jury returns a verdict, and instead, must be raised in a pretrial motion or specifically articulated in a Rule 29 motion for acquittal at the close of the Government's case. *See*, *e.g.*, *Price*, 447 F.2d at 27; *Starzecpyzel*, 1995 WL 640507, at \*1; *Vinieris*, 606 F. Supp. at 1396. The defendant failed to raise such a challenge until two weeks after trial—and, indeed, at multiple junctures before and during trial—and has waived any objection to having been tried in this District.

As described above, the defendant and his counsel have been on notice from the time the Indictment was unsealed in April 2022 that the Government intended to establish venue under 18 U.S.C. § 3238, and specifically, that venue is proper because the charges in the Indictment were based on either the defendant *or* any joint offenders being "first brought" to this District. (*See* Indictment ¶¶ 6, 12, 14). In 2022, as described above, the Government produced the *Tony Hernandez* and *Fuentes Ramirez* trial transcripts and admitted exhibits making clear that the Government established venue at those trials based on their co-conspirators having been first brought to this District, as well as DEA reports reflecting that the airplane transporting the defendant briefly stopped in Florida to refuel on its way to White Plains. Moreover, the *defendant* himself was plainly aware that the aircraft stopped to refuel in Florida; indeed, his knowledge is identified specifically as one of the sources from which counsel recently learned this fact. (*See* Mot. at 10). The stipulation at issue was signed on February 23, 2024, produced to the defense as an exhibit, read aloud during trial, admitted into evidence, and referenced during the Government's summation and the Court's delivery of jury instructions. Thus, to the extent the defendant ever

41

intended to contest venue, as he does now, he had all the information he needed to make that motion long before his February 2024 trial, and at multiple times during trial.

Moreover, the defendant filed pre-trial motions in 2023—none of which sought to contest venue—and he did not, at any point throughout the trial or at the close of evidence, seek to challenge venue. Where, as here, the defendant was plainly on notice of the Government's venue theory, and the information necessary to challenge venue was "reasonably available" to him from the start because it was produced in discovery and the defendant himself had personal knowledge of the relevant facts, *see* Fed. R. Crim. P. 12(b)(3), his failure to move to dismiss the case based on improper venue until two weeks after trial amounts to a waiver, *see, e.g.*, *Price*, 447 F.2d at 27-28 (finding that venue challenge was waived where, "[d]espite clear notice and actual knowledge of the presumed [venue] defect before trial commenced, William never moved to dismiss the indictment on this basis," and where "no objection to venue was raised" in a motion for a judgment of acquittal); *Cordero*, 668 F.2d at 44 (finding that defendants' venue challenge made "twenty days after the jury returned its verdict" was "too late" and thus waived).[4]

Nor did the defendant's catch-all Rule 29 motions, made after the close of the Government's case and again after the close of the defense case, remedy the defendant's waiver. After the Government rested, defense counsel moved "to dismiss the entire indictment, each and

---

[4] Indeed, Fed. R. Crim. P. 12(c)(3) states, in relevant part, that "[i]f a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause." Here, for the reasons described above, the defense cannot make a showing of good cause for having failed to file a motion to dismiss for improper venue under Rule 12(b)(3) prior to trial, since the facts needed to make such a motion were "reasonably available" to the defense since 2022, *see* Fed. R. Crim. P. 12(b)(3).

