UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    - v. -

JUAN ORLANDO HERNANDEZ,

              Defendant.

S7 15 Cr. 379 (PKC)

**THE GOVERNMENT'S SENTENCING SUBMISSION**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Jacob H. Gutwillig
David J. Robles
Elinor L. Tarlow
Kyle A. Wirshba
Assistant United States Attorneys
    *Of Counsel*

## <u>TABLE OF CONTENTS</u>

THE DEFENDANT'S CRIMINAL CONDUCT ........................................................... 3

I.   Background ....................................................................................................... 3

   A.  Cocaine Trafficking to the United States........................................................ 3

II.  2009 to 2011: The Defendant Partners with Drug Traffickers ................................. 5

   A.  The Defendant Partners with Alex Ardon ........................................................ 5

   B.  The Defendant Partners with Fabio Lobo ........................................................ 7

   C.  The Defendant Partners with Geovanny Fuentes Ramirez and the Valles ........ 8

III. 2012 to 2013:  The Defendant Campaigns for President of Honduras with the Support of His Drug Trafficker Partners ...................................................................................... 10

   A.  The Defendant Partners with *Los Cachiros* .................................................... 10

   B.  The Defendant Continues to Accept Bribes from Major Drug Traffickers ..................... 11

IV.  2014 to 2022: The Defendant Continues to Accept Bribes and Protects Drug Traffickers as President........................................................................................................... 12

V.   The Use and Possession of Machineguns and Destructive Devices ....................................... 20

VI.  The Defendant's False Trial Testimony .............................................................. 21

THE DEFENDANT'S OBJECTIONS TO THE PSR ARE MERITLESS ................................. 22

THE SENTENCING GUIDELINES RECOMMEND LIFE IMPRISONMENT ......................... 24

I.   Count One ...................................................................................................... 25

   A.  Drug Quantity: § 2D1.1(a)(5) .................................................................... 25

   B.  Violence: § 2D1.1(b)(2) ............................................................................ 27

   C.  Use of Private Aircraft: § 2D1.1(b)(3)......................................................... 27

   D.  Leadership: § 3B1.1(a)............................................................................... 29

   E.  Abuse of Trust: § 3B1.3 ............................................................................ 30

F.   Obstruction of Justice: § 3C1.1 ............................................................... 31

II.   Counts Two and Three: Use of Weapons ........................................................ 33

III.  Grouping Analysis .......................................................................................... 34

DISCUSSION ............................................................................................................. 34

I.    The Court Should Impose a Life Sentence ..................................................... 34

A.   The Nature and Circumstances of the Offense ..................................... 34

B.   The History and Characteristics of the Defendant ............................... 44

C.   The Need to Afford Adequate Deterrence ............................................ 46

D.   A Life Sentence Would Not Result in Unwarranted Sentencing Disparities ................. 48

II.   The Defendant's Sentencing Arguments Are Meritless ................................. 52

III.  The Court Should Order the Defendant to Forfeit $15,525,000 ................... 54

A.   Applicable Law ...................................................................................... 54

B.   Discussion ............................................................................................. 55

IV.   The Court Should Order the Defendant to Pay a $10 Million Fine .............. 56

A.   Applicable Law ...................................................................................... 56

B.   Discussion ............................................................................................. 57

CONCLUSION ........................................................................................................... 59

The Government respectfully submits this memorandum in response to the defendant's sentencing submission (Dkt. 799 ("Def. Mem.")), and in connection with the sentencing in this matter, scheduled for June 26, 2024 at 11:00 a.m.  Following a three-week trial, the defendant was convicted of (i) participating in a conspiracy to import cocaine into the United States, in violation of 21 U.S.C. § 963; (ii) using machineguns and destructive devices in furtherance of his drug-trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(B)(ii); and (iii) participating in a conspiracy to carry and use machineguns and destructive devices in furtherance of his drug-trafficking offense, in violation of 18 U.S.C. § 924(o).  The proof underlying this conviction laid bare that the defendant and his co-conspirators played a vital role in flooding the United States with cocaine.  The defendant was an essential participant at the heart of this conspiracy, and a sentence of life imprisonment is appropriate in this case.

For more than a decade, the defendant abused his political power to operate Honduras—a country of roughly ten million people—as a narco-state.  The defendant's rise was fueled by millions of dollars in drug money from some of the largest and most violent cocaine traffickers in the world.  Once he gained control of Honduras, he protected those drugs and his partners with the full power of the state, channeling his country's law enforcement, military, and financial resources to protect his co-conspirators and help them grow their international drug distribution network.  In the process, the defendant facilitated the importation of at least 400 *tons* of cocaine into the United States, causing untold damage in this country and leaving unimaginable suffering in its wake.  The defendant engaged in this egregious conduct while publicly posing as an ally of the United States in its efforts to combat the importation of narcotics that destroy countless lives in this country.  But behind closed doors, the defendant protected the very traffickers he vowed to pursue.

1

As a direct result of the defendant's crimes, Honduras became one of the world's largest transshipment points for United States-bound cocaine and one of the most violent places in the world. Those conditions contributed to corruption across Honduras, caused poverty and fear, and fueled a mass exodus of individuals fleeing Honduras, many bound for the United States. For more than a decade, the defendant presided over this vicious cycle of corruption and drug trafficking that destabilized Honduras and damaged countless American and Honduran lives. He did this by protecting his drug trafficking co-conspirators from prosecution and extradition, giving safe harbor to violent, massive cocaine traffickers as they used Honduras as a springboard for pumping cocaine into the United States, protected by machineguns and destructive devices, while also destroying their own community.

Commensurate with the defendant's egregious crimes, the United States Probation Office (the "Probation Office") has recommended a within-Guidelines sentence of life imprisonment, emphasizing that, "the United States and its citizens were victims of all the damage wrought by the massive quantities of cocaine that [the defendant] helped bring to this country . . . and equally as tragic were [the effects on] the citizens of Honduras who were betrayed by a corrupt government that made their country unsafe[.]"  (Final Presentence Investigation Report, dated June 13, 2024, Dkt. 796 ("PSR") at 46).  As set forth below, this recommendation is appropriate based on the § 3553(a) factors and is consistent with the life sentences imposed by the Court for two of the defendant's primary co-conspirators: Juan Antonio Hernandez Alvarado, a/k/a "Tony Hernandez," the defendant's brother and a former Honduran congressman who worked hand-in-hand with the defendant and relied on him for protection while he transported approximately 185 tons of cocaine to the United States, and Geovanny Fuentes Ramirez, a violent Honduran cocaine trafficker who

bribed the defendant with briefcases full of cash in exchange for similar protection, including through the defendant's use of the Honduran military. Accordingly, and as further detailed below, the Government respectfully submits that the Court should impose a sentence of life imprisonment, order the defendant to forfeit $15,525,000, and pay a $10 million fine.

## THE DEFENDANT'S CRIMINAL CONDUCT

The defendant's sweeping criminal conduct was exposed at trial and is set forth, in detail, in the PSR, to which the defendant has offered various objections while maintaining his innocence despite overwhelming proof of his guilt. A summary of the offense conduct is below.

I.   **Background**

A.   **Cocaine Trafficking to the United States**

Colombia is the largest producer of cocaine in the world, and approximately 90 to 95 percent of the cocaine consumed in the United States is produced in Colombia. (Tr. 568; PSR ¶38). Cocaine is produced in remote areas of Colombia, oftentimes hidden by the cover of jungle or trees, in clandestine laboratories. (Tr. 569-71; *see also* GX 504). Cocaine is produced with coca leaf that is then mixed with gasoline, as well as other chemicals, to create cocaine base. (*Id.*). Once the cocaine base is created, it is pressed into a final, brick-shaped product, often weighing a kilogram per brick. (*See* Tr. 570-71). In turn, one kilogram of cocaine weighs approximately 2.2 pounds, each kilogram contains approximately 15,000 to 35,000 individual doses, and there are 1,000 kilograms in a ton of cocaine. (Tr. 571-72). Sometimes bricks of cocaine are stamped with a logo or imprint, to indicate brand recognition or accountability, *i.e.*, where the cocaine originated or who distributed the cocaine. (*See id.*).

Once manufactured, cocaine typically is routed from Colombia to the United States by what is known as the "Central American route." (Tr. 574-75; PSR ¶ 38). From Colombia, the cocaine usually is first transported to Venezuela, then into Honduras, Guatemala, Mexico, and, ultimately, the United States. (Tr. 574-77; PSR ¶¶ 38, 40). Cocaine is transported into Honduras by air, land, and sea. (Tr. 577-85; *see also* GX 504; PSR ¶ 38). Within Honduras, cocaine is moved across land to the border with Guatemala, where it crosses toward Mexico. (Tr. 585-87; *see also* GX 504). Approximately 90 percent of the cocaine imported into Honduras ultimately is transported to the United States. (Tr. 588). Cocaine gets more expensive as it is transported north to the United States. (Tr. 589-91; *see also* GX 504). In approximately 2013, a kilogram of cocaine in Colombia cost approximately $2,300; a kilogram of cocaine in Honduras cost approximately $11,500; a kilogram of cocaine in Mexico cost approximately $16,000; and a kilogram of cocaine in the United States cost approximately $37,000. (Tr. 590-91). In approximately 2016, a kilogram of cocaine in Colombia cost approximately $1,725; a kilogram of cocaine in Honduras cost approximately $13,500; a kilogram of cocaine in Mexico cost approximately $17,000; and a kilogram of cocaine in New York, New York cost approximately $40,000. (*Id.*). From approximately 2004 to 2022, the largest cocaine trafficking organization in the world was the Sinaloa Cartel, headed by Joaquín Guzmán Loera, a/k/a "Chapo Guzmán," a/k/a "El Chapo" ("Chapo"), who partnered with the defendant and his co-conspirators to receive and transport massive quantities of cocaine. (Tr. 587-88; PSR ¶ 41). Indeed, as detailed throughout trial, much of the cocaine distributed by the Sinaloa Cartel to the United States passed through Honduras, under the protection and control of the defendant and his co-conspirators. (*See, e.g.*, PSR ¶¶ 40, 57). For example, during trial, one of the defendant's principal co-conspirators, Amilcar Alex

Ardon Soriano ("Ardon"), the National Party Mayor of El Paraiso and a major drug trafficker, identified a photograph of a kilogram of cocaine stamped "TH" as similar in appearance to kilograms of cocaine he saw that Tony Hernandez sold to the Sinaloa Cartel.  (Tr. 245-46, GX 305; PSR ¶ 72).

## II.     2009 to 2011:  The Defendant Partners with Drug Traffickers

### A.     The Defendant Partners with Alex Ardon

The defendant's political career in Honduras spanned more than two decades.  In 1998, he was elected as a congressman.  (Tr. 1466; PSR ¶ 43, 44).  By 2009, the defendant began campaigning to become President of the Honduran National Congress ("HNC") and Porfirio Lobo Sosa ("Pepe Lobo"), the defendant's close political ally and fellow National Party member, began his own campaign to become President of Honduras.  (*See* Tr. 208-10, 1105-06, 1113, 1468-1473; PSR ¶ 44).  It was also in 2009 when the defendant met Ardon, who had already established himself as a major drug trafficker, for the first time in person.  (Tr. 179, 210-11; PSR ¶ 44).  Over the course of multiple subsequent in-person meetings, the defendant and Pepe Lobo obtained approximately $2 million in drug trafficking proceedings for their respective campaigns from Ardon, then the mayor of El Paraiso, a municipality in Honduras that was a key location in the cocaine trade due to its proximity to the Guatemalan border.  (Tr. 179-80, 211-13; PSR ¶ 44).

Before meeting the defendant, in approximately 2008, Ardon met privately with Pepe Lobo.  (Tr. 207-08).  During that meeting, Ardon requested from Pepe Lobo protection from arrest and extradition; a position in the Honduran government for his brother, Hugo Ardon; and government assistance in paving roads in El Paraiso.  (Tr. 208; PSR ¶ 45).  In exchange, Pepe Lobo requested $2 million from Ardon.  (Tr. 209; PSR ¶ 45).  During that meeting, Pepe Lobo

also told Ardon that, were Pepe Lobo to be elected President, the defendant would become the President of the HNC. (Tr. 208; PSR ¶ 45). Shortly after that meeting, Ardon sent approximately $1 million to Pepe Lobo. (Tr. 209-210; PSR ¶ 45).

Thereafter, in approximately 2009, Ardon met with the defendant and Pepe Lobo about similar topics. (Tr. 210-13; PSR ¶ 45). During that meeting, the defendant confirmed that he would grant Ardon's requests made to Pepe Lobo, and told Ardon "not to worry about the prosecutor's office, about them investigating me; that I would be given protection." (Tr. 212; PSR ¶ 46). After reaching this agreement with the defendant and Pepe Lobo, Ardon provided them with a second payment of $1 million. (Tr. 213; PSR ¶ 46). Subsequently, with the defendant's protection, Ardon became a more powerful drug trafficker, ultimately responsible for importing approximately 250 tons of cocaine to the United States. (Tr. 184; PSR ¶ 46). Among others, Ardon trafficked drugs with Tony Hernandez, as well as with the prolific cartel led by brothers Miguel Arnulfo Valle and Luis Valle, the leaders of the Valles drug trafficking organization ("*Los Valles*"). (*See, e.g.*, Tr. 215-20; PSR ¶ 46).

