O6Q3HERS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        15 Cr. 379 (PKC)

5   JUAN ORLANDO HERNANDEZ,

6                                        Sentencing
              Defendant.
7   ------------------------------x

8
                                        New York, N.Y.
9                                        June 26, 2024
                                        11:00 a.m.
10

11  Before:

12                  HON. P. KEVIN CASTEL,

13                                        District Judge

14                      APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    BY:  KYLE A. WIRSHBA
17       JACOB GUTWILLIG
         ELINOR TARLOW
18       DAVID ROBLES
         Assistant United States Attorneys
19
    RENATO C. STABILE
20       Attorney for Defendant

21

22  Also Present:   Francisco Olivero, Interpreter (Spanish)
                    Gabriel Mitre, Interpreter (Spanish)
23

24

25

O6Q3HERS

1      THE DEPUTY CLERK:  United States of America v. Juan

2  Orlando Hernandez.

3      For the government?

4      MR. GUTWILLIG:  Good morning, your Honor.  Jacob

5  Gutwillig for the government.  I'm joined at counsel table by

6  my colleagues Elinor Tarlow, David Robles, Kyle Wirshba, Kayla

7  Collins, and Special Agent Matthew Passmore from the DEA.

8      THE COURT:  Good morning.  And for the defendant.

9      MR. STABILE:  Good morning, your Honor.  Renato

10  Stabile for Juan Orlando Hernandez.

11      THE COURT:  Good morning, Mr. Stabile, and good

12  morning, Mr. Hernandez.

13      THE DEFENDANT:  Good morning.

14      THE COURT:  So, the first order of business,

15  Mr. Stabile, will be to make sure that I have everything I

16  should have on the subject of sentencing.

17      So I have a presentence report, recommendation and

18  addendum revised by probation on June 13, 2024.  I have an

19  extensive memorandum with exhibits from you, which is dated

20  June 21, 2024.  I have a sentencing submission from the

21  government, which is dated June 24, 2024.  I have a forfeiture

22  order, proposed forfeiture order from the government.  I have a

23  letter from Ms. Shroff explaining that she's on trial.  I have

24  an application from you dated June 25 regarding the defendant

25  remaining at the MDC.  I have a letter from the government

O6Q3HERS

```
1   dated June 25, 2024, on the subject of forfeiture.

2           Do I have everything I should have on the subject of

3   sentencing?

4           MR. STABILE:  Yes, your Honor.

5           THE COURT:  Same question for the government.

6           MR. GUTWILLIG:  Yes, your Honor.

7           THE COURT:  Has the defendant read, reviewed, and

8   discussed with you the presentence report, recommendation, and

9   addendum?

10          MR. STABILE:  Yes, the presentence report.

11          THE COURT:  Does the defendant have any objections to

12  the facts set forth in the presentence report?

13          MR. STABILE:  Yes.

14          THE COURT:  All right.

15          MR. STABILE:  So, as your Honor knows from my

16  sentencing submission, and as you will hear from Mr. Hernandez,

17  he maintains his innocence.  But I'm not going to go through

18  paragraph by paragraph, because there is a trial record, and of

19  course the Court can rely on the trial record to make certain

20  factual findings.

21          However, there are some facts that are included in the

22  PSR that I believe are not supported by the trial record, and

23  which I objected to, and those are identified within the

24  defendant's objections.

25          THE COURT:  Please tell me what they are.  I'll go
```

O6Q3HERS

1   through them.

2          MR. STABILE:  So, the first one would be paragraph 36.

3          THE COURT:  One second, please.  All right.

4          MR. STABILE:  And specifically, to the extent that

5   paragraph 36, and I'm directing the Court's attention to really

6   the last two lines, the suggestions that Juan Orlando Hernandez

7   engaged in acts of violence, including five murders.  We would

8   object that there was any evidence that he engaged in any

9   conduct that included five murders.

10          THE COURT:  My guess is, and I'll hear from the

11   government, that seems to be a grammatical issue, so let me see

12   whether we can adjust this.

13          I propose the following, and see if this works from

14   your stand point.  Before the word "bribed" on the third line

15   up from the bottom of 36, inserting the word "and," and then

16   put a period after "then president of Honduras," period.  And

17   insert "Fuentes Ramirez also engaged in acts of violence,

18   including five murders."

19          Does that take care of your objection?

20          MR. STABILE:  Yes, your Honor.

21          THE COURT:  Any objection from the government?

22          MR. GUTWILLIG:  No, your Honor.

23          THE COURT:  Next objection, please.

24          MR. STABILE:  Paragraph 74, your Honor.

25          THE COURT:  All right.

O6Q3HERS

1          MR. STABILE:  Your Honor, the obvious implication here

2     is that Mr. Hernandez and his brother somehow orchestrated or

3     solicited the murder of Nery Orlando Lopez Sanabria.  There was

4     no evidence in the trial record to support what is in

5     paragraph 74, and we would object to its inclusion, to the

6     extent that it would give the reader the impression that

7     Mr. Hernandez had anything to do with that.  But also, I don't

8     know what the factual support is for that.

9          THE COURT:  Well, a couple of points.  First of all,

10    this was my recollection, not in the trial record.  There are

11    many things in this presentence report that were not in the

12    trial record.

13         MR. STABILE:  Agreed, your Honor.

14         THE COURT:  That's number 1.

15         Number 2, you are correct there is no basis to jump to

16    a conclusion that either Tony Hernandez or Juan Orlando

17    Hernandez caused the murder of Sanabria.  There is no evidence

18    of that.  The fact of the matter is, it is relevant background.

19    And in fact, as you'll recall, I cited it in some of my prior

20    orders, with regard to the violence that arises from the drug

21    trafficking activities.

22         I do believe that the evidence supports -- when I say

23    "evidence," I'm not talking about trial evidence.  But the

24    circumstantial evidence supports the inference that the murder

25    was causally related to the use of the drug ledgers at the

O6Q3HERS

1    trial.  That of course does not mean that your client or Tony

2    Hernandez caused it, sought it, aided and abetted it, or any

3    such thing.  There is no evidence of that.

4                MR. STABILE:  Well, your Honor, I don't think there

5    is, as you pointed out, there was no evidence in the trial

6    record to support the facts, whatever those facts are.

7                THE COURT:  It's not in the trial record at all.

8                MR. STABILE:  Right.

9                THE COURT:  But as I said, there are many things in

10   the presentence report that are not in the trial record.

11               MR. STABILE:  And some are harmless and I'm not

12   objecting to them.

13               THE COURT:  No, some of them are important.  Like the

14   defendant's background, his history, and characteristics.  Many

15   of these things, his family situation.  They're standard, as

16   you and I both know very, very well, in all presentence

17   reports.  So this is absolutely appropriate to be in the

18   presentence report.

19               I simply state unequivocally that I do not, in

20   sentencing this defendant, attribute to him this murder.

21   Period.  Unqualified statement on my part.

22               MR. STABILE:  Okay.  I appreciate that statement from

23   the Court.  We maintain our objection, and just to note --

24               THE COURT:  That's fine.

25               MR. STABILE:  -- I'm objecting to things that are

O6Q3HERS

```
 1  │  prejudicial to my client.  I'm obviously not going to object to
 2  │  everything that isn't supported by the trial record, your
 3  │  Honor.
 4  │           THE COURT:  But, Mr. Stabile, the foundational
 5  │  principle is that the presentence report is not intended as a
 6  │  summary of the trial record.  Correct?
 7  │           MR. STABILE:  Agreed.
 8  │           THE COURT:  That's the point.  That's the precise
 9  │  point.  Go ahead.
10  │           MR. STABILE:  Next is paragraph 107, and this is the
11  │  two-point enhancement for making a threat against Byron Ruiz,
12  │  and the government's support for that enhancement, they cite in
13  │  the PSR on page 42, they cite this exhibit that was introduced
14  │  at trial, 404-T, which I have a copy of.  And I believe the
15  │  portion that the government is relying on is, and I'm reading
16  │  from a translation, it's 404-T.  GX 404-T, and it's on page 2,
17  │  and line 9, and Mendoza says in the translation, "They're
18  │  searching for Byron Ruiz, they just informed me, the ones who
19  │  are with the Americans there, that they heard Juan Orlando gave
20  │  orders to shoot him because it seems he worked, Byron Ruiz
21  │  worked for a brother of President Juan Orlando."
22  │           He's referring to a "they."  He's not relating any
23  │  first-hand knowledge.  He's relating to some hearsay, and we
24  │  don't know who the "they" is.  And we made this objection at
25  │  trial, and I'm just renewing the objection.  That if this is
```