every element of it, each and every charge . . . [and] for judgment of acquittal as well[.]" (Tr. 1325). A similar application was made after the defense rested, seeking "a judgment of acquittal pursuant to Federal Rule 29." (*Id*. at 1646-47). These general, catch-all Rule 29 motions are insufficient to challenge venue. Courts in this Circuit have routinely found that defendants waive a venue objection where, as here, it is not specifically articulated in a Rule 29 motion at the close of evidence. *See, e.g.*, *Potamitis*, 739 F.2d at 791; *Vinieris*, 606 F. Supp. at 1396; *United States v. Boney*, 572 F.2d 397, 400-401 (2d Cir. 1978) (finding waiver where the defendant "made several pretrial motions but failed to object to venue" and did not "make a motion to dismiss for lack of venue at the close of the Government's case, although she did make a general motion for a directed verdict of acquittal"); *United States v. Pughe*, 441 Fed. App'x 776, 778-79 (2d Cir. 2011) ("The established law of the Circuit is now that '[a] general motion for a judgment of acquittal . . . is not sufficient to raise and preserve for appeal the question of venue. . . . Rather, '[o]bjections to venue are waived unless specifically articulated in defense counsel's motion for acquittal.'") (internal citations omitted). Indeed, the Second Circuit has strictly enforced that standard. For example, in *Bala*, the defendant did not specifically raise venue in his Rule 29 motion at the close of the evidence at trial, but, at the conclusion of the court's jury instructions, requested and received an instruction from the court that Buffalo was in the Western District of New York and Manhattan was in this District. The Circuit rejected the defendant's post-trial challenge to venue, finding that "[c]ounsel's actions showed at best an intention to put the government to its proof on the issue rather than a specifically articulated objection." *Bala*, 236 F.3d at 96. A corollary to this line of cases standing for the proposition that any venue challenge is waived if not specifically raised by, at latest, a Rule 29 motion at the close of the Government's case, is that if a defendant *does*

43

specifically raise such a challenge, "[g]enerally a district court will allow reopening to establish venue . . . or to attend to other technical matters. *United States v. Leslie*, 103 F.3d 1093, 1104-05 (2d Cir. 1997). This is exactly what Judge Caproni permitted in *United States v. Percoco*, allowing the Government to reopen its case for the specific purpose of presenting evidence of venue after that had been challenged on a Rule 29 motion at the close of the Government's case. *See United States v. Percoco, et al.*, *Percoco, et al.*, 16 Cr. 776 (VEC), Dkt. 813, July 2, 2018 Trial Tr. at 2134-35. Put differently, an idea animating Second Circuit caselaw on the waiver of venue is that venue is a "technical matter," and if the defense wishes to challenge venue it must do so at a point where the Government can supplement its proof to address any shortcoming, further underscoring that that venue has been waived here—and why that is the case.

Moreover, even if the defendant were not required to specifically identify venue as a ground for acquittal, which he was, the catch-all Rule 29 application made at the close of the Government's case as to "every element" and "every charge," (Tr. 1325), did not and could not cover venue, since it is well-settled that "venue is not an element of any crime." *United States v. Davis*, 689 F.3d 179, 185 (2d Cir. 2012); *United States v. Rommy*, 506 F.3d 108, 119 (2d Cir. 2007) ("As this court has frequently observed, the venue requirement, despite its constitutional pedigree, is not an element of a crime.") (collecting cases) (internal quotation marks omitted); *United States v. Smith*, 198 F.3d 377, 384 (2d Cir. 1999) ("As previously noted, although venue is grounded in the Sixth Amendment, it is not an element of the crime[.]"); *United States v. Conteh*, 2 F. App'x 202 (2d Cir. 2001) ("Venue is not an 'element' of the crime in the formal sense."); *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) ("[V]enue is not an element of a crime[.]"). Accordingly, any argument that the defendant's Rule 29 motions included venue fails.

44

### ii. The Defendant Waived Any Challenge to Venue by Entering the Stipulation

That the defendant never intended to contest venue in this case and thus waived his venue objection is also evidenced by his entering into the stipulation at issue, which explicitly referenced the defendant being "first brought" to this District.  (Ex. B).  There was no dispute as to venue being appropriate in this District and, as evidenced by the stipulation, there was a decision by the defense not to contest venue—there was no other purpose or explanation for the stipulation otherwise—regardless of the facts establishing that.

Having agreed to those facts and effectively conceded venue, the defendant cannot now assert a post-trial venue objection, regardless of whether the stipulation contained an inadvertent inaccuracy.  Indeed, "[g]enerally, a stipulation of fact that is fairly entered into is controlling on the parties and the court is bound to enforce it." *Fisher v. First Stamford Bank and Trust Co.*, 751 F.2d 519, 523 (2d Cir. 1984); *Stanley Works v. F.T.C.*, 469 F.2d 498, 506 (2d Cir. 1972) ("Having agreed on a set of facts, the parties [who adopted the stipulation], and this Court, must be bound by them.").  Such agreements "are not subject to judicial scrutiny to ensure that the admissions are fully supported by the underlying record." *Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009). "This rule of non-inquiry promotes efficiency and judicial economy by facilitating the concession of specific issues, thereby provid[ing] notice to all litigants of the issues remaining in dispute, identify[ing] those that can be eliminated from the case and those that cannot be[.]" *Id*.