In 2009, there was a military coup in Honduras, and then-President Jose Manuel Zelaya Rosales was removed from power. (Tr. 213; PSR ¶ 47). Following the coup, Tony Hernandez informed Ardon that the coup would make it easier for the defendant to become President of the HNC, after which "he would have access to government information . . . such as radar information, which is what the government uses to identify aircrafts." (Tr. 220-21; PSR ¶ 47). As Tony Hernandez promised, their drug trafficking partnership flourished after the defendant became President of the HNC, and Ardon detailed his subsequent prolific drug trafficking with Tony Hernandez. (*See, e.g.*, Tr. 222-24; PSR ¶ 47). Ardon also testified that he saw Tony Hernandez

armed with firearms throughout their cocaine trafficking partnership, and identified particular firearms he saw Tony Hernandez carrying, including an AR-15 and 9-millimeter semiautomatic handgun.  (Tr. 222-24, GX 201R-62; PSR ¶47).

### B.    The Defendant Partners with Fabio Lobo

It was also in approximately 2009 that the defendant first spoke with cooperating witness Fabio Lobo, the son of Pepe Lobo, about drug trafficking.  (Tr. 1108-09; PSR ¶49).  Fabio Lobo met the defendant through his father, became friends with the defendant, and, over time, asked the defendant for both personal and political favors.  (Tr. 1106-07; PSR ¶ 49).  Eventually, their relationship developed into another cog in this massive cocaine trafficking partnership.  In 2009, the defendant invited Fabio Lobo to a restaurant in Tegucigalpa, where the two had dinner along with Tony Hernandez and a Colombian drug trafficker, identified by the defendant as "Cinco." (Tr. 1108-11; PSR ¶ 49).  During the dinner, the defendant, Tony Hernandez, and Cinco discussed who would assume responsibility for a seized plane that had "merchandise" and asked Fabio Lobo, who was then a judge, for help recovering the plane.  (Tr. 1110-11; PSR ¶ 49).  The defendant also told Fabio Lobo that one of the defendant's friends would be reaching out to Fabio Lobo about the plane.  (Tr. 1111).  Two days after this dinner, Fabio Lobo received a call from an individual who identified himself as "El Sentado."  (Tr. 1111; PSR ¶ 49).[1]  Fabio Lobo then agreed to meet with El Sentado ("Sentado"), and during their subsequent meeting, Sentado told Fabio Lobo that a plane had crashed in Roatan, Honduras, loaded with approximately 1,200 kilograms of cocaine that

---

[1] Sentado refers to Amilcar Leva-Cabrera, a large-scale Colombian cocaine trafficker who was murdered in approximately 2015.  Leonel Rivera also testified at trial that he knew "Sentado" and that the Valles had told him that Sentado was a drug trafficker.  (Tr. 766-67).

"belonged to a partnership between the Hernandez brothers, *Los Valles*, and another person who was Colombian." (Tr. 1111-13; PSR ¶ 49).  Sentado asked Fabio Lobo to "help him to recover" the plane.  (Tr. 1112; PSR ¶ 49).  Fabio Lobo ultimately was unable to help due to his concerns over the scrutiny it would bring to his father's presidential campaign, and, days later, discussed the matter with the defendant.  (Tr. 1113-15; PSR ¶ 49).  During their subsequent conversation in Fabio Lobo's home, Fabio Lobo reported back to the defendant, "that the plane that had been seized was carrying cocaine," and the defendant asked Fabio Lobo to "be discrete."  (Tr. 1114-15; PSR ¶ 49).  They never discussed the plane seizure again.  (Tr. 1115; PSR ¶ 49).

### C.    The Defendant Partners with Geovanny Fuentes Ramirez and the Valles

In November 2009, Pepe Lobo was elected as President of Honduras and the defendant was re-elected as a Congressman, and, as noted above, shortly thereafter became the President of the HNC, a position he held until he was inaugurated as president of Honduras in January 2014. (*See, e.g.*, Tr. 1468; PSR ¶ 48).   With his increased political power, the defendant continued to help his drug trafficking partners, including Ardon and Tony Hernandez, and also began to protect and support Geovanny Fuentes Ramirez, a violent Honduran drug trafficker.  For example, testimony at trial established that, in approximately 2011, Honduran law enforcement raided Fuentes Ramirez's cocaine laboratory.  (Tr. 78; PSR ¶ 52).  Approximately 30 to 40 days after the raid, Fuentes Ramirez met with Julio Cesar Barahona, then the President of the Judiciary in Honduras, a position appointed by the HNC.  (Tr. 79-85; PSR ¶ 52).  Upon his arrival, Barahona stated that he had been sent by the "boss" so that he could "help" Fuentes Ramirez, meaning "[t]o expunge [Fuentes Ramirez's] record regarding the drug lab case."  (Tr. 83-84; PSR ¶ 52).

Following that meeting, Fuentes Ramirez continued to operate with impunity and, as described further below, in partnership with the defendant with protection from the Honduran military.

Prior to entering into a partnership with Fuentes Ramirez, the defendant also had formed relationships with other significant drug traffickers, as he sought to rise from President of the HNC to President of Honduras. Rivera testified that, in approximately 2010, Miguel Valle—at the time one of the most significant cocaine traffickers operating in Honduras—showed Rivera the photograph below on his phone, explained that he had attended the 2010 World Cup with the defendant, and told Rivera that during their time together at the World Cup, the defendant requested that Miguel Valle support his campaign for President of the HNC. (GX 309; *see also* Tr. 760-64; PSR ¶ 51).



The evidence at trial also established that the Valles did just that, trafficking significant quantities of cocaine and providing financial support to the defendant through cocaine trafficking proceeds. (*See, e.g.*, Tr. 631-33 (Perez testimony about providing bribes, with the Valles, to the defendant);

Tr. 825 (Rivera testimony that the Valles had told him that the defendant was protecting them, they had made "a lot of money thanks to that protection" and they had "bribed him several times."); Tr. 1020 (Santos testimony about the Valles supplying MS-13 with cocaine); *see also* Tr. 217-19 (Ardon identifying photograph of the defendant with Miguel Valle)).

### III.   2012 to 2013:  The Defendant Campaigns for President of Honduras with the Support of His Drug Trafficker Partners

In advance of the 2013 presidential election, the defendant privately solicited and accepted millions of dollars from drug traffickers for his campaign.  Multiple witnesses testified at trial about these bribes, including Ardon and Fabio Lobo, who personally paid bribes to the defendant, and Jose Sanchez, who witnessed Fuentes Ramirez do so.  Additionally, both Rivera and Luis Perez, a former member of the Sinaloa Cartel, testified about drug-fueled bribes paid to the defendant during this time period, which fueled his rise to become President.

#### A.   The Defendant Partners with *Los Cachiros*

In approximately 2012, the defendant attended a birthday party for Pepe Lobo's brother, Ramon "Moncho" Lobo, along with numerous Honduran drug traffickers.  As described by Rivera, the attendees included Javier Rivera Maradiaga, who, along with Rivera, led *Los Cachiros*, Neftali Duarte Mejia, Ramon Mata, Wilter Blanco, Ton Montes, and Chinda Montes, all major Honduran traffickers.  (Tr. 789-794; PSR ¶ 54).  Javier Rivera reported to his brother that he spoke to the defendant at this birthday party and the defendant told him that if *Los Cachiros* supported the defendant's campaign, "we could count on him" for protection from arrest and extradition.  (Tr. 790-91; PSR ¶ 54).  Similarly, Chinda Montes (a leader of the Montes-Bobadilla drug trafficking organization) told Rivera that she had given the defendant $300,000 because the defendant was "going to be the next president of the republic."  (Tr. 794; PSR ¶ 55).  And another major trafficker

identified by Rivera, Neftali Duarte, paid the defendant $100,000 and provided the defendant with access to his helicopter for the campaign after this party. (Tr. 812; PSR ¶ 55). Finally, not long after the birthday party, Javier Rivera, on behalf of *Los Cachiros*, provided $250,000 to Hilda Hernandez, the defendant's sister, for the defendant's campaign. (Tr. 797-800; PSR ¶ 55).

### B.        The Defendant Continues to Accept Bribes from Major Drug Traffickers

The defendant also accepted numerous other bribes from drug traffickers throughout the course of 2013, among them: $1 million from Chapo, paid directly to Tony Hernandez (Tr. 262-65, 638); a total of approximately $2.4 million from the Sinaloa Cartel (Tr. 626; *see also* Tr. 1116); and $200,000 paid by Fabio Lobo and Javier Rivera to Hilda Hernandez (Tr. 1119-11120). (*See also* PSR ¶ 57). The defendant also received millions of dollars from *Los Valles*, paid to Tony Hernandez by an individual who identified himself as "Wilson," an alias for a Honduran drug trafficker named Nery Lopez Sanabria, or Magdaleno Meza. (Tr. 1124-27; *see also* Tr. 441, 470; GX 319; PSR ¶ 58).[2] After receiving the duffel bag from "Wilson," Tony Hernandez told Fabio Lobo that it contained $4 million. (Tr. 1125; PSR ¶ 58).[3]

Also in 2013, the defendant received two bribes, totaling approximately $25,000, during meetings with Fuentes Ramirez. During the first of these meetings, the defendant told Fuentes Ramirez that he "was interested in having him and his drug lab work for him" because of its proximity to Puerto Cortes, Honduras' largest port; said that Fuentes Ramirez, "need not worry

---

[2] As proved at trial and described in more detail below, the drug ledgers with the initials of the defendant and Tony Hernandez in them, seized in June 2018 by Honduran law enforcement, belonged to Sanabria.

[3] This bribe was further corroborated by an intercepted call, dated June 19, 2015, in which Porky said, "it appears that . . . El Valle gave him 5." (GX 403-T, Line 31).

about the transportation and protection of the drugs because the military and police would take care of it"; gloated that, "by the time the gringos find out, we will have eliminated extradition"; gave Tony Hernandez's cellphone number to Fuentes Ramirez so that he, "could put himself at Mr. Tony Hernandez's disposal"; and declared that they would "shove the drugs up the gringos' noses and they won't even realize it." (Tr. 96-98; PSR ¶ 58). Following those meetings, Fuentes Ramirez in fact received the promised support from the Honduran military for his cocaine trafficking. (Tr. 107; *see also* GX 902; Tr. 1058; PSR ¶ 58).[4]

In November 2013, bought and paid for by millions of dollars from his drug trafficking partners, the defendant was elected President of Honduras. (PSR ¶ 60).

## IV.   2014 to 2022: The Defendant Continues to Accept Bribes and Protects Drug Traffickers as President

As President, the defendant continued to support his drug trafficking partners. He also kept them in line in an effort to ensure he would not be exposed. By 2013, Ardon, both the National Party Mayor of El Paraiso and a major drug trafficker, was attracting too much attention for the defendant's liking, so the defendant "told [him] not to go for re-election as mayor because the media were talking a lot about how [he] was a drug trafficker and how [he] financed part of [the defendant's] campaign." (Tr. 253; PSR ¶ 62). Ardon acquiesced and, in return, continued to receive the defendant's protection. (Tr. 253-54; PSR ¶ 62). Conversely, Arnaldo Urbina Soto, also a drug-trafficking and political partner of the defendant's—as the National Party Mayor of

---

[4] Jose Sanchez testified, on cross-examination, that he provided video recordings of the defendant to two people: Marlene Banegas, a prosecutor, and to a man named Christian Ayala. (Tr. 147). Banegas told Sanchez that she delivered the recording to the then-Attorney General of Honduras; approximately one month later, she was killed. (Tr. 147, 173-74). Similarly, Ayala was murdered approximately two weeks after Sanchez provided him with a recording. (Tr. 174).

Yoro—failed to heed that warning.  Indeed, despite being cautioned by the defendant that as long as he was "discrete" in his drug trafficking there would be no problems (GX 409-T, Tr. 831-35) and "ordered" by the defendant to no longer participate in politics, Urbina again ran for Mayor in the 2013 elections and, subsequently, was arrested by Honduran authorities (Tr. 840-42).[5]  (*See also* PSR ¶ 52).

Moreover, in 2014, at a time when the Honduran Government was beginning to seize certain properties belonging to *Los Cachiros* after their public designation by the U.S. Treasury's Office of Foreign Assets Control ("OFAC"), Fabio Lobo spoke with the defendant about supporting *Los Cachiros* because the Honduran Government had "already taken enough."  (Tr. 1192-94; GX 410, 410-T; PSR ¶ 63).