O6Q3HERS

| | |
|---|---|
| 1 | the sum of the evidence that is supporting this enhancement, my |
| 2 | argument is this is insufficient, especially because we don't |
| 3 | know who the "they" is, we don't know the basis of knowledge, |
| 4 | and we object for that reason. |
| 5 | THE COURT:  All right.  I'm going to hear from the |
| 6 | government, but it seems to me that there is a distinction |
| 7 | between admissibility of evidence, which is one standard, what |
| 8 | is admissible to come in at a trial, and then there is a |
| 9 | different question of whether this evidence alone supports a |
| 10 | finding by the preponderance of the evidence that the |
| 11 | enhancement is warranted.  Am I correct? |
| 12 | MR. STABILE:  Yes. |
| 13 | MR. GUTWILLIG:  Yes. |
| 14 | THE COURT:  I'm talking to you, Mr. Stabile. |
| 15 | MR. STABILE:  Yes.  I agree, but I believe this |
| 16 | doesn't even satisfy the preponderance standard, because -- |
| 17 | THE COURT:  No, but I'm saying admissibility at trial |
| 18 | and whether it satisfies the preponderance standard for an |
| 19 | enhancement are two different questions. |
| 20 | MR. STABILE:  Oh, yes. |
| 21 | THE COURT:  Right.  And my understanding is that at |
| 22 | least this was June of 2015, and as of some time in 2021, |
| 23 | Mr. Ruiz was alive and well and in U.S. custody. |
| 24 | MR. STABILE:  That's true, too. |
| 25 | THE COURT:  All right.  So let me hear from the |

O6Q3HERS

1    government.  Why does the government think this supports by the

2    preponderance of the evidence an enhancement?

3        MR. GUTWILLIG:  Your Honor, the guidelines provision

4    here, 2D1.1(b)(2), applies if the defendant used violence, made

5    a credible threat to use violence, or directed the use of

6    violence.

7        Here, Government Exhibit 404, which was admitted into

8    evidence, includes the portion your Honor just read, and also a

9    line from Mendoza, "They're searching for Byron Ruiz, they just

10    informed me, the ones who are with the Americans there, that

11    they heard Juan Orlando give orders to shoot him because it

12    seems that he works for" and then there is a break, "Byron Ruiz

13    worked for a brother of President Juan Orlando."

14        The government's position is the enhancement applies

15    because this reflects a threat of violence to kill Byron Ruiz.

16    The inference here is that if he were to go to the Americans,

17    he might provide information.

18        All of that said, the applicability of this

19    enhancement, whether the Court elects to or not, does not

20    impact the overall guidelines range here.  But the government

21    believes on this record, and this is all it's relying on, that

22    it would apply.

23        THE COURT:  I find that the enhancement is not

24    established by a preponderance of the evidence, and so it will

25    not be included in the sentencing calculation.

O6Q3HERS

1          MR. STABILE:  Thank you, your Honor.

2          Next would be paragraph 111 of the PSR, the

3    enhancement for the defendant being an organizer or a leader.

4    I don't believe there was any trial evidence that the -- I

5    mean, he was the president of Honduras, but other than that,

6    your Honor, his functions as the president of Honduras are

7    independent of whatever the government thinks his involvement

8    was in narcotrafficking, that he denies.  And so, as to that,

9    as to involvement in narcotrafficking, don't believe there was

10   trial evidence that he organized or directed anyone to do

11   anything.  So, that's why we would object to that enhancement.

12         THE COURT:  All right.  Let me hear from the

13   government.

14         MR. GUTWILLIG:  Your Honor, on this point, the

15   government largely relies on its papers.  As I understand it,

16   the objection is to the additional two-point enhancement as

17   distinct from being a manager or supervisor.  And the

18   government's contention, and what the trial evidence showed,

19   was not just that the defendant was the president of Honduras.

20   It was that he abused that position in a leadership role as the

21   head of an enormous cocaine trafficking conspiracy.

22         THE COURT:  Wait a minute.  Did you just say he was

23   the head of an enormous drug trafficking conspiracy?

24         MR. GUTWILLIG:  I said he had a leadership role in a

25   large drug trafficking conspiracy.

O6Q3HERS

1    THE COURT:  Okay.  I'm sorry.  I misheard you.  I

2    thought you said he was the head --

3    MR. GUTWILLIG:  If I said that, I misspoke.  What I

4    meant to say was that he was both the president of Honduras and

5    a leader within a large drug trafficking conspiracy.

6    THE COURT:  So, the fact of the matter is for the

7    enhancement to apply, the defendant has to be an organizer or a

8    leader of a criminal activity that involved five or more

9    participants or was otherwise extensive.  And the defendant

10   must have been the organizer, leader, manager, or supervisor of

11   one or more of the participants, if, for example, the extensive

12   prong is being utilized.

13   So, tell me.  Who did the defendant direct or lead or

14   organize?

15   MR. GUTWILLIG:  Yes, your Honor.  I think there are a

16   few different examples here.  One that comes to mind is his

17   partnership with Geovanny Fuentes Ramirez.  In exchange for

18   bribes, he directed the protection of the military for cocaine.

19   He directed that Tony Hernandez, another of his

20   co-conspirators, receive the million dollar bribe from El

21   Chapo.  And he also took certain steps as well with Alex Ardon

22   in exchange for bribes.

23   THE COURT:  Tell me about the certain steps you are

24   relying on that would be the direction of another participant.

25   MR. STABILE:  Your Honor, I'm sorry to --

O6Q3HERS

1          THE COURT:  Let the government finish.

2          MR. GUTWILLIG:  The direction I'm thinking of here is

3    telling Ardon to pay off other congresspeople.

4          THE COURT:  Telling Ardon to pay off other

5    congresspeople?

6          MR. GUTWILLIG:  To vote for him, yes.

7          THE COURT:  And also I guess telling Ardon not to run

8    for mayor of El Paraiso, because this would attract attention,

9    because there were rumors around Ardon's participation as a

10   drug trafficker.  Would that be one example?

11         MR. GUTWILLIG:  Just as he told Arnaldo Urbina the

12   same with respect to the Yoro Department.

13         THE COURT:  Mr. Stabile.

14         MR. STABILE:  If those are the examples, those are, I

15   would submit, not directing somebody within the drug

16   organization to do activities that further the drug

17   organization.  Those are political directions, to the extent he

18   directed them at all.  I can't recall perfectly what the trial

19   evidence exactly was.  If the government has a citation, I

20   would be happy to look at it.  I'm not trying to put anybody on

21   the spot.

22         THE COURT:  I think they cited, they cited in their

23   brief specifically the -- and I remember the trial testimony.

24   Telling Ardon not to run for mayor and he didn't run for mayor,

25   run for reelection as mayor.  And there was another individual

O6Q3HERS

1    who did not follow the direction, and my recollection is that

2    that individual was apprehended.  Is that correct?

3            MR. GUTWILLIG:  That's correct.

4            THE COURT:  Yes.  So, I find, just to move this along,

5    I find that the enhancement is warranted, because it was

6    criminal activity that was otherwise extensive, and that the

7    defendant directed the activities of one or more of the

8    participants.  So therefore, the enhancement stands.

9            Next, please.

10           MR. STABILE:  Your Honor, that's it for the factual

11   objections to the PSR.

12           THE COURT:  Okay.  Any objections to the guideline

13   calculation?

14           MR. STABILE:  Not -- no, not other than what I've

15   already stated.

16           THE COURT:  All right.  Thank you.

17           And does the government have any objections to the

18   facts set forth in the PSR?

19           MR. GUTWILLIG:  No, your Honor.

20           THE COURT:  Any objection to the guideline

21   calculation?

22           MR. GUTWILLIG:  No, your Honor.

23           THE COURT:  There is one point I want to raise, and

24   that's paragraph 113, the obstruction of justice enhancement.

25   And the PSR indicates that probation defers to the Court on the

1  matter, and it is my judgment that the enhancement does apply.

2  And specifically, the enhancement only applies if there is an

3  intentional falsehood -- not a mistake, not a misunderstanding,

4  not a misrecollection -- but an intentional falsehood at trial

5  by a testifying witness.  And I believe that the defendant did

6  testify falsely.  For example, he testified that he never met

7  Geovanny Fuentes Ramirez.  And the transcript at page, that was

8  at 1546.  At 9698 Jose Sanchez testified that he witnessed Juan

9  Orlando receive a bribe from Geovanny Fuentes Ramirez, and

10  heard Juan Orlando telling Fuentes Ramirez that he was

11  interested in having him and his drug lab work for him.

12          And, of course, there was also the testimony regarding

13  the Waze data admitted.  GX 204 at 200 shows Fuentes Ramirez

14  traveling to Casa Presidencial on May 29, 2019, and June 12,

15  2019.

16          In addition, Juan Orlando lied when he said he never

17  met the drug trafficker Arnulfo Valle, and the government

18  introduced a photo, GX 309, of Juan Orlando and Arnulfo Valle

19  at the World Cup tournament.  And when confronted with this,

20  Juan Orlando suggested that the photograph may be a fake.

21          These are just two examples of what I considered to be

22  knowing falsehoods in the course of defendant's testimony,

23  which warrants the imposition of the obstruction enhancement.