Moreover, it is well-settled that "[s]tipulations freely and voluntarily entered into in criminal trials are as binding and enforceable as those entered into in civil actions." *United States v. Gwaltney*, 790 F.2d 1378, 1386 (9th Cir. 1986); *United States v. Kanu*, 695 F.3d 74, 78-79 (D.C. Cir. 2012) (collecting cases); *United States v. Boothman*, 654 F.2d 700, 703 (10th Cir. 1981).  For

this reason, by entering a stipulation, a criminal defendant waives his right to assert the Government's duty to present evidence to the jury on the stipulated issue. *See United States v. Celaj*, 649 F.3d 162, 170 n.5 (2d Cir. 2011); *United States v. Trzaska*, 111 F.3d 1019, 1029 (2d Cir. 1997); *see also United States v. Harrison*, 204 F.3d 236, 240 (D.C. Cir. 2000) (collecting cases). In accordance with these principles, numerous courts have declined requests for relief from stipulations based on the discovery of alleged factual inaccuracies in the stipulations. *See, e.g., Kaufman*, 2023 WL 4493499, at *2; *Pan*, 2015 WL 13016355, at *3-4; *United States v. Keck*, 773 F.2d 759, 769-70 (7th Cir. 1985) (rejecting defendant's request for reversal of conviction where defendant stipulated that firearm was an "AMT," as charged in the indictment, but Government expert testified that firearm was a "Kurz," rather than an AMT); *United States v. Boothman*, 654 F.2d 700, 703 (10th Cir. 1981) (affirming admission of stipulation despite defendant's subsequent claim that it was "factually inaccurate"); *United States v. Houston*, 547 F.2d at 107 ("declin[ing] to entertain a claim that the stipulation was erroneous" because "when parties have entered into stipulations as to material facts, those facts will be deemed to have been conclusively established"); *United States v. Chavez-Amaro*, 228 F. App'x 648, 649 (9th Cir. 2007) ("there is no obligation to revisit allegedly erroneous facts of a valid stipulation"). Thus, because the defendant never challenged venue until after trial, and stipulated that venue was proper, he has waived any challenge to venue.

Accordingly, for the reasons set forth above, the defendant has waived his right to challenge venue and his motion to dismiss the Indictment for improper venue should be denied.

### iii.    A New Trial is Not Warranted as a Result of the Stipulation

To the extent the defendant seeks a new trial under Rule 33 based on an inaccuracy in the stipulation, that motion also should be denied.  As set forth below, the defendant cannot meet the high burden of showing that a new trial is warranted.  As a threshold matter, the defendant's brief stop in Florida prior to arriving in this District is not newly discovered evidence.  Second, and for numerous reasons, the inadvertent inaccuracy in the stipulation does not amount to manifest injustice.  This is because, among other reasons, venue is not an element of the crimes of conviction and does not bear on guilt or innocence, and therefore there can be no "real concern that an innocent person may have been convicted," *Kaufman*, 2023 WL 4493499 at *2, as a result of the stipulation; venue plainly exists in this District and, but for the entry of the stipulation early in the trial, the Government easily could have proved venue through other evidence; and, beyond venue, as to the actual elements of the crimes of conviction, the trial evidence overwhelmingly established the defendant's guilt.  Accordingly, the interests of justice do not counsel in favor of granting the extraordinary remedy of a new trial under Rule 33; to the contrary, they weigh against doing so.