The defendant did more than exact political retribution on his drug trafficking partners who became too visible.  For example, on a call intercepted in June 2015, Yulan Adonay Archaga Carias, a/k/a "Porky," ("Porky"), the leader of Mara Salvatrucha ("MS-13") in Honduras, told David Campbell, one of Porky's drug trafficking partners, that the defendant had "assigned an elite police team to kill" a drug trafficker named Byron Ruiz, who had worked with Tony Hernandez, "because it's inconvenient if the Americans catch him and take him away," *i.e.*, out of concern that he would cooperate if extradited.  (GX 404-T, Lines 9-13; *see also* Tr. 768; PSR ¶ 64).[6]  The

---

[5] Urbina Soto remained in jail in Honduras until his extradition to the United States  in February 2023, approximately one year after the defendant's April 2022 extradition.  *See United States v. Urbina Soto*, 18 Cr. 497 (DLC), Dkts. 20-23.  On May 16, 2024, Urbina Soto pled guilty to one count of conspiracy to import cocaine, in violation of Title 21, United States Code, Sections 952(a), 960(a)(1), 960(a)(3), 960(b)(2)(B)(ii), and 963.  *See id*. at Dkt. 34.

[6] On March 30, 2017, Ruiz was charged in the Eastern District of New York with cocaine importation and firearms charges.  *See United States v. Ruiz*, 17 Cr. 172 (ILG), Dkt. 1 (Mar. 30,

opposite was true for the defendant's drug trafficking allies.  For example, on an intercepted call from September 2015, Porky described how "the president," *i.e.*, the defendant, had "gifted" a drug route to *Los Cachiros*.  (GX 405-T, Line 23; PSR ¶ 64).

The defendant and his co-conspirators took other steps in an effort to derail potential witnesses against them.  For example, in 2016, the defendant's cousin and eventual co-defendant in this case, Mauricio Hernandez Pineda, a former HNP officer, approached cooperating witness Giovanni Rodriguez, another corrupt HNP officer who was planning to surrender to U.S. authorities in connection with his own public charges.  (Tr. 1218; PSR ¶ 65).  Pineda cautioned Rodriguez not to mention the defendant, Tony Hernandez, or Pineda because "that could be very dangerous" for Rodriguez.  (*Id.*; PSR ¶ 65).  Pineda also told Rodriguez that the defendant "had passed the extradition law due to pressure from the United States, but [the defendant's] thinking at the time was to get rid of extradition in Honduras."  (Tr. 1219; PSR ¶ 65).

The defendant's partnerships continued through his second election—which, like his first, was fueled with drug money and bribes to election officials and politicians[7]—and second term as President.  (PSR ¶ 66).  For example, in 2018, during the defendant's second term as President, Honduran law enforcement recovered drug ledgers, which the trial evidence showed belonged to Sanabria, in a hidden compartment of a vehicle, located next to firearms, almost $200,000 in cash, and two grenades.  (Tr. 439-41; PSR ¶ 66).

---

2017).  Ruiz pled guilty to the charges in his indictment and was sentenced on September 10, 2021 to five years' imprisonment.  (*See id.* at Dkts. 55, 56.)

[7] *See* Tr. 116-17 (Sanchez testifying that, following the defendant's victory in the 2013 presidential election and in response to Fuad Jarufe's doubts, in retrospect, that the defendant would win, the defendant stated, "Just so you can see, Mr. Fuad, when there's a will, there's a way.").



Inside certain of the ledgers were notations to "JOH," the defendant, and his brother, "TH."  (*See* GXs 250A-2, 250C-2; *see also* Tr. 448-49; PSR ¶ 66).





The trial evidence proved that these ledgers belonged to Sanabria.  One of the individuals who had been in the cars that were searched gave his name as Magdaleno Meza Funez (Tr. 470) and, in one of the notebooks—the drug ledgers—that were seized, law enforcement found a document with the name "Magdaleno Meza Funez" on it.  (Tr. 441).  Detective Reynoso also testified, on cross-examination, that, also on June 6, 2018, he received information that Nery Orlando López, who was known as Magdaleno Meza Funez, maintained a drug laboratory in Santa Barbara, Honduras.  (Tr. 470).  Rivera testified that in approximately 2012, six years before the drug ledgers bearing the defendant's and Tony Hernandez's names were seized, Rivera spoke with Sanabria, who Rivera also knew as "Wilson," by phone, because Sanabria wanted Rivera's assistance in receiving small planes loaded with cocaine that were coming from Colombia to land at a clandestine airstrip located in La Mosquitia, Honduras.  (Tr. 764-65; PSR ¶ 67).  Rivera also testified that "Nava," referred to a Navajo, a type of "piston-engine plane" that Rivera previously had used to receive drugs; as pictured above, one of Sanabria's drug ledgers, which included the defendant's name ("JOH"), included the notation "Nava" at the top right.  (*See* Tr. 853; GX 250-A-2; PSR ¶ 67).  Rivera also learned, through an associate of *Los Valles*, that Sanabria worked in drug trafficking with *Los Valles* and Tony Hernandez.  (Tr. 765-66).

As described above, Fabio Lobo testified that he watched Tony Hernandez receive a duffel bag containing millions of dollars from an associate of *Los Valles* who identified himself as "Wilson."  (Tr. 1124-27; PSR ¶ 58).  In the below photograph depicting the evidence seized and individuals arrested by Honduran law enforcement on June 6, 2018 (*see* Tr. 444-45), Fabio Lobo identified the individual in the blue polo shirt as "Wilson," who Fabio Lobo testified was the same

individual who gave Tony Hernandez the duffel bag containing what Tony Hernandez told Fabio

Lobo contained $4 million.  (Tr. 1124-25).



In sum, the ledgers and surrounding testimony reveal that Sanabria paid the defendant and

his co-conspirators drug proceeds, and maintained ledgers reflecting some of those payments.  On

October 26, 2019, just eight days after Tony Hernandez was convicted of narcotics and weapons

offenses, and after the ledgers were publicly admitted at that trial, Sanabria was murdered at a

maximum security prison in the Santa Bárbara Department.  (PSR ¶ 74).  At the time, López

Sanabria was in prison with charges pending in the United States.  (PSR ¶ 74).  López Sanabria's

attorneys confirmed to the media that an investigator hired by the defendant's family—Chase

Lalani—and Jose Amilcar Hernandez Flores (one of the defendant's brothers) had made

unauthorized visits to Sanabria prior to Tony Hernandez's trial; López Sanabria had rebuffed their

efforts to obtain information about whether he was cooperating with the DEA; and López Sanabria

had planned to cooperate with the DEA against Tony Hernandez and the defendant.  (PSR ¶ 74;

*see also* Ex. A, *What Did Nery Know? A Prison Murder in Honduras Deepens Suspicions of*

*Government Involvement in Drug Trafficking*, Univision (Dec. 6, 2019)).

17

Leaked surveillance video of the murder shows López Sanabria talking to the warden of the facility, Pedro Ildefonso Armas, while a masked man walked past and unlocked a nearby door. (PSR ¶ 74). Several individuals who are believed to be prisoners then storm through the door and viciously shoot and stab Sanabria to death. (PSR ¶ 74).





Approximately a few weeks after Sanabria's murder, Erika Bandy, his widow who was then incarcerated in Honduras herself for drug trafficking, gave an interview to a media outlet. (*See* Ex. B, *Murder, Corruption, and Drugs: The Ledgers That Could Sink Honduras' Ex-President*, InSight Crime (Feb. 9, 2024)).   Bandy stated, among other things, that Sanabria, "told me that the president of this country was going to kill him for his links with his brother, and we have the proof," referring to the defendant and Tony Hernandez. (*Id.*).   Within weeks of the interview of Bandy, both a lawyer who had worked for Sanabria and Bandy, as well as Armas, the prison warden who was speaking with Sanabria shortly before his murder, were killed. (*Id.*).   Years later, in June 2023, after Bandy had been released from prison and was residing in Honduras, she herself was gunned down by assailants wearing bulletproof police vests. (*Id.*).

The defendant's relationship with his other drug trafficking partners continued after Sanabria's murder, well into his second term as President of Honduras.   In 2019, evidence from Fuentes Ramirez's cellphone, seized by law enforcement in connection with his March 2020 arrest, showed that Fuentes Ramirez visited *Casa Presidencial*, the Honduran Presidential Palace, twice in 2019. (*See* GX 204-200; PSR ¶ 68).   Both meetings were on days significant to this prosecution: the first on May 29, 2019, the day after the defendant was first identified as a co-conspirator in a public filing in this case; and then again on June 12, 2019, on the date of a similar filing in the case. (Tr. 1039, 1044-47; PSR ¶ 68).   Fuentes Ramirez also admitted to Rivera, in approximately 2020 while both were in custody in the Metropolitan Correctional Center, that prior to his arrest he had paid the defendant two additional bribes, one of approximately 450,000 lempiras (about $20,000 USD), prior to his arrest in exchange for protection. (Tr. 868-69; PSR ¶ 68).

## V.  The Use and Possession of Machineguns and Destructive Devices

In addition to the detailed, corroborated, extensive evidence concerning the defendant's role in the drug trafficking conspiracy, the evidence at trial also established that the defendant caused others to be armed with machineguns and destructive devices, and actively participated in the cocaine-importation conspiracy with advanced knowledge that co-conspirators would possess these types of weapons.  (PSR ¶ 69).  The trial was flush with testimony and other evidence about how members of the conspiracy used a veritable armory of firearms to protect their cocaine, to protect themselves, and to ensure that their cocaine operation could grow and flourish.  They carried firearms to meetings and used firearms to protect their cocaine loads as they transited across Honduras towards the United States, and members of the conspiracy used firearms to commit violence and murders to protect and grow their cocaine trade.

For example, Ardon, Fabio Lobo, and Rivera each testified that they transported drugs across Honduras in armed trucks, guarded by AK-47s, AR-15s, and grenade launchers.  (*See, e.g.*, Tr. 185 (Ardon testifying that, when trafficking cocaine, he would carry, among other things, AR-15s, AK-47s, and, on occasion, bazookas), Tr. 244 (Ardon testifying that he also used M-16s and semi-automatic handguns to guard cocaine shipments); Tr. 755-56, 780 (Rivera testifying that he and other members of *Los Cachiros* guarded drug shipments with, among other weapons, AK-47s, AR-15s, grenade launchers, and [Claymore] mines); Tr. 1101-02 (Fabio Lobo testifying that he transported drugs with *Los Cachiros* using his security detail, armed with weapons including, among others, M-16s); *see also* PSR ¶¶ 70-73).  Fuentes Ramirez, the defendant's drug-trafficking partner with whom the defendant met both in 2013 when he was campaigning for President and, later, in 2019, when the defendant was in his second term, carried automatic weapons and

transported drug shipments using them as protection. (PSR ¶ 71). Rivera saw Fuentes Ramirez with AR-15s, AK-47s, grenade launchers, and short handguns with laser sights. (Tr. 845; PSR ¶ 71). Both Sanchez and Rivera testified about Fuentes Ramirez's drug laboratory at Cerro Negro— to which the defendant specifically requested access, because of its proximity to Puerto Cortes— being guarded by men armed with automatic weapons. (*See* Tr. 77-78 (Sanchez testifying about seeing armed guards with AK-47s and semi-automatic handguns); Tr. 847-48 (Rivera testifying about MS-13 members guarding Fuentes Ramirez's drug laboratory with AR-15s, AK-47s, and grenade launchers); PSR ¶71)). As described above, Fuentes Ramirez continued trafficking drugs, with the defendant's protection, for years following his two in-person meetings with the defendant in 2013. (PSR ¶ 71).

Ardon also explained that he saw Tony Hernandez armed with firearms during their cocaine trafficking partnership, and identified particular firearms he saw Tony Hernandez carrying, including an AR-15 and 9-millimeter semiautomatic handgun. (Tr. 222-24, GX 201R-62; PSR ¶ 72). Additionally, Giovanni Rodriguez (who worked alongside the defendant's cousin, Mauricio Hernandez Pineda) testified that, as a member of the HNP, he and other officers escorted cocaine shipments across Honduras, armed with M-16s, AR-15s, and other weapons. (Tr. 1197-98; PSR ¶ 73).

## VI.    The Defendant's False Trial Testimony

The defendant testified in his defense, over the course of two trial days, during which he repeatedly lied under oath. (*See generally* PSR ¶¶ 75-77). The defendant unequivocally disclaimed any involvement in protecting drug traffickers and specifically denied ever having received bribes from drug traffickers. (Tr. 1559-60). This testimony, of course, was rejected by

the jury and refuted by the mountain of evidence at trial.  For example, as described above, two cooperating witnesses—Ardon and Fabio Lobo—testified that they directly bribed the defendant., and other cooperating witnesses testified about providing bribes indirectly to the defendant's political campaigns in exchange for the defendant's continued protection of their drug trafficking activities.

The defendant also attempted to distance himself from drug traffickers who had bribed him despite overwhelming proof of their meeting with the defendant.  By way of example, when asked on cross-examination about the photograph from the 2010 World Cup showing the defendant arm in arm with Arnulfo Valle (GX 309), the defendant suggested that the photograph was fake (Tr. 1561), and then claimed that he "never met" Arnulfo Valle (Tr. 1564).   In another example, the defendant denied ever meeting with Fuentes Ramirez (Tr. 1546), despite testimony from Jose Sanchez about having witnessed the defendant receiving a bribe from Fuentes Ramirez (Tr. 96-98), as well as Waze location data showing that Fuentes Ramirez visited *Casa Presidencial* twice in 2019.  (*See* GX 204-200).  As described above, both meetings were on days significant to this prosecution: the first on May 29, 2019, the day after the defendant was first identified as a co-conspirator in a public filing in this case; and then again on June 12, 2019, on the date of a similar filing in the case.  (Tr. 1039, 1044-47).