24          Mr. Stabile, anything you want to say?

25          MR. STABILE:  No, your Honor.

O6Q3HERS

1      THE COURT:  Anything from the government on that

2  point?

3      MR. GUTWILLIG:  The government agrees and relies on

4  its papers on that point, your Honor.

5      THE COURT:  Okay.  And how many points is the

6  enhancement?

7      MR. GUTWILLIG:  Two points, your Honor.

8      THE COURT:  So, it appears, therefore, that the

9  adjusted offense level remains at 50, but maxes out at a total

10  offense level 43, and criminal history category I.

11      I'll now give Mr. Stabile an opportunity to speak.

12  One of the points I'm going to make at the outset of any

13  presentation by Mr. Stabile, Mr. Hernandez, or the government,

14  is the purpose of today is sentencing.  There was a trial,

15  there was the opportunity for testimony from the defendant and

16  from closing argument from defense counsel.  There was the

17  opportunity for post-verdict motions, which were made by the

18  defendant.  There is the opportunity for an appeal.

19      Today is not the opportunity to argue why the appeal

20  should succeed or not.  The verdict stands, and the question is

21  what punishment should be imposed by the Court for the crime as

22  it stands.  This Court is not in the habit of sentencing people

23  who are not guilty of crimes.  If the defendant is not guilty

24  of any crime, then no sentence is imposed.

25      I have already ruled on the post-verdict motions.  The

O6Q3HERS

1   next stop on challenging the conviction is the United States

2   Court of Appeals for the Second Circuit.  So as long as

3   Mr. Hernandez understands that, and you understand that,

4   Mr. Stabile, I would be happy to hear from you.

5          MR. STABILE:  Well, thank you, your Honor.  And I

6   appreciate that.  I'm going to rely on my sentencing

7   submission.  As I wrote in my sentencing submission, there is a

8   mandatory minimum of 40 years in prison, and that Mr. Hernandez

9   is 55 years old.  That's effectively, I submit, a life

10  sentence.  There is no need to impose a life sentence on him.

11         I would rely on, despite the trial evidence, his

12  lifetime of good works, and I know we gave a very lengthy

13  presentation to the Court in our sentencing material, so I'm

14  not going to stand here and belabor that, your Honor.  You have

15  it in front of you.

16         But I do know that Mr. Hernandez -- and he heard what

17  you said -- has a statement he would like to make to the Court.

18         THE COURT:  Thank you.  Mr. Hernandez, this is your

19  opportunity to speak, to address the Court directly, to bring

20  to my attention any facts or circumstances that you wish to

21  raise.  With the understanding of the limitation that I've

22  indicated, that today is not the day to argue your case of

23  innocence.  But, you are welcome to make a statement at this

24  time.

25         THE DEFENDANT:  Your Honor, thank you.

O6Q3HERS

1          I understand what you've told me, and I'd like you to

2     understand that for me, this is my only chance.  Because with

3     most certainty, I will be in jail for life.  I humbly ask you

4     to allow me to say what I'd like to say, because this is for

5     Honduras and also for this country, the United States.

6          THE COURT:  Well, Mr. Hernandez, I don't want to

7     quarrel with you.  But you are welcome to issue a statement, a

8     public statement, that's your prerogative.  I don't control

9     that, subject to any rules that are imposed by the Bureau of

10    Prisons.

11         But my courtroom here today is available for a

12    different purpose.  Not for you to make a statement to the

13    people of Honduras or the people of the United States.  But

14    rather, to tell me what I should know on determining a

15    sentence.  You know what the government has sought in this case

16    and what probation has recommended.  They have sought a

17    sentence of life imprisonment, to be followed by 30 consecutive

18    years of imprisonment.  That's what the guidelines provide, and

19    that's what probation has recommended, and I understand the

20    government is seeking.  Is that correct?

21         MR. GUTWILLIG:  Yes, your Honor.

22         THE COURT:  So, I have discretion from the bottom of

23    the mandatory minimums up to the top of that, and you're

24    welcome to tell me what I should know about you in deciding

25    that.  You're not welcome to make a speech about your views of

1    the prosecution in this case.

2            Please proceed.

3            THE DEFENDANT:  Your Honor, I reiterate that I am

4    innocent.  I was wrongfully and unjustly accused and convicted.

5    I was able to ascertain, reviewing the prosecution's documents,

6    that information was omitted that should have been essential

7    for the verdict, that you should have had knowledge of and did

8    not.  The jurors should have known it and did not.

9            For instance, three meetings, three meetings that I

10   requested as president of congress back then in Honduras, to

11   the Department of State of this country, so that they would

12   know that we were ready to try out the constitutional reform

13   for extraditions, and the plan so that the United States and

14   Honduras could jointly combat drug trafficking.

15           And from that meeting held in Miami, between officials

16   of the Department of State, DEA, Department of Justice, and

17   local prosecutors, directors, and administrators of the DEA

18   attended that meeting, and a meeting held by agency

19   intelligence officials for having an impact on the Atlantic

20   side of Honduras.

21           That meeting not only showed my willingness and my

22   acts that were later picked up in wires, but they were opinions

23   of United States officials that were working against drug

24   trafficking in Honduras and in Washington.

25           THE COURT:  Mr. Hernandez, I reiterate what I said to

1    you.  This is not a public forum for you to express your views

2    on whether you were rightly convicted or wrongfully convicted.

3    You have avenues to address that.  You have a competent legal

4    team of three lawyers who represent you, and you may also be

5    able to get a different counsel for your appeal.  And if you

6    cannot afford counsel on your appeal, counsel will be appointed

7    at public expense.

8          Nothing you say today, there is no motion before me

9    for a new trial.  There is no motion before me to set aside the

10   verdict.  That is not what today is about.  And therefore, in

11   this courtroom, I ask you to confine your remarks to the

12   subject of, if you want to profess your innocence, that's fine.

13   If you want to express remorse, that's fine.  If you don't want

14   to say anything, that's fine.  I'm not going to mold or shape

15   what you say, except to say that you cannot use this courtroom

16   for matters that do not relate to the subject matter at hand,

17   which is the determination of the sentencing.

18         For example, I have to determine the fine to be

19   imposed upon you.  The forfeiture to be imposed in this case.

20   Maybe you have something you want to say on that subject.

21         But it's not for you to discuss the issues of guilt or

22   innocence.  You took the stand in front of the jury, they

23   listened to your testimony, you were questioned by counsel, and

24   you gave your testimony, and your lawyers summed up in front of

25   the jury.  So please confine yourself to the matters that

O6Q3HERS

1    relate to what we're doing today.

2              MR. STABILE:  Your Honor, if I could just interject

3    for one moment.  I think, and I have not read the statement in

4    advance, but I think what Mr. Hernandez would like to convey to

5    the Court, and what I tried to convey to the Court in my

6    sentencing submission is, despite the trial evidence, and the

7    jury's verdict, Mr. Hernandez wants to tell the Court the good

8    things he did.  The positive things he did in Honduras.  And

9    part of those positive things were his cooperation over many,

10   many, many years with the United States in battling

11   narcotrafficking as well as other things that he did for the

12   people of Honduras.

13             And so I think, and of course I appreciate the Court's

14   guidance, but that is the gist of what I believe he wants to

15   express to the Court.

16             THE COURT:  Well, as we know, because we talked about

17   this at the trial, certainly he is not being sentenced today

18   for being a good president or a bad president.  That's not the

19   purpose of today's proceeding.  He is being sentenced today for

20   a finding that he was a knowing participant in a narcotics

21   trafficking conspiracy, and of course a conspiracy to further

22   the use of machine guns and destructive devices in aid of that,

23   and also the third count relating to weapons as well.

24             That's why he's being sentenced.  So, if you will,

25   please, sir.

O6Q3HERS

| 1 |  | MR. STABILE:  I agree, of course, with your Honor. |

1      MR. STABILE:  I agree, of course, with your Honor.

2  But, to the extent that the Court will consider his background

3  and character and good works he did, the fact of the matter is

4  president of Honduras was his job.  And so, to the extent he

5  did good things in his position as the president of Honduras,

6  he would like the Court to consider those things.

7      THE COURT:  So, is this any different than what you

8  have in your sentencing submission?

9      MR. STABILE:  I don't know.  I have not read his

10  statement.  But I know the gist of it.

11      THE COURT:  Well, is it any different than what's in

12  his letter to me?  Because I have a letter from Mr. Hernandez.

13      THE DEFENDANT:  It is.

14      THE COURT:  So Mr. Hernandez, you wrote me an

15  extensive letter, right?  Let's take a look at the letter here.

16      THE DEFENDANT:  There are some subjects that aren't

17  covered in the letter, Judge.

18      THE COURT:  Well, that's what I'm about to ask you

19  about.  Because your letter to me is, I'm trying to get to this

20  now, with exhibits, well, the letter itself is 29 pages, and

21  then there are numerous exhibits attached to it.