*First*, the Motion asserts that it has "come to [counsel's] attention," after trial, that the DEA airplane transporting the defendant briefly stopped in Florida on its way to this District.  (Mot. at 10).  But this is not "newly discovered evidence."  As described above, the Government produced in discovery DEA reports reflecting that the aircraft briefly stopped in Florida to refuel on the way to this District.  Moreover, the defendant himself knew this fact because he was there, and counsel acknowledges in the Motion that the defendant was indeed a "source"—along with an undated excerpt of a news article—of that information to counsel.  Beyond that, as set forth above, the defendant was present during trial and heard multiple times the contention that he was flown from

47

Tegucigalpa to Westchester County Airport, "where he was first brought into the United States." (*See* Ex. B). Nevertheless, the defendant waited until two weeks after trial to raise this issue that was within his personal knowledge, and the discovery materials, for years; this, despite seeking to reopen the record multiple times, in connection with purported "new" evidence following Taul's testimony, even after the Court had instructed the jury. (*See infra* at I.B.1). Indeed, in an analogous circumstance, Judge Kaplan rejected a Rule 33 motion based on purportedly newly discovered venue evidence where the defendant personally attended the meeting at issue, which occurred in the Eastern District of New York, and thus "had direct knowledge of the location of the [meeting] prior to trial." *Kaufman*, 2023 WL 4493499 at *2 (finding that "given [the defendant's] personal knowledge, it simply cannot be that the location of the closing could not have been discovered before trial with the exercise of due diligence"). Moreover, as described above, DEA reports reflecting the defendant's stop in Florida were produced to the defense in August 2022. (*See* Exs. D and E). Accordingly, any suggestion that this evidence was "newly discovered," or could not have been discovered with the exercise of due diligence prior to or during trial, is belied by the record.

*Second*, and as an independent reason to deny the Rule 33 motion, permitting the defendant's convictions to stand despite the inaccuracy in the stipulation does not amount to manifest injustice—far from it. For there to be a finding of manifest injustice, courts have recognized that "there must be a real concern that an innocent person may have been convicted." *Sanchez*, 969 F.2d at 1413; *Kaufman*, 2023 WL 4493499, at *2. There is no such concern here. As described above, venue is not an element of a criminal offense, *see supra* I.A.2, I.C.2(i), and a result, the "failure to establish venue does not go to guilt or innocence," *United States v. Hart-*

48

*Williams*, 967 F. Supp. 73, 76 (E.D.N.Y. 1997).  Accordingly, there is no manifest injustice here

based on a post-trial venue dispute that has no bearing whatsoever on whether or not the defendant

committed the crimes of which he was found guilty.  Further underscoring that point, the Second

Circuit has questioned whether issues of venue even need to be decided by a jury.  *See, e.g.*, *Davis*,

689 F.3d at 185 n.2 ("[B]ecause venue is not an element of a crime, a question might be raised as

to whether venue disputes must, in fact, be submitted to a jury."); *Rommy*, 506 F.3d at 119 n.5

(same); *United States v. Liu*, 515 Fed. App'x 49, 52, (2d Cir. 2013) (same);  *see also United States*

*v. Parrilla*, 13 Cr. 360 (AJN), 2014 WL 7496319, at *10 n.2 (S.D.N.Y. Dec. 23, 2014) (noting that

"[t]he Second Circuit has recently questioned whether the jury should be instructed on venue at

all").  And at least one district court in this Circuit has ruled that, "because venue is neither an

element of the crime charged, 'no[r] an integral part of a criminal offense,' it is simply absurd to

suggest that the issue must be submitted to the jury."  *Hart-Williams*, 967 F. Supp. 73 at 76-77

(declining to follow *United States v. Gillette,* 189 F.2d 449 (2d Cir. 1951)) in holding that venue

"is not a matter for the jury" and that "[t]aking the venue issue from the jury does not in any way

undermine the Framers' 'insistence upon community participation in the determination of guilt or

innocence.'").[5]

---

[5] Moreover, unlike elements of a crime or facts that serve to increase a defendant's sentence, which must be proven beyond a reasonable doubt and found by a jury, *see, e.g.*, *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) ("[A]ny fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."), venue need only be established by a preponderance of the evidence.  And courts may take judicial notice of facts relating to whether venue is proper. *See, e.g.*, *United States v. Wilkerson*, 444 Fed. App'x 708, 709 (4th Cir. 2011) ("[W]hether an offense occurred within particular geographical boundaries is an appropriate subject for judicial notice."); *United States v. Pierre*, 525 Fed. App'x