## THE DEFENDANT'S OBJECTIONS TO THE PSR ARE MERITLESS

The defendant submitted objections to the PSR on June 4, 2024, including both factual objections and objections to the applicability of certain sentencing enhancements.   Those objections, as well as the Government's and Probation Office's responses, are included in the PSR.

(*See* PSR at 39-42).  The Government addresses the defendant's objections to the applicability of sentencing enhancements below, in the context of its analysis of the Guidelines.

With respect to factual objections, the defendant, "maintains his innocence and asserts that he has been wrongfully convicted" and "[a]ccordingly, [the defendant] disputes the entirety of The Offense Conduct as described in the draft presentence report as disclosed on May 16, 2024."  (PSR at pg. 39).  This position was rejected  by the jury and the PSR's thorough discussion of the defendant's conduct is strongly supported by the trial record.  Accordingly, the defendant's blanket objection should be rejected.  *See, e.g.*, Tony Hernandez Sent. Tr. at 8-9 ("I am going to leave the paragraphs in the PSR unchanged.  There has been no argument advanced to me that the paragraphs are inconsistent with the trial evidence.  It is simply the defendant's view is the trial evidence ought not be believed, which is contrary to the jury's verdict."); *see also United States v. Ware*, No. 04 Cr. 1224 (RWS), 2009 WL 102215, at *2 (S.D.N.Y. Jan. 14, 2009) (rejecting factual objections to PSR as "contrary to the record at trial").

In addition to objecting to the entirety of the factual summary contained in the PSR, the defendant also makes several specific objections to particular factual assertions.  These generally fall into two categories: (i) specific assertions amounting to claims of innocence that are flatly contracted by the trial record; and (ii) additional, extraneous information not presented at trial that, at the defendant's request, has in certain instances been noted in the PSR.  The Government does not address the second category here.[8]  With respect to the former category, *i.e.*, specific factual

---

[8] The Probation Office added footnotes reflecting the defendant's position to PSR ¶¶ 29, 34, 37, and 74.   The Probation Office, at the defendant's request and without objection from the Government, included in ¶ 47 that the defendant is from the Lempira Department, but did not

objections to the PSR asserted by the defense to PSR ¶¶ 29, 33, 34, 44, 52, 54, and 66, the Government relies on the trial record, and the citations provided to the Probation Office and noted in its response to the defendant's objections.  (PSR at pgs. 39-42).  The information contained in these paragraphs is supported by the trial record and properly included in the PSR.  Finally, and specifically with respect to the factual recitation of murders committed by Fuentes Ramirez (PSR ¶ 36) and the murder of Sanabria (PSR ¶ 74), the Probation Office agreed with the Government that the additional, non-factual assertions by the defense should not be included in the PSR.  In any event, the defendant's contentions about these events—and, in particular, his disputing that he "had anything to do with a murder," in connection with the facts in PSR ¶ 74 about Sanabria's murder (*see* PSR at pg. 42)—are sentencing arguments that go to the weight the Court may ultimately decide to place upon this evidence at sentencing, but these arguments are not a valid basis for excluding information from the PSR or included the defendant's claims about them.  *See United States v. Delacruz*, 862 F.3d 163, 175 (2d Cir. 2017) ("[P]rinciples of due process do not bar the sentencing judge from consider[ing] any and all information that reasonably might bear on the proper sentence for the particular defendant." (internal quotation marks omitted)).

## THE SENTENCING GUIDELINES RECOMMEND LIFE IMPRISONMENT

Based on an offense level of 50, which is capped at 43, and Criminal History Category I, the Guidelines recommend a sentence of life imprisonment with a mandatory minimum sentence of 10 years' imprisonment on Count One and a mandatory consecutive 30-year sentence on Count Two.  The defendant does not object to the calculation of the drug quantity, pursuant to U.S.S.G.

---

include additional information and inferences supplied by the defendant to which the Government objected.

§ 2D1.1(a)(5); the applicability of the enhancement pursuant to U.S.S.G. § 2D1.1(b)(3) for use of

a private aircraft; or the two-level enhancement for abuse of a position of public trust, pursuant to

U.S.S.G. § 3B1.3.  He objects to the applicability of the enhancement, pursuant to U.S.S.G. §

2D1.1(b)(2) for directing the use of violence; and to two levels, of the overall four levels, for being

an organizer or leader of the offense, pursuant to U.S.S.G. § 3B1.1(a).  (*See* PSR at 39-42).  Finally,

the Government asserts that a two-level enhancement for obstruction of justice applies, pursuant

to U.S.S.G. § 3C1.1, and the Probation Office has deferred adjudication of that to the Court.  (*See*

PSR ¶¶ 98-99, 113).  For the reasons set forth below, each of the sentencing enhancements set

forth in the PSR, as well as the enhancement for obstruction of justice, applies.

## I.     Count One

### A.     Drug Quantity: § 2D1.1(a)(5)

Pursuant to U.S.S.G. § 2D1.1(a)(5), the base offense level for Count One is 38 because the

offense involved at least 400 tons of cocaine, almost 100 times higher than the 450-kilogram

threshold to trigger Level 38.  (PSR ¶ 106).  This quantity is based on the testimony of Ardon and

Leonel Rivera.  Ardon testified that, with the defendant's support and protection, he, along with

co-conspirators including Tony Hernandez and *Los Valles*, imported approximately 250 tons of

cocaine to the United States.  (Tr. Tr. 184; PSR ¶ 46).  Leonel Rivera, another of the defendant's

co-conspirators, estimated that he trafficked approximately 130 to 150 tons of cocaine to the

United States.  (Tr. 755).  The defendant does not object to this calculation of drug quantity.

This is a conservative estimate that does not necessarily take into account the additional,

and potentially partially overlapping, at least approximately 195 tons of cocaine that arguably are

attributable to the defendant.  Pursuant to U.S.S.G. § 2D1.1 app. n.5, relevant conduct principles

govern the drug quantity for which a defendant is responsible.  Under U.S.S.G. §§ 1B1.3(a)(1)(B) or (a)(2), the defendant is responsible for the (i) 185 tons of cocaine for which this Court found Tony Hernandez responsible (*see* Tony Hernandez Presentence Investigation Report, Dkt. 129 at ¶ 47; *see also* Dkt. 326 ("Tony Hernandez Sent. Tr.") at 11); and (ii) conservatively, the five tons of cocaine for which this Court found Fuentes Ramirez responsible (*see* Fuentes Ramirez Presentence Investigation Report, Dkt. 350 at ¶¶ 61, 74; *see also* Dkt. 370 ("Fuentes Ramirez Gov't Sent. Submission") at 24-27 (calculating that Fuentes Ramirez was responsible for importing approximately 21 tons of cocaine into the United States)).  As set forth above and established at trial, Tony Hernandez and Fuentes Ramirez were two of the defendant's principal drug trafficking co-conspirators.  The defendant also is responsible for the amount of drugs attributable to Hernandez Pineda and Bonilla, who are scheduled to be sentenced by this Court on July 2, 2024 and August 1, 2024, respectively.  Although the Court has not yet ruled on the drug quantity attributable to either, as part of these conspiracies, the PSR reflects that both are being held responsible for similarly massive amounts of cocaine—185 tons for Bonilla, for his trafficking with Tony Hernandez; and five tons for Pineda.  (*See* PSR ¶¶ 88-89).

The defendant's cocaine trafficking conspiracy also went well beyond Tony Hernandez, Fuentes Ramirez, Bonilla, and Pineda.  For example, the defendant also provided protection for and accepted bribes from *Los Valles* (*see, e.g.*, Tr. 217-19; PSR ¶ 46), who were "responsible for the distribution of tens of thousands of kilograms of cocaine per month directly into the United States," s*ee* U.S. TREASURY DEPT., *Treasury Targets Honduran Drug Trafficking Organization and its Network* (Aug. 20, 2014), *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl2611.aspx.; as well as Hector Emilio Fernandez Rosa (PSR ¶ 54), who, at his

sentencing in August 2019, Judge Richard J. Sullivan found was responsible for the distribution of approximately 155 tons of cocaine.  (*See* Dkt. No. 77 59-60, *United States v. Fernandez Rosa*, No. 19-2529 (2d Cir. Feb. 22, 2021)).  And, of course, beyond his Honduran co-conspirators, the defendant accepted approximately $2.4 million in bribes from the Sinaloa Cartel, including $1 million directly from Chapo himself, who was responsible for the importation or attempted importation of approximately 1,213,100 kilograms of cocaine and 1,440 kilograms of cocaine base, among other drugs.  (*See United States v. Joaquin Archivaldo Gusman Loera*, Criminal Docket No. 09-0446 (E.D.N.Y.), Dkt. 648 at 2).

In short, and by any reasonable calculation, the defendant is responsible for *at least* over 400 tons of cocaine, and likely much more.

### B.      Violence: § 2D1.1(b)(2)

Pursuant to U.S.S.G. § 2D1.1(b)(2), a two-level enhancement is applied because the defendant directed the use of violence in connection with Count One.  (PSR ¶ 107).  Specifically, and as set forth above, on an intercepted call in June 2015, Porky told David Campbell that the defendant had "assigned an elite police team to kill" a drug trafficker named Byron Ruiz, who had worked with Tony Hernandez, "because it's inconvenient if the Americans catch him and take him away."  (GX 404-T, Lines 9-13; Tr. 768; PSR ¶ 64).

### C.      Use of Private Aircraft: § 2D1.1(b)(3)

Pursuant to U.S.S.G. § 2D1.1(b)(3), a two-level enhancement is applied because the defendant used private aircraft in connection with the importation of cocaine.  (PSR ¶ 108).  The defendant does not object to the applicability of this enhancement.

Multiple witnesses testified about using clandestine airstrips to receive planes filled with cocaine as part of the conspiracy.  For example, and as set forth above, Rivera testified about conspiring with "Wilson," *i.e.*, Nery Sanabria, the since-murdered *Los Valles* worker who provided a $4 million bribe to Tony Hernandez, to traffic cocaine by plane (Tr. 765-66); and one of Sanabria's drug ledgers including both the defendant's name ("JOH") and "Nava," the abbreviation for a small, piston-engine plane used to traffic drugs (Tr. 853; GX 250-A-2; PSR ¶ 67).  Similarly, Fabio Lobo testified about the defendant, Tony Hernandez, and Cinco asking him for help, in his capacity as a judge, to recover "merchandise" from a plane that had crashed which Fabio Lobo later learned was loaded with approximately 1,200 kilograms of cocaine that "belonged to a partnership between the Hernandez brothers, *Los Valles*, and another person who was Colombian."  (Tr. 1111-13; PSR ¶ 49).  Later, Rivera testified, he and Fabio Lobo received loads of cocaine from Colombia at clandestine airstrips.  (Tr. 779).  Additionally, Rivera also testified that as part of the conspiracy he and Fuentes Ramirez, who personally paid $25,000 in bribes to the defendant, received cocaine shipments at a clandestine airstrip in the department of Colon, Honduras, which Fuentes Ramirez protected with automatic weapons.  (Tr. 844-45; PSR ¶ 36).  Finally, Rivera testified about a recorded conversation he had Arnaldo Urbina, the corrupt National Party Mayor of Yoro Department, Honduras, in which they discussed whether the defendant would provide them with a clandestine airstrip that he used.  (Tr. 830-31, 836-840; GX 409A-T).  Specifically, Rivera testified that he learned from Juan Gomez, a political ally of the defendant, that the defendant and Tony Hernandez "had an airstrip . . . in the area of Lempira and that they had received helicopters loaded with money there and several planes loaded with cocaine."  (Tr. 837).

### D.     Leadership: § 3B1.1(a)

Pursuant to U.S.S.G. § 3B1.1(a), a four-level aggravating-role adjustment is applied because the defendant was an organizer and leader of the criminal activity, and Count One involved five or more participants and was otherwise extensive.  (PSR ¶ 111).  The defendant objects to the applicability of this enhancement, and instead argues that only a two-level adjustment is appropriate; in effect, the defendant argues that neither U.S.S.G. §§ 3B1.1(a) or (b) applies, and instead that, pursuant to U.S.S.G. § 3B1.1(c), "the defendant was an organizer, leader, manager, or supervisor in any criminal activity" other than described in the preceding provisions.  (PSR at pg. 42).