22      Is there a particular reason why you held back on

23  certain things and did not include them in the letter that you

24  submitted to me earlier this week and held them back for today?

25  This morning?

O6Q3HERS

1          THE DEFENDANT:  Two reasons, Judge.  One is that I

2     only learned a short time ago what the prosecutors submitted

3     two days ago.  And second, because I wanted to review and

4     ensure that of the key meetings held so that Honduras would not

5     be a south-north pathway for drugs.  For it to stop ranking as

6     number 1, but rather rank all the way down to 5, and that was

7     thanks to the joint efforts of us and the United States.  I

8     wanted to ensure that so you would know it, Judge.  And that

9     information is not contained in what the prosecutors turned

10     over to us, and in what the agencies turned over about what was

11     done with the DEA.  Either the prosecutors knew of it or they

12     hid it purposefully.  But, in the end we did not receive it.  I

13     want you to know that, and I want them to know it in case they

14     don't.

15          THE COURT:  Well, you've heard what I said,

16     Mr. Hernandez.  What do you have to say?

17          THE DEFENDANT:  With regards to what you were saying

18     earlier, your Honor, about Geovanny Fuentes Ramirez, on the

19     video taken when he was captured, he was asked if he knew me

20     and had participated in my campaign and he clearly stated that

21     he did not.  But besides that, besides that, it is a fact that

22     I did not know him.  I do not know him.  And I'm surprised how

23     by one single piece of testimony, something that isn't so is

24     taken as a certainty.

25          Look at another matter about Fuentes Ramirez.  On his

O6Q3HERS

1    phone, taken by the U.S. attorneys, the Waze application, it

2    says there that he visited the United States Embassy in

3    Honduras that day.  Judge, we do not use Waze in Honduras.

4    It's so small that if one has it, it's just to show that you

5    have it, but not to get from one place to another.  Everybody

6    knows their way around.

7         So this sentence is being imposed based on those two

8    things.  This is my life and my family's life and about

9    Honduras.

10        And the photo about you having said that in the trial

11   I had said that I did not know Arnulfo Valle.  That is true,

12   Judge.  I do not know him.  I knew him through seeing him in a

13   photograph once he had been captured when he was extradited

14   during my presidency.  And he's one of the people who paid

15   hitmen to assassinate me, and I learned of it because the FBI

16   told me.

17        The other request -- the other issue that I did not

18   know about until last night is this request by the U.S.

19   attorneys for 15 million and 10 million.  The holdings of my

20   family, even before, never surpassed 3 million.  Taking into

21   consideration also that 70 percent of that was inherited from

22   my father.  And now I don't have anything, we don't have

23   anything because the Honduran government took it all away.

24        But, because of one piece of testimony about them

25   having contributed to my campaign, without any supporting photo

O6Q3HERS

1    or document or anything, nor any video, nor any other solid

2    evidence, it's just the testimony of people who are seeking

3    benefit from the U.S. attorneys.

4            And this is why I want to call attention to you about

5    this.  I see a selective judgment from the U.S. attorneys.  For

6    instance, there is a very high-impact incident when Attorney

7    General Barr said that charges should be dropped in Mexico --

8    here, in the United States, they said that about an ex-defense

9    minister in Mexico.  And the argument was as follows.  What

10   there is, is testimony from people who have interests.  But

11   there is no evidence regarding the weight of guilt.  I don't

12   see that here.  And yet they are requesting $15 million,

13   $10 million in this last request to you of theirs.

14           And Judge, I already mentioned the three meetings of

15   which I had no information.  And just 36 hours ago I realized

16   about their argument regarding the calls that were intercepted

17   in Honduras with the MS-13 Mara leaders.

18           And there they were saying, first of all, the Mara

19   leaders were saying there as their calls were being recorded,

20   they said we're being recorded, we're being listened to.  So

21   they started to speak and to say things mocking the authorities

22   and also looking to divert attention.  And look at how this

23   makes sense.  In the document that the prosecutors submitted

24   that they said that in that call, the leader Porky says to

25   another MS-13 leader in Honduras, the president gave the

O6Q3HERS

1    Cachiros a drug route.  And that call was intercepted in the

2    year 2015.  And the leader of the Cachiros who was here

3    testifying against me turned himself in, in 2015, but in

4    January.

5         But the most egregious thing is one of the Cachiros

6    brothers never said that they had an opportunity for me to give

7    them any kind of drug route.  And they're among the most

8    damaging witnesses against me.  They had been working with the

9    U.S. attorneys for 6 years and they had never said it.

10         Then in the case of Byron Ruiz that you mentioned.  He

11    was arrested in 2017, pled guilty, and was sentenced in 2021.

12    So, my investigation was already ongoing.  But they never

13    presented any evidence about Byron Ruiz or his trial or his

14    proffers at my trial.

15         So you see how these criminals put together their

16    cases, listening to the news, listening to other drug

17    traffickers, and then they seek for the prosecutors to buy

18    their idea.

19         And that's how they ruin the life of institutions of a

20    country like mine, my family, and my own, but also the

21    credibility of this justice system, Judge.  If it's not today,

22    it will be tomorrow, but the truth will be known.  And that is

23    going to cause great harm.  Not only against the United States

24    justice system, but against the alliance of all of our

25    countries who have agreed that we need to combat this

O6Q3HERS

1  wrongdoing.

2          And look, Judge, at how the information that was not

3  allowed to be brought out at trial causes great harm.  And look

4  at how three agencies, the DEA, the State Department, and three

5  presidencies, Barack Obama, Donald Trump, and Biden, they

6  informed the United States Congress during every year of my

7  presidency that the passage of drug was being reduced from

8  90 percent that was traveling through Honduras and coming to

9  the United States, down to 4 percent.  But you were not able to

10 hear that, nor was the jury.  So the witness presented by the

11 DEA is saying that the DEA lied and those three presidents and

12 all of them lied?

13          And with that information, Judge, by United States

14 law, my government was certified to work alongside United

15 States agencies.  You did not know the contents of cables, nor

16 did the jury.  But since this is information that was already

17 relayed to the United States Congress and to the media, and I

18 will cite the precise words.  It said "Juan Orlando is a man of

19 his word.  He handled the approval of extradition when he was

20 president of the congress.  And when he was president of

21 Honduras, he began undertaking the extraditions, despite the

22 risks against his life."  And it said the government of Juan

23 Orlando like never before began working hand in hand between

24 the United States and Honduras.  And it says that $800 million

25 was seized from the Cachiros group.

O6Q3HERS

1          And Judge, that was work done in collaboration between

2     the United States and my government.  And then it says there

3     the Cachiros Cartel is completely dismantled.  And the leader

4     of the Cachiros came to take a seat there next to you, before

5     the jury, to say that I had been protecting him.  And U.S.

6     officials wrote that on official documents.  And then the

7     public was informed.  And now I'm in jail for life and he will

8     surely be out soon.

9          And he was a murderer of 78 people of my countrymen.

10    I'm certain that if those casualties were from the United

11    States, he would not be receiving the treatment that he's being

12    given now.  Because I heard other cases where the prosecutors

13    say, no, there is a limit to this.  But it got out of hand

14    because they were so incentivized, more than they should be.

15    And that is a bad thing for everyone, Judge, for this court,

16    for the people of the United States, for my country, and for

17    the world.

18          Today is the international day of the fight against

19    drug trafficking.  And everything we did alongside Honduran

20    citizens, Americans, Colombians, and from other countries, all

21    of those who lost their lives because they believed in our

22    fight, because they have now been buried because the agreements

23    between the DEA, the prosecutors, and these criminals has

24    prevailed.

25          And the other thing, Judge, I won't go on about it

O6Q3HERS

1    because you already know, but just to say, my first attorney in

2    this case said that he could not continue it because I had lost

3    trust in him and because of his health issues, and other

4    reasons.  I was not able to review the information that the

5    prosecutors gave us.  And when you appointed attorney Stabile

6    as my additional attorney, he realized he was unable to do a

7    sufficient and adequate job within three weeks.

8          Judge, the prosecutors and the agents, they had nearly

9    a decade to put together their prosecution.  Had I had a chance

10   to see about people who know about how this information from

11   cables is relayed, for people who had been working with my

12   government who were American, I am certain that this verdict

13   would have been entirely different.

14         I was denied many things at the end of the day, Judge.

15   It's as if I had been thrown into a deep river with my hands

16   bound.  The result to come was already known.

17         And another thing, Judge, that I must mention, that

18   each one of the cooperating witnesses for the prosecution, when

19   they were interviewed by prosecutors and DEA agents, the first

20   months and some in fact even for years, I was never mentioned,

21   I was never mentioned to them as someone who collaborated with

22   them.

23         And so you can see this precise point, Judge, both

24   leaders of the Cachiros, one of them testified here, they were

25   asked a key question about the year 2013, '14 and '15.  They

1    were asked in the year 2013, give us the names of politicians

2    and officials that are corrupt in Honduras that have worked

3    with the Cachiros and that the Cachiros had paid also.  They

4    gave names.  Hundreds of videos that contained recordings.  But

5    they never mentioned my name, nor did they submit any video

6    that I appeared in.  But then one of the Cachiros came to

7    testify, and said that I had been protecting him.