Even if a venue challenge could be the basis for the defendant's claim of manifest injustice in this case—which it cannot—from a substantive perspective, and as described above, proof of the defendant's guilt was overwhelming and included the testimony of numerous cooperating witnesses, recorded phone calls, drug ledgers, and electronic evidence. (*See supra* The Trial Evidence). Additionally, as described above, if the stipulation had not been entered, the Government would have otherwise established venue based on joint offenders having been first brought to this District, or that the defense would have stipulated to that fact given that venue was never at issue or contested in this case. Indeed, in *United States v. Pan*, which also concerned a factual inaccuracy in a stipulation, Judge Sullivan denied a Rule 33 motion where there was no showing that the inaccuracy would have led to an acquittal or that the defense "was somehow induced to stipulate to an element of a crime that could not otherwise have been proven." *Pan*, 2015 WL 13016355, at *4. Judge Sullivan wrote:

> Although Defendants make clear that there is "no evidence that the government intentionally misrepresented the facts," Defendants nevertheless assert that they were somehow "induced" into entering the Interstate Wire Stipulation and that they were prevented from verifying the information contained in the government's proposed stipulation before trial. This argument is unpersuasive. First, there was no need for Defendants to enter into a stipulation at all, since the government bore the burden of proof at trial, and the Court is reluctant to endorse a rule in which defense counsel's own failure to fact-check could itself justify a new trial. Moreover, this is not a case in which a defendant was somehow induced to stipulate to an element of a crime that could not otherwise have been proven. Once again, Defendants do not contend that the wire transfers were actually intrastate; Defendants merely take issue with the details of the interstate *route* set forth in the Interstate Wire Stipulation. Thus, there is simply no reason to conclude that the admission of the newly-discovered evidence was "so material" that it "would probably lead to an acquittal." Defendants in essence argue for strict liability—

---

237, 238 (4th Cir. 2013) ("A district court may take judicial notice that venue is proper in a particular district.") (citing *United States v. Kelly*, 535 F.3d 1229, 1235-36 (10th Cir. 2008)).

> that *any* error in a stipulation is enough to eviscerate the stipulation and the verdict. That, however, is not the standard. Rule 33's requirements are clear and have not been met here. Simply put, "the interests of justice" do not require a new trial.

*Id.* (internal citations omitted). The same is true here. The Government did not intentionally misrepresent any facts, and instead, the parties entered into the stipulation on the good faith belief that it was accurate. Additionally, and even beyond that, in *Pan* the inaccuracy in the stipulation at issue related to an actual element of the offense (the jurisdictional element of wire fraud), and the Court still found no manifest injustice. Here, of course, venue is *not* an element of any offense, and therefore the inaccuracy in the stipulation does not implicate "interests of justice" that would require a new trial.

Moreover, as described above, there is no question that venue is proper in this District under 18 U.S.C. § 3238's joint offender theory. That is how the Government established venue during the trials of co-conspirators Tony Hernandez and Fuentes Ramirez, and how it would have established venue here but for the stipulation at issue. The stipulation was entered on February 23, 2024, during Ardon's testimony, and near the beginning of trial. But for the entry of the stipulation, the Government could—and would—have elicited facts establishing a joint offender theory through other evidence, including by (i) asking cooperating witnesses Ardon, Rivera, and Fabio Lobo where they were first brought, (ii) testimony from a law enforcement or summary witness about joint offenders having been first brought to this District, or (iii) a stipulation with the defense. But for the stipulation early in the trial the Government easily could have, and, as in *Tony Hernandez* and *Fuentes Ramirez*, would have established venue, by stipulation or otherwise. Put simply, in a case where venue is otherwise proper and was never contested, the defense stipulated to facts establishing venue, and proof of actual guilt was overwhelming, to grant a new

51

trial simply because an airplane destined for this District stopped to refuel for 30 minutes (during which time the defendant was permitted to use the restroom) would be an extraordinary result that would not be in the interests of justice.[6]

Nor is there any no reason to believe that, but for the stipulation, the jury would have acquitted the defendant. To the contrary, as described above, had the stipulation not been admitted, the Government would have simply sought to establish venue by offering proof, described above, that other co-conspirators were first brought to this District. Rule 33 motions based on "newly discovered evidence" will only be granted "sparingly and in the most extraordinary circumstances," where a defendant can establish that the evidence was discovered after trial, could not have been discovered with the exercise of due diligence prior to or during trial, and is "so material and noncumulative" that it would lead to an acquittal. *Kaufman*, 2023 WL 4493499 at *1-2. The defendant cannot satisfy any of these requirements and, for this reason alone, his motion fails.