The defendant's contention is directly and exhaustively undermined by the record.  The trial evidence made abundantly clear that Count One "involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(a).  "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted."  U.S.S.G. § 3B1.1 cmt. n.1.  Dozens of specific participants were identified at trial.  To name *only* those who directly paid bribes to the defendant:  Ardon (Tr. 179-80, 211-13; PSR ¶ 45); Fabio Lobo and Javier Rivera (Tr. 1119-1120; PSR ¶ 55); Fuentes Ramirez (Tr. 96-98; PSR ¶ 58); Sanabria, and, generally, *Los Valles* (Tr. 1124-27; *see also* Tr. 441, 470; GX 319; *see also* GX 403-T, Line 31; PSR ¶ 58); Fernandez Rosa (GX 403-T, Line 31; *see also* Tr. 1479); multiple members of the Sinaloa Cartel, including Chapo (Tr. 262-65, 638; PSR ¶ 57) and Luis Perez (Tr. 626; *see also* Tr. 1116; PSR ¶ 57); and multiple other various attendees at Moncho Lobo's 2012 birthday party, including Honduran traffickers Neftali Duarte Maja, Ramon Mata, Wilter Blanco, Elial Sierra, Ton Montes, and Chinda Montes, among others (Tr. 790-94; PSR ¶ 54).  There were also scores of

other traffickers, police, military, and politicians who conspired with the defendant, including, among others, Tony Hernandez, Bonilla, Pineda, Rodriguez, Oscar Najera, Fredy Najera, Julio Cesar Barahona, and others, to say nothing of the numerous individuals who transported industrial-sized loads of cocaine across Honduras in armored vehicles protected by machineguns.

It is equally clear that the defendant was an "organizer or leader." "In distinguishing a leadership or organizational role from one of mere management or supervision . . . [f]actors the court should consider" including, among others, "the exercise of decision making authority, the nature of participation in the commission of the offense," "the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *See* U.S.S.G. § 3B1.1, Application Note 4. By any metric, the defendant qualifies. As the President of Honduras, he held ultimate decision making authority and control—over the police, military, and judiciary, and over whom to arrest and whom to grant safe harbor. He used this power to preside over both a country and an expansive cocaine trafficking conspiracy.

In short, the defendant was the *President* of Honduras and a leader of a sweeping drug trafficking conspiracy, which involved dozens of conspirators who were identified at trial and untold more. The four-level enhancement pursuant to U.S.S.G. § 3B1.1(a) clearly applies.

### E.     Abuse of Trust: § 3B1.3

Pursuant to U.S.S.G. § 3B1.3, two levels are added because the defendant "abused a position of public trust" as a Honduran congressman, President of the HNC, and the two-term President of Honduras "in a manner that significantly facilitated the commission or concealment of the offenses." The "applicability of a § 3B1.3 enhancement turns on the extent to which the

position provides the freedom to commit a difficult-to-detect wrong." *United States v. Allen*, 201 F.3d 163, 166 (2d Cir. 2000) (internal quotation marks omitted).

The defendant does not object to the applicability of this enhancement; and nor could he. The defendant was elected to the HNC in 1998; he served as a member until 2010, when he became President of the HNC; and he was elected President in November 2013 and then again in November 2017. (PSR ¶ 43). All told, the defendant held political office in Honduras from 1998 to January 2022, the last eight years of which as the highest elected official in the country. As was made clear at trial, and described in detail above, *see supra*, it is difficult to imagine a more appropriate case for this enhancement to apply.

### F.     Obstruction of Justice: § 3C1.1

Pursuant to U.S.S.G. § 3C1.1, the Government submits that a two-level enhancement applies because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense(s) of conviction, and the obstructive conduct related to the defendants offense(s) of conviction.

As described above, the defendant testified under oath and lied about his relationships with drug traffickers and about having received bribes from those drug traffickers. Under the Guidelines, such false trial testimony is an appropriate basis for imposing an obstruction of justice upgrade. *See* U.S.S.G. § 3C1.1, Application Note 1(c); *see also United States v. Matos*, 907 F.2d 274, 275-76 (2d Cir. 1990) (upholding imposition of two-level upward adjustment where defendant offered testimony that was flatly contradicted by the record). Because "[t]here is no protected right to commit perjury," *United States v. Grayson*, 438 U.S. 41, 54 (1978), penalizing

a defendant at the sentencing stage for false statements made at trial does not violate the defendant's right to testify on his own behalf.  *See id.*  Rather, an enhancement for obstruction of justice is wholly warranted when the jury verdict contradicts the defendant's factual testimony.  *See, e.g.*, *United States v. Stewart*, 686 F.3d 156, 174-78 (2d Cir. 2012) (affirming enhancement where "[t]he jury's findings contradicted Stewart's factual testimony to the effect that she did not engage in this conduct, or at least did not do so knowingly"); *United States v. Bonds*, 933 F.2d 152, 155 (2d Cir. 1991) (citation omitted) ("[B]y finding Bonds guilty of *knowingly* distributing counterfeit money, the jury necessarily determined that Bonds knew that the money he had distributed was counterfeit" and, therefore, that Bonds lied at trial).  Where, as here, a defendant perjures himself and attempts to obstruct proceedings, "[i]t is rational for a sentencing authority to conclude that a defendant . . . [is] attempt[ing] to avoid responsibility" and therefore is "more threatening to society and less deserving of leniency than a defendant who does not so defy the trial process."  *United States v. Dunnigan*, 507 U.S. 87, 97 (1993).  That is because "[t]he perjuring defendant's willingness to frustrate judicial proceedings to avoid criminal liability suggests that the need for incapacitation and retribution is heightened as compared with the defendant charged with the same crime who allows judicial proceedings to progress without resorting to perjury."  *See id.* at 98.  That is clearly the case here.

There is also a separate, independent basis supporting the application of this enhancement.  The defendant and Tony Hernandez tried to silence Giovani Rodriguez prior to his 2016 surrender by sending a message through Hernandez Pineda.  *See* U.S.S.G. § 3C1.1 app. n.4(A) (enhancement applies to conduct involving "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so").  Specifically, in 2016,

prior to his surrender to the United States, Pineda directed Rodriguez "not [to] mention to [the United States authorities] what [Pineda], Tony Hernandez, and [the defendant] were doing in Honduras," referring to their drug trafficking, "because that could be very dangerous" for Rodriguez. (Tr. 1218-19; PSR ¶ 65). Rodriguez also testified about this incident at the Tony Hernandez trial and it was one of the bases offered by the Government in arguing that U.S.S.G. § 3C1.1 should apply to Tony Hernandez's Guidelines calculation set forth in his PSR, which the Court adopted at sentencing. (*See* Dkt. 269 ("Tony Hernandez Gov't Sent. Submission") at 38; Tony Hernandez PSR ¶ 72)).

## II.     Counts Two and Three: Use of Weapons

Pursuant to U.S.S.G. § 2K2.4(b), the Guidelines sentence for Count Two, the defendant's use of machineguns and destructive devices in furtherance of the Count One drug-trafficking conspiracy, is the mandatory consecutive 360 months' imprisonment. (PSR ¶ 105).

Although the offense level for the Count Three conspiracy to use machineguns and destructive devices does not impact the offense-level calculation due to the grouping analysis set forth below, several Guidelines enhancements illustrate the severity of this additional crime. Pursuant to U.S.S.G. § 2K2.1(b)(1), an enhancement of at least six levels applies because the Count Three conspiracy involved a large armory of heavy weapons, including 40mm grenade launchers, AK-47s, AR-15s, semi-automatic and automatic pistols, shotguns, and extended magazines. As set forth above, the defendant caused others to be armed with machineguns and destructive devices, and actively participated in the cocaine importation conspiracy with advanced knowledge that certain of his co-conspirators would possess those weapons. This included, among others Ardon, Fabio Lobo, Leonel Rivera, Fuentes Ramirez, and Tony Hernandez, who transported massive

amounts of cocaine across Honduras guarded by machineguns and destructive devices.  The defendant was a member of the conspiracy involved in *Tony Hernandez* and *Fuentes Ramirez*, each of which involved hundreds of weapons.  (*See* Tony Hernandez Gov't Sent. Submission at 39; Fuentes Ramirez Gov't Sent. Submission at 33-34).  Finally, a 15-level enhancement applies, pursuant to U.S.S.G. § 2K2.1(b)(3), because Count Three also involved rocket-propelled grenade launchers and destructive devices.  (*See, e.g.*, Tr. 185, 244, 755-56, 780, 1101-02; PSR ¶ 39).

## III.    Grouping Analysis

Pursuant to U.S.S.G. § 3D1.2(c), Count One and Count Three are grouped because the Count One cocaine-importation conspiracy includes a specific offense characteristic relating to use of weapons, U.S.S.G. § 2D1.1(b)(1), that is embodied in the Count Three weapons conspiracy. Therefore, pursuant to U.S.S.G. § 3D1.3(a), the offense level for the group comprised of Counts One and Three is the highest offense level of the counts in the group, which is 52—capped at level 43 pursuant to U.S.S.G. ch. 5, part A, app. n.2—for Count One.  Based on Criminal History Category I, the Guidelines recommend a sentence of life imprisonment.

## DISCUSSION

## I.    The Court Should Impose a Life Sentence

### A.    The Nature and Circumstances of the Offense

The defendant abused his position as the President of Honduras to flood the United States with an almost unimaginable quantity of cocaine.  He rose to power through cocaine-fueled bribes from his co-conspirators, who were some of the largest and most violent drug traffickers in the world.  He protected their drugs with the full power of the state; corrupting and corroding Honduran government institutions, including the military, police, and the justice system, in service

of preserving his hold on power by ensuring that cocaine could flow freely through Honduras to the United States. To accomplish this, the defendant protected his co-conspirators—Tony Hernandez, Ardon, Fabio Lobo, Fuentes Ramirez, Leonel Rivera, and many others—from arrest and extradition, allowing them to send at least *400 tons* of cocaine to the United States, to commit unspeakable acts of violence, and to cause rampant destruction in Honduras through their violent narcotics trafficking. Almost as galling as the conduct itself is that the defendant committed it while claiming that he "stood up" to the very drug traffickers he was providing safe harbor. Publicly, including during his testimony at trial, the defendant touted his purported crackdown on cocaine trafficking and corruption; privately, he accepted millions of dollars in drug money and protected his co-conspirators. The defendant's rise, his abuse of power, his duplicity, and his indifference to the immeasurable harm he caused in his own country and in this country is conduct of the most serious kind and befitting the most serious sentence.

The defendant was propelled to power with drug money. Some of the most prolific, violent traffickers in the world were his partners and political allies. Those included Ardon, the National Party Mayor of El Paraiso who admitted to trafficking 250 tons of cocaine (Tr. 184) and his role in 56 murders (Tr. 281), and who gave the defendant and Pepe Lobo $2 million in exchange for protection; Leonel Rivera, the OFAC-designated Honduran drug kingpin who admitted to trafficking approximately 130 to 150 tons of cocaine (Tr. 755) and his role in 78 murders (Tr. 756), and who, on behalf of the *Cachiros*, bribed the defendant with $250,000; Fuentes Ramirez, the exceptionally violent Honduran drug trafficker who personally committed brutal murders, including torturing and killing a Honduran police officer who had participated in a raid on his cocaine laboratory (Tr. 858-59), and who gave the defendant cash bribes and access to that same

cocaine laboratory; Miguel and Arnulfo Valle, the heads of *Los Valles* Cartel[9]; and even Chapo, the head of the Sinaloa Cartel, who trafficked over 1,000 tons of cocaine to the United States and who personally supported the defendant with a $1 million bribe; and, of course, Tony Hernandez, who trafficked at least approximately 185 tons of cocaine to the United States, was personally responsible for two murders, and who was the defendant's own brother and confederate in corruption and crime.  At trial, Leonel Rivera, when asked on cross-examination what happened to the approximately $55 million he earned from selling drugs, explained in stark terms the circular nature of bribery and narcotics trafficking:

> Of the 55 million, I paid many bribes.  I paid $250,000 as a bribe to Juan Orlando Hernandez.  I took [$]50,000 to bribe Tony Hernandez.  I took [$]800,000 to pay to Juan Orlando Hernandez's allies . . . I bribed Pepe Lobo.  I gave Pepe Lobo about $600,000.  He was Juan Orlando Hernandez's political ally.  There were other bribes paid to Fabio Lobo so that he would in turn bribe the chief of intelligence that Juan Orlando Hernandez had when he was president of Congress, Tinoco Pacheco, among other things.

(Tr. 906).  Leonel Rivera, and the others listed above, were the defendant's *partners*-the largest cocaine traffickers in the world.  And, as the trial demonstrated, while the producers of drugs in Colombia and the distributors in Mexico, like Chapo, may be more publicly notorious, the violent drug transporters in Honduras and Guatemala—Rivera, Ardon, the Valles, and other of the

---

[9] In December 2013, Miguel and Arnulfo Valle and others were charged with a cocaine-importation conspiracy in the Southern District of Florida.  *See* No. 13 Cr. 20897 (S.D. Fla. Dec. 4, 2013).  In June 2014, the Valle brothers and others were charged with drug-trafficking offenses in the Eastern District of Virginia.  *See* No. 14 Cr. 135 (E.D. Va. June 19, 2014).  Honduras extradited the Valle brothers in December 2014.  The Valle brothers pleaded guilty to the charges in both Districts in 2016, and each was sentenced principally to 30 years' imprisonment.

defendant's partners, including Neftali Duarte Mejia,[10] Wilter Blanco,[11] and Ton and Chinda Montes-Bobadilla[12]— were no less important in moving mountains of cocaine to the United States.