8            But this is the most egregious part.  Politicians in

9    Honduras and in this country, the United States, they launch a

10   campaign talking about a narco-dictatorship in my country.

11   They went to the United States Congress.  There were hearings

12   with the Senate Foreign Relations Committee.  And when my

13   reelection came about, these people, these Hondurans came to

14   pose doubts about me.  And they said how can you all keep

15   vouching if you know that he participates in drug trafficking.

16   And in the meeting between the Senate Foreign Relations

17   Committee and the U.S. Congress they said no, we are doing

18   well, and the elections are being well handled.

19           THE COURT:  Mr. Hernandez, I'm going to ask you to

20   please wrap up your remarks and bring them to a conclusion.

21           THE DEFENDANT:  And, Judge, I was not given any

22   information about that meeting.

23           So I'd like to request from your Honor and of

24   journalists and people who investigate and do their research,

25   too, to use my case so that it can be thoroughly investigated.

O6Q3HERS

1  And that will be of help to the United States, to my country,

2  and to the entire world, because the truth must be known.

3      Because as Dante said, the darkest places in hell are

4  reserved for those who maintain their neutrality in times of

5  moral crisis.  And as Martin Luther King said, injustice

6  anywhere is a threat to justice for all.

7      I'll end, Judge, telling you that you did not find out

8  about a lot of information that you and the jury should have

9  learned of.  It was not presented to you.  It was not given to

10  me, to us, either.  I have trust that, as you mentioned, in an

11  appeal or through other legal means, I hope to have the

12  opportunity to prove this.  Because today an innocent person is

13  being sentenced, and that is not a good thing for anybody.

14      I would like to ask the people of the United States

15  who worked in Honduras, when another trial comes about, whether

16  it be mine or somebody else's, for them to tell what happened.

17  Because otherwise, that would constitute concealing

18  information, and concealing is the same as lying.

19      And since I think that after this sentencing of yours,

20  life in prison is what will fall on my shoulders, I don't have

21  another opportunity, Judge, to tell all those who have shown

22  solidarity with me that I really am eternally grateful to them.

23  I'd like to thank my family and friends who have provided me

24  with support, especially my wife and children.  Thanks to them,

25  and also to say that we cannot give up, otherwise we will

1    remain under the same circumstances.  And if I were faced with

2    the decision again, Judge, of taking the same -- of making the

3    same decisions again, I would do it.  Because that saved a lot

4    of lives in the United States and in my country, in Latin

5    America.

6         And despite everything done to me, which is an

7    outrage, and a lynching, I am an optimist and I know that the

8    truth will be known later on.

9         And Judge, the U.S. agencies nor the Honduran

10   government ever let me know about the agreement to assassinate

11   my family and me, that the FBI reported, in which high-ranking

12   politicians in Honduras and a criminal organization were

13   involved.  If there is anything you can do to defend or protect

14   my family, so these reports are known, I will be grateful.  And

15   since the United States brought me here to be tried, the United

16   States is responsible for whatever happens to me here.

17        Since I have a lot of work ahead of me, Judge, with

18   all my possible legal recourses and appeals, we've discussed it

19   with my attorney Mr. Stabile, because of the scope of this case

20   with so much information, if I could continue in the prison

21   facility where I am now, it would be easier to continue working

22   with him.  That is a request that was made of you by my

23   attorney, and I hope you consider it.

24        And I hope that political persecutions cease because

25   this was a political persecution by drug traffickers and

O6Q3HERS

1    politicians.

2              And I will close, your Honor, saying that certain

3    parts of the DEA did not like what I did in Honduras, because

4    they were used to letting everything happen.  When the U.S.

5    Congress began an investigation of the DEA, due to bloodletting

6    that was happening in Honduras, and inspectors from the U.S.

7    Department of Justice and Department of State, when they opened

8    an investigation into the DEA, the DEA had nearly no presence

9    in Honduras.  That's why those scandals went on.  But when I

10   was elected president, I could not wait, and I went to seek

11   General Kelly from the Southern Command in Miami.  And I spoke

12   with high-ranking members of the Department of State.  And I

13   told them that I could not be successful in Honduras without

14   the help of the United States.  For them to help us stop the

15   flow of drugs through Honduras and we did so, your Honor.

16             THE COURT:  Thank you.  Please bring it to a close.

17             THE DEFENDANT:  So, with this event from the DEA

18   called Ahuas, they became upset at me.  And they also became

19   upset because we built the airport at Comayagua in Honduras.

20             THE COURT:  I'm giving you three minutes more.  At the

21   end of the three minutes that will be it, sir, okay?  So if

22   there is anything you want to say, get it in the next three

23   minutes.

24             THE DEFENDANT:  Okay.

25             And also when we passed the law to take down aircraft

O6Q3HERS

1    that were illegally transiting through Honduras, but I should

2    say that other Americans had no issue with those measures.  And

3    in the end, we were successful.  And that's reflected in the

4    reports that were used in the Congress and by the United States

5    presidents to certify Honduras.  But I was not allowed to bring

6    those in your presence or before the jury.  I just have one

7    last question remaining.

8         How is it that greater weight is lent to the

9    statements of drug traffickers who haven't been sentenced when

10   all of them were affected by the measures that I took, and why

11   was no weight given to the Americans who worked in Honduras

12   with us with whom we had extraordinary results in the fight

13   against drug trafficking, nor was any weight lent to their

14   reports.

15        I merely appeal to common sense, Judge.  And there

16   were people who were not requested for extradition from

17   Honduras here who were brought here to testify, and they came

18   to testify about me, not having issued those extraditions.

19        All of the extraditions that were requested of my

20   government were issued.  They will be out free, and I will you

21   be in jail for life.  Thank you, Judge.

22        THE COURT:  Thank you very much.

23        This is the government's opportunity to speak.

24   Mr. Gutwillig.

25        MR. GUTWILLIG:  Thank you, your Honor.  The defendant

O6Q3HERS

1    was convicted after trial by a unanimous jury of drug

2    trafficking and firearms offenses.  That was for very good

3    reason.

4            Juan Orlando Hernandez abused his position as the

5    president of Honduras to send incomprehensible amounts of

6    cocaine here to the United States.  He rose to power with

7    cocaine fueled bribes from his co-conspirators who were some of

8    the largest and most violent cocaine traffickers in the world.

9    And he protected those drugs with the full power of the state.

10           He corrupted and corroded Honduran government

11   institutions, including the military, police, and the justice

12   system, all in service of preserving his hold on power, by

13   ensuring that cocaine could flow freely from Honduras to the

14   United States.

15           And despite what he says today, the evidence at trial

16   was crushing.  It is set forth in detail in our submission.  I

17   won't go into all of it again.  Suffice to say that included

18   the testimony of multiple witnesses who had face-to-face

19   meetings with the defendant where they gave him drug money, he

20   received millions of dollars, where he entered into

21   partnerships with prolific violent drug traffickers.  These

22   witnesses, drug traffickers, police, others, they said the same

23   thing.  That the defendant was propelled to power with drug

24   money, and he maintained his perch through cocaine and

25   corruption.

O6Q3HERS

1          He says there is no solid evidence.  There were drug

2     ledgers with his name JOH on them.  There were intercepted

3     calls from the leader of MS-13 in Honduras talking about the

4     defendant taking bribes, gifting drug routes, and preventing

5     himself from being exposed.  Electronic messages, videos,

6     pictures.  All of these were clear and incontrovertible

7     evidence of the defendant's crimes.

8          And yet, in the face of all of this evidence,

9     remarkably, he continues to profess his innocence just now, and

10    in his letter to the Court, a 30-page diatribe that sets out an

11    alternate reality of his false innocence.  He ticks off

12    measures he ostensibly took to prevent the very cocaine

13    trafficking that he enabled.  He has made untrue and unfounded

14    accusations against the government, he has attacked the justice

15    system, he claims to be the victim of some large conspiracy

16    against him, and he asked today for a thorough investigation.

17         We don't need another investigation.  The trial

18    evidence showed exactly what happened.  It showed the

19    defendant's breathtaking criminal conduct in Honduras and the

20    damage it caused here, in the United States.  Under the

21    defendant's administration, violence, poverty, fear, and

22    migration sored.  Untold tons of cocaine arrived into Honduras

23    by boat, plane, and truck.  And he allowed them, he sanctioned

24    them to be transported across Honduras in armored vehicles

25    protected by men with automatic weapons, destructive devices,

O6Q3HERS

weapons of war, under the protection of the military and the police. And he ultimately helped his partners use Honduras as a springboard for that cocaine into the United States through Guatemala and Mexico.