Finally, even if venue were not proper in this District, there is no "manifest injustice" in the defendant being tried in this District, as opposed to in the Southern District of Florida, where

---

[6] Moreover, while it was the Government's intention that the "first brought" language in the stipulation referred to the district where the defendant first arrived in the United States, it notes that there does not appear to be controlling Second Circuit precedent for the proposition that a brief stop to refuel on the way to the District in which an extradited defendant was charged is considered "entry" into the United States for purposes of "first brought" venue under 18 U.S.C. § 3238. The Government further notes, however, that there does exist caselaw in other circuits to the contrary, *see, e.g.*, *Chandler v. United States*, 171 F.2d 921, 933 (1st Cir. 1948); *United States v. Han*, 199 F. Supp. 3d 38, 49–50 (D.D.C. 2016) (holding that defendant was first brought to Hawai'i after plane transporting him, in custody, from American Samoa had layover in Honolulu); *United States v. Ghanem*, 993 F.3d 1113, 1122 (9th Cir. 2021) ("The length of time a defendant spends in the district to which he is first brought does not matter, nor does the purpose.").

the plane transporting him from Honduras to White Plains stopped briefly, and thus Rule 33 does not provide the defendant with any relief in this case. "The venue requirement serves to shield a federal defendant from 'the unfairness and hardship' of prosecution 'in a remote place,'" *Rommy*, 506 F.3d at 119, and is memorialized both in safeguards in the Constitution, *see* U.S. CONST. art. III, § 2, cl. 3, and Federal Rule of Criminal Procedure 18. The concerns underpinning the venue requirement—generally, to ensure that a defendant isn't inconveniently and unfairly tried in a jurisdiction to which the defendant has no connection—are not implicated, for purposes of evaluating whether letting a verdict stand would be a manifest injustice, by a prosecution under 18 U.S.C. § 3238. As set forth above, that provision specifically authorizes prosecutions in the United States where the offense was begun or committed outside the United States; put differently, it necessarily involves trying a defendant "in a remote place." *Rommy*, 506 F.3d at 119. Here, the defendant has no particular connection to the Southern District of Florida, where the aircraft transporting him briefly landed on the way to White Plains, that weighs in favor of having conducted the trial there instead of in this District. Rather, to the extent there is any equity among districts here, two criminal trials—*Tony Hernandez* and *Fuentes Ramirez*—and numerous other prosecutions of the defendant's co-conspirators have occurred in this District. Under these circumstances, and in a prosecution under 18 U.S.C. § 3238, there is no manifest injustice in the defendant having been tried in this District, as opposed to in the Southern District of Florida.

For all of these reasons, there is no manifest injustice in this case. There is no question that venue is proper in this District or that the defense freely entered into a stipulation that established facts that, while inadvertently inaccurate, established venue. Similarly, the defendant cannot credibly claim that the present motion is based on "newly discovered evidence," not least of which

because he himself was on the flight and knew about the brief stop in Florida.  Moreover, because it is well-settled that venue does not bear on guilt or innocence, and in light of the overwhelming evidence of the defendant's guilt presented a trial, there can be no "real concern that an innocent person may have been convicted." *See Sanchez*, 969 F.2d at 1413.  Finally, and although the Court need not reach this question, it is an open question in this Circuit whether venue even needs to be decided by a jury; that state of the law only underscores that there can be no manifest injustice based on the defendant's belated objection to venue.  Accordingly, there is no manifest injustice warranting a new trial based on the factual inaccuracy in the venue stipulation.

**CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should deny the defendant's motion.

Dated:  New York, New York
April 12, 2024

Respectfully Submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: _____/s/_____
Jacob H. Gutwillig / David J. Robles
Elinor L. Tarlow / Kyle A. Wirshba
Assistant United States Attorneys
(212) 637-2215 / 2550 / 1036 / 2493

cc:   Defense Counsel
By ECF

54