So too, of course, were the corrupt police, military, and judges, who conspired with the defendant.  Bonilla, the *Chief* of the Honduran National Police, who murdered one of Ardon's and Tony Hernandez's drug trafficking rivals, Franklin Arita, to clear the way for their drug trafficking (Tr. 247-251)—which, of course, supported the defendant's political campaigns; as well as Hernandez Pineda, who approached Giovanni Rodriguez and warned him not to cooperate against the defendant and Tony Hernandez (Tr. 1219); and others, like Giovanni Rodriguez, who were supposed to enforce the laws in Honduras, but instead abused their authority to transport truckloads of cocaine across Honduras.  The conspiracy involved not just police power, but also the Honduran military, which supported the defendant and his drug trafficking partners, like Fuentes Ramirez, by protecting the cocaine made in Fuentes Ramirez's laboratory and shipped through Puerto

---

[10] In 2018, Duarte Mejia was sentenced principally to life in prison following a trial conviction for cocaine importation conspiracy.  *See* 15 Cr. 20540 (S.D.F.L.); *see also United States v. Mejía Duarte*, 780 F. App'x 730 (11th Cir. 2019).

[11] In 2016, Blanco was charged in the Southern District of Florida with participating in a cocaine-importation conspiracy.  *See* No. 16 Cr. 2002 (S.D. Fla. June 23, 2016).  Costa Rica extradited Blanco in approximately March 2017, Blanco subsequently pleaded guilty, and in August 2017 he was sentenced principally to 240 months' imprisonment.

[12] Ton and Chinda Montes were leaders of the Montes-Bobadilla drug trafficking organization, one of the most significant such organizations operating in Honduras.  In 2023, Chinda Montes was sentenced to 20 years imprisonment following her conviction of participating in a cocaine trafficking conspiracy.  *See* 15 Cr. 290 (LMB) (E.D.V.A).  Another member of the Montes-Bobadilla trafficking organization, Noe Montes-Bobadilla, previously had been sentenced to 37 years' imprisonment.  *See* "Matriarch Sentenced for Role in Violent Multimillion-Dollar Honduran Cocaine Trafficking Organization," *available at* https://www.justice.gov/opa/pr/matriarch-sentenced-role-violent-multimillion-dollar-honduran-cocaine-trafficking (Mar. 28, 2023).

Cortes.  One of the defendant's military associates, General Tulio Armando Romero Palacios, even admitted during trial to providing security for Tony Hernandez, and, prior to Hernandez's 2018 trip to Miami—when he was arrested by the DEA—checked whether the coast was clear for Tony Hernandez to travel, even *after* Palacios had at least heard "rumors" of Tony Hernandez drug trafficking.  (*See, e.g.*, Tr. 1380-83, 1393-95, 1398).  The corruption also extended to the judiciary, including then-President of the Judiciary in Honduras, Julio Cesar Barahona, who the defendant dispatched to help Fuentes Ramirez avoid prosecution after his cocaine laboratory was raided.  (Tr. 79-85).

The defendant's corruption seeped into every facet of Honduran government, as he leveraged drug traffickers, and military, police, and judicial allies to support his political ambitions, hold on to power, and greed—for power and money.  (*See* Dkt. 288, "Tony Hernandez Stmt. of Reasons" at 2 ("state sponsored-narco-trafficking . . . corrupts every facet of society")).  In certain respects, his conduct is similar to that of Tony Hernandez, whom this Court sentenced to life imprisonment in March 2021, and Fabio Lobo, who, after previously being sentenced by Judge Schofield to 24 years' imprisonment, ultimately cooperated with the Government and testified against the defendant at trial.  Both Tony Hernandez and Fabio Lobo used their *proximity* to political power—the defendant, in Tony Hernandez's case, and Pepe Lobo, in Fabio Lobo's case—to traffic massive amounts of cocaine.  As Judge Schofield observed in sentencing Fabio Lobo:

> The most damning fact in your background and in your participation in this is that you are not like the police officers who have made plea agreements with the government for a much less amount of time in prison.  You were the son of the sitting president of Honduras, and you used your connections, your reputation in your political network to try to further corrupt connections between drug traffickers and Honduran government officials. And these included not only lowly officials,

like customs people and military and law enforcement personnel, but also extremely high level officials.  In short, what distinguishes your case from so many is that you facilitated strong government support for a large drug trafficking organization for multiple elements of the Honduran government, and you enriched yourself in the process.

*United States v. Romero*, 904 F.3d 238, 241-42 (2d Cir. 2018) (quoting sentencing transcript).[13]

Reviewing that language, the Second Circuit found that, "[c]onsidering the breadth of Lobo Sosa's corruption and the extent of his criminal activity, the district court acted well within its discretion when it imposed a sentence reflecting the need to deter government officials from using their positions of power to facilitate drug trafficking."  749 F. App'x 31, 34-35 (2d Cir. 2018).

The Court applied similar logic in sentencing Tony Hernandez to life imprisonment, stating that Tony Hernandez, "was elected as a member of the Honduran Congress and could have used his considerable talents for good.  But [Tony Hernandez] elected to go in a very different direction."  (Tony Hernandez Stmt. of Reasons at 2).  The same is true for the defendant—by many orders of magnitude.  He was a Congressman; the President of the Honduran National Congress; and the two-term President of Honduras.  He was supposed to be the leader of Honduras, and to protect the safety, livelihood, and interests of the Honduran people; instead, he sold them out to drug traffickers, for his own advancement and gain.

---

[13] Unlike the defendant, Fabio Lobo Sosa accepted responsibility by pleading guilty to a cocaine-importation conspiracy, he was not convicted of weapons offenses or false-statements charges, and there was no evidence that Lobo Sosa.  Lobo Sosa's father was the president, but, unlike the defendant, Lobo Sosa himself was not an elected official, let alone a multi-term congressman and multi-term president.  Judge Schofield applied a three-level role enhancement, as opposed to the four levels applicable here.  Judge Schofield also did not apply the enhancements for criminal livelihood, violence, bribes, or obstruction.

The defendant's conduct continued well into his second term as President.  It was not the case, for example, that the defendant took bribes simply to get elected, and then turned his attention to improving his country and fulfilling his promise.  To the contrary, he doubled down—becoming more brazen, believing that he was untouchable.  In 2015, Porky, the leader of MS-13 in Honduras, spoke with David Campbell, another MS-13 member, in private conversation.  Those calls were intercepted and they provide an unvarnished view, from high-level gang members, of the lengths to which the defendant went to ensure the flow of drug trafficking and protect himself from being exposed as complicit.  In those intercepted calls, Porky and Campbell talk openly about how the defendant had "gifted" a drug route to *Los Cachiros* (GX 405-T, Line 23; PSR ¶ 64), and how the defendant benefit from that drug trade, receiving millions of dollars in bribes from *Los Valles* and Fernandez Rosa, a major Honduran drug trafficker who himself later received a life sentence. (GX 403-T, Line 31).   Conversely, those intercepted calls also made clear both the defendant's exposure, as a result of his corruption and involvement in drug trafficking, and his willingness to use violence to keep that truth from being exposed.   Right after talking about the defendant receiving millions of dollars from *Los Valles* and Fernandez Rosa, Porky said, "Juan Orlando made them negotiate . . . the campaign was financed," *i.e.*, drug traffickers had financed the defendant's campaign for President, "[b]ut the Americans already know it.  That's why . . . he's not giving them much help."  (GX 403-T, Line 37).  Put differently, the defendant accepted millions of dollars in bribes but, when the Americans caught on, distanced himself from certain drug trafficking allies to protect himself.  And, as set forth above, he was willing to do so with violence, assigning an "elite police team to kill [Byron Ruiz] because it's inconvenient if the Americans catch him and

take him away." (GX 404-T Lines 9-13; *see also* Tr. 768 (Leonel Rivera testifying that Byron Ruiz was a drug trafficker)).

At trial, the defendant tried to make much of his supposed alliance with the United States in fighting drug trafficking (*see, e.g.*, 1508-1513); but, in private, he knew that if one of his co-conspirators cooperated with the United States—someone like Byron Ruiz, or Giovanni Rodriguez—it all would come crashing down. As Porky said of the defendant in a call in 2015, "I doubt he'll last from now until June because they picked up a call from Tigre Bonilla." (GX 403-T, Line 29). So deep were the defendant's connections to violent drug traffickers and corrupt police that a single "call" by Bonilla, intercepted by law enforcement, could lead to the defendant's downfall.

Nevertheless, through a combination of money, corruption, and the tolerance of and willingness to commit violence—*i.e.*, that the defendant harnessed the full power of the state—he was able to maintain and expand his power, and to protect his drug-trafficking partners. Until, of course, some of them were caught by law enforcement. One was Nery Sanabria, or "Wilson," who in 2013, had given Tony Hernandez a duffel bag with what Hernandez told Fabio Lobo was $4 million in cash from *Los Valles*. (Tr. 1125; PSR ¶ 58). Five years later, in 2018, Honduran law enforcement recovered drug ledgers that belonged to Sanabria—in a hidden compartment of a vehicle, located next to firearms, and almost $200,000 in cash, plus two grenades (Tr. 439-41; PSR ¶ 66)—that had the defendant's and Tony Hernandez's names in them. (*See* GXs 250A-2, 250C-2; *see also* Tr. 448-49; PSR ¶ 66). These ledgers first were made public at the October 2019 trial of Tony Hernandez. Then, as set forth above, just eight days after Tony Hernandez was convicted, Sanabria was brutally murdered in prison. (PSR ¶ 74; see also Ex. A). Reportedly, Sanabria

41

intended to cooperate with the Americans.  Around the same time, in 2019, and true to form, the defendant took a different tact with Fuentes Ramirez, whom he continued to protect from extradition in exchange for bribes.  (*See* Tr. 1039, 1044-47; PSR ¶ 68).  The story remained the same: the defendant protected his close cadre of drug trafficking partners, and, through extradition (Miguel and Arnulfo Valle), arrest (Arnaldo Urbina), or otherwise, dispatched the others, while using that as a veneer of false virtue to keep his public persona alive.

The damage the defendant caused to his country—his betrayal of Honduras—defies description.  One particularly salient example is that of Jose Sanchez.  Sanchez worked at Graneros, a grain company located in Choloma, Honduras.  In his role there as an accountant, he witnessed two in-person meetings between the defendant, Fuentes Ramirez, and one of the defendant's political benefactors, Fuad Jarufe. (Tr. 96-98; PSR ¶ 58). It was more than an instance of "wrong place, wrong time."  For years, Sanchez had worked as an accountant at Graneros, watching Fuentes Ramirez arrive with armed guards; receiving thousands of dollars from him in drug money.  Then, over the course of 2013, Sanchez watched as the defendant came, each month, to collect his campaign check.  He overheard the defendant's arrogance, and his contempt for the Honduran people, derisively referring to them as "indios," and boasting that for "a piece of meat, a piece of steak, a beer," a Honduran citizen would vote for him.  (Tr. 93).  He watched as the defendant entered into a drug trafficking partnership with Fuentes Ramirez.  And he saw firsthand what would happen if the defendant or his drug trafficking partners were exposed.  Both people— Marlene Banegas, a prosecutor; and a man named Christian Ayala—to whom he provided copies of recordings, which featured the defendant, were murdered shortly thereafter.  (Tr. 147, 173-74). So Sanchez fled Honduras, like so many others during defendant's two terms as President.  This

story—of drugs, corruption, violence—led, in Sanchez's case, and in many others, to helplessness and hopelessness in the face of the pervasive government breakdown sowed by the defendant. In sentencing Tony Hernandez, this Court recognized the importance of striking at the leaders of criminal organizations to neutralize the organizations themselves. (*See* Tony Hernandez Stmt. of Reasons at 5 ("The experience of law enforcement with La Cosa Nostra or the Mafia—is instructive. By repeatedly going after leaders and organizers of these organized crime families, their impact has been weakened. They are a shadow of what they once were.")). In this case, the defendant attempted to co-opt an entire country, and, in doing so, turned it into a narco-state.

But the seriousness and deleterious effects of the defendant's crimes did not stop at Honduras' borders. Far from it. The justification for this prosecution, and the reason the defendant's conduct is so egregious that it warrants a life sentence based on seriousness alone, is because of the unfathomable destruction cocaine causes in the United States. As this Court put it in sentencing Fuentes Ramirez to life imprisonment:

> Now, why is this case being heard in the United States? Why isn't this a matter for the courts in Honduras? The answer is because, as indicted by the grand jury and found by the trial jury beyond a reasonable doubt, that the object and intent was that the drugs enter the United States. Now, there's certainly in excess of 5,000 kilograms of cocaine that were part of the conspiratorial shipments. It's measured in tons. And where does that cocaine go? It goes to fathers and mothers whose lives are destroyed by it, whose health is destroyed by the addiction, who engage in acts of violence to secure and protect the cocaine, who wind up in jail for selling the cocaine. The cocaine that is imported affects lives here in the United States, and this is why United States law punishes this activity. It doesn't punish drug sales or drug conspiracies that have no connection to the United States. It was part of the government's burden to prove – and they did prove – that the object was the importation of the narcotics into the United States.