And with those drugs came unspeakable violence and destabilizing corruption. Dozens upon dozens of murders, traffickers becoming politicians, and politicians becoming traffickers. The defendant fed this never-ending cycle of drug trafficking and corruption that tore his country apart. That is real injustice. Not the false kind the defendant complains of.

And it wasn't just the drug traffickers and the police and the politicians. Ordinary Hondurans were swept into the defendant's cycle of corruption and cocaine. Those people were just collateral damage for him. Collateral damage for all of the crimes the defendant committed in Honduras, where, for more than a decade, he and his partners acted with total impunity.

Throughout the course of this case, we've used the terms narco-state, state sponsored drug trafficking, to describe this egregious conduct. And that doesn't refer to Honduras writ large or to the majority of its people. Those phrases describe what the defendant and his circle of co-conspirators used Honduras for. They exploited the country for their own ends, and without regard to their fellow citizens. The defendant served himself and his drug

1    trafficking, not the Honduran people.

2            And that's the first half of this story.  The

3    defendant's Honduras, immense cocaine trafficking, pervasive

4    corruption, and damage to the state's institutions and its

5    people.  That's the backdrop for the unfathomable harm and

6    damage caused here in the United States.

7            The goal of this drug trafficking conspiracy was to

8    import cocaine into the United States on a massive scale.  It

9    was to make money.  Getting the drugs here was the lifeblood of

10   the conspiracy and of the defendant's political career.

11           Put simply, cocaine is worth more in the United

12   States.  The profits are higher selling it here.  And even

13   today, the defendant offers high-minded sentiments about

14   anticorruption measures, purported cooperation with the United

15   States.  But at the end of the day, it was about something much

16   more simple.  Cold, hard cash.  The defendant wanted money and

17   power, and he could get both in the form of millions of dollars

18   in cocaine fueled bribes, and political office, because he had

19   a monopoly on the power of the state, and he achieved that and

20   maintained it by importing untold amounts of cocaine to the

21   United States by causing pain, addiction, suffering, and death.

22           The defendant wasn't just indifferent to that.  He

23   knew it and he just didn't care.  He wanted to shove the drugs

24   up of the noses of the gringos, and he reveled in the fact that

25   they won't even realize it.

1          Even now, today, he claims to be an ally of the United

2    States.  But behind closed doors, he was polluting this country

3    with incomprehensible amounts of poison.

4          A life sentence is appropriate, and each of the

5    sentencing factors here supports it.  In this case, the

6    defendant's conduct demands such a sanction.  In brief, the

7    defendant's conduct is among the most serious ever prosecuted

8    here in a United States court.  His history and characteristics

9    demonstrate that he had every opportunity to do good, but

10   instead, chose to commit evil.

11         Deterrence is critical in imposing this sentence to

12   show that no one, not even the former president of a country,

13   is above the law.  And he is in a category all his own.  There

14   can be no unwarranted sentencing disparities here.  Though, to

15   the extent benchmarks are useful, two of the defendant's

16   principal co-conspirators have both been sentenced to life

17   imprisonment by this Court.  So, too, is the requested

18   forfeiture for the bribes defendant received, and the fine that

19   the government has requested.

20         In attempting to put into context the defendant's

21   conduct, we've used words like incomprehensible, unfathomable,

22   untold, flood of cocaine, breathtaking violence, sweeping

23   corruption.  But those adjectives, and any others, can't

24   capture the defendant's criminal conduct.

25         Here are the facts.  The defendant was the president

O6Q3HERS

1     of Honduras, and he abused his position sending over 400 tons

2     of cocaine to the United States for money, power, and

3     influence.  His criminal conduct was singular.  And for all of

4     those reasons, the government respectfully submits that a

5     sentence of life imprisonment is both appropriate and

6     necessary.  Thank you, your Honor.

7                 THE COURT:  Thank you.

8                 This is the Court's statement of reasons and the

9     proposed sentence to be imposed on defendant Juan Orlando

10    Hernandez.

11                In sentencing the defendant, I've considered all of

12    the materials that I referenced at the outset of this

13    proceeding.  This includes the 28-page letter of Mr. Hernandez,

14    the letters from his wife, his children, friends, and

15    supporters.  I've considered the thoughtful statements of

16    Mr. Stabile and Mr. Gutwillig on behalf of the government, and

17    on behalf of the defendant.  I've considered the statement of

18    Mr. Hernandez.

19                I've considered each of the circumstances set forth in

20    Section 3553(a).  I need not recount all of the factors I've

21    considered, but I've considered each of them.

22                I will be relatively brief.  I note that the trial of

23    defendant Hernandez was the third trial over which I presided

24    relating to the same international narcotics conspiracy.

25                Juan Orlando Hernandez first appeared in this court on

O6Q3HERS

1    May 10, 2022.  The Sixth Amendment guarantees him a speedy and

2    public trial before a fair and impartial jury.  This is what

3    Mr. Hernandez received.  The parties sought an adjournment of

4    the trial date, which was first set for January 17, 2023.  The

5    Court adjourned it to April 24, 2023.  And then again, at the

6    request of the parties, it adjourned the trial to September 18,

7    2023.  And then again, the parties requested an adjournment,

8    and the Court adjourned the trial date to February 5, 2024.

9        Mr. Hernandez was represented by two privately

10   retained attorneys who he selected, Mr. Raymond Colon, lead

11   counsel, and Ms. Sabrina Shroff, cleared counsel for classified

12   information.  Mr. Hernandez expressed no complaint to the Court

13   about his own choice of counsel until shortly before the

14   February 5 trial date.  In fact, it was January 10, 2024, to be

15   exact.  Ultimately, the Court adjusted the trial date to start

16   on February 20, added Renato Stabile to assist Mr. Colon at

17   public expense, and authorized Ms. Shroff to appear as an

18   additional trial counsel at public expense.

19       Defendant had one year and nine months to prepare for

20   trial.

21       As is the case in this district, the array of

22   potential jurors were summoned to the courthouse from

23   throughout Westchester, Rockland, Putnam, Bronx, and New York

24   Counties.  None knew the cases they might hear.  They were

25   questioned in the presence of counsel for both sides, and any

O6Q3HERS

1   with disqualifying interests were eliminated.  When the pool

2   was narrowed, the defense was given 10 strikes of jurors for

3   whom they did not need to explain their reasons.  The

4   government was given six strikes.

5          The jurors who were selected were from all walks of

6   life and had no prior connection to one another.  On the

7   record, at the outset of the trial, the defense was asked

8   whether the jury was satisfactory to the defendant.  And in

9   open court, on the record, confirmed that it was.

10          The jurors were instructed that the defendant was

11  presumed innocent of all charges, and that the government and

12  the government alone bore the burden of proving each element of

13  each crime by proof beyond a reasonable doubt.  The jury's

14  verdict, they were told, on each count, must be unanimous.  If

15  a single juror held a reasonable doubt as to the defendant's

16  guilt on a particular count, a retrial would be required.

17          Each witness called by the government was subject to

18  cross-examination by the defense.  The jurors learned of the

19  horrific crimes committed by the cooperating witnesses, and

20  their possible motivations and incentives in testifying.  All

21  statements of the cooperating witnesses known to the government

22  were turned over to the defense prior to trial.

23          Mr. Hernandez was not required to testify at trial,

24  but he elected to do so.  The jury heard his testimony.  They

25  observed the demeanor of all witnesses.

O6Q3HERS

1    The jury returned a unanimous verdict, and in the

2  presence of the defendant, each juror was individually asked if

3  it was his or her verdict, and each confirmed that it was.  The

4  jury of 12 persons unanimously agreed that Mr. Hernandez was

5  guilty of three crimes:  First, conspiracy to import into the

6  United States, and into the customs, territory of the United

7  States from a place outside thereof a controlled substance,

8  specifically cocaine.  Second is conspiracy to use or aid and

9  abet the use, during and in relation to the narcotics

10  conspiracy, a fully automatic firearm, also known as a machine

11  gun, and/or destructive device.  Third, the use of or aiding

12  and abetting the use of automatic firearms or destructive

13  devices in relation to the narcotics conspiracy.

14    It is important to note that the defendant is not

15  being sentenced today for any act of misfeasance, malfeasance,

16  or corruption as a public official of the Republic of Honduras.

17  Those are matters left to the people of Honduras and their

18  government.

19    The narcotics conspiracy that lies at the heart of

20  today's sentencing was aimed directly at transshipping massive

21  amounts of cocaine from Colombia through Honduras, knowing and

22  understanding that the ultimate destination of the cocaine was

23  the United States.

24    Some members of the conspiracy processed, packaged or

25  stored cocaine.  Some drove trucks, piloted boats, or flew

O6Q3HERS

1    airplanes loaded with cocaine.  Some of these individuals used

2    weapons, including automatic weapons, which, like machine guns,

3    were capable of firing in rapid succession with the single pull

4    of a trigger, or bazookas or grenade launchers, which are

5    destructive devices.  And they did this to protect the

6    shipments or to enforce the rules of the conspiracy.