(Dkt. 411, Feb. 8, 2022, Fuentes Ramirez Sent. Tr. at 25-26). The same is true for this defendant, to an even greater extent. The defendant was responsible for more drugs, more violence, and more

corruption, because he was *the President*.  This harm was compounded, and aggravated, by his lies, to this country and his own people, that he was fighting the very thing that he used to seize power and rotted Honduran government institutions to the core: cocaine trafficking.  The defendant's position at the pinnacle of Honduran political power was a force multiplier—one that he chose to use for evil.  Evil so powerful that it enabled him not just to work with the largest cocaine traffickers in the world—but to become one.  To become a drug trafficker so powerful that he was responsible for moving 400 tons of poison to this country—equivalent to billions of individual doses of cocaine; a number that places him among the very most culpable ever prosecuted in the United States.

In the final analysis, the nature and seriousness of the defendant's conduct is almost unthinkable in scale, and demands the most serious sanction available.

### B.    The History and Characteristics of the Defendant

A Guidelines sentence of life imprisonment is also appropriate in light of the defendant's history and characteristics.  The defendant committed his crimes despite having immense privilege and holding the most powerful political positions in Honduras: President of the Honduran National Congress and then President of Honduras.  As described above, it is entirely unsurprising that the defendant has no prior criminal record largely due to his history and characteristics, which allowed him to protect himself and his drug trafficking allies from arrest, prosecution, and extradition for over a decade and which facilitated the importation of massive amounts of cocaine to this country.

The defendant's upbringing makes clear that he had every opportunity to lead a law-abiding life, but instead, he made the deliberate choice to partner with drug traffickers to fuel his rise to power.   The defendant was raised in a "stable" household under "middleclass economic

conditions." (PSR ¶ 128). He described his childhood to Probation as involving "helping his father and the farm workers to take care of the crops and animals" and "rid[ing[ horses with his older sister and their friends." (*Id.*). The defendant "resided comfortably," his "father provided them with everything," and both his parents were supportive throughout his upbringing. (*Id.* ¶¶ 129-132). The defendant received his master's degree in administration while living in the United States and a law degree in Honduras, went on to serve in the military, and then rocketed through the Honduran political system, elected first as a Honduran congressmember, then president of the Honduran Congress, and ultimately becoming the president of Honduras in 2014 until 2022. (*Id.* ¶¶ 150-51).

Despite this privileged life, in a country where poverty is rampant and education levels are low, the defendant chose to wade deep into the waters of the drug trade. The defendant was "provided . . . with everything" by his family as a child, yet he wanted more. (*Id.* ¶ 129; *see* Ex. C, Honduras, *Events of 2023*, Human Rights Watch (noting that "nearly 80 percent of rural Hondurans lived in poverty, having income below US$7 per day" and that "[a]s of March 2023, official data showed 14 percent of Hondurans could not read or write" and that "[o]nly 56 percent of children between 12 and 14, and 29 percent between 15 and 17, were attending school"). He wanted more money and more power, and he was willing to obtain it at the expense of his own people. The defendant abused his privilege, his skills and education as a lawyer, and the trust of the Honduran people to enrich himself. As the Court recognized at the sentencing of Tony Hernandez, who likewise had a privileged upbringing, this is not a case of someone who came from a family where drug addiction and crime impacted the defendant's decisions in life, or of someone who is "unskilled, impoverished and endeavoring to support" his

family through drug trafficking.  (Tony Hernandez Stmt. of Reasons at 1-2).  The defendant cannot point to poverty, lack of opportunity, or a need to support his family through narcotics trafficking as an excuse or mitigating consideration for his conduct.  He cannot claim that he had no other choice or path forward.  Quite the contrary—despite having every opportunity to lead law-abiding life, the defendant chose one of the most destructive paths possible, and left countless others without the same chance in his wake.  As described above, the specific circumstances applicable to the defendant—here, that he held powerful political positions in Honduras and abused those positions to enrich himself and protect the drug traffickers who fueled his rise to power—make his conduct all the more serious.  The defendant's history and characteristics thus provide no justification for leniency in this case and instead serve as aggravating factors justifying the imposition of a life sentence.

## C.   The Need to Afford Adequate Deterrence

A life sentence is also necessary to achieve adequate deterrence.  With respect to specific deterrence, although this is the defendant's first conviction, the evidence at trial conclusively established that he abused his powerful political positions to commit crimes for over a decade.  During his time in power, and up until his arrest in the instant case, the defendant's positions of authority—and his corrupt allies in the Honduran government, military, police, and judiciary—made him untouchable as he partnered with some of the most notorious and violent drug traffickers in Honduras to flood the United States with cocaine.  The length of the defendant's crimes and the impunity with which he operated in Honduras, including as the President of the country, speaks to the importance of specific deterrence in this case.  Indeed, should the defendant be released from prison, he would almost certainly be deported to Honduras, where his powerful connections and

prior support for drug trafficking organizations could easily result in his return to committing crimes against the United States[14].   And given the defendant's continued pronouncement of innocence in the face of overwhelming evidence of his guilt, there is every reason to believe that the defendant has the incentive to commit crimes against the United States in the future should he ever be released from prison.

The need for the imposition of a life sentence to afford general deterrence is particularly salient here.  The audacity of the defendant's crimes as a world leader has understandably captured the attention of the public in the United States, Honduras, and elsewhere in South and Central America.  During the defendant's trial, concerned members of the public and the media packed the courtroom.   Any sentence imposed by the Court in this case will thus undoubtedly receive significant attention, not only from the media and the public, but from corrupt government officials and drug traffickers around the world.  A life sentence for the defendant will send a clear message that the American justice system will not tolerate such abhorrent conduct.  The deterrent effect of the Court's sentence will also resonate significantly with any powerful official engaging in, or tempted to engage in, conduct like that which the defendant committed.  That aspect of the message resulting from the defendant's sentence is critically important because, without corrupt politicians

---

[14] In March 2024, after the defendant's conviction in the instant case, the defendant's wife, Ana Hernandez, announced her candidacy for President of Honduras as a member of the National Party. *See, e.g.*, *Ex-Honduran first lady announces run for presidency days after husband's drug trafficking conviction* (March 12, 2024) *available at* https://apnews.com/article/honduras-president-drug-trafficking-hernandez-cecda5df1d44d2db2dc74cfb53a3925b.  In connection with that announcement, Ana Hernandez vowed to "start an active and proactive fight for the world to know the injustice that was committed [against the defendant]." *Id*.

like the defendant, the kind of large-scale, international drug trafficking at issue in this case, and the rampant drug-related violence that follows, is difficult if not impossible.

This Court encountered a similar situation Tony Hernandez's trial, which also generated significant attention.  In sentencing Tony Hernandez to life imprisonment, the Court stated:

> The Court is under no delusion that the [life] sentence will end narco-trafficking through Honduras.  But today's sentence is an important step.  It is not the only prosecution in this district of individuals accused of using Honduras as a transit point for drugs.  The experience of law enforcement with La Cosa Nostra or the Mafia—is instructive.  By repeatedly going after leaders and organizers of these organized crime families, their impact has weakened.  They are a shadow of what they once were.
>
> Ending the movement of cocaine from Colombia through Honduras, Guatemala and Mexico is a hope of all good people of Honduras and the United States and other countries of the Americas.  We can hope that looking back in years to come today will have been an important step in eliminating the corrupting influence of narco trafficking.

(Tony Hernandez Stmt. of Reasons at 5).  The sentence to be imposed on the defendant is an even more important step in eliminating such corruption and presents an even stronger messaging opportunity for general deterrence.  The deterrent effect of a life sentence imposed by the Court on the former President of Honduras will resonate not only with drug traffickers and corrupt government officials around the world, but also to any whose lives have been harmed by drugs, violence, and corruption, that the American justice system will prosecute and punish such repugnant conduct, regardless of how powerful, well-connected, and influential the perpetrators of such crimes may be.  As such, a life sentence is also necessary to achieve deterrence.

### D.    A Life Sentence Would Not Result in Unwarranted Sentencing Disparities

A life sentence would not result in unwarranted sentencing disparities.  *See* 18 U.S.C. § 3553(a)(6).  The defendant's egregious conduct, coupled with his political position atop a

sovereign nation, makes his conviction *sui generis*.  Perhaps the most apt historical analogue is the prosecution of former Panamanian military and political leader Manuel Noriega, who, following trial, was convicted in 1992 of drug trafficking, racketeering, and money laundering offenses, and later sentenced to 40 years' imprisonment.  *See United States v. Noriega*, 88 Cr. 79 (S.D. Fla.).  But even that comparison is not enough, as the international drug trade—and the sheer amount of cocaine—has ballooned in the more than three decades since Noriega's conviction.  The sheer scope and scale of the defendant's conduct, and his role as Honduras's two-term President, who publicly professed to be allied with the United States in fighting drugs, puts in him a category all his own.

Even so, in looking for benchmarks, courts around the country have sentenced many of the defendant's co-conspirators—responsible for a significant quantity of cocaine transiting Latin America and arriving in the United States since 2004.  Those traffickers and politicians have universally received significant sentences, commensurate with the scale of their conspiracy and responsibility for violence and drug abuse here and abroad.  The defendant played a—and perhaps *the*—vital role, setting the tone from the top, allowing drug trafficking to flourish and violence and corruption to go unchecked.  He provided protection from prosecution, provided cover violence, and sat atop a system of patronage that lent political legitimacy to a generation of Honduran drug traffickers.

The closest comparator, both temporally and in regard to his role in this specific drug trafficking conspiracy, is Tony Hernandez, who along with the defendant, used political power as a force multiplier to traffic drugs at a jaw-dropping scale, and with total impunity.  The principal difference, of course, is that Tony Hernandez derived his power *from* the defendant's political

power.  To be sure, Tony Hernandez was more involved in the day-to-day business of drug trafficking by this conspiracy, but he could do so only because of the protections provided by the defendant and the defendant's immense political power.  Tony Hernandez, like Ardon, became a politician *after* he was already a drug trafficker; and he was able to become a prolific trafficker because of the defendant.  Following a trial before this Court, following which he was convicted of the same offenses for which the defendant is being sentenced, Tony Hernandez received a life sentence and was ordered to pay more than $150 million in forfeiture.  *See United States v. Hernandez Alvarado*, S2 15 Cr. 379 (PKC).  The kilograms of cocaine may have borne Tony Hernandez's initials, "TH," but he was able to sell massive amounts of them to Chapo and others because of the power, influence, and protection he received from proximity to his brother, the defendant.  As Fabio Lobo testified during trial, "[t]he Cachiros told me that Tony Hernandez was the face of the operation, and that his brother, [the defendant], was backing him up in the shadows." (Tr. 1102).  That was when the defendant was only the President of the HNC; not of the entire country.  The defendant allowed Tony Hernandez, and many others—Ardon, the *Cachiros*, *Los Valles*—to traffic tons of drugs and operate above the law.  He was uniquely situated atop the nation and the conspiracy, and, in many respects, is relatively more culpable than was Tony Hernandez.

While sentences imposed on narcotics traffickers, without the aggravating twin factor of political corruption—like the defendant and Tony Hernandez—are not necessarily on point as comparators, they are useful data points nonetheless.  Indeed, other traffickers involved in the conspiracy who were protected by the defendant have likewise received life sentences.  Fuentes Ramirez, a violent and prolific trafficker who the defendant assisted in securing weapons and who

bribed the defendant with a briefcase full of cash in exchange for protection, including through the Honduran military, received a life sentence following his conviction after trial on the same offense for which the defendant was convicted.  *See United States v. Fuentes Ramirez*, S6 15 Cr. 379 (PKC).  Fernandez Rosa, a close associate of Ardon, who, as set forth above, provided millions of dollars in bribes to the defendant, received a life sentence from Judge Sullivan after pleading guilty to cocaine-distribution conspiracy involving 155 tons of cocaine and methamphetamine and to participated in 19 murders.  *See United States v. Fernandez-Rosa*, No 12 Cr. 894 (RJS).  Similarly, Duarte Mejia, another violent drug dealer under the defendant's protection, too was sentenced principally to life in prison following a trial conviction for cocaine importation conspiracy.  *See United States v. Duarte Mejia*, 15 Cr. 20540 (S.D.F.L.).  And Chapo, the leader of the Sinaloa Cartel who provided a $1 million bribe to the defendant to support his campaign in exchange for safe passage for his cocaine through Honduras, was sentenced in the Eastern District of New York for being the principal leader of a continuing criminal enterprise to a mandatory life sentence.  *See United States v. Guzman Loera*, No. 09 Cr. 466 (BMC) (E.D.N.Y.)  To the extent that other traffickers received sentences below life, such sentences reflect those  relative and more limited roles in the conspiracy when compared to the defendant, for whom each of these drug dealers depended for protection; and who, as described above, was more influential and instrumental to the overall conspiracy than simply being a trafficker.[15]

---

[15] The Valles, for example, who both pled guilty to cocaine distribution conspiracy in the Eastern District of Virginia, were each sentenced to 30 years in prison.  *See United States v. Valle Valle*, 14 Cr. 135 (LO) (E.D.V.A.).  The Valles, while surely responsible for more direct involvement with cocaine than the defendant, were less significant (and less powerful and important) players in

The defendant's conduct—at the pinnacle of both politics and drug trafficking—is singular. There is no clear comparison; and therefore a life sentence cannot create an unwarranted disparity. This is even more appropriate in light of the reference point of one of the defendant's principal co-conspirators, Tony Hernandez, as well as numerous other co-conspirators, many of whom have been sentenced to life imprisonment.