7          The numbers of killings attributable to members of the

8    conspiracy was staggering.  Alex Ardon, who testified at trial,

9    admitted to participating in 56 murders.  And Devis Leonel

10   Maradiaga, the leader of the Los Cachiro, admitted to 78

11   murders.  There has been no claim made that Juan Orlando

12   Hernandez had any direct role in any of the murders in which

13   they participated.

14         The role of Juan Orlando Hernandez was mainly, and

15   with some exceptions, to use his political power as president

16   of the National Congress and later president of the Republic,

17   to limit the risk of interdiction of cocaine and the risk of

18   arrest, prosecution, and extradition to those drug traffickers

19   who provided financial support to him, his family members, or

20   his political campaigns.

21         In a political environment in which the public

22   sentiment in Honduras and its allies, including the U.S., was

23   vehemently opposed to drug trafficking, it was necessary for

24   Hernandez to maintain the public image of being an antidrug

25   crusader, while secretly aiding select drug traffickers.

1         Hernandez's secret support was not provided freely,

2    nor was it provided to any and all persons who wished to

3    traffic in cocaine.  His protection was available only to those

4    select drug trafficking organizations that came across with the

5    money.  The money was usually used to bolster his political

6    power, the ability to win elections.  It was accomplished by,

7    among other means, allowing sensitive law enforcement

8    information to be tipped to the favored drug trafficking

9    organizations so as to evade interdiction, thwarting efforts by

10   honest members of law enforcement, the Honduran National

11   Police, and the military, to stop the particular drug

12   traffickers.  And by agreeing to pave certain roads that would

13   facilitate the movement of drugs.

14        This required caution, intelligence, political talent,

15   and strong interpersonal skills.  It also required considerable

16   acting skills.  These were the tools that Hernandez used to

17   promote his criminal activity.

18        Of course, Hernandez, like many members of narcotic

19   conspiracies who have appeared in this courthouse, did not

20   always live up to his commitments made to his fellow

21   conspirators who were drug traffickers.  His number 1 goal was

22   his own political survival.

23        Hernandez was first elected to Congress in 1998.  His

24   ally Pepe Lobo began his campaign for president of the Republic

25   in about 2008, 2009, at the same time Alex Ardon, who testified

O6Q3HERS

1    at trial, had become a major drug trafficker and mayor of the

2    town of El Paraiso in the Department of Copan, close to the

3    border with Guatemala, and hence a major transshipment point.

4    Ardon sought protection from arrest from Pepe Lobo for himself

5    and his brother.  Pepe Lobo told him that if he was elected,

6    Hernandez would also become president of the National Congress.

7          Pepe Lobo sought $2 million for protection.  After the

8    meeting, Ardon gave him a million dollars, and later a second

9    payment of a million.  Ardon trafficked drugs with defendant's

10   brother Tony Hernandez as well as the Valle brothers.

11   Defendant Juan Orlando Hernandez met with Fabio Lobo, who also

12   testified at trial, in order to discuss drug trafficking.

13   Fabio Lobo was the son of Pepe Lobo.

14         Defendant Fabio Lobo, Tony Hernandez, and a Colombian

15   drug trafficker met to discuss assistance in recovering a lost

16   shipment of 1200 kilos of cocaine in a crashed plane.  Fabio

17   Lobo later learned that the drugs belonged to a partnership

18   between the Hernandez brothers, the Valle brothers, and another

19   trafficker.  Fabio Lopez reported that he could not help.

20   Defendant cautioned Fabio Lobo to be discrete.

21         So, it's not true, and it was never the government's

22   theory of the case, that anything a drug trafficker who paid a

23   bribe wanted, Mr. Hernandez gave.  No.  He was too smart for

24   that.  He was too cautious.  And of course, once he was paid,

25   he was free to do what he wanted to do, when he wanted it.  But

O6Q3HERS

1    he received the money for this protection.  He agreed to

2    provide the protection and he did wherever he could.

3         Hernandez eventually began to plan his own candidacy

4    for president of the Republic.  Campaign contributions flowed

5    from Ardon, Fuentes Ramirez, who was a violent drug trafficker.

6    In 2012, Hernandez met Javier Rivera Maradiaga, who, along with

7    Devis Leonel Rivera Maradiaga, led Los Cachiros, a major drug

8    trafficking organization.  Hernandez informed Javier that if

9    Los Cachiros supported him, they could count on him for

10   protection.

11        Later a member of Los Cachiros arranged for a

12   $6 million payment to the campaign of Hernandez.  Javier

13   arranged for Hernandez's sister to be paid $250,000 for the

14   campaign.

15        In 2013, El Chapo Guzman, head of the Sinaloa Cartel,

16   paid a $1 million bribe to Hernandez and his campaign,

17   delivered directly to Hernandez's brother Tony.  The Sinaloa

18   Cartel depended on cocaine shipped from Colombia through

19   Honduras to supply the U.S. market.

20        Once Hernandez became president, he exerted his

21   authority to maintain secrecy around his activities and those

22   of his allies in drug trafficking.  He pressured a reluctant

23   Ardon not to run as mayor of El Paraiso because his drug

24   trafficking activities were the subject of rumor, and Ardon was

25   known to be close to Hernandez.  Another drug trafficker who

O6Q3HERS

did not follow Hernandez's instruction not to run for office
was arrested.

In 2014, the Honduran government did seize some
properties and assets from Los Cachiros, but this was only
after the group's activities triggered a public listing by the
U.S. Office of Foreign Asset Control.  He would protect those
who bribed him as far as he could, without attracting
unwarranted scrutiny.  If this became untenable, then he would
allow public action to be taken against the drug trafficker.

Hernandez knew that automatic weapons and destructive
devices were being used to protect the cocaine.  The array of
firearms, automatic weapons, grenade launchers, bazookas
utilized by drug traffickers who were part of the conspiracy
with Hernandez are detailed in paragraph 69-73 of the PSR.  The
evidence is also marshaled on pages 20 and 21 of the
government's submission.

Hernandez is held criminally responsible for
conspiring to import 400 metric tons of cocaine into the United
States.  400 metric tons is 400,000 kilograms of cocaine, a
quantity with a wholesale price on the U.S. market of at least
$37,000 for each of the 400,000 kilograms.  That's well over
$10 billion market value on the U.S. market.

I've considered the history and background of
Mr. Hernandez.  He was raised in a humble town in Western
Honduras, Gracias, located in the Department of Lempira.  He's

O6Q3HERS

55 years old, married for 34 years with three children and one granddaughter. He has a law degree from a Honduran institution, and a master's degree in public administration from the State University of New York in Albany.

The letters of support, particularly from his daughter Ana Daniela, portray him as a good father. The letter from his daughter is quite moving.

He has no criminal convictions. He has hypertension and high cholesterol readings, but is otherwise in good physical and mental health. He has been in U.S. custody since April 2022, and has experienced difficult conditions at the Metropolitan Detention Center.

There is a need for just punishment. Mr. Hernandez was a facilitator of drug trafficking. He knew and understood the violence that accompanies drug trafficking, and in facilitating trafficking, he knowingly facilitated the violence. He knew the weaponry that was used by the drug traffickers he facilitated. Because the cocaine was transshipped through Honduras, and destined for the United States, he also facilitated disease, addiction, violence, and incarceration that accompanies cocaine trafficking in communities within the United States.

There is no need to protect the public from further crimes of this defendant, because he is not likely to gain a position that would enable him to facilitate drug trafficking.

O6Q3HERS

But there is a need, a great need, to deter others from engaging in this conduct or anything of the sort.

The sentence in this case is a message to well-educated, well-dressed, personable, and the eloquent, who believe that their fine appearance and elegant manner of presentation insulates them from prosecution for aiding a drug trafficking operation.

The jury heard the testimony of Juan Orlando Hernandez, and saw right through his polished demeanor.  They saw him for what he was, a two-faced politician, hungry for power, who presented himself as a champion against gangs, murder, crime, and drug trafficking, but secretly protected a select group of drug traffickers.

I've considered the sentencing guidelines, policy statements, and application notes of the United States sentencing commission.  I've considered them in an advisory manner, and recognize that I have variance discretion.

There is also a need to avoid unwarranted sentence disparities among defendants with similar records who have been guilty of similar crimes.

The statutory minimum sentence on Count One is 10 years or 120 months' imprisonment, and the maximum is life imprisonment.  The statutory minimum on Count Two is 30 years consecutive to the sentence on Count One.  There is no statutory minimum on Count Three, but the statutory maximum is

O6Q3HERS

1    life.

2          The guideline range in this case is life imprisonment

3    plus 30 years, which is the sentence the Office of Probation

4    and the government recommends.