## II.      The Defendant's Sentencing Arguments Are Meritless

The defendant makes several arguments in support of his position that the Court should impose the mandatory minimum sentence of forty years.  In sum, however, they largely amount to a proclamation of innocence.  These arguments reflect an alternate reality, not the evidence that was presented at trial and resulted in the jury's unanimous guilty verdict on all counts. Accordingly, the defendant's sentencing arguments, do not merit serious consideration.

The defendant's sentencing memorandum and his letter to the Court attempt to relitigate arguments that were rejected by the jury, and which are entirely undermined by the record in this case.  In his submissions to the Court, the defendant argues, in substance, that he is innocent, that the Government's evidence was weak and its witnesses not credible, and that he was not afforded a fair trial. *See generally* Def. Mem. (Dkts. 799, 800-3).  The Court should summarily reject these baseless arguments, which demonstrate nothing more than a break with reality and inability to accept responsibility for his conduct. *See, e.g.*, *United States v. Cox*, 299 F.3d 143, 149 (2d Cir. 2002) (affirming district court's denial of acceptance credit where the defendant's "outlandish racial profiling claim was 'powerful evidence that [he] has not accepted his own personal

---

the conspiracy.  Indeed, when the Valles fell out of favor with the defendant, he had them arrested and extradited to the United States to face charges.

responsibility"); *see also United States v. Hirsch*, 239 F.3d 221, 226 (2d Cir. 2001) (recognizing that a defendant's attempt to withdraw his guilty plea is a valid basis to deny acceptance credit where defendant's reason for withdrawing the plea relates to his claim of innocence). After a three-week trial, the jury concluded beyond a reasonable doubt that the defendant was guilty on all counts and rejected the defendant's perjurious testimony proclaiming his innocence and attempting to distance himself from the drug traffickers he promised to protect. As did the jury, the Court should reject the defendant's continued efforts to lie to the Court and the public by claiming his innocence and seeking to undermine the jury's sound verdict.

The Court should similarly reject the defendant's attempts to rely on his purported "good works" in Honduras, including legislation and initiatives aimed to combat drug trafficking, violence, and corruption, to argue that he is an innocent man deserving of leniency. (*See* Def. Mem. at 6-12, 20-26). There is no dispute that, while the defendant was in power, legislation was passed aimed at going after drug traffickers and other criminals in Honduras. But that is not what this case was about, nor does it cast any doubt on the defendant's criminal conduct in this case. As the Court recognized in denying the defendant's motion for a new trial, "[t]he Government's theory of the case was not that all drug traffickers in Honduras were members of the conspiracy, but that Hernandez conspired with certain drug traffickers to assist their drug trafficking activities." (Dkt. 783 at 8). Indeed, "[t]he jury's conviction of Hernandez had nothing to do with the collateral points of whether cocaine trafficking in the aggregate increased or decreased during Hernandez's administration. . . . Hernandez's conviction was based on the testimony, over the course of a three-week trial, of numerous witnesses whose testimony was corroborated in part by phone records and a recovered drug ledger." (*Id*.). Thus, the fact that public measures were taken

to combat drug trafficking and other crime during the defendant's time as a prominent politician in Honduras should have no bearing on whether he receives a life sentence, particularly in light of the Section 3553(a) factors described above, all of which weigh heavily in favor of such a sentence.

As such, and for the reasons set forth above, the Court should reject the defendant's arguments proclaiming innocence and sentence him to life in prison.[16]

### III.   The Court Should Order the Defendant to Forfeit $15,525,000

### A.   Applicable Law

Pursuant to Title 21, United States Code, Section 853, "a defendant convicted of a drug crime 'shall forfeit . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of' the crime of conviction." *United States v. Roberts*, 660 F.3d 149, 165 (2d Cir. 2011) (quoting 21 U.S.C. § 853(a)(1)). "Congress could not have

---

[16] The Court should similarly reject the defendant's argument, raised for the first time in connection with sentencing, that "events that occurred before February 27, 2012 should not have been presented at [the defendant's] trial and that the Court should not rely on pre-February 27, 2012 facts to sentence [the defendant]." (Def. Mem. at 35-36). While this rule of specialty-based argument has been waived, it is nonetheless meritless for multiple reasons. First, the defendant lacks standing to bring a claim based on a purported violation of the rule of specialty, since the Second Circuit has been explicit that a defendant "would only have prudential standing to raise the claim that his sentence violated the terms of his extradition if the [surrendering government] first makes an official protest," *United States v. Suarez,* 791 F.3d 363, 367 (2d Cir. 2015), and Honduras has not lodged any such protest. Second, despite the defendant's arguments to the contrary, there was ample evidence of the defendant's post-February 27, 2012 conduct introduced at trial, including, for example, the $1 million bribe paid by Chapo towards the defendant's 2013 presidential campaign; the defendant's receipt of bribes from Fabio Lobo, Geovanny Fuentes Ramirez, and others; and the 2018 recovery of drug ledgers reflecting the defendant's initials. And finally, as this Court has previously acknowledged, "[t]he rule of specialty forecloses charges, not evidence relevant to approved charges." *United States v. Fusco*, No. S4 09 Cr. 1239 (PKC), 2011 WL 5116843, at *4 (S.D.N.Y. Oct. 27, 2011) (holding that the rule of specialty "presents no bar to presenting evidence" relating to crimes for which extradition was approved) (citing *United States v. Flores*, 528 F.2d 939, 944 (2d Cir. 1976)). Accordingly, the defendant's belated arguments based on the rule of specialty should be rejected.

chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied, or broader words to define the scope of what was to be forfeited." *United States v. Monsanto*, 491 U.S. 600, 607 (1989).  The purpose of forfeiture is "punitive rather than restitutive," *Roberts*, 660 F.3d at 166, and the defendant's ability to pay is irrelevant, *United States v. Awad*, 598 F.3d 76, 78 (2d Cir. 2010).

"[T]he forfeiture statute for drug crimes is not limited to profits from those crimes." *United States v. Khan*, 761 F. App'x 43, 47 (2d Cir. 2019).  "[D]istrict courts may use general points of reference as a starting point for a forfeiture calculation and make reasonable extrapolations supported by a preponderance of the evidence." *United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011).  The defendant is liable to forfeit all gross proceeds that he personally obtained, directly or indirectly, but is not liable for proceeds received that the defendant did not personally acquire. *Honeycutt v. United States*, 137 S. Ct. 1626, 1635 (2017).

### B.    Discussion

The Court should order the defendant to forfeit $15,525,000, which represents the bribes paid to the defendant and/or his co-conspirators in connection with Count One, including for his support and protection from prosecution and extradition.

This figure is calculated as follows: (i) Ardon testified that he paid approximately $2 million to Pepe Lobo and the defendant (Tr. 209-213; ¶¶ 45-46); (ii) Luis Perez testified that the Sinaloa Cartel paid the defendant approximately $2.4 million in bribes, including the $1 million bribes paid by Chapo himself (Tr. 262-65, 626, 638, 1116; PSR ¶ 57); (iii) $250,000 paid by Javier Rivera, on behalf of *Los Cachiros*, to Hilda Hernandez (Tr. 812; ¶ 55); (iv) $200,000 paid by Fabio Lobo and Javier Rivera to Hilda Hernandez (Tr. 1119-1120; ¶ 57); (v) $250,000 paid by Fabio

Lobo to the defendant (Tr. 1132); (vi) $300,000 from Chinda Montes (Tr. 794; PSR ¶ 55); (vii) $100,000 from Neftali Duarte (Tr. 812; PSR ¶ 55)[17]; (viii) $4 million paid by "Wilson," *i.e.*, Sanabria, to Tony Hernandez (Tr. 1125; *see also* GX 403-T, Line 31; PSR ¶ 58); (ix) $25,000 from Fuentes Ramirez (Tr. 96-98; PSR ¶ 48); and (x) $6 million paid by Fernandez Rosa (GX 403-T, Line 31; *see also* Tr. 1479).

## IV. The Court Should Order the Defendant to Pay a $10 Million Fine

The defendant has not met his burden of demonstrating an inability to pay a fine and, in light of the balancing of the Section 3553(a) factors, the Government respectfully submits that the Court should impose a within-Guidelines, statutory-maximum fine of $10 million.

### A. Applicable Law

The Guidelines provide that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). "The burden of establishing inability to pay rests on defendant." *United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001) (citing *United States v. Thompson*, 227 F.3d 43, 45 (2d Cir. 2000)). "Evidence of lucrative illegal activity may support an inference that such funds, although hidden, remain at the defendant's disposal." *United States v. Fields*, 113 F.3d 313, 325 (2d Cir. 1997); *United States v. Orena*, 32 F.3d 704, 716 (2d Cir. 1994) (explaining that "evidence of lucrative illegal activity can support a judge's finding that a defendant is able to pay a fine"). Where a defendant fails to demonstrate an inability to pay a fine, the Court must craft

---

[17] PSR ¶ 55 appears to contain a typographical error, inadvertently listing the bribe amount paid by Duarte Mejia as $10,000 instead of $100,000.

one based in part on consideration of the § 3553(a) factors.  *See* 18 U.S.C. § 3572(a); *see also United States v. Elfgeeh*, 515 F.3d 100, 136 (2d Cir. 2008).

### B.    Discussion

Pursuant to U.S.S.G. § 5E1.2(c)(4), the maximum Guidelines fine in this case corresponds to the maximum fine authorized by statute, which is $10 million.  *See* 21 U.S.C. § 960(b).  The Government respectfully submits that, based on consideration of the Section 3553(a) factors, the maximum fine prescribed by Congress and the Sentencing Commission is appropriate in this case.

The defendant cannot meet his burden of establishing inability to pay a fine.  The defendant claims that, following his arrest, "all properties and bank accounts were seized by the Honduran government."  (*See* PSR ¶ 164, n.7).  Nevertheless, he identified for the Probation Office numerous banking accounts, vehicles, and residences, but, incredibly, provides the value for each as "unknown" and claims that "because all of his assets have been seized by the Honduran government, he is unaware of any bank account balances, or fair market values." (*Id.*, n.8).  Even so, as the PSR reflects, the defendant had available a line of credit over $400,000, and reported that, in March 2022, one of his several homes was valued at over $584,000 and transferred to a bank. (PSR ¶ 166).  The PSR does not state when the defendant purchased this residence; however, it does reflect that the original cost of the home was over $700,000.  In a country wracked by poverty, that is a significant sum for one of several homes and calls into question the defendant's claims.  More likely, and as the trial evidence proved, the defendant received millions upon millions of dollars in drug money; beyond that, he had access to the full power of a nation, which he corrupted and exploited for his own benefit, and he certainly should pay a fine.  In this way, the defendant is differently situated from his co-defendants Tony Hernandez and Fuentes Ramirez, for

whom the Court declined the Government's requests to impose fines.  (*See* Tony Hernandez Sent. Tr. at 39 ("Because I am imposing the forfeiture of 138 and a half million dollars, there will not also be a fine"); Fuentes Ramirez Sent. Tr. at 30 (concluding that "waiver of the fine based on limited assets and limited earning ability" was appropriate)).  Here, the Government is seeking a significantly lower amount of forfeiture—$15.525 million, as opposed to the approximately $138.5 imposed on Tony Hernandez and the approximately $151.725 imposed on Fuentes Ramirez—and, beyond that, the $15.275 estimate likely fails to capture the full scope of the bribes the defendant accepted or the profits he received from drug trafficking.  Moreover, unlike Fuentes Ramirez, the defendant clearly has assets and, owing to his former position of power and influence, the ability to earn money.  (*See* 18 U.S.C. § 3572(a)(1) (1988) (In imposing a fine, a court is to consider, *inter alia*, "the defendant's income, earning capacity, and financial resources."; *see also United States v. Valdez*, 522 F. App'x 25, 32 (2d Cir. 2013) (upholding imposition of $10 million fine as part of sentence for defendant's conviction of money laundering conspiracy)).  Finally, in this case, where the importance of sending a message of deterrence to other corrupt politicians who would accept drug-fueled bribes and profit from the misery of cocaine trafficking, the § 3553(a) factors also support the imposition of a significant fine.

Therefore, absent a stronger showing by the defendant of an inability to pay, the statutory maximum fine of $10 million is appropriate.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should sentence the defendant to life imprisonment and require forfeiture in the amount of $15,525,000, and order the defendant to pay the maximum $10 million fine.


Dated:  New York, New York
        June 24, 2024

                                    Respectfully Submitted,

                                    DAMIAN WILLIAMS
                                    United States Attorney for the
                                    Southern District of New York

                            By:  _____/s/_____
                                    Jacob H. Gutwillig
                                    David J. Robles
                                    Elinor L. Tarlow
                                    Kyle A. Wirshba
                                    Assistant United States Attorneys
                                    (212) 637-2215 / -2550 / -1036 / -2493

cc:    Defense Counsel
       By ECF