5          Considering all of the Section 3553(a) factors, the

6    Court concludes that a sentence of 180 months on Count One and

7    Three, to run concurrently with each other, and a sentence of

8    360 months on Count Two to run consecutively to Count One and

9    Count Three, for a total term of imprisonment of 540 months or

10   45 years, plus supervised release for a term of 5 years on

11   Counts One, Two, and Three, a fine of $8 million, plus a $300

12   special assessment, together with forfeiture in an amount to be

13   determined at a later date, is sufficient, but not greater than

14   necessary, to achieve the purposes of Section 3553(a).

15         The Court will direct that the defendant receive

16   credit for time served dating back to February 14, 2022, when

17   he was first taken into custody by Honduran authorities in

18   connection with an extradition request by the United States

19   authorities.

20         Does the defendant or his counsel have any objection

21   to the Court's proposed sentence, or to the statement of

22   reasons for that sentence?

23         MR. STABILE:  No, your Honor.  Just on forfeiture, may

24   I submit something on forfeiture?

25         THE COURT:  I am going to set a schedule on that, but

O6Q3HERS

1    I'm imposing the remedy of forfeiture today.  The amount is to

2    be determined.

3                 MR. STABILE:  Understood.

4                 THE COURT:  Any objection from the government to the

5    proposed sentence or the statement of reasons?

6                 MR. GUTWILLIG:  No, your Honor.

7                 THE COURT:  The defendant will please stand and I will

8    pronounce sentence.

9                 Juan Orlando Hernandez, it is the judgment of this

10   Court that you are hereby remanded to the custody of the United

11   States Bureau of Prisons to be imprisoned for 180 months on

12   Count One, 180 months on Count Three, to run concurrently with

13   each other.  And on Count Two, a sentence of 360 months'

14   imprisonment to run consecutively to the terms imposed on

15   Counts One and Three, for a total term of imprisonment of 540

16   months or 45 years.

17                I will also impose a term of 5 years' supervised

18   release on Counts One, Two, and Three, with the following terms

19   and conditions:  You shall not commit another federal, state or

20   local crime.  You must not unlawfully possess a controlled

21   substance.  You must refrain from any unlawful use of a

22   controlled substance.  You must submit to one drug test within

23   15 days of release from imprisonment, and at least two periodic

24   drug tests thereafter.

25                That condition, incidentally, the drug testing

O6Q3HERS

1    condition, I am going to suspend in this case because I

2    determine that you pose a low risk of future substance abuse.

3              You must cooperate in the collection of DNA as

4    directed by probation.  You must comply with the standard

5    conditions of supervision that have been adopted by this court

6    as well as any other conditions, and these conditions are 1

7    through 12 on pages 47 and 48 of the PSR.

8              In addition, you may be supervised in the district of

9    your residence.

10             You must obey the immigration laws and comply with the

11   directives of immigration authorities.  You must provide the

12   probation officer with access to any requested financial

13   information, and you must not incur new credit card charges or

14   open additional lines of credit without the approval of the

15   probation officer, unless you are in compliance with the

16   installment payment schedule.

17             These two restrictions and terms are because of the

18   criminal financial penalties in this case.

19             Because the conspiracy and your conduct was conducted

20   in the utmost of secrecy, you shall submit your person, any

21   property, residence, vehicle, papers, computer, other

22   electronic communication, data storage devices, cloud storage

23   or media and effects to a search by any probation officer, and,

24   if needed, with the assistance of any law enforcement.  The

25   search is to be conducted when there is a reasonable suspicion

O6Q3HERS

1    concerning violation of a condition of supervision or unlawful

2    conduct by the person being supervised.  Failure to submit may

3    be grounds for revocation.  You shall warn any other occupants

4    that the premises may be subject to search pursuant to this

5    condition.  Any search shall be at a reasonable time and in a

6    reasonable manner.

7            It is further ordered that you must pay to the United

8    States a special assessment of $300, which shall be due

9    immediately.

10           The Court imposes a fine of $8 million in this case,

11   and the Court has considered all of the relevant factors in

12   setting the amount of the fine.

13           Further, the Court orders that you forfeit to the

14   United States all property constituting or derived from any

15   proceeds the defendant obtained, directly or indirectly, as a

16   result of the offense, and any and all property used or

17   intended to be used in any manner or part to commit and to

18   facilitate the commission of the offense charged in Count One

19   of the indictment.

20           And similarly, on Counts Two and Three, forfeiture of

21   all firearms and ammunition involved in and used in the

22   commission of the offenses charged in Counts Two and Three of

23   the indictment.

24           I will set a schedule for defense to respond to the

25   forfeiture amount proposed by the government of 14 days from

O6Q3HERS

```
1    today for a letter brief, and the government can respond seven
2    days thereafter.  And I will enter a further order on
3    forfeiture which the government may propose with the amount
4    blank in the order.
5             Mr. Hernandez, you have the right to appeal the
6    sentence I've imposed upon you.  If you cannot afford the cost
7    of an appeal, you may apply for leave to appeal as a poor
8    person.  The time limits for filing a notice of appeal are
9    brief and they're strictly enforced.  If you request, the clerk
10   of court will prepare and file a notice of appeal on your
11   behalf immediately.
12            Do you understand all that?
13            THE DEFENDANT:  Yes, your Honor.  I would just ask
14   whether I can keep on with my attorney Mr. Stabile throughout
15   that process?
16            THE COURT:  Well, Mr. Stabile will stay on through the
17   process of filing the notice of appeal and through the process,
18   per the directions of the United States Court of Appeals, he
19   must stay with you until the Court of Appeals decides
20   otherwise.  He has the power to move to withdraw, to seek the
21   appointment of other counsel, but he will remain as your
22   counsel until such time as the United States Court of Appeals
23   for the Second Circuit rules otherwise.
24            And Mr. Stabile, you'll undertake to file that notice
25   of appeal, correct?
```

O6Q3HERS

1        MR. STABILE:  Yes, I understand, your Honor.  Yes.

2        THE COURT:  Please be seated.

3        Now, I have a request from Mr. Stabile that the

4   defendant be permitted to remain at the MDC.  I will say this

5   is, Mr. Stabile, this is a little unusual.  I have not had too

6   many requests by defendants to remain at the MDC.

7        MR. STABILE:  It is a first for me as well, your

8   Honor.

9        THE COURT:  It is interesting we have someone who

10  wants to stay there.  Let me hear from the government.  Any

11  objection?

12       MR. GUTWILLIG:  Your Honor, obviously this application

13  came in last night.  It cites another case in this district,

14  *United States v. Sam Bankman-Fried*.  My understanding of what

15  happened there is the defendant, after being convicted, was

16  transferred out of the MDC.  And then the order was entered,

17  and at this point, the Bureau of Prisons opposes his return to

18  the MDC, for a number of reasons, including administration of

19  the Bureau of Prisons and their normal course of designating

20  defendants after they've been convicted.

21       We have not had an opportunity to consult with the BOP

22  about this particular request.  But I did want to note the

23  status of at least that case where this was done.

24       THE COURT:  Rule 38(b)(2) provides that if the

25  defendant is not released pending appeal, the Court may

O6Q3HERS

1    recommend to the Attorney General that the defendant be

2    confined near the place of the trial or appeal for a period

3    reasonably necessary to permit the defendant to assist in

4    preparing the appeal.

5         What I am going to do is make the recommendation, but

6    in light of the record in this case, and I have written on the

7    subject of what I viewed to be manipulation of the schedule, I

8    will put a sunset of 120 days in my recommendation.

9         And Mr. Stabile, you may, once this is docketed, you

10   may forward that to the Bureau of Prisons.

11        MR. STABILE:  Thank you, your Honor.

12        THE COURT:  All right.  Anything further from the

13   government?

14        MR. GUTWILLIG:  Your Honor, just one note.  The Court

15   obviously reviewed the presentence report in detail and

16   adjudicated objections and calculated the guidelines.  I

17   apologize if I missed it, but we request, to the extent the

18   Court hasn't already, adopting the factual finding in the PSR.

19        THE COURT:  I adopt as my findings of fact the facts

20   as set forth in the presentence report, augmented with the

21   trial testimony, exhibits, record, and the record of prior

22   proceedings in this action.

23        MR. GUTWILLIG:  Thank you, your Honor.  And also the

24   guidelines calculation, which I think your Honor put on the

25   record already.

O6Q3HERS

1          THE COURT:  All right.  Well, on the guidelines, so

2     there is no -- thank you for pointing this out.  So there is no

3     ambiguity in the subject.  I find that the defendant is in

4     total offense level 43, criminal history category I, and that

5     the guideline range is the term of life, followed by a

6     mandatory and consecutive 30 years.

7          MR. GUTWILLIG:  Thank you, your Honor.  And nothing

8     further from the government.

9          THE COURT:  All right.  Anything further, Mr. Stabile?

10          MR. STABILE:  No, your Honor.

11          THE COURT:  All right.  Mr. Hernandez, I wish you and

12     your family long lives and good health.  I wish for the victims

13     of the crimes in this case that there is a small degree of

14     closure as a result of today's proceeding.

15          We are adjourned.

16          (Adjourned)

17

18

19

20

21

22

23

24